No. 2024-2270

**UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT**

DENTAL MONITORING SAS,

*Plaintiff-Appellant*,

v.

ALIGN TECHNOLOGY, INC.,

*Defendant-Appellee*.

Appeal from the United States District Court for the Northern District of California, No. 3:22-cv-07335-WHA, Hon. William Alsup

**OPENING BRIEF FOR APPELLANT DENTAL MONITORING SAS**

Jaysen S. Chung, *Principal Attorney*
GIBSON, DUNN & CRUTCHER LLP
One Embarcadero Center, Suite 2600
San Francisco, CA 94111
(415) 393-8271

Josh A. Krevitt
Charlotte Jacobsen
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166
(212) 351-3961

Albert Suarez IV
Julia Tabat
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Avenue Suite 2100
Dallas, TX 75201
(214) 698-3151

*Counsel for Appellant Dental Monitoring SAS*

# REPRESENTATIVE PATENT CLAIMS

## U.S. Patent No. 11,049,248 – Claim 14

1. A method for assessing the shape of an orthodontic aligner, said method comprising the following steps:

a") more than 1 week after the start of the treatment with the aligner, acquisition of at least one image at least partially representing the aligner in a service position in which it is worn by a patient, called "analysis image", the analysis image being a photograph, or an image extracted from a film;

b") analysis of the analysis image by means of a deep learning device, trained by means of a learning base, so as to determine a value

for at least one tooth attribute of an "analysis tooth zone" representing, at least partially, a tooth on said analysis image, the tooth attribute relating to a separation between the tooth represented by the analysis tooth zone, and the aligner represented on the analysis image,

in the step a), a cellphone is used to acquire the analysis image.

14. The method as claimed in claim 1, in which the step b) comprises the following steps:

1) creation of a learning base comprising more than 1000 images of dental arches, or "historical images", each historical image representing an aligner worn by a "historical" patient and comprising one or more zones each representing a tooth, or "historical tooth zones", to each of which, for at least one tooth attribute relating to a separation between the tooth represented by the historical tooth zone considered, and the aligner represented, a tooth attribute value is assigned;

2) training of at least one deep learning device, by means of the learning base;

3) submission of the analysis image to the deep learning device for it to determine at least one probability relating to:

the presence, in a location of said analysis image, of an analysis tooth zone; and

the attribute value of the tooth represented on said analysis tooth zone;

4) determination, as a function of said probability, of an amplitude of said separation.

**U.S. Patent No. 10,755,409 – Claims 7 and 12**

1. A method for acquiring an image of a dental arch of a patient, said method comprising the following steps:

   a′) activation of an image acquisition apparatus so as to acquire an image, called “analysis image”, of said arch;

   b′) analysis of the analysis image by means of a deep learning device trained by means of a learning base;

   c′) determination, for the analysis image, as a function of the results of the analysis in the preceding step, of a value for an image attribute;

   d′) comparison of said image attribute value with a setpoint;

   e′) sending of an information message as a function of said comparison, the information message being related to the quality of the image acquired or to the position of the acquisition apparatus in relation to said arch or to the setting of the acquisition apparatus or to the opening of the mouth or to the wearing of a dental appliance, or to a combination thereof,

to check whether the analysis image respects the setpoint and, if it does not respect the setpoint, to guide the operator in order for him or her to acquire a new analysis image.

7. The method as claimed in claim 1, in which the step b′) comprises the following steps:

   1′) creation of a learning base comprising more than 1000 images of dental arches, or “historical images”, each historical image comprising an attribute value for at least one image attribute, or “image attribute value”;

2′) training of at least one deep learning device by means of the learning base;

3′) submission of the analysis image to the deep learning device for it to determine, for said analysis image, at least one probability relating to said image attribute value.

12. The method as claimed in claim 1, in which the information message is sent by the acquisition apparatus.

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** 24-2270

**Short Case Caption** Dental Monitoring SAS v. Align Technology, Inc.

**Filing Party/Entity** Dental Monitoring SAS

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.
2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.
3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.
4. Please do not duplicate entries within Section 5.
5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 11/27/2024

Signature: /s/ Jaysen S. Chung

Name: Jaysen S. Chung

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☑ None/Not Applicable |
| Dental Monitoring SAS | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐ Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| Andrew Robb<br>Gibson, Dunn & Crutcher LLP | Y. Audrey Yang<br>Gibson, Dunn & Crutcher LLP | NoahLani Litwinsella<br>Gibson, Dunn & Crutcher LLP |
| William Feldman<br>Gibson, Dunn & Crutcher LLP | | |
| | | |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☑ Yes (file separate notice; see below) ☐ No ☐ N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases.** Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# TABLE OF CONTENTS

Page

STATEMENT OF RELATED CASES ..... v
INTRODUCTION ..... 1
STATEMENT OF JURISDICTION ..... 4
STATEMENT OF THE ISSUES ..... 4
STATEMENT OF THE CASE ..... 4
I. Technical Background ..... 5
A. Orthodontic Aligner Treatment ..... 5
B. Deep Learning Technology ..... 7
C. Align's Dental Expert Concedes That Using Deep Learning Devices Was Not "Part of the Standard of Care" for Orthodontic Aligner Assessment as of July 2017 ..... 9
II. The Claimed Inventions ..... 9
A. The '248 Patent ..... 9
B. The '409 Patent ..... 11
III. Procedural History ..... 14
A. The Accused Products and the "Patent Showdown" ..... 14
B. Align's Motion for Summary Judgment of Patent Ineligibility ..... 15
C. The District Court's Questions to Align About Voluntarily Withdrawing Its Counterclaims and Subsequent Grant of Summary Judgment in Align's Favor ..... 17
D. Stipulation of Patent Ineligibility as to Claim 7 of the '409 Patent ..... 19
SUMMARY OF ARGUMENT ..... 20
STANDARD OF REVIEW ..... 23
ARGUMENT ..... 24
I. Claim 14 of the '248 Patent ..... 24
A. Step One ..... 24
1. Claim 14 is Directed to a Specific Technological Solution ..... 24

## TABLE OF CONTENTS
## (Continued)


Page

2. The District Court Committed Multiple Reversible Errors ......33

B. Step Two ........................................ 41

1. Claim 14 Contains an Inventive Concept, and Align Failed to Meet Its Burden of Establishing Otherwise ..............41

2. Additional Material Evidence, Which the District Court Overlooked, Precludes Summary Judgment ..............................45

II. Claims 7 and 12 of the ’409 Patent ........................................50

A. Step One ........................................ 50

1. The Claims Are Directed to a Specific Technological Solution ........................................50

2. The District Court Committed Multiple Reversible Errors ......53

B. Step Two ........................................ 57

1. Claims 7 and 12 Contain an Inventive Concept, and Align Failed to Meet Its Burden to Establish Otherwise ..........57

2. Additional Material Evidence, Which the District Court Overlooked, Precludes Summary Judgment ..............................59

CONCLUSION ........................................61

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Alice Corp. v. CLS Bank, Int'l*,
573 U.S. 208 (2014)........25, 37, 56

*Apple, Inc. v. Ameranth, Inc.*,
842 F.3d 1229 (Fed. Cir. 2016)........28

*BASCOM Global Internet Servs. v. AT&T Mobility*,
827 F.3d 1341 (Fed. Cir. 2016)........41, 42, 44

*Berkheimer v. HP Inc.*,
881 F.3d 1360 (Fed. Cir. 2018)........41, 44, 45

*CardioNet LLC v. InfoBionic, Inc.*,
955 F.3d 1358 (Fed. Cir. 2020)........25, 31, 35, 53

*Contour IP Holding LLC v. GoPro, Inc.*,
113 F. 4th 1373 (Fed. Cir. 2024)........24, 26, 33, 37, 53, 55

*Core Wireless Licensing S.A.R.L. v. LG Elecs., Inc.*,
880 F.3d 1356 (Fed. Cir. 2018)........38

*CosmoKey Solutions GmBH v. Duo Security*,
15 F.4th 1091 (Fed. Cir. 2021)........42, 49, 58

*Data Engine Technologies LLC v. Google LLC*,
906 F.3d 999 (Fed. Cir. 2018)........55

*Diamond v. Chakrabarty*,
447 U.S. 303 (1980)........40

*Electric Power Group v. Alstom S.A.*,
830 F.3d 1350 (Fed. Cir. 2016)........34, 35

*Enfish, LLC v. Microsoft Corp.*,
822 F.3d 1327 (Fed. Cir. 2016)........35, 38

*Finjan, Inc. v. Blue Coat Sys., Inc.*,
879 F.3d 1299 (Fed. Cir. 2018)........28, 32, 38, 53, 55

*Koninklijke KPN NV v. Gemalto M2M GmbH*,
942 F.3d 1143 (2019)........28

*Mayo Collaborative Servs. v. Prometheus Labs., Inc.*,
566 U.S. 66 (2012)........35

**TABLE OF AUTHORITIES**
**(*Continued*)**

Page(s)

*McRO, Inc. v. Bandai Namco Games Am. Inc.*,
837 F.3d 1299 (Fed. Cir. 2016) ....................25, 32

*Smart Sys. Innovation, LLC v. Chicago Transit Authority*,
873 F.3d 1364 (Fed. Cir. 2017) ....................38, 49

*TecSec, Inc. v. Adobe Inc.*,
978 F.3d 1278 (Fed. Cir. 2020) ....................37

*Thales Visionix Inc. v. U.S.*,
850 F.3d 1343 (Fed. Cir. 2017) ....................35

*Uniloc USA, Inc. v. LG Electronics USA, Inc.*,
957 F.3d 1303 (Fed. Cir. 2020) ....................33

*Visual Memory LLC v. NVIDIA Corp.*,
867 F.3d 1253 (Fed. Cir. 2017) ....................28, 33, 39, 53

*Weisner v. Google LLC*,
51 F.4th 1073 (Fed. Cir. 2022) ....................40

## STATEMENT OF RELATED CASES

Pursuant to Federal Circuit Rule 47.5(a), counsel for Dental Monitoring SAS ("Dental Monitoring" or "DM") states that no appeal in or from this same proceeding was previously before this Court or any other court.

DM further states that the following cases are pending that will be directly affected by this Court's decision in the pending case:

- *Align Technology, Inc. v. Dental Monitoring SAS*, IPR2023-01369
- *Align Technology, Inc. v. Dental Monitoring SAS*, IPR2024-00052
- *Align Technology, Inc. v. Dental Monitoring SAS*, IPR2024-00110
- *Dental Monitoring SAS v. Get-Grin, Inc.*, No. 22-cv-647-WCB (D. Del.)

## INTRODUCTION

The claims at issue are directed to specific technological solutions that are patent eligible under 35 U.S.C. § 101: a deep learning device that is specially trained for assessing orthodontic aligner fit ('248 patent, claim 14), and another deep learning device that is specially trained to effect a method that guides a user to acquire dental images suitable for aligner assessment ('409 patent, claims 7 and 12). As Align's own dental expert conceded, using any deep learning device for aligner assessment was *not* "part of the standard of care" at the time—a glaring admission that Align never addressed despite contending the claims are ineligible.

Claim 14 of the '248 patent is directed to a deep learning device that is trained, according to a specifically constructed learning base, to assess aligner fit by quantitatively measuring the separation between a patient's aligner and teeth on a tooth-by-tooth basis. This deep learning device, the objective assessment and "fine analysis" it can perform remotely, and the learning base used to train the device were not previously available to dental practitioners, who had no such tool to perform that type of measurement. At the time, conventional methods did not involve any artificial intelligence functionality, much less a specially trained deep learning device, and were limited to subjective, in-person visual and manual inspections.

Central to the '248 patent's invention is the separate invention of claims 7 and 12 of the '409 patent, which require a distinct deep learning device that is specially

trained to effect a method that guides a user to acquire dental images suitable for aligner assessment by evaluating and providing specific feedback about the images (*e.g.*, if the images are of insufficient quality for assessment or oriented to the wrong tooth). This deep learning device, and claim 7's specific learning base used to train it, were not previously available. The claimed invention, which can perform this "global analysis" remotely, provided a significant technological advance beyond the limited prior attempts to use then-existing technology for remote dental treatment, such as patients sending images of their teeth or dental practitioners trying to perform visual assessments over video calls. Those attempts, which employed no artificial intelligence functionality at all, failed due to the inability of medically untrained patients to send proper images and the inconsistent quality of video calls.

Thus, at *Alice* Step One, the claims of both patents are patent eligible and the inquiry need not proceed to *Alice* Step Two. Even at Step Two, however, the record confirms the claims contain an inventive concept or, at the very least, presents material factual disputes that preclude the grant of summary judgment. Indeed, the concession of Align's dental expert alone should end the inquiry in DM's favor because it establishes the claims do not involve *only* well-understood, routine, and conventional elements: that, at the time, using any deep learning device was *not* part of the standard of care for aligner assessment. Only further underscoring the

significance of this concession is the same expert's testimony that the "very conservative" dental and orthodontic field is slow to adopt new methods.

The district court's judgment of ineligibility was fraught with error. For instance, at Step One, the court reduced the claims to mere data collection and analysis. But the court overlooked key claim limitations at the heart of the specific technological improvement that the claims provide, including the specially trained deep learning device and learning base used to train it. Ignoring those same limitations, the court also incorrectly concluded that the recited deep learning devices are "generic" computers simply adapted to a new field. That mistaken conclusion likewise infected the court's cursory Step Two analysis, which ignored the significant material evidence establishing that the claims contain an inventive concept. Notably, the court—and Align—never explained or even addressed how the claims could have involved *only* well-understood, routine, and conventional elements if, as Align's dental expert conceded, it was *not* part of the standard of care to use deep learning devices for aligner assessment.

Thus, the claims are patent eligible and the district court's judgment of patent ineligibility should be reversed. At a minimum, there are material factual questions that preclude the grant of summary judgment and require a remand.

## STATEMENT OF JURISDICTION

The district court had jurisdiction under 28 U.S.C. §§ 1331 and 1338(a), and entered final judgment on August 8, 2024. Dkt. 164 1-8. DM timely appealed on August 29, 2024. Dkt. 165. This Court has jurisdiction under 28 U.S.C. § 1295.

## STATEMENT OF THE ISSUES

**I.** Whether claim 14 of the '248 patent, which is directed to a specially trained deep learning device that performs a previously unavailable method of aligner assessment by quantitatively measuring the separation between a patient's aligner and teeth on a tooth-by-tooth basis, is patent eligible.

**II.** Whether claims 7 and 12 of the '409 patent, which are directed to a deep learning device that is specially trained to effect a previously unavailable method that guides a user to acquire dental images suitable for aligner assessment by evaluating and providing specific feedback about the images' quality and content, are patent eligible.

**III.** Whether underlying genuine disputes of material fact preclude the district court's grant of summary judgment on the basis of ineligibility with respect to both patents.

## STATEMENT OF THE CASE

In a proceeding called the "patent showdown," the district court granted summary judgment in Align's favor on the basis that claim 14 of the '248 patent and

claim 12 of the '409 patent are not patent eligible. Although DM disagreed with the decision, the parties stipulated that claim 7 of the '409 patent is also ineligible in view of the court's reasoning in its summary judgment decision. The court then entered final judgment as to all three claims. DM appeals from that judgment.

## I. Technical Background

The patents-in-suit relate to specifically training a deep learning device to implement particular methods relating to the assessment of orthodontic aligner treatment. Appx37(1:22-2:3, 3:13-17); Appx67(1:22-2:3, 3:13-17). It is undisputed that the priority date for each patent is July 2017. *Infra* p. 14.

### A. Orthodontic Aligner Treatment

Orthodontic treatment typically involves aligning a patient's bite or straightening their teeth. Appx38(4:46-62); Appx68(4:46-62); Appx861-863(¶¶16-24). One type of orthodontic treatment employs a removable appliance called an aligner, which exerts pressure on and shifts a patient's teeth over time according to a treatment plan. Appx38(4:52-62); Appx50(27:25-67); Appx68(4:52-62); Appx80(27:36-28:11); Appx861-863(¶¶16-24).

As of July 2017, aligner treatment generally involved three steps. *First*, a patient wore a series of aligners according to their dental practitioner's treatment plan. Appx861(¶¶17-18); Appx50(27:25-47); Appx80(27:36-58). The patient would switch from one aligner to the next aligner in the series according to the plan,

so as to continue shifting their teeth. Appx861(¶18); Appx50(27:43-47); Appx80(27:54-27:58). *Second*, the practitioner conducted an in-person examination to assess treatment progress, such as the fit of the aligner on the patient's teeth. Appx861-863(¶¶17, 21-24); Appx526(¶20); Appx50(27:55-59); Appx80(27:66-28:3). *Third*, based on the assessment, the practitioner adjusted the treatment plan as necessary. Appx861(¶17); Appx865(¶28); Appx45(17:39-54); Appx50(27:55-67); Appx75(17:46-61); Appx80(27:66-28:11).

Relevant to this appeal is the second step of aligner assessment. As of July 2017, in-person examinations involved a practitioner conducting a subjective visual and manual inspection of aligner fit. Appx862-863(¶¶22-24); Appx50(27:55-28:7); Appx80(27:66-28:17); Appx526(¶20). The visual inspection focused on making an estimated comparison of the current state of the patient's teeth to the state that would be expected at that point of the treatment. Appx862-863(¶22-24); Appx526(¶20); Appx50(27:55-59); Appx80(27:66-28:3). For the manual inspection, the practitioner would apply pressure to portions of the aligner to see if there was rocking, which would indicate poor fit. Appx863(¶24).

As of July 2017, practitioners did not perform quantitative measurements for aligner assessment, such as measuring the separation between the aligner and the patient's teeth on a tooth-by-tooth basis. Appx862(¶21); Appx868(¶43); Appx869-870(¶48); *cf.* Appx50(27:55-59); Appx80(27:66-28:3); Appx526(¶20). At the time,

practitioners had no tool to make those types of measurements. Appx869-870(¶48). Thus, measuring the separation between an aligner and teeth was a "step of aligner treatment that simply did not exist as part of conventional aligner treatment methods as of July 2017." Appx868(¶43); *cf.* Appx526(¶20).

### B. Deep Learning Technology

Deep learning is a type of machine learning, which is a subset of artificial intelligence ("AI"). Appx793(¶27 & n.1); Appx795(¶30); Appx306. Deep learning involves multiple layers of sets of algorithms called neural networks, which can be trained to perform specific tasks by analyzing sets of training examples (referred to as a "learning base"). Appx795(¶30); Appx797(¶35). A learning base of images that are labeled with specific features of interest may be used to train a neural network to identify those features in images. Appx797-802(¶¶35-36); Appx306.

Although in July 2017 there were architectures that could serve as a starting point for deep learning neural networks, those architectures could perform no function without specific training. Appx809-811(¶¶53-54). Dr. John Mongan, a professor of radiology at UC San Francisco's School of Medicine who served as DM's technical expert (Appx791-859), stated that "the use of deep learning" for a particular task in 2017 was (and still is) "not necessarily straightforward, reliable, or possible." Appx807(¶40). He explained that training a deep learning neural network to perform specific tasks relating to aligner assessment, such as measuring the

separation between an aligner and teeth, or acquiring and providing specific feedback about images suitable for that assessment, would have been "particularly complex." Appx810-811(¶54); Appx809-820(¶¶53-77); Appx838-841(¶¶116-122).

Dr. Mongan explained that, as of July 2017, there was no learning base that had been created to train a deep learning neural network to perform such tasks, and thus, before the claimed inventions, a skilled artisan would not have known it was possible to train the device to accomplish those tasks. Appx809-814(¶¶53-59); Appx838(¶16); Appx840(¶¶120-121). He also provided exemplary reasons why training a deep learning neural network to perform these methods would have posed additional complications: (1) "[t]eeth are arrayed in a curve and covered by the patient's lips, requiring particular angles and lip movement to acquire images that show the full scope of the relevant portion of the aligner that needs to be analyzed"; (2) "the aligner on the teeth is clear, and there can be inconsistent overlap between the bottom and top teeth in an image, causing issues with distinction between the aligner and the teeth"; (3) "[t]he moisture in the mouth and the aligner itself can also distort the view of the tooth"; (4) teeth are small and have "similar colors and shapes"; and (5) the "necessary measurements are extremely small and require a high degree of accuracy." Appx810-811(¶54).

### C. Align's Dental Expert Concedes That Using Deep Learning Devices Was Not "Part of the Standard of Care" for Orthodontic Aligner Assessment as of July 2017

Align's dental expert, Dr. Maureen Valley, opined that using any deep learning device was not part of the standard of care for aligner assessment as of July 2017. Appx532(¶34). She stated that "using a deep learning device to carry out image analysis" was not "part of the standard of care" at the time. *Id.* Furthermore, on behalf of Align in a separate proceeding, Dr. Valley testified that "[i]n the dental and orthodontic field, it's a very conservative field," and thus "[i]t takes a while before new methods become mainstream." Appx898(50:3-5).

Consistent with this testimony, Dr. Mongan and DM's dental expert (Appx860-875), Dr. Budi Kusnoto, a practicing orthodontist and professor of orthodontics at the University of Illinois, Chicago, testified they were unaware of any deep learning device technology in July 2017 that performed aligner assessment or effected a method of acquiring images suitable for aligner assessment—whether remotely or otherwise. Appx795-797(¶¶31, 33); Appx811-812(¶56); Appx838-840(¶¶116-17, 121); Appx863-864(¶25); Appx866-867(¶¶33, 35).

## II. The Claimed Inventions

### A. The '248 Patent

The '248 patent relates to a deep learning device that is trained, according to a specifically constructed learning base, to assess aligner fit by quantitatively

measuring the separation between a patient's aligner and teeth on a tooth-by-tooth basis. Appx52-53(claims 1, 14). Relevant to this appeal is claim 14, which depends on independent claim 1.

**Learning Base and Training.** Claim 14 requires creating a specific learning base comprised of a specific number of images of a specific type: "more than 1000 images of dental arches, or 'historical images', each historical image representing an aligner worn by a 'historical' patient and comprising one or more zones each representing a tooth, or 'historical tooth zones,' to each of which, for at least one tooth attribute relating to a separation between the tooth represented by the historical tooth zone considered, and the aligner represented, a tooth attribute value is assigned." Appx53(34:23-31). This learning base is then used to "train[]" "at least one deep learning device" to implement a specific task at a specific time according to a specific set of steps. Appx52-53(claims 1, 14). The specification explains that this "training" is a process where, "[b]y presenting, as input for the deep learning device, historical images (images+descriptions), the deep learning device progressively learns to recognize patterns on an image." Appx44(16:38-43).

**Aligner Assessment.** Once trained, the deep learning device performs a specific sequence of steps: (1) using an "image at least partially representing the aligner in a service position in which it is worn by a patient" (2) that has been acquired "more than 1 week after the start of the treatment with the aligner," (3) to

"determine a value" for a "tooth attribute" that is then used (4) to determine the "amplitude of" the "separation" between a tooth and the aligner on that image by determining "at least one probability relating to: the presence, in a location of said analysis image, of an analysis tooth zone; and the attribute value of the tooth represented on said analysis tooth zone." Appx52-53(claims 1, 14).

The value for the "tooth attribute" described above "provides an information item relating to the shape of the aligner relative to the shape of the teeth of the patient," such as a tooth number (*i.e.*, the position of a specific tooth in the mouth), a tooth type, and a tooth shape parameter. Appx40(7:64-8:7); Appx51(30:42-54). The deep learning device's measurement and "assessment of the suitability of the aligner" can be "for example[,] a measurement of the maximum separation, or of the mean separation for the tooth represented by the historical tooth zone." Appx50(28:29-31); Appx51(30:45-48).

Finally, the specification contemplates that capturing the images for aligner assessment and making the required measurements in this "fine analysis" can be performed remotely and by a medically untrained patient. Appx38(3:20-22); Appx42(12:47-54); Appx44(15:30-35); Appx46(19:41-44); Appx49(25:60-63).

### B. The '409 Patent

The '409 patent is directed to a distinct deep learning device; namely, one that is specially trained to effect a method that guides a user to acquire dental images

suitable for aligner assessment by evaluating and providing specific feedback about the quality and content of those images. Appx82-83(claims 1, 7, 12). Relevant to this appeal are claims 7 and 12, which each depend on independent claim 1.

**Guiding Acquisition of Dental and Aligner Images.** Both claims require acquiring an "analysis image" of a "dental arch" with an "image acquisition apparatus" (which the specification describes as "[p]referably" a "cellphone" (Appx70(8:57-63))) and using "a deep learning device trained by means of a learning base" to determine a specific "image attribute value" for that analysis image. Appx82-83(claims 1, 7, 12).

The "image attribute" may relate to the "orientation" or "quality" of the image, or to the "dental situation of the patient" or the "presence" or "absence" of an orthodontic appliance. Appx68(4:14-32). The patent explains that "train[ing]" the deep learning device to determine a value for the image attribute involves "presenting, as input for the deep learning device, historical images (images+descriptions)," so that "the deep learning device progressively learns to recognize patterns on an image." Appx74(16:44-50).

Next, the "image attribute value" from the analysis image is "compare[d]" to a particular "setpoint" and "an information message" is sent "as a function of said comparison." Appx82-83(claims 1, 7, 12). That message may include information "related to the quality of the image acquired," the "position" of the camera "in

relation to" the dental arch, the "setting" of the camera, or to "the opening of the mouth or to the wearing of a dental appliance, or to a combination thereof." *Id.* If that comparison reveals that the image attribute value from the analysis image does not "respect the setpoint" value, the "operator" receives the "information message" that "guide[s] the operator" to acquire a new image of sufficient quality. *Id.*

**Learning Base and Training.** Claim 7 builds on the specific training of the deep learning device and, similar to claim 14 of the '248 patent, requires that the learning base used to train the deep learning device must be comprised of a specific number of a specific type of "historical images": "more than 1000 images of dental arches," each image having an "attribute value" for at least one "image attribute." Appx83(claim 7). Claim 7 further clarifies that, after the deep learning device is trained, the "analysis" image is then "submi[tted]" to the device, which employs its training to determine "at least one probability relating to said image attribute value," which the specification explains may relate to "whether the mouth is open or closed, or, more generally, whether the image is suitable for a subsequent treatment, for example whether it makes it possible to monitor [an] occlusion [*i.e.*, the contact between teeth]." Appx83(claim 7); Appx68(3:26-37).

In contrast to the invention of the '248 patent and claim 3 of the '409 patent, which focus on training a deep learning device to perform a "fine analysis" of a "tooth attribute" (*i.e.*, analyzing particular zones of an image and the characteristics

of teeth therein) (*supra* pp. 9-11), the focus of claims 7 and 12 of the '409 patent on training a deep learning device to analyze an "image attribute" (*i.e.*, analyzing the "image as a whole") allows for a "global analysis." Appx68(3:19-37); Appx38(3:19-37); Appx68(3:20-37); Appx74-75(15:26-17:15). More specifically, the invention of claims 7 and 12 "makes it possible to immediately and globally assess a dental situation" (*e.g.*, whether the mouth is open or closed) "without having to determine values for" each individual tooth, which "is therefore advantageously more rapid." Appx68(4:36-39); Appx79(26:27-32); Appx75(17:16-30).

## III. Procedural History

### A. The Accused Products and the "Patent Showdown"

In November 2022, DM sued Align, alleging that Align's virtual aligner assessment products and services, which include versions of Align's Virtual Care product, infringe the patents-in-suit. Appx123-124(¶46); Appx126(¶57); Appx267. Align did not launch its Virtual Care product until May 2020, almost three years after the patents' July 2017 priority date. Appx263; Appx293; Appx889. Indeed, Align's CEO stated in May 2020 that it was only "[e]arly on [in the COVID-19 pandemic]" that "many doctors began using video calls, texts, and patient-submitted photos." Appx889. At the time, the product focused on remote imaging and had no AI functionality, and was only later updated with an AI functionality and rebranded as Virtual Care AI. Appx814(¶60); Appx923.

After Align answered DM's complaint,[1] the case entered into what the district court calls the "patent showdown," where the plaintiff and defendant each selects "one asserted claim" (regardless of the number of patents-in-suit) that "presumably [is their] strongest case for infringement and strongest case for noninfringement or invalidity, respectively." Appx241-243. The parties then proceed through expedited discovery and file cross motions for summary judgment that are limited to 25 pages and 120 pages of exhibits, excluding the patents. Appx241-242(¶2). DM selected claim 14 of the '248 patent and Align selected claim 12 of the '409 patent. Appx17.

**B. Align's Motion for Summary Judgment of Patent Ineligibility**

In February 2024, the parties filed their "showdown" summary judgment motions. Relevant to this appeal, Align contended in its motion that both showdown claims are not patent eligible under 35 U.S.C. § 101.

**1.** At *Alice* Step One, Align characterized claim 14 of the '248 patent as directed to the abstract idea of "collecting, analyzing, and presenting information to 'assess[] the shape of an orthodontic aligner.'" Appx447. As to claim 12 of the '409 patent, Align argued it is "directed to the abstract idea of collecting, analyzing, and presenting information to guide a camera operator to take a picture of teeth." Appx445. At *Alice* Step Two, Align addressed both claims together, arguing it was

---

[1] Align filed counterclaims alleging that DM infringed four of Align's patents. Appx162. The court stayed those counterclaims pending resolution of DM's infringement case. *See* Appx234-240.

"well understood, routine, and conventional for patients to take photos of their teeth and send them to dental practitioners." Appx450-452. As to the "ordered combination" of the claim elements, Align argued only that the combinations "are no more inventive" than the individual elements and that "[t]he steps are conventionally organized." Appx452; Appx941-943.

**2.** DM responded that Align had failed to establish by clear and convincing evidence that the "showdown" claims are patent ineligible, and that there were at least disputed material facts concerning eligibility. Appx764-780.

As to claim 14 of the '248 patent, DM explained that it provides a specific technological solution: a deep learning device that is trained, according to a specifically constructed learning base, to assess aligner fit by quantitatively measuring the separation between a patient's aligner and teeth on a tooth-by-tooth basis. Appx764-765. As to claim 12 of the '409 patent, DM argued that it is directed to a separate deep learning device that is specially trained to effect a method that guides a user to acquire dental images suitable for aligner assessment (*e.g.*, as in the method of claim 14 of the '248 patent) by evaluating and providing specific feedback about those images. Appx776-778.

As to both claims, DM emphasized the concession of Align's dental expert that it was not "part of the standard of care" to use deep learning devices for aligner assessment. Appx765; Appx767; Appx773; Appx778; *see also* Appx898(50:3-5).

DM argued this concession and additional evidence established that the claim elements, whether considered individually or in combination, could not have involved only well-understood, routine, and conventional activities. Appx771-776; Appx778-780.

### C. The District Court's Questions to Align About Voluntarily Withdrawing Its Counterclaims and Subsequent Grant of Summary Judgment in Align's Favor

**1.** The district court then heard argument on the parties' "showdown" summary judgment motions. The court focused on the patents' lack of a specific "algorithm" for training the deep learning device, suggesting that if the claims or the specification included novel algorithms (like "$E = MC^2$"), the invention may be considered "brand new" and therefore "patentable." Appx1251 (10:10-21); Appx1255(14:1-16); Appx1273(32:4-24); Appx1277-1278(36:18-37:1). The court "want[ed] to know the specific source code or the specific algorithm" that enables the deep learning device to function. Appx1274(33:9-14). Align stated there was "no algorithm in the claim or specification" and agreed that DM must "claim a specific algorithm in order to be able to say that there's been some technological improvement." Appx1255-1256(14:17-15:4); Appx1264(23:3-12).

DM responded by explaining that this Court's precedent does not require the express recitation of an algorithm or source code in a claim or specification as a prerequisite for patent eligibility. Appx1281-1287(41:21-45:15). DM also called

out facts and issues that Align had not addressed in its briefing, including certain of DM's cited case law and the concession of Align's dental expert that using deep learning devices was not part of the "standard of care" for the assessment of orthodontic aligner treatment in 2017. Appx1287-1288(46:17-47:16); Appx1282-1283(41:21-42:25); *see also* Appx1279(37:2-38:1). Align offered no response (at the hearing or in its briefing) about its own expert's concession. Appx1288-1290(47:17-49:19).

At the close of the hearing, the court asked Align whether the case was "over" if Align won "under *Alice* grounds." Appx1343(102:18-24). Align reminded the court of its counterclaims, and stated it would "ask the court to move forward" with them regardless of the court's decision on the patent eligibility of DM's "showdown" claims. Appx1343-1344(102:25-103:3). The court indicated its disapproval of that outcome, and asked Align to report "within a few days" whether Align would "withdraw" its counterclaims—suggesting that a withdrawal was "going to make a difference" as to whether the court "let it all" proceed to trial. Appx1344(103:4-18). The following day, Align stated it would "voluntarily withdraw its counterclaims" if the court "enter[ed] final judgment in Align's favor." Appx1075.

**2.** On May 14, 2024, the court granted summary judgment in Align's favor on both showdown claims, holding both to be patent ineligible. Appx1-15.

As to the '248 patent, the court held at *Alice* Step One that claim 14 is

"'directed to a patent ineligible concept,' namely 'collecting information, analyzing it, and displaying certain results of the collection and analysis.'" Appx6. The court reasoned, for example, that "neither [the] claim nor specification detail[ed] a novel (or any) algorithm or otherwise disclose[d] an improvement to extant deep learning devices" and the claim "merely describe[d] how a generic learning device is applied (or limited) to a particular field of use." Appx7-9. At *Alice* Step Two, the court held that the claim lacked an inventive concept, again characterizing the deep learning device as "generic" and merely placed in a new field. Appx12-13.

As to the '409 patent, the court concluded at Step One that claim 12 is directed to the abstract idea of "acqui[ring]" an image, "anal[yzing]" "the contents of that image," and "present[ing]" "information regarding the quality and composition of the image to the camera operator." Appx10. Again, the court held that the lack of "any specific algorithm" necessitated a conclusion that the claim was directed to "a common practice" of taking photos of teeth. Appx10-11. At Step Two, the court quoted claim 12's limitations, stated that "[n]one of the above constitutes an inventive concept," and concluded that the "limitations do not amount to significantly more than the execution of an abstract idea by means of generic computer components." Appx14.

### D. Stipulation of Patent Ineligibility as to Claim 7 of the '409 Patent

After the court's grant of summary judgment, the parties stipulated to the entry

of final judgment of patent ineligibility as to (1) the two showdown claims, claim 14 of the ’248 patent and claim 12 of the ’409 patent, and (2) claim 7 of the ’409 patent. Appx16-23. As explained in the stipulation, although DM disagreed with the court’s decision, both parties agreed that claim 7 of the ’409 patent is not patent eligible under the court’s reasoning in its summary judgment decision “with respect to claims 1 and 12 of the ’409 patent and the ‘creation’ and ‘training’ limitations of claim 14 of the ’248 patent.”[2] Appx17-18. The court then entered final judgment pursuant to the stipulation, and DM timely appealed. Appx22-23; Appx1388-1390.

## SUMMARY OF ARGUMENT

Because the appealed claims provided specific technological solutions used for aligner assessment that were, as Align’s own dental expert conceded, *not* even “part of the standard of care” at the time, the claims are patent eligible. This Court should reverse the district court’s judgment of ineligibility or, at a minimum, remand for the factfinder to consider the underlying factual questions concerning eligibility.

**I.** Claim 14 of the ’248 patent provides a specific technological solution in two particular regards. First, the claim recites constructing a specific learning base and using it to train a deep learning device to perform a method of aligner

[2] DM dismissed without prejudice its other asserted non-showdown patent claims, but retained the right to reassert them in the event of a reversal or vacatur of the district court’s judgment. Appx17-18; Appx22. Consistent with its prior representation to the district court, Align dismissed its counterclaims against DM without prejudice. Appx18; Appx22; Appx1075.

assessment that the device could not previously implement. Second, the claim requires using the specially trained deep learning device to perform the method: assessing aligner fit by quantitatively measuring the separation between an aligner and teeth on a tooth-by-tooth basis. This invention provided a significant technological improvement for dental practitioners, who had no such tool to perform those types of measurements. Instead, at the time, conventional methods were limited to subjective, in-person visual and manual inspections. Thus, at *Alice* Step One, claim 14 is patent eligible and there is no need to reach *Alice* Step Two.

Even at Step Two, claim 14 is eligible because it contains an inventive concept. Although there was significant additional material evidence demonstrating an inventive concept, the concession of Align's dental expert alone should end the inquiry in DM's favor: that using any deep learning devices was *not* "part of the standard of care" for aligner assessment at the time. The same expert had also testified that in the "very conservative" dental and orthodontic field, "[i]t takes a while before new methods become mainstream." Align failed to meet its burden of proving the claim lacks an inventive concept, offering no evidence establishing that the specific combination of claim elements involved *only* well-understood, routine, and conventional activities.

There are a series of errors underlying the district court's judgment. For instance, in reducing the claim to mere data collection and analysis at Step One, the

court ignored key limitations relating to the specially trained deep learning device and the learning base used to train it. The court also incorrectly assumed the recited deep learning device is simply a "generic" computer. That flawed assumption also was central to the court's Step Two analysis, which overlooked the significant material evidence establishing an inventive concept. Indeed, the court—and Align—never explained how the claim could have involved *only* well-understood, routine, and conventional elements if, as Align's dental expert conceded, using deep learning devices was *not* part of the standard of care for aligner assessment.

**II.** The specific technological solution provided by claims 7 and 12 of the '409 patent involves a distinct deep learning device; in particular, one that is specially trained to effect a method that guides a user to acquire dental images suitable for aligner assessment (*e.g.*, as in the method of claim 14 of the '248 patent) by evaluating and providing specific feedback about the quality and content of those images. Claim 7 also specifies creating a particular learning base used to train the deep learning device. In 2017, there was no deep learning device that had been trained to be used in such a method. Instead, there were limited but failed attempts to use then-existing technology for remote dental treatment purposes, such as patients sending images of their teeth or practitioners endeavoring to perform visual inspections over video calls. The claims therefore are patent eligible at Step One.

The claims are eligible even if the inquiry reaches Step Two. As with the ’248 patent, although additional material evidence establishes an inventive concept, the inquiry should end in DM’s favor given the concession of Align’s dental expert discussed above, which applies equally to the ’409 patent. In any event, Align failed to meet its burden of proving that the claims lack an inventive concept, and offered no evidence that the specific combination of claim elements involved *only* well-understood, routine, and conventional activities.

The district court’s judgment as to the ’409 patent was infected with the same categories of errors that the court made with respect to the ’248 patent, including its flawed assumption that the specially trained deep learning device of the ’409 patent claims is merely a “generic” computer. Furthermore, in addition to overlooking material evidence establishing an inventive concept, the court again failed to explain how the claims involved *only* well-understood, routine, and conventional activities where the core invention of the claims—the specially trained deep learning device—was indisputably *not* “part of the standard of care” at the time.

## STANDARD OF REVIEW

This Court “review[s] the grant of a summary judgment under the law of the applicable regional circuit,” which in this case is the Ninth Circuit. *Contour IP Holding LLC v. GoPro, Inc.*, 113 F. 4th 1373, 1378 (Fed. Cir. 2024). In the Ninth Circuit, summary judgment determinations are reviewed *de novo*. *Id.* “Summary

judgment is appropriate in the Ninth Circuit when, drawing all reasonable inferences in favor of the non-moving party, there are no genuine issues of material fact." *Id.*

Federal Circuit law applies to the review of a patent-eligibility determination under 35 U.S.C. § 101. *Id.* "Eligibility is ultimately a question of law that may be based on underlying factual findings." *Id.*

## ARGUMENT

The appealed claims are patent eligible at either step of the inquiry because they provide specific technological solutions for aligner assessment that were, as Align's dental expert conceded, *not* "part of the standard of care" at the time—a significant concession about which Align has remained silent. The district court's judgment of ineligibility should be reversed or, at a minimum, there are material factual questions that preclude the grant of summary judgment and require a remand.

## I. Claim 14 of the '248 Patent

### A. Step One

#### 1. Claim 14 is Directed to a Specific Technological Solution

Claim 14 is patent eligible at Step One because it provides a specific technological solution in two particular respects. *First*, the claim requires training a deep learning device with a specifically constructed learning base, which allows the device to perform a method it could not previously implement. *Second*, the trained device must perform that method: assessing aligner fit by quantitatively measuring the separation between an aligner and teeth on a tooth-by-tooth basis. The claimed

invention provided a specific technological advance beyond conventional aligner assessment methods, which were limited to in-person, subjective visual and manual inspections. The specification's recognition of these concrete benefits that flow from the invention only further confirms that claim 14 is eligible.

Under the two-step inquiry for patent eligibility, claims are eligible at Step One where they "focus on a specific means or method that improves the relevant technology," rather than on a "result or effect that itself is [an] abstract idea" and simply "invoke[s] generic processes and machinery." *Alice Corp. v. CLS Bank, Int'l*, 573 U.S. 208, 217-18 (2014); *McRO, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299, 1314 (Fed. Cir. 2016). At Step One, the Court considers the claim "as a whole[] and in light of the written description." *CardioNet LLC v. InfoBionic, Inc.*, 955 F.3d 1358, 1368 (Fed. Cir. 2020). This analysis also involves "examin[ing] the 'focus of the claimed advance over the prior art.'" *Contour*, 113 F.4th at 1379.

**i.** Claim 14 requires using a specifically constructed learning base to train a deep learning device to perform a method that it could not previously implement. These learning base and training limitations are critical to the aligner assessment method that claim 14 provides because, as of July 2017, there were no deep learning devices that could perform that method and, indeed, a deep learning device without training has no function. Appx793-795(¶¶28-31); Appx802(¶37); Appx807(¶¶39-40) Appx809-811(¶¶53-55).

In particular, the claim requires a specific manner of training the deep learning device, which entails "creat[ing] [] a learning base" composed of "more than 1000 images of dental arches" each representing "an aligner worn by a 'historical' patient" and each labeled with a "tooth attribute relating to a separation between the tooth" "and the aligner." Appx53(34:21-31). Those "historical images" are necessary to "train[]" the deep learning device. *Id.* This training requires a process referred to as "deep learning," which involves "presenting, as input for the deep learning device, historical images (images+descriptions)" so the "deep learning device progressively learns to recognize patterns on an image, and to associate them with tooth zones and with tooth attribute values, for example tooth numbers" (*i.e.*, the position of a specific tooth in the mouth) or tooth type. Appx44(16:37-43); Appx40(7:64-8:7). For example, the device is trained to recognize patterns associated with "tooth attribute value[s]" assigned to "historical tooth zones," so that the "amplitude of [] separation" (*i.e.*, any space) "between the tooth represented by the historical tooth zone[] and the aligner represented" can be measured. Appx53(34:21-31).

As DM's technical expert explained, without the '248 patent, a skilled artisan in July 2017 would not have known how to construct the learning base necessary to train the deep learning device or even whether that training would be successful. Appx809-814(¶¶53-59); Appx807(¶40). A skilled artisan would not have known, for example, "how large the dataset should be, what images it would need to contain,

or how those images would have to be labeled such that the learning base could be used to train a deep learning device to assess aligner treatment." Appx809(¶53); Appx811(¶55). Even with the proper learning base, it would have been "particularly complex" to train the deep learning device, and a skilled artisan would not have known whether that training would necessarily be successful without the patent's teachings. Appx810-811(¶54); Appx807(¶¶39-40). Further complicating the issue was the unique nature of teeth and aligners, for instance, the small size, similar color, and arrangement of teeth, the transparency of an aligner on a patient's teeth, and distortions of view caused by the aligner and moisture in the mouth. Appx810-811(¶54); Appx807(¶40); Appx871-872(¶65).

This Court has held claims patent eligible where they improved a particular process by requiring the "specific implementation" of an "existing tool." *Koninklijke KPN NV v. Gemalto M2M GmbH*, 942 F.3d 1143, 1151, 1153 (2019) (holding as patent eligible claims that recited a "sufficiently specific implementation" of an "existing tool" that "improves the functioning of the overall technological process of detecting systematic errors in data transmissions"); *cf. Apple, Inc. v. Ameranth, Inc.*, 842 F.3d 1229, 1241 (Fed. Cir. 2016) (holding that claims to "menus with particular features" were ineligible because they "d[id] not claim a particular way of programming or designing the software to create menus that have these features, but instead merely claim[ed] the resulting systems"). This

Court also has held that claims which enabled a tool "to do things it could not do before" were patent eligible. *Finjan, Inc. v. Blue Coat Sys., Inc.*, 879 F.3d 1299, 1305 (Fed. Cir. 2018) ("[T]he method of claim 1 employs a new kind of file that enables a computer security system to do things it could not do before").

Here, claim 14 similarly requires a "specific implementation" of an "existing tool" by requiring the creation of a specific learning base and using it to train a deep learning device to perform a specific aligner assessment method—a method that the deep learning device "could not do before." *Koninklijke*, 942 F.3d at 1151; *Finjan*, 879 F.3d at 1305. As this Court has explained, such "improvement[s] in computer technology" "require[] no more from the claims or the specification to support [the] conclusion that the claims are not directed to an abstract idea." *Visual Memory LLC v. NVIDIA Corp.*, 867 F.3d 1253, 1261-62 (Fed. Cir. 2017) (holding patent eligible claims that required "[c]onfiguring [a] memory system based on the type of processor connected to the memory system").

**ii.** Claim 14 further requires that the specially trained deep learning device perform a specific aligner assessment method that was not previously available to dental practitioners in 2017: quantitatively measuring the separation between an aligner and teeth on an objective, tooth-by-tooth basis.

As Align's dental expert conceded, the "standard of care" for aligner assessment in 2017 would *not* have included using a deep learning device.

Appx532(¶34). Indeed, there is no evidence that anyone in the orthodontics or AI fields had considered creating or using a deep learning device for aligner assessment. Appx795-796(¶31); Appx811(¶56). Instead, conventional methods employed no AI functionality at all and were limited to in-person, subjective visual and manual inspections by a dental practitioner. Appx45(17:39-54); Appx50(27:55-59, 28:1-4); Appx862-863(¶¶21-24); Appx526(¶20). Practitioners did not measure the separation between an aligner and teeth and had no tool to make such a measurement. Appx863-864(¶25); Appx868(¶43); Appx869-870(¶48); Appx812(¶57).

The claimed invention departed from those conventional methods and offered a new aligner assessment method that quantitatively measures the separation between an aligner and teeth on a tooth-by-tooth basis. Appx807(¶39); Appx811-812(¶¶56-57); Appx862-863(¶¶21-22); Appx868(¶43); Appx869-870(¶¶48-49). The claim requires a specific manner of implementing that method. The specifically trained deep learning device receives an "analysis image" that "represent[s] the aligner in a service position in which it is worn by [the] patient." Appx52(32:6-23); Appx53(34:21-31). Next, to make the measurement, the device must assess the analysis image at each "analysis tooth zone" (*i.e.*, on a tooth-by-tooth basis) and a value for the "amplitude of [] separation" "between the tooth represented by the analysis tooth zone, and the aligner represented on the analysis image" is then determined. Appx52(32:6-23); Appx53(34:21-31). The claim also specifies that the

device must perform the method "more than 1 week after the start of the treatment with the aligner," and that the "analysis image" should be acquired with a "cellphone." Appx52(32:6-23); Appx53(34:21-31). This invention allowed for a previously unattainable level of precision by "measur[ing] such separations to a degree that a dental professional could not and did not previously determine with their naked eye (*e.g.*, spaces less than one mm) even during in-person patient visits." Appx869-870(¶48).

In this regard, claim 14 is similar to claims that this Court has held patent eligible. For instance, in *CardioNet*, the patent-eligible claims recited a device "for detecting [cardiac abnormalities] in a patient" that employed "variability determination logic to determine a variability in the beat-to-beat timing of a collection of beats" and, in so doing, identified heartbeat anomalies. 955 F.3d at 1364-65. This Court held that "by identifying 'variability in beat-to-beat timing'" using "logic," "the claimed invention achieves multiple technological improvements" that were explicitly recognized by the written description, including "speedier, more accurate, and clinically significant detection of two specific medical conditions out of a host of possible heart conditions." *Id.* at 1368-70. The Court also found there was "no suggestion" in the record "that doctors were 'previously employing' the techniques performed on the claimed device." *Id.*

Here, as in *CardioNet*, there is "nothing in the record" demonstrating that dental practitioners "were 'previously employing'" or had "long used" the specific aligner assessment method of claim 14, much less a deep learning device specially trained to perform that method. 955 F.3d at 1370. Instead, as discussed, neither the claimed deep learning device nor the particular method it performs was available in July 2017. *Supra* pp. 25-30. In fact, Align's dental expert conceded that using deep learning devices was *not* "part of the standard of care" for aligner assessment at the time. Appx532(¶34). In addition, just like the *CardioNet* patent, the '248 patent expressly recognizes the numerous concrete benefits that flow directly from the claimed invention, including (as discussed below, *infra* pp. 32-33) that it provides a simplified and reliable method of aligner assessment that can be performed remotely. 955 F.3d at 1368-70.

Furthermore, in *McRO*, the patent-eligible claims were directed to a set of rules with "specific characteristics" that resulted in animating the speech of a digital character. 837 F.3d at 1311, 1313. The Court upheld the claims at Step One, holding that the "claimed process uses a combined order of specific rules that renders information into a specific format that is then used and applied to create desired results." *Id.* at 1315. The Court reasoned that these rules represented a specific technological improvement to prior animation techniques, which were "driven by subjective determinations rather than specific, limited mathematical rules." *Id.* at

1314. Here, claim 14 similarly provides a specific technological improvement beyond conventional methods, which were limited to subjective visual and manual inspections by a dental practitioner. In contrast to those prior methods, the claimed invention requires employing a specially trained deep learning device to perform an objective, quantitative measurement of the separation between an aligner and teeth.

Thus, claim 14 is directed to a specific technological solution that employs a specially trained deep learning device to perform a particular quantitative measurement for aligner assessment—a method that not only deep learning devices, but also dental practitioners, "could not do before." *Finjan*, 879 F.3d at 1305.

**iii.** The specification further confirms that claim 14 is eligible because its specially trained deep learning device and aligner assessment method provide several concrete benefits. In holding claims patent eligible, this Court has looked to the specification for benefits that "flow" from claimed inventions. *See, e.g.*, *Visual Memory*, 867 F.3d at 1259 ("The specification explains that multiple benefits flow from the [patent's] improved memory system"); *Contour*, 113 F.4th at 1379.

Here, for instance, the specification states that the claimed invention "considerably simplifies the assessment of the good suitability of the aligner to the treatment, while making this assessment particularly reliable" through the required quantitative measurements performed by the specially trained deep learning device. Appx50(28:34-42). It also explains that, by performing this "fine analysis" that

focuses on specific "tooth attributes," the invention "makes it possible, from simple photos or a simple film, to determine whether the aligner is abnormally detached … to determine the regions in which the aligner is separated from the teeth and assess the scale of this separation." Appx38(3:20-22); Appx52(31:30-36).

Furthermore, although claim 14 does not expressly use the words that the deep learning device must perform the recited method *remotely*, the benefits of remote aligner assessment "flow" directly from the claimed invention. *Uniloc USA, Inc. v. LG Electronics USA, Inc.*, 957 F.3d 1303, 1309 (Fed. Cir. 2020) ("Claims need not articulate the advantages of the claimed combinations to be eligible."); *Visual Memory*, 867 F.3d at 1259. The claim, for instance, requires the analysis image to be taken with a "cellphone," which allows the process to be performed remotely. Appx52(32:6-23); Appx53(34:21-31); Appx42(12:47-54). The specification also explains that the invention's benefits include avoiding "costly" and "restrictive" *in-person* visits to a dental practitioner's office. Appx45(17:48-54); Appx50(28:1-9). Thus, the specification's discussion of the many concrete benefits that flow from the claimed invention only further supports that claim 14 is patent eligible.

### 2. The District Court Committed Multiple Reversible Errors

In holding claim 14 ineligible at Step One, the district court made three primary errors: (1) oversimplifying the claim language and thus ignoring key claim limitations to arrive at an abstract idea; (2) concluding that the specially trained deep

learning device is merely a "generic" computer; and (3) requiring that the claim or patent disclose a novel algorithm.

**i.** The district court overgeneralized claim 14 as merely directed to basic data analysis, collection, and presentation. Appx6.

The court analogized the claim to the ineligible claims in *Electric Power Group v. Alstom S.A.*, concluding that information is an "intangible" and that claim 14's "purported advance" was merely "a 'process of gathering and analyzing information of a specified content,' … 'and displaying the results.'" Appx6 (quoting 830 F.3d 1350, 1353-54 (Fed. Cir. 2016)). But simply because claim 14 involves some amount of data collection and analysis does not render it abstract. Rather, because "all inventions at some level embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas," the Supreme Court and this Court have warned that "describing the claims at such a high level of abstraction and untethered from the language of the claims all but ensures that the exceptions to § 101 swallow the rule." *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 566 U.S. 66, 71 (2012); *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1337 (Fed. Cir. 2016); *Thales Visionix Inc. v. U.S.*, 850 F.3d 1343, 1347 (Fed. Cir. 2017) ("We must therefore ensure at step one that we articulate what the claims are directed to with enough specificity to ensure the step one inquiry is meaningful").

Here, claim 14 is not broadly directed to just data collection and analysis. Instead, the claim is narrowly tailored to a specific process for training a deep learning device according to a specific learning base to perform a specific method of aligner assessment that was not available to dental practitioners as of July 2017. Even the district court acknowledged that claim 14 "provides a great degree of particularity" when reciting "how" the invention operates. Appx9.

Nevertheless, the court incorrectly held that the claim is merely "directed to 'analyzing information by steps people go through in their minds, or by mathematical algorithms.'" Appx6 (quoting *Elec. Power Grp.*, 830 F.3d at 1354). As in *CardioNet*, however, there is "nothing in the record" to support the conclusion that "doctors long used" or were "'previously employing' the techniques performed" by the specially trained deep learning device of claim 14. 955 F.3d at 1370. The record confirms the opposite. DM presented evidence establishing that dental practitioners did *not* conduct quantitative measurements for aligner assessment as of July 2017, and had no tool for it. *Supra* pp. 6-7, 28-30. This evidence was corroborated by the concession of Align's dental expert that using deep learning devices were *not* "part of the standard of care" for aligner assessment at the time. Appx532(¶34). Instead, conventional methods were limited to in-person, subjective visual and manual inspections. *Supra* pp. 6-7, 28-30. In addition, the claimed invention can measure separations between an aligner and a tooth "to a degree that

a dental professional could not and did not previously determine with their naked eye (*e.g.*, spaces less than one mm) even during in-person patient visits." Appx869-870(¶48). Thus, the court's conclusion that practitioners could perform "through their minds" (Appx6) the specific method of claim 14 was unfounded.

Furthermore, in the name of "stripp[ing]" claim 14 "of excess verbiage and techno-jargon," the district court disregarded the specific limitations of claim 14 as mere "field of use particulars" rather than patent-eligible technological "improvements." Appx6; Appx9. As a result, the court overlooked the limitations at the heart of the claim that are key to its specific technological advance: (a) constructing the specifically required learning base; (b) using the learning base to train the deep learning device; and (c) employing the deep learning device to perform the required aligner assessment method. Appx52-53(claims 1, 14).

This Court has warned that "[t]o disregard … express claim elements is to proceed at 'a high level of abstraction' that is 'untethered from the claim language' and that 'overgeneraliz[es] the claim.'" *TecSec, Inc. v. Adobe Inc.*, 978 F.3d 1278, 1294-95 (Fed. Cir. 2020); *Contour*, 113 F.4th at 1379-80 (explaining that "characteriz[ing] the claim[] at an impermissibly high level of generality" and "disregard[ing] the disclosed technological means for obtaining a technological result" "all but ensured the incorrect conclusion that the claims were drawn to an abstract idea"). Here, the district court did just that when it reduced claim 14 to data

collection and analysis, which was "materially inaccurate" and "disregard[ed] elements of the claims" that "the specification makes clear are important parts of the claimed advance in the combination of elements." *TecSec*, 978 F.3d at 1294-95.

**ii.** In addition, the district court relied on statements in the specification to erroneously diminish the specially trained deep learning device of claim 14 to a "generic computer" that performs an old method of aligner assessment. Appx6-9.

There is nothing in the record to support the court's conclusion. The specially trained deep learning device of claim 14 is not "generic," particularly as the term has been used in the patent-eligibility context. For instance, the Supreme Court in *Alice* explained that "using some *unspecified*, generic computer" is insufficient to confer eligibility. 573 U.S. at 225-26 (emphasis added). Likewise, although this Court has explained that a basic "processor," "interface," "memory," or "data" are examples of such generic components, it has cautioned that the use of a "general-purpose computer" does not alone automatically "doom[] the claims" to ineligibility. *See Smart Sys. Innovation, LLC v. Chicago Transit Authority*, 873 F.3d 1364, 1374-75 (Fed. Cir. 2017) (citing cases); *Enfish*, 822 F.3d at 1338; *Core Wireless Licensing S.A.R.L. v. LG Elecs., Inc.*, 880 F.3d 1356, 1362 (Fed. Cir. 2018).

Here, contrary to the district court's conclusion, claim 14 requires using not just *any* deep learning device or "some unspecified, generic computer," but instead one that has been specially trained according to a specific learning base to perform

a specific method. Indeed, without that training, the deep learning device has no function at all. Appx793-795(¶¶28-29); Appx809-811(¶¶53-55). In addition, the specific aligner assessment method that the deep learning device must perform was not available to dental practitioners in July 2017, and thus was not an old method as the district court held. *Supra* pp. 28-30; *cf. Finjan*, 879 F.3d at 1305.

Furthermore, the passages of the specification on which the court relied (Appx6-7) do not support its conclusion that the deep learning device is generic. The first passage states only that "recent orthodontic treatments use images to assess the therapeutic situations" and are "conventionally performed by an orthodontist." Appx37(1:11-15). But this general statement does not refer to orthodontic treatment with *aligners* (or images of aligners when worn by a patient) specifically. Nor does it mention the training or use of deep learning devices to perform any step of aligner or other orthodontic treatment.

The second passage adds that "orthodontic aligners" require the patient to "go[] to the orthodontist for a *visual* inspection" "[a]t regular intervals" "to check whether the displacement of the teeth conforms to the expectations and whether the aligner worn by the patient is still suited to the treatment." Appx50(27:53-50) (emphasis added). As discussed above, however, the specification criticizes these conventional methods that were limited to in-person "visual inspection[s]" and describes how the claimed invention's method improved upon those methods. *Supra*

pp. 29-33; Appx50(28:1-9). The third passage recognizes there are existing architectures that can be used as a *starting point* for the deep learning device. Appx44(16:5-36). But that does not mean the specific deep learning device of claim 14 itself is generic. As explained, even with an existing architecture, the deep learning device must still be trained according to the specific steps of claim 14—without training, it can perform no function. *Supra* pp. 25-27.

Thus, none of the passages on which the court relied establishes that the specially trained deep learning device in claim 14 is "generic." *Cf. Visual Memory*, 867 F.3d at 1259-62 (holding that claims requiring "conventional computer components" to have specific "programmable operational characteristic[s]" were directed to a patent-eligible "improved computer memory system").

**iii.** Finally, the district court imparted its own standard for evaluating whether the claim is patent eligible, stating that "[n]either claim nor specification details a novel (or any) algorithm," and that it is not "enough to be the first to introduce generic neural networks or other deep learning devices to a particular field, such as dental aligners, without more."[3] Appx7.

[3] The court even suggested that a "brand new" algorithm like "$E = MC^2$" might confer eligibility. Appx1251(10:10-21); Appx1277-1278(36:18-37:1). These exchanges only further indicate the court applied the wrong legal standard because $E = MC^2$ is a patent-ineligible law of nature. *Diamond v. Chakrabarty*, 447 U.S. 303, 309 (1980) ("Einstein could not patent his celebrated law that $E = mc^2$" because

The question here is not whether a claim recites a novel algorithm. Neither the Supreme Court nor this Court has ever held that a "novel (or any) algorithm" is required to confer patent eligibility to a claim that involves a computer or other AI-based invention. In fact, although discussed in the context of Step Two, this Court has explained that a "new" algorithm "is not necessary" for eligibility where claims are "specific[] as to the mechanism through which they achieve" a particular improvement. *Weisner v. Google LLC*, 51 F.4th 1073, 1085-86 (Fed. Cir. 2022) (holding that a "new search engine algorithm [was] not necessary" for eligibility given the "claims' specificity as to the mechanism through which they achieve improved search results"). Here, as discussed, claim 14 is "specific as to the mechanism through which [it] achieve[s]" the particular training of the deep learning device and the aligner assessment method the device must perform. *Supra* pp. 25-30.

It is true, as the district court found, that the specification recognizes that a deep learning device is "preferably a neural network" (Appx12) and that a "neural network[]" is "[a] set[] of algorithms well known to a person skilled in the art." Appx7 (quoting Appx44(16:5-36)). The claimed invention, however, is *not* a preexisting deep learning device. Instead, the invention is a particular method for

---

"[s]uch discoveries are 'manifestations of … nature, free to all men and reserved exclusively to none'").

specifically training a deep learning device (*e.g.*, a neural network) with a particular learning base to perform a previously unavailable method of aligner assessment—a method that no deep learning device at the time could perform. *Supra* pp. 25-30.

### B. Step Two

Because claim 14 is patent eligible at Step One, this Court does not need to proceed to Step Two. Claim 14, however, is patent eligible even at Step Two.

Step Two "is satisfied when the claim limitations involve more than performance of well-understood, routine, and conventional activities," which is a "question of fact." *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1367-68 (Fed. Cir. 2018). This Court has cautioned that "[t]he inventive concept inquiry requires more than recognizing that each claim element, by itself, was known in the art." *BASCOM Global Internet Servs. v. AT&T Mobility*, 827 F.3d 1341, 1350 (Fed. Cir. 2016). Thus, "an inventive concept can be found in the non-conventional and non-generic arrangement of known, conventional pieces." *Id.*

#### 1. Claim 14 Contains an Inventive Concept, and Align Failed to Meet Its Burden of Establishing Otherwise

Whether its elements are considered individually or in combination, claim 14 provides a specific technological improvement that constitutes an inventive concept at Step Two.

As of July 2017, conventional aligner assessment methods were limited to in-person, subjective visual and manual inspections performed by a dental practitioner.

*Supra* pp. 6-7. Claim 14 provided a previously unavailable method of aligner assessment by employing a deep learning device that is specially trained to perform an objective, quantitative measurement of the separation between an aligner and teeth on a tooth-by-tooth basis. *Supra* pp. 25-30. This specific technological improvement is grounded in claim 14's "specific set of ordered steps": creating a specific learning base, training the deep learning device according to that learning base, and using the trained deep learning device to measure the separation between an aligner and teeth on a tooth-by-tooth basis. *Supra* pp. 25-30; Appx52-53 (claims 1, 14); *CosmoKey Solutions GmBH v. Duo Security*, 15 F.4th 1091, 1099 (Fed. Cir. 2021) (holding claims that "recite[d] an improved method for overcoming hacking" included "an inventive concept by requiring a specific set of ordered steps that [went] beyond the abstract idea identified by the district court" and "improve[d] upon the prior art").

The concessions of Align's dental expert alone should end the Step Two inquiry in DM's favor. As discussed, the expert conceded that using any deep learning device was *not* "part of the standard of care" for aligner assessment at the time. Appx532(¶34). The significance of this concession was further magnified by the same expert's prior testimony that, in the "very conservative" "dental and orthodontic field," "[i]t takes a while before new methods become mainstream." Appx898(50:3-5). Align's expert's concession establishes that the claimed

invention did not involve *only* well understood, routine, and conventional activities—or, at the very least, it creates a factual dispute that precludes the grant of summary judgment. Notably, the court—and Align—never explained or even addressed how the claims could have involved only well-understood, routine, and conventional elements if using deep learning devices was *not* part of the standard of care for aligner assessment at the time.

At the same time, although it was Align's burden to prove ineligibility by clear and convincing evidence, Align failed to offer a *single* piece of evidence establishing that the specific combination of elements in claim 14 was well understood, routine, and conventional. Instead, Align cited a slew of prior-art references relating generally to deep learning to argue that certain *individual* claim elements had been disclosed in those references. Appx450-452. Align's technical expert also offered no analysis concerning the specific combination of elements. He merely concluded that the deep learning devices described in some of those references could be applied to assessing aligner fit and that it "makes no difference to consider the limitations of claim 14 individually or as an ordered combination." Appx505(¶122). Align's and its expert's reliance on these references fail for two reasons.

First, this Court has explained that "[t]he mere fact that something is disclosed in a piece of prior art, for example, does not mean it was well-understood, routine, and conventional." *Berkheimer*, 881 F.3d at 1369; *BASCOM* 827 F.3d at 1350. Yet,

here, Align failed to explain how these references did anything more than purportedly disclose certain individual claim elements.

Second, Align's cited references do not individually or collectively disclose all of the elements of claim 14, let alone establish by clear and convincing evidence that they all were well understood, routine, and conventional in 2017. Appx450-452. Align and its expert likewise failed to explain how these references establish that the *specific combination* of the elements was well understood, routine, and conventional. As DM's technical expert explained, the references fall into two categories: (1) references that relate to the dental arts, but come nowhere close to disclosing quantitative assessment of aligner fit, let alone by using a specially trained deep learning device; and (2) references that have "nothing to do with teeth, dentistry, or orthodontics" at all and do not disclose a specific deep learning device trained by means of a specific learning base. Appx775; Appx815-819(¶¶62-68).

Align's *only* cited reference that even mentioned deep learning devices in the dental context was Salah, a patent publication authored by the *same DM inventors* of the '248 and '409 patents. Appx446; Appx450-452; Appx564-574. That Align needed to rely on a *DM* reference only supports that DM was the unique leader in the field, *not* that DM's claimed invention was conventional. But even Salah related to subject matter distinct from claim 14. Salah describes only a method for "monitoring the positioning, shape, and/or appearance of a patient's teeth in

comparison to a reference model"—not a method that requires a specially trained deep learning device to measure the separation between an aligner and teeth on a tooth-by-tooth basis. Appx815-816(¶63); Appx566.

Align therefore failed to meet its burden of establishing by "clear and convincing evidence" that a skilled artisan would have considered each "claim element or combination of elements" "well-understood, routine and conventional." *Berkheimer*, 881 F.3d at 1368. To the contrary, as Align's own dental expert's concession established, the claimed deep learning device and the "measurement method" it performs were not part of the "standard of care" and thus the specific combination of claim elements was not well understood, routine, and conventional.

### 2. Additional Material Evidence, Which the District Court Overlooked, Precludes Summary Judgment

In addition to the concession of Align's dental expert, there was significant material evidence that further confirms the elements of claim 14 were not well understood, routine, and conventional as of July 2017. At a minimum, this evidence, which the district court failed to address, precludes summary judgment.

**i.** DM presented evidence, including from Align, establishing that the individual elements of claim 14 and their specific combination—(1) a deep learning device that is (2) specially trained according to a particular learning base (3) to perform a particular method of aligner assessment—did not involve *only* well-understood, routine, and conventional activities.

For example, the testimony of DM's technical expert supports that it was not well-understood, routine, or conventional in July 2017 to construct a learning base for training a deep learning device to perform the aligner assessment method of claim 14, or to train the deep learning device according to that learning base. *Supra* pp. 9, 25-27. He explained that although neural networks existed in 2017, those architectures had no utility and performed no function unless they were specially trained to perform a task. Appx793-796(¶¶28-31); Appx797-803(¶¶35-37). He stated that a skilled artisan would not have known precisely how to construct the specific learning base of claim 14, and that it would have been "particularly complex" to train the claimed deep learning device. Appx809-812(¶¶53-57). He further explained that a skilled artisan would not have known whether that training would necessarily be successful without the patent. Appx807(¶¶39-40); Appx809-812(¶¶53-57). Additionally complicating the issue was the unique nature of teeth and aligners, *e.g.*, the small size, similar color, and arrangement of teeth, the transparency of an aligner on a patient's teeth, and distortions of view caused by the aligner and moisture in the mouth. Appx810-811(¶54); Appx807(¶40); Appx871-872(¶65). There was also no preexisting manual system for quantitatively measuring aligner fit to use as an analog or a starting point because practitioners at the time did not and could not make such measurements on a tooth-by-tooth basis. *Supra* pp. 25-30.

In addition, although Align released its first Virtual Care product for remote aligner assessment in 2020, the product had no AI functionality. Appx814(¶60); Appx873-874(¶¶67-68); Appx923-924. That Align itself had no remote aligner assessment tool with any AI functionality even three years *after* the relevant date, July 2017, only further confirms that training and using the specific deep learning devices of claim 14 were not well understood, routine, and conventional. Appx814(¶60).

Furthermore, the patent expressly recognizes the benefits provided by the claimed invention; specifically, that by using a deep learning device to measure the "value" corresponding to the "separation" between each tooth and the aligner (Appx52-52(claims 1, 14)), the invention "considerably simplifies the assessment of the good suitability of the aligner to the treatment, while making this assessment particularly reliable." Appx50(28:34-42); Appx869-870(¶¶47-50). Likewise, the invention measures separations with a level of precision (*e.g.*, spaces less than one mm) that dental practitioners cannot even detect with the naked eye. Appx869-870(¶48). Align does not dispute that objective, quantitative measurements of aligner fit have provided important benefits to aligner treatment. Notably, in a 2022 press release for Align's new Virtual Care AI product, Align's Senior Vice President stated that aligner fit is an "important clinical indicator[] of [] treatment progress tracking and compliance" and an Align Technology Global Faculty member stated

that the "*objective measurement* of aligner spaces" is now "the *single most important indicator* of [aligner] treatment tracking." Appx923-924 (emphasis added).

Finally, remote aligner assessment, which flows directly from the claimed invention (*supra* p. 33), was not part of the standard of care at the time. Align's CEO acknowledged with the release of its original, non-AI Virtual Care product—in May 2020, nearly three years after the relevant time period—that many dental practitioners had only just *begun* using video calls, text messages, and other forms of remote communication for aligner assessment tracking. Appx889; Appx863-865(¶¶25-27); Appx866(¶33); Appx873-874(¶68). Yet even in that statement Align did not suggest the possibility of performing quantitative measurements for aligner assessment, with or without deep learning technology.

**ii.** The district court did not address any of this evidence and instead repeated its Step One conclusion that the claim places "generic" computer parts in a new field and, at best, "lend[s] speed or efficiency" to performance of the abstract idea. Appx12-13.

As explained, the recited deep learning device was not "generic" because the claim requires a "specific set of ordered steps" for training the deep learning device according to a specific learning base to perform a method that the deep learning device could not implement before and that was unavailable to dental practitioners in 2017. *Supra* pp. 25-30; *CosmoKey*, 15 F.4th at 1099. "Nothing in the

specification or anywhere else in the record" supports the court's conclusion that the individual training and performance limitations (including the creation of a learning base with over 1000 specific images, the training of the device based on the learning base, and the particular use for which the device is trained) in claim 14 were well understood, routine or conventional. *CosmoKey*, 15 F.4th at 1098. Thus, claim 14's deep learning device is unlike the "generic computer components" in claims that this Court has held ineligible, such as a basic "interface" or a "processor" that required no changes or improvements. *See, e.g.*, *Smart Sys.*, 873 F.3d at 1374-75; *supra* pp. 37-39.

The court also repeated its Step One conclusion that "[a] long-practiced process has simply been transposed from the mind to a machine." Appx13. As discussed, however, there is no evidence that the specific method of claim 14 was a "long-practiced process." *Supra* pp. 34-36. In addition, the court again failed to address the concession of Align's dental expert that deep learning devices were not part of the "standard of care" at the time. Appx13; Appx532(¶34). This concession and all of the other evidence that DM presented, which the court overlooked, establishes that claim 14 contains an inventive concept.

## II. Claims 7 and 12 of the '409 Patent

### A. Step One

#### 1. The Claims Are Directed to a Specific Technological Solution

Claims 7 and 12 of the '409 patent are directed to a distinct deep learning device; namely, one that is specially trained to effect a method that guides a user to acquire dental images suitable for aligner assessment (*e.g.*, the method of claim 14 of the '248 patent) by evaluating and providing specific feedback about the quality and content of those images.

As of July 2017, there had been limited attempts to use then-existing technology for remote dental treatment purposes, such as having patients send images of their teeth or dental practitioners seeking to perform visual inspections over video calls. Appx527(¶22); Appx863-865(¶¶25-27); Appx836-837(¶111). But those attempts, which involved no AI functionality, failed due to the inability of medically untrained patients to acquire proper images and the inconsistent quality of video calls. Appx863-865(¶¶25-27); Appx871(¶63); Appx795-796(¶31); Appx836-837(¶111). Thus, at the time, there was no technology, much less specially trained deep learning devices, that allowed for remotely obtaining dental images suitable for aligner assessment. Appx863-865(¶¶25-27); Appx871(¶63); Appx836-837(¶111); Appx795-796(¶31); Appx532(¶34). Indeed, there is no evidence that anyone in the

orthodontics or AI fields had even considered creating or using a deep learning device for this purpose. Appx863-865(¶¶25-27); Appx795-796(¶31).

The claimed invention thus provided a specific technological advance, and it requires a specific manner in which to achieve that goal. The claims recite a specific set of steps directed to training a deep learning device to analyze an image submitted by a user (an "analysis image") by ascertaining a specific "image attribute value" (*e.g.*, related to the "quality" or "orientation" of an image (Appx68(4:14-32)) for the analysis image, which can then be compared to a particular "setpoint." Appx82-83(claims 1, 7, 12). If it is determined that the "image attribute value" does not match the setpoint value, feedback can be sent to the user to acquire a new image. *Id.* The patent further specifies that the deep learning device is trained to perform this task using deep learning methods, which include "presenting, as input for the deep learning device, historical images (images+descriptions)," so that the "device progressively learns to recognize patterns on an image." Appx74(16:44-56).

Beyond those requirements, claim 7 adds that a specific learning base must be used to train the deep learning device that effects the recited method. The learning base must comprise a specific number of images of a specific type (*e.g.*, "more than 1000 images of dental arches" with image "attribute value[s]"). Appx83(33:10-21). This specific learning base did not exist in 2017, and there was no existing learning base that could be used to train a deep learning device to perform the claimed

method. Appx807(¶39); Appx840(¶120). DM's technical expert also explained that a skilled artisan would not have known that training a deep learning device with such a learning base to perform the claimed method would have been successful without the patent's teachings, especially given the unique nature of teeth and orthodontic aligners. Appx839-840(¶¶118-121); *supra* pp. 7-9.

In addition, the specification recognizes the benefits of the claimed invention, which include providing immediate feedback to users when a submitted image does not conform to the "expected image, for example because its quality is insufficient or because it does not represent the desired teeth." Appx79(26:27-47). In this way, the images a user submits (*e.g.*, via a cellphone) "may be analyzed and checked" for quality control "in real time," avoiding the fallbacks of the prior methods for acquiring from untrained patients' images suitable for aligner assessment. Appx79(25:50-52). Further, the claimed invention provides a "global analysis" that "makes it possible to immediately and globally assess a dental situation" (*e.g.*, whether the mouth is open or closed) "without having to determine values for" each individual tooth, which "is therefore advantageously more rapid." Appx68(4:36-39); Appx79(26:27-32); Appx75(17:16-30). This is distinct from training a deep learning device to perform a "fine analysis" of a "tooth attribute" of each tooth (*i.e.*, analyzing particular zones of an image and the characteristics of teeth therein)—as in the '248 patent and claim 3 of the '409 patent. Appx68(3:19-37); Appx38(3:19-

37); Appx68(3:20-37); Appx74-75(15:26-17:15). The specification's recognition of these benefits of the claimed invention only further supports the eligibility of the claims. *See, e.g.*, *Contour*, 113 F.4th at 1379; *Visual Memory*, 867 F.3d at 1259.

Thus, claims 7 and 12 are patent eligible because they require "specific steps" for training a deep learning device so that it can operate in a "new way" to effect the specific recited method. *Finjan*, 879 F.d at 1305-06. In addition, similar to the advances provided by other claims that this Court has held patent eligible (as discussed above, *supra* pp. 30-32), the specially trained deep learning device of the claims was a specific technological improvement beyond the prior failed attempts to use then-existing technology for remote dental treatment purposes, rather than a mere "result." *CardioNet*, 955 F.3d at 1370-71; *Contour*, 113 F.4th at 1380.

**2. The District Court Committed Multiple Reversible Errors**

The district court's judgment that claims 7 and 12 of the '409 patent fail Step One suffers from the same categories of errors the court made for claim 14 of the '248 patent. *Supra* pp. 33-41.

**i.** The district court oversimplified claims 7 and 12 in holding that they are directed to "an abstract idea: the acquisition of an image, the analysis of the contents of that image, and the presentation of information regarding the quality and composition of the image to the camera operator, intended to guide them in the acquisition of a new, better image." Appx10.

The court disregarded the specific claim limitations at the core of the technological improvement discussed above. *Supra* pp. 50-53. Its characterization of the claims (Appx10-11) wholly ignores, for example, the claims' requirements that the "deep learning device trained by means of a learning base" "determin[es]" a "value for an image attribute," which is then compared to a "setpoint" to "guide the operator" if the analysis image does not "respect[] the setpoint." Appx82(32:13-30). Likewise, claim 7, which was not part of the "patent showdown" but was held ineligible under the district court's judgment (Appx22-23), adds that the device must be trained according to a specific learning base comprised of particular images (more than 1000) of a particular type (dental arches) and with particular "image attribute[s]." Appx83(33:10-21). Yet the court disregarded the similar learning base requirement of claim 14 of the '248 patent. *Supra* pp. 36-37. Thus, as a result, the court "characteriz[ed] the claims at an impermissibly high level of generality." *Contour*, 113 F.4th at 1380.

To the extent the court addressed any claim limitations, it characterized them as supplying the abstract concept of "common sense," concluding that if a poor-quality photo was sent to an orthodontist, "[c]ommon sense" would have dictated that the recipient would include a message "relating to the quality or composition of the subpar image and guidance as to the acquisition of a better one." Appx10-11. But "common sense" is not the test for patent eligibility. Step One instead requires,

for example, determining whether a claim recites a specific technological improvement to a problem that allows the device to operate in a "new way." *Finjan*, 879 F.3d at 1305-06. Indeed, common sense would dictate that it is desirable to fix any problem with existing technology, so if it were the case that a technological improvement is ineligible because it was the result of a common-sense solution, several of this Court's decisions upholding the eligibility of certain patent claims would be wrong. *See, e.g.*, *Data Engine Technologies LLC v. Google LLC*, 906 F.3d 999, 1009 (Fed. Cir. 2018) (holding patent eligible claims that allowed a user to "simply and conveniently 'flip through' several pages of [a] notebook to rapidly locate information of interest").

**ii.** Relying on a pair of passages in the specification, the district court held that the claims merely employ a generic deep learning device to perform "a common practice long performed by dental practitioners." Appx10-11(citing Appx67(1:10-15) and Appx74(16:15-45)).

To start, there is no support in the record that the deep learning device of claims 7 and 12 of the '409 patent is "generic," particularly as the Supreme Court and this Court have used that term in the patent-eligibility context. *Supra* pp. 37-39. Here, the deep learning device of the claims is not "some unspecified, generic computer." *Alice*, 573 U.S. at 225-26. Rather, the claims recite a deep learning device that has been specifically trained to be used as part of a particular method that

was unavailable in 2017. *Supra* pp. 50-53. Claim 7 further requires the deep learning device to be trained according to a specific learning base that was also unavailable at that time. *Supra* pp. 51-52.

The record confirms the recited deep learning device was not merely a "generic" computer. *Supra* pp. 37-39. For example, Align's dental expert conceded that using deep learning devices, including for "image analysis," was *not* "part of the standard of care" for aligner assessment in 2017. Appx532(¶34). Consistent with that testimony, DM's dental expert explained that prior limited attempts to use then-existing technology for remote dental treatment (*e.g.*, visual inspections over video calls or patients sending images solely of their teeth) suffered from quality and accuracy problems. *Supra* pp. 50-51; Appx863-865(¶¶ 25-27); Appx871(¶63).

Furthermore, the passages from the specification on which the district court relied do not support its conclusion. The first passage generally refers only to the use of "images" in orthodontics. Appx67(1:10-15). It makes no concessions about acquiring dental images suitable for aligner assessment. *See id.* It states only that a user "transmit[s]" images to an "orthodontist," but does not concede that it was "conventional" for medically untrained patients to capture those images themselves. *See id.* Nor does it discuss the process of providing feedback about the content and quality of the images to a user to guide the acquisition of dental images, much less in connection with the use of a specially trained deep learning device. Appx67(1:10-

15); *cf.* Appx10. As discussed above for the '248 patent (*supra* pp. 37-39), the second passage recognizes certain existing architectures that can be used as a *starting point* for the deep learning device, but does not concede that the claimed deep learning device (which can perform no function unless trained, *supra* pp. 7-9, 55-56) in claims 7 and 12 is generic. Appx74(16:15-45).

**iii.** Finally, the district court repeated its view that the claims are ineligible given their lack of a "specific" or novel algorithm. Appx10. That was error for the same reasons discussed above. *Supra* pp. 39-41.

### B. Step Two

This Court need not proceed to Step Two because claims 7 and 12 are patent eligible at Step One. Regardless, the claims are patent eligible even at Step Two.

#### 1. Claims 7 and 12 Contain an Inventive Concept, and Align Failed to Meet Its Burden to Establish Otherwise

Whether the claims' elements are considered individually or in combination, the claims provide a specific technological improvement that constitutes an inventive concept at Step Two.

As discussed, by 2017, there had been limited, failed attempts to use then-existing technology for remote dental treatment purposes, such as having patients send images solely of their teeth or dental practitioners seeking to perform visual examinations over video calls. *Supra* pp. 50-51. The claimed invention provided a specific technological advance beyond those attempts by employing a specially

trained deep learning device to effect a method that guides a user to acquire dental images suitable for aligner assessment by evaluating and providing specific feedback about the quality and content of the images. *Supra* pp. 50-53. The claims recite a "specific set of ordered steps" (*CosmoKey*, 15 F.4th at 1099) to arrive at this specific technological improvement: (1) specifically training a deep learning device "by means of a learning base," and using that device as part of a method that, (2) evaluates the quality of "an image of a dental arch of a patient" by determining the "attribute value" for each "image attribute" and comparing those values to a defined "setpoint," and (3) "sending [] an information message as a function of said comparison" "related to the quality of the image," including the "position," "setting," or "opening of the mouth." Appx82(32:13-33). Claim 7 adds that the deep learning device must be trained according to a specific learning base that comprises a specific number of images of a specific type (*e.g.*, "more than 1000 images of dental arches" with image "attribute value[s]"). Appx83(33:10-21).

As with the '248 patent (*supra* pp. 42-43), the concessions of Align's dental expert alone should end the Step Two inquiry in DM's favor with respect to the '409 patent claims. Neither the district court nor Align ever explained how the claims involve *only* well-understood, routine, and conventional elements if using deep learning devices, including for "image analysis," was *not* "part of the standard of care" for aligner assessment at the time—particularly given the same expert's

testimony that "[i]t takes a while before new methods become mainstream" in the "very conservative" "dental and orthodontic field." Appx532(¶34); Appx898(50:3-5).

For its part, Align failed to satisfy its burden of establishing by clear and convincing evidence that, despite these concessions of its dental expert, the elements of claims 7 and 12, considered both individually and in combination, were all well understood, routine, and conventional. Align did not even attempt to address the '409 patent separately from the '248 patent for Step Two, and instead made the same arguments for both. Align failed to meet its burden of proof for the same reasons discussed above. *Supra* pp. 41-49.

#### 2. Additional Material Evidence, Which the District Court Overlooked, Precludes Summary Judgment

There was additional material evidence confirming that claims 7 and 12 recite an inventive concept. At a minimum, this evidence, which the district court failed to address, precludes the grant of summary judgment.

For instance, as DM's experts explained, the specially trained deep learning device of the claims did not exist as of July 2017. Appx807(¶¶39-40); Appx810-811(¶¶54-55); Appx840-841(¶¶121-22); Appx866-867(¶35); Appx871(¶63); Appx872-874(¶¶66-68). In addition, as discussed, given the unique complications that dental images present (*e.g.*, size and shape of teeth, coloring, and other factors), it would have been "particularly complex" (Appx810-811(¶54)) to train a deep

learning device to perform its required steps in claims 7 and 12. *Supra* pp. 7-9, 51-52.

Align's own statements additionally confirm that it was not well understood, routine, or conventional to employ specially trained deep learning devices in connection with remotely obtaining images suitable for aligner assessment. For instance, Align's CEO admitted in May 2020 that it was only "[e]arly on [in the COVID-19 pandemic]"—years after July 2017—that "many doctors *began using* video calls, texts, and *patient-submitted* photos." Appx889. Likewise, although Align considers itself a "leading global medical device leader," its own Virtual Care product that uses remotely obtained images for aligner assessment did not launch until May 2020 and did not include any AI functionality even at that time. Appx887; Appx889; Appx923-924.

The district court addressed none of this evidence, and instead offered only a cursory analysis that concluded the "various limitations," including "when considered in an ordered combination," did not confer an inventive concept. Appx14. The court merely stated that the claims involve implementing an "abstract idea by means of generic computer components" and placing those components in the "field of dental aligners." Appx14. As explained, however, this conclusion ignores the language of the claims, which do not require just *any* deep learning

device, but instead one that has been specially trained according to a specific learning base (as recited in claim 7) to effect the claimed method. *Supra* pp. 53-55.

## CONCLUSION

This Court should reverse the district court's judgment and hold that the appealed claims are patent eligible. Alternatively, the Court should remand for the factfinder to consider the underlying questions of fact concerning eligibility.

Dated: November 27, 2024

Respectfully submitted,

*/s/ Jaysen S. Chung*

Jaysen S. Chung, *Principal Attorney*
GIBSON, DUNN & CRUTCHER LLP
One Embarcadero Center, Suite 2600
San Francisco, CA 94111
(415) 393-8271

Josh A. Krevitt
Charlotte Jacobsen
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166
(212) 351-3961

Albert Suarez IV
Julia G. Tabat
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Avenue, Suite 2100
Dallas, TX 75201
(214) 698-3465

*Counsel for Appellant Dental Monitoring SAS*

# ADDENDUM

## Table of Contents

Page

Order Granting in Part Align's Motion for Summary Judgment (Dkt. 151 May 16, 2024) .......... Appx1

Joint Stipulation to Entry of Final Judgment (Dkt. 164 Aug. 8, 2024) .......... Appx16

U.S. Patent No. 11,049,248 .......... Appx24

U.S. Patent No. 10,755,409 .......... Appx54

United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

DENTAL MONITORING SAS,

Plaintiff,

v.

ALIGN TECHNOLOGY, INC.,

Defendant.

No. C 22-07335 WHA

**ORDER RE SUMMARY JUDGMENT**

**INTRODUCTION**

Dueling summary judgment motions contest the validity of two of plaintiff's patents and their infringement. The asserted claims of both patents recite an abstract idea and include no further inventive concept and are therefore invalid. Defendants' motion is **GRANTED IN PART**; all else is **DENIED AS MOOT**.

**STATEMENT**

Dental aligners, like braces, are used to reposition a patient's teeth. After a dental practitioner scans a patient's starting dentition and determines a desired final dentition, third parties like defendant Align Technology, Inc. design and manufacture a series of aligners that, when worn in sequence, exert pressure on the patient's teeth and thereby gradually move them from the starting to final dentition. Typically, a dental practitioner must visually assess a patient's aligner at regular intervals to evaluate progress and determine if and when a patient should progress to the next aligner in the sequence, revert to a previous aligner, and so forth.

Defendant Align Technology, Inc., creator of the "Invisalign" group of aligner products, is described by plaintiff as a "dominant provider[ ] of aligner and dental treatments" (Dkt. No. 101 at 1). Align, plaintiff says, was "caught flat-footed" when COVID-19 upended the "outdated approach of in-person visits" then common among dental practitioners employing Align's products (*ibid.*). In contrast, plaintiff-patentee Dental Monitoring SAS, founded in 2014, describes itself as a "pioneer[ ] and the technological leader in remote dentistry and orthodontics," with some 200 pending and issued patents in the space (*ibid.*). Plaintiff now alleges that in defendant's scramble to re-gain its footing and adopt COVID compatible methods for remote aligner treatment, it infringed upon plaintiff's patents.

The parties have identified two claims for summary judgment argument. First is claim 12 (and claim 1, on which it depends) of U.S. Patent No. 10,755,409, titled "Method For Analyzing an Image of a Dental Arch," which discloses a method for acquiring an image of the dental arch of a patient. The invention recited in the '409 patent claims a method for guiding a patient to capture images of their dental arches and aligner fit in order to facilitate remote treatment. Claims 1 and 12 are reproduced here:

> **1.** A method for acquiring an image of a dental arch of a patient, said method comprising the following steps:
>
> a) activation of an image acquisition apparatus so as to acquire an image, called "analysis image," of said arch;
>
> b) analysis of the analysis image by means of a deep learning device trained by means of a learning base;
>
> c) determination, for the analysis image, as a function of the result of the analysis in the preceding step, of a value of an image attribute;
>
> d) comparison of said image attribute value with a setpoint;
>
> e) sending of an information message as a function of said comparison, the information message being related to the quality of the image acquired or to the position of the acquisition apparatus in relation to said arch or to the setting of the acquisition apparatus or to the opening of the mouth or to the wearing of a dental appliance, or to a combination thereof,
>
> to check whether the analysis image respects the setpoint and, if it does not respect the setpoint, to guide the operator in order for him or her to acquire a new analysis image.

> **12.** The method as claimed in claim 1, in which the information message is sent by the acquisition apparatus.

The second claim at issue is claim 14 (and claim 1, on which it depends) of U.S. Patent No. 11,049,248, titled "Method for Analyzing an Image of a Dental Arch," which discloses a method for assessing the shape and fit of an orthodontic aligner by way of a "deep learning device, trained by means of a learning base." The claim at issue provides as follows:

> **1.** A method for assessing the shape of an orthodontic aligner, said method comprising the following steps:
>
> **a)** more than 1 week after the start of the treatment with the aligner, acquisition of at least one image at least partially representing the aligner in a service position in which it is worn by a patient, called "analysis image", the analysis image being a photograph, or an image extracted from a film;
>
> **b)** analysis of the analysis image by means of a deep learning device, trained by means of a learning base, so as to determine a value
>
> for at least one tooth attribute of an "analysis tooth zone" representing, at least partially, a tooth on said analysis image, the tooth attribute relating to a separation between the tooth represented by the analysis tooth zone, and the aligner represented on the analysis image,
>
> in the step a), a cellphone used to acquire the analysis image.
>
> **14.** The method of claim **1**, in which the step b) comprises the following steps:
>
> **1)** creation of a learning base comprising more than 1000 images of dental arches, or "historical images", each historical image representing an aligner worn by a "historical" patient and comprising one or more zones each representing a tooth, or "historical tooth zones", to each of which, for at least one tooth attribute relating to a separation between the tooth represented by the historical tooth zone considered, and the aligner represented, a tooth attribute value is assigned;
>
> **2)** training of at least one deep learning device, by means of the learning base;
>
> **3)** Submission of the analysis image to the deep learning device for it to determine at least one probability relating to:
>
> the presence, in a location of said analysis image, of an

analysis tooth zone; and

the attribute value of the tooth represented on said analysis tooth zone;

**4)** determination, as a function of said probability, of an amplitude of said separation.

The parties have filed dueling summary judgment motions concerning the above claims. Plaintiff argues that defendant has infringed upon the claims as a matter of law. Defendant, meanwhile, argues that the claims are invalid under 35 U.S.C. Section 101, that they are invalid under 35 U.S.C. Section 112, and that, if they are valid, defendant's products do not infringe. This order follows full briefing and oral argument.

**ANALYSIS**

A "court shall grant summary judgment if the movant shows that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Summary judgment is appropriate only if, taking the evidence and all reasonable inferences drawn therefrom in the light most favorable to the non-moving party, there are no genuine issues of material fact." *Furnace v. Sullivan*, 705 F.3d 1021, 1026 (9th Cir. 2013) (internal quotation marks omitted). Material facts are those that may affect the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–49 (1986). A genuine dispute about a material fact exists if there is enough evidence for a reasonable jury to find for the non-moving party. *Ibid*. "In judging evidence at the summary judgment stage, the court does not make credibility determinations or weigh conflicting evidence. Rather, it draws all inferences in the light most favorable to the nonmoving party." *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007).

Infringement requires a valid patent. This order therefore begins, and, because they have met their burden, ends, with defendant's Section 101 argument.

**1. INVALIDITY.**

Section 101 of the Patent Act defines patent eligible subject matter to include "any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof." 35 U.S.C. § 101. However, a century-old exception excludes laws of

nature, natural phenomena, and abstract ideas – "the basic tools of scientific and technological work" – from the otherwise unfettered reach of Section 101. *Alice Corp. Pty. v. CLS Bank Int'l*, 573 U.S. 208, 216 (2014). In creating the exception, the Supreme Court reasoned that "monopolization of those tools through the grant of a patent might tend to impede innovation more than it would tend to promote it." *Mayo Collaborative Servs. v. Prometheus Lab'ys, Inc.*, 566 U.S. 66, 71 (2012).

The Supreme Court's two-step *Alice* test serves to sift ineligible laws, phenomena, and ideas from patent-eligible subject matter. "First, we determine whether the claims are directed to a patent-ineligible concept, such as an abstract idea. If so, we consider the elements of each claim both individually and as an ordered combination to determine whether the additional elements transform the nature of the claim into a patent-eligible application." *Customedia Techs., LLC v. Dish Network Corp.*, 951 F.3d 1359, 1362 (Fed. Cir. 2020) (citing *Mayo*, 566 U.S. at 78-79) (cleaned up). If a claim is captured by step one and flunks step two, it is ineligible under Section 101. That is the case here.

**A. *ALICE STEP ONE.***

At step one, the district court must consider the claims "in their entirety to ascertain whether their character as a whole is directed to excluded subject matter." *Internet Pats. Corp. v. Active Network, Inc.*, 790 F.3d 1343, 1346 (Fed. Cir. 2015). However, "[a]t some level, all inventions . . . embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas. Thus, an invention is not rendered ineligible for patent simply because it involves an abstract concept." *Alice*, 573 U.S. at 217. The district court must therefore "articulate what the claims are directed to with enough specificity to ensure the step one inquiry is meaningful." *Thales Visionix Inc. v. United States*, 850 F.3d 1343, 1347 (Fed. Cir. 2017). Where, as here, a particular technological environment is at issue, the step one inquiry often turns on whether the claims "focus on a specific means or method that improves the relevant technology" or are instead "directed to a result that itself is the abstract idea and merely invoke generic processes and machinery." *McRO, Inc. v. Bandai Namco Games Am. Inc.,* 837 F.3d 1299, 1314 (Fed. Cir. 2016). The claims at issue here are of the latter type.

***(i) Claim 14 of the '248 Patent.***

This order begins with claim 14 (and claim 1, on which it depends) of the '248 patent. Stripped of excess verbiage and techno-jargon, claim 1 is of "a familiar class of claims directed to a patent-ineligible concept," namely "collecting information, analyzing it, and displaying certain results of the collection and analysis." *Electric Power Group*, 830 F.3d 1350, 1353 (Fed. Cir. 2016). As the Federal Circuit explained:

> Information as such is an intangible. Accordingly, we have treated collecting information, including when limited to particular content (which does not change its character as information), as within the realm of abstract ideas. In a similar vein, we have treated analyzing information by steps people go through in their minds, or by mathematical algorithms, without more, as essentially mental processes within the abstract-idea category. And we have recognized that merely presenting the results of abstract processes of collecting and analyzing information, without more (such as identifying a particular tool for presentation), is abstract as an ancillary part of such collection and analysis.

*Electric Power Group*, 830 F.3d 1350, 1353-54 (citations omitted) (emphasis added). Here, too, the purported advance lies in a "process of gathering and analyzing information of a specified content," here dental aligner shape and fitment, "and displaying the results, and not any particular assuredly inventive technology for performing those functions." *Id*. at 1354. Moreover, the patent's specification concedes that this analysis was conventionally performed by an orthodontist, via in-person visual inspection or through review of patient-provided images ('248 patent cols. 1:11-15; 27:55-59). Claims directed to "analyzing information by steps people go through in their minds, or by mathematical algorithms, without more," are directed to "essentially mental processes within the abstract-idea category." *Electric Power Group*, 830 F.3d at 1354; *see also Synopsys, Inc. v. Mentor Graphics Corp.*, 839 F.3d 1138 (Fed. Cir. 2016). Claim 14 details the method of training by which a deep learning device is applied to the task above. True, the claim describes the training process with a great deal of particularity, but the focus of the claim itself remains the abstract idea, albeit accompanied by a detailed set of instructions regarding its implementation in a particular technological context and field of use.

Plaintiff's arguments to the contrary fail.

*First*, plaintiff asserts that claim 14 is directed to "a specific technological solution: a first-of-its-kind, remote aligner assessment technology powered by a particular trained deep learning device" (Dkt. No. 112 at 3). However, the patent specification concedes that neural networks, the patent's preferred species of a deep learning device, are "set[s] of algorithms well known to a person skilled in the art," and simply directs practitioners to pick from any one of over a dozen off-the-shelf neural networks "specializing in the classification of images" or "in the location and detection of objects in an image" ('248 patent col. 16:5-36). Neither claim nor specification details a novel (or any) algorithm or otherwise discloses an improvement to extant deep learning devices. It is not enough to be the first to apply an abstract idea to a specific technological environment, such as a deep learning device. *Electric Power Group*, 830 F.3d at 1354 ("Most obviously, limiting the claims to [a] particular technological environment . . . is, without more, insufficient to transform them into patent-eligible applications of the abstract idea at their core."). Nor is it enough to be the first to introduce generic neural networks or other deep learning devices to a particular field, such as dental aligners, without more. *Ibid*.

Relatedly, plaintiff notes that the claim "provides numerous concrete benefits," including greater speed, ease, and the ability to "make a *quantitative* measurement of the separation between an aligner and teeth," as opposed to the *"qualitative*[ ] assess[ment]" performed by dental practitioners' visual or manual inspections (Dkt. No. 112 at 2). But "[c]laiming the improved speed or efficiency inherent with applying the abstract idea on a computer is insufficient to render the claims patent eligible." *Enco Systems Inc. v. DaVincia*, 845 Fed.Appx. 953, 955 (2021) (cleaned up); *see also Recentive Analytics, Inc. v. Fox Corp.*, No. CV 22-1545-GBW, 2023 WL 6122495 (D. Del. Sept. 19, 2023) (Judge Gregory Williams) (rejecting patentee's attempt to distinguish "qualitative" human processing from "quantitative" machine learning analysis). The assertion that a computer can perceive more granular aligner separations than the naked eye is likewise an improvement inherent to applying the abstract idea on a machine learning device. This is evidenced by the claim and specification's presumption that just about *any* off-the-shelf device will suffice.

But plaintiff argues more: this is a "*specific* deep learning device trained by the *specific* learning base of claim 14," the first trained to perform "aligner assessment . . . for aligner treatment" (Dkt. No. 112 at 3) (emphasis added). As plaintiff's counsel stated during oral argument, the generic neural networks listed in the specification "are architectures for products that can be trained, but they don't do anything. They're not useful until they have been trained" (Dkt. No. 143 at 33). The argument, then, is that the training of the generic device is transformative: it *improves* the deep learning device by allowing it to operate in a particular field of use, dental aligner assessment.

While a method of training and application may conceivably constitute a "specific asserted improvement in [deep learning device] capabilities," that is not the case here. *Finjan, Inc. v. Blue Coat Sys., Inc.*, 879 F.3d 1299, 1303 (Fed. Cir. 2018) (internal quotation marks omitted). Here, claim 14's method of training merely describes how a generic deep learning device is applied (or limited) to a particular field of use. Neural networks specialized in the classification of images, as well as the location and detection of objects in an image, were well known in the prior art ('248 patent col. 16:5-30). These networks, by their very nature, must be trained before they are put to a use. (Dkt. No. 143 at 33). The claim limitations identified by plaintiff as "improved computer techniques" – that the images in the learning base be "images of dental arches," that they represent "an aligner work by a 'historical patient" and "compris[e] one or more zones each representing a tooth," that a "tooth attribute value is assigned," and so forth – are not *improvements* to the training or operation of deep learning devices, they are field-of-use limitations describing the configuration of a deep learning device to perform the abstract idea at issue in the field at issue.

*Alice* is instructive. There, a claim drawn to the abstract idea of intermediated settlement required the following steps:

> (1) "creating" shadow records for each counterparty to a transaction; (2) "obtaining" start-of-day balances based on the parties' real-world accounts at exchange institutions; (3) "adjusting" the shadow records as transactions are entered, allowing only those transactions for which the parties have sufficient resources; and (4) issuing irrevocable end-of-day instructions to the exchange institutions to carry out the

permitted transactions.

*Alice*, 573 U.S. at 224. True, the claims at issue in *Alice* "simply instruct[ed] the practitioner to implement the abstract idea of intermediated settlement on a generic computer." *Ibid*. But implicit in the command to "do it on the computer" is a great deal of field-of-use specific configuration: a computer yanked off the shelf will not create shadow records, obtain start-of-day balances from accounts, and so on. That is true for most, if not all, "do it on a computer" claims held invalid under Section 101. The work necessary to turn a generic computer to the field of use at issue does not *improve* the computer, just as the limitation of an abstract idea to the same field of use does not render the idea non-abstract.

Also true, claim 14 provides a great deal of particularity when disclosing *how* one may go about applying the abstract idea (collecting, analyzing, and displaying information) in a specific technological environment (a generic deep learning devices) adapted to a particular field of use (dental aligners). But these field of use particulars are not improvements. "Do it on a computer" is "do it on a computer," even when a draftsman takes the time to describe the doing in great detail. *Alice*, 573 U.S. 208 at 224 ("This Court has long warned against interpreting § 101 in ways that make patent eligibility depend simply on the draftsman's art.") (cleaned up). To be clear, this order does not hold that the process of re-tooling an extant device to a field of use can *never* constitute patentable subject matter, only that in this instance, the claims asserted do little more than describe the process of "doing it on a computer."

*Second*, plaintiff argues that claim 14 is directed to a "specific, new treatment method of aligner assessment," citing to *Vanda Pharms. Inc. v. W.-Ward Pharms. Int'l Ltd*. 887 F.3d 1117 (Fed. Cir. 2018). Not so. In *Vanda,* the claim at issue recited a method for treating a schizophrenic patient with iloperidone, which required, *inter alia*, "(1) determining the patient's CYP2D6 metabolizer genotype by (a) obtaining a biological sample and (b) performing a genotyping assay; and (2) administering specific dose ranges of iloperidone depending on the patient's CYP2D6 genotype." *Id.* at 1134. *Vanda* held that this constituted a "novel method of treating a disease" that required the administration of specific dosages of iloperidone depending on the results of a genotyping assay. *Ibid*. "The specification further

United States District Court
Northern District of California

highlight[ed] the significance of the specific dosages by explaining how certain ranges of administered iloperidone correlate with the risk of QTc prolongation," and how the method patented resulted in treatment "safer for patients because it reduce[d] the risk of QTc prolongation." *Id.* at 1135.

Claim 14 gets only halfway there: it discloses a method of evaluating aligner fit, but no more. The claim does not disclose any novel, specific course of treatment to be carried out on the basis of that information. Nor does the specification. What if the aligner separation is 0.5mm? 0.7mm? When should a patient revert to a previous aligner, or progress to the next, and so forth? The claim in *Vanda* disclosed novel answers to these questions. The claim at issue here does not get beyond collect, analyze, and display.

***(ii) Claim 12 of the '409 Patent.***

Claim 12 of the '409 patent, dependent on claim 1, does not fare any better. Claim 1 is directed to an abstract idea: the acquisition of an image, the analysis of the contents of that image, and the presentation of information regarding the quality and composition of the image to the camera operator, intended to guide them in the acquisition of a new, better image. Claim 12 adds only that the information message be sent by the same device taking the picture (*e.g.*, a cellphone). Neither claim nor specification provides any specific algorithm or other improvement to the deep learning device to be used, beyond that it may be selected from any of a dozen or more existing options, and that it must be "trained by means of a learning base" ('409 patent cols. 16:15-45; 32:17-22).

Again, this claim merely recites a common practice long performed by dental practitioners. The specification concedes that orthodontists "conventionally performed" assessments of aligner treatment via images transmitted to them by patients ('409 patent col. 1:10-15; Dkt. No. 112 at 14). Defendant further concedes that, because "the quality and accuracy of photos taken by medically untrained patients were not consistent or guaranteed," a dental practitioner would "review [the photos], and "[i]f a patient sent poor-quality or incorrect photos," the treatment provider would "ask[ ] the patient to send new ones" (Dkt. No. 112 at 14). Common sense dictates that the request for a new photo contained an "information

message" relating to the quality or composition of the subpar image, and guidance as to the acquisition of a better one. Moving beyond the field of dental aligners, it is beyond cavil that "capture, analysis, critique, recapture" is a dialogue as old as photography itself.

Again, attempts to reframe the focus of the claim fall short. For example, plaintiff argues that the claimed method allows "even medically untrained patients to remotely acquire aligner and dental images that are suitable for clinical assessment" (Dkt. No. 112 at 16). But neither remote acquisition nor suitability for clinical assessment are limitations connected to the language of the claim. Moreover, medically untrained patients have long captured and relayed images of their aligners to practitioners for assessment ('409 patent col. 1:10-15). Plaintiff also notes that absent a deep learning device, the acquisition and analysis of patient images was a slower and less reliable process, but again, "[c]laiming the improved speed or efficiency inherent with applying the abstract idea on a computer is insufficient to render the claims patent eligible." *Enco Systems*, 845 Fed.Appx. at 955 (cleaned up).

Finally, plaintiff asserts that the claim cannot involve "only generic computer elements" because, as conceded by defendant's expert, "using a deep learning device to carry out image analysis was not part of the standard of care in aligner treatment in 2017" (Dkt. No. 112 at 16). This argument again presumes that the limitation of a generic computer component to a new field of use constitutes an *improvement* of the computer. As discussed above, that is not the case.

### ***B. ALICE STEP TWO.***

At step two we ask what more, if anything, a claim has to offer. The claim elements, individually or as an ordered combination, must contain an "inventive concept" or "additional features" sufficient to ensure that the claim, in practice, amounts to "*significantly* more" than a patent upon the ineligible abstract idea. *Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 715 (Fed. Cir. 2014) (emphasis added); *Alice*, 573 U.S. at 221. The object of the inquiry is the claim language: a district court may not rely on "technological details set forth in the patent's specification and not set forth in the claims to find an inventive concept." *Intell. Ventures I LLC v. Symantec Corp.*, 838 F.3d 1307, 1322 (Fed. Cir. 2016); *Two-Way Media Ltd. v.*

*Comcast Cable Commc'ns, LLC*, 874 F.3d 1329, 1338 (Fed. Cir. 2017) ("To save a patent at step two, an inventive concept must be evident in the claims."). The Federal Circuit has explained that "an inventive concept can be found in the non-conventional and non-generic arrangement of known, conventional pieces." *BASCOM Global Internet Servs. v. AT & T Mob.*, 827 F.3d 1341, 1350 (Fed. Cir. 2016). But, "the components must involve more than performance of 'well-understood, routine, conventional activit[ies]' previously known to the industry." *In re TLI Commc'ns LLC Pat. Litig.*, 823 F.3d 607, 613 (Fed. Cir. 2016) (quoting *Alice*, 573 U.S. at 225).

***(i) Claim 14 of the '248 Patent.***

Taken alone, the elements of claim 1 invoke no more than the performance of an abstract idea in a particular field of use (dental aligner assessment) via generic and functional hardware (a deep learning device). A "deep learning device" is "preferably a neural network," which, in turn, "is a set of algorithms well known to a person skilled in the art," including the dozen or so listed by the patent. The "training" of that device is not described with any specificity – the limitation merely commands one to "train[ ] at least one deep learning device, by means of the learning base" containing those 1000 plus images ('248 patent col. 34:32-33). The use of a "learning base," including one "comprising more than 1000 images," was well known at the time (Dkt. No. 104-4 at ¶111 – 118). The device's method of analysis is equally opaque: handed an "analysis image," the device simply "*determine[s]* at least one probability relating to: the presence in a location of said analysis image, of an analysis tooth zone; and the attribute value of the tooth represented on said analysis tooth zone," after which the deep learning device again "*determine[s]*, as a function of said probability, [ ] an amplitude of said separation." The remaining particulars do not move the needle – they describe the process of aligner fit evaluation, long practiced by dental practitioners, adapted to a deep learning device.

Plaintiff's arguments to the contrary cut no figure. *First*, plaintiff argues that the individual elements of the claim were not well understood, routine, or conventional. Plaintiff's arguments here boil down to the fact that, while the neural network architectures themselves were well known, there was, in July 2017, no "deep learning device trained specifically by [the

specific learning base in the claim] to perform the particular steps of the claimed aligner method" (Dkt. No. 112 at 10). Elsewhere, plaintiff contends that defendant's cited references are "deficient" because they do not "disclose a deep learning device," or the use of "a specific deep learning device trained by means of a specific learning base" (*id*. at 13). This is the "first to the field" argument in new guise. As explained at length above, generic computer parts and functions do not become patentable every time they enter a new field. Nor is applying a generic computer to a new field an inventive concept. Moreover, the method of training by which claim 14 tools a generic deep learning device for operation in the relevant field was well known and understood (Dkt. No. 104-4 at ¶ 111-118).

*Second*, plaintiff argues that "the record is replete with evidence that the specific combination of claim elements provided numerous concrete benefits that simply were not available in July 2017" (Dkt. No. 112 at 11). Even if true, "simply appending generic computer functionality to lend speed or efficiency to the performance of an otherwise abstract concept does not meaningfully limit claim scope for purposes of patent eligibility." *CLS Bank, Int'l v. Alice Corp*., 717 F.3d 1269, 1286 (Fed.Cir.2013) (en banc) *aff'd*, 573 U.S. 208 (2014); *see also Intell. Ventures*, 792 F.3d at 1367; *Bancorp Servs., LLC v., Sun Life Assurance Co. of Can.*, 687 F.3d 1266, 1278 (Fed. Cir. 2012).

*Finally,* plaintiff argues that *Exergen Corp. v. Kaz USA, Inc*. compels a finding of patent eligibility because the combination of the claim's elements was not well understood, routine, and conventional. 725 F. App'x 959 (Fed. Cir. 2018). Not so. In *Exergen*, the court reasoned that "[1] the inventor determined for the first time the coefficient representing the relationship between temporal-arterial temperature and core body temperature and [2] incorporated that discovery into an unconventional method of temperature measurement. As a result, the method is patent eligible[.]" *Id*. at 966. Nothing in the claim at issue discloses a discovery related to aligner fit assessment. A long-practiced process has simply been transposed from the mind to a machine.

***(ii) Claim 12 of the '409 Patent.***

Claim 12 also lacks an inventive concept, whether its limitations are considered in isolation or as an ordered combination. An "image acquisition apparatus" is just about anything with a camera attached to it, including a cellphone. An "analysis image" is "an image . . . of a dental arch of a patient." That image is "analyz[ed]" by means of a "deep learning device trained by means of a learning base." A "deep learning device" includes, but is not limited to, more than a dozen existing neural networks. The "learning base" is the same as above. The "analysis," meanwhile, produces a "determination, for the analysis image, as a function of the results of the analysis in the preceding step, of a value for an image attribute." The image attribute may, but need not, relate to "the orientation of the acquisition apparatus upon acquisition of the image," "the quality of the image," "the dental situation of the patient," or "the presence or absence of a . . . orthodontic, appliance, or to the state of the opening of the mouth." It is, fairly stated, just an attribute related to the image. An "information message" is again fairly summed up as a message containing any information related to the quality or content of the image. Finally, the claim discloses that, if necessary, the message should "guide the operator . . . to acquire a new analysis image." That "guidance" is undefined, but presumably includes anything relating to the content or quality of the analysis image. Finally, the dependent claim adds that the cellphone or other "acquisition apparatus" that took the "analysis image" may be used to send the "information message" (*i.e.*, the cellphone you took the picture with displays a message telling you how to take a better one). None of the above constitutes an inventive concept. Nor do the various limitations that serve to limit the claim to the field of dental aligners. Likewise, when considered in an ordered combination, these claim limitations do not amount to significantly more than the execution of an abstract idea by means of generic computer components.

Plaintiff's contrary arguments re-tread unproductive ground. It is not enough that a deep learning device had not previously been turned to the field of dental aligners. And as before, the training of the device for use in that field does not constitute a sufficient inventive concept.

**CONCLUSION**

Claim 14 and underlying independent claim 1 of U.S. Patent No. 11,049,248 B2 recite an abstract idea without an inventive concept and thus, under *Alice*, rate as invalid under 35 U.S.C. Section 101. The came is true for claim 12 and independent claim 1 of U.S. Patent No. 10,755,409 B2. To the extent above, defendant's motion is **GRANTED**.

Because the claims at issue are invalid, this order need not reach the question of written description or infringement. The remainder of the parties' motions are **DENIED AS MOOT.**

As to next steps, the Court has reviewed defendant's pending motion to stay, and understands that plaintiff intends to file an opposition, but has not yet done so (Dkt. No. 150). The Court will come to the issue when it has been fully briefed.

**IT IS SO ORDERED.**

Dated: May 16, 2024

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

JOSH A. KREVITT (SBN 208552)
jkrevitt@gibsondunn.com
ANDREW ROBB (SBN 291438)
arobb@gibsondunn.com
**GIBSON, DUNN & CRUTCHER LLP**
310 University Avenue
Palo Alto, CA 94301
Telephone: 650.849.5300
Facsimile: 650.849.5333

CHARLOTTE JACOBSEN (*pro hac vice*)
cjacobsen@gibsondunn.com
**GIBSON, DUNN & CRUTCHER LLP**
200 Park Avenue
New York, NY 10166-0193
Telephone: 212.351.3961
Facsimile: 212.716.0781

JAYSEN S. CHUNG (SBN 280708)
jschung@gibsondunn.com
**GIBSON, DUNN & CRUTCHER LLP**
One Embarcadero Center, Suite 2600
San Francisco, CA 94111-3715
Telephone: 415.393.8200
Facsimile: 415.393.8306

*Attorneys for Plaintiff*
DENTAL MONITORING SAS

Renée E. Rothauge (SBA 271239)
RRothauge@perkinscoie.com
**PERKINS COIE LLP**
505 Howard Street, Suite 1000
San Francisco, CA 94105
T: (415) 344-7000 / F: (415) 344-7050

Hari Santhanam (*pro hac vice*)
HSanthanam@perkinscoie.com
**PERKINS COIE LLP**
110 North Wacker Drive, Suite 3400
Chicago, IL 60606
T: (312) 324-8400 / F: (312) 324-9400

John Gray (*pro hac vice*)
JHGray@perkinscoie.com
**PERKINS COIE LLP**
2525 E. Camelback Road, Suite 500
Phoenix, AZ 85016-4227
T: (602) 351-8000 / F: (602) 648-7000

Sarah Fowler (SBA 264838)
SFowler@perkinscoie.com
**PERKINS COIE LLP**
3150 Porter Drive
Palo Alto, CA 94304
T: (650) 838-4300 / F: (650) 838-4350

*Attorneys for Defendant*
ALIGN TECHNOLOGY, INC.

**UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

Dental Monitoring SAS,
Plaintiff/Counterclaim Defendant,

v.

Align Technology, Inc.,
Defendant/Counterclaim Plaintiff.

CASE NO. 3:22-cv-07335-WHA

**JOINT STIPULATION TO ENTRY OF FINAL JUDGMENT CONCERNING CLAIMS 1 AND 14 OF U.S. PATENT NO. 11,049,248 AND CLAIMS 1, 7, AND 12 OF U.S. PATENT NO. 10,755,409**

Pursuant to Federal Rule of Civil Procedure 58, Plaintiff Dental Monitoring SAS ("Dental Monitoring") and Defendant Align Technology, Inc. ("Align") (collectively, "the parties"), by and through their respective undersigned counsel of record, and subject to the approval of the Court, hereby stipulate and agree to entry of final judgment as follows:

WHEREAS, Dental Monitoring has asserted that Align infringes claims 1, 2, 4, 7, 13, and 14 of U.S. Patent No. 11,049,248 ("'248 patent") and claims 1, 7, 12, 14, and 15 of U.S. Patent Nos. 10,755,409 ("'409 patent");

WHEREAS, pursuant to the Court's Patent Showdown Scheduling Order (Dkt. 56), Dental Monitoring selected claim 14 of the '248 patent (which depends from independent claim 1) as its "Showdown Claim" and Align selected claim 12 of the '409 patent (which depends from independent claim 1) as its "Showdown Claim," and the parties conducted fact and expert discovery and briefed summary judgment motions on certain issues relating to those two Showdown Claims;

WHEREAS, after hearing argument on the parties' summary judgment motions (Dkt. 130), the Court entered a Showdown Order holding that both Showdown Claims and their corresponding independent claims are not patent-eligible under 35 U.S.C. § 101 (Dkt. 151 at 15);

WHEREAS, after the Court's Showdown Order, only dependent claims 2, 4, 7, and 13 of the '248 patent and dependent claims 7, 14, and 15 of the '409 patent remain unadjudicated and still asserted in this case;

WHEREAS, although Dental Monitoring respectfully disagrees with the Court's Showdown Order, and further respectfully disagrees that the Showdown Claims are representative of the remaining unadjudicated and still-asserted claims of the '248 and '409 patents, so that the Court may enter an appealable final judgment, (1) Dental Monitoring agrees to voluntarily withdraw its allegations of infringement by Align of claims 2, 4, 7, and 13 of the '248 patent and claims 14 and 15 of the '409 patent, and dismisses those particular claims of the two patents from the above-captioned matter without prejudice, except that Dental Monitoring may reassert those claims against Align only in this case in the event that the U.S. Court of Appeals for the Federal Circuit reverses or vacates the judgment entered by this Court and remands for further proceedings; and (2) the parties agree that claim 7 of the '409 patent is not patent-eligible under the Court's reasoning in the Showdown Order

with respect to claims 1 and 12 of the ’409 patent and the “creation” and “training” limitations of claim 14 of the ’248 patent (*see, e.g.*, Dkt. 151 at 8–9, 12–13);

WHEREAS, for the reasons stated in the Court’s Showdown Order and in the preceding paragraph of this joint stipulation, Align seeks entry of final judgment of patent ineligibility as to claims 1 and 14 of the ’248 patent and claims 1, 7, and 12 of the ’409 patent, pursuant to its Fifth and Sixth Defenses and Fourth and Fifth Counterclaims for invalidity of the ’248 and ’409 patents (Dkt. 54 at 11-13, 53-54), to bring this case to a close and to that end agrees to dismiss each of its other counterclaims without prejudice;

NOW, THEREFORE, the parties hereby jointly stipulate and agree, subject to the approval of the Court, the following:

1. Under the Court’s Showdown Order, and for the reasons stated in this joint stipulation, Align is entitled to judgment of patent ineligibility as to claims 1 and 14 of the ’248 patent and claims 1, 7, and 12 of the ’409 patent, pursuant to Align’s Fifth and Sixth Defenses and Fourth and Fifth Counterclaims for invalidity of the ’248 and ’409 patents;
2. For the reasons stated in this joint stipulation, Dental Monitoring voluntarily withdraws its allegations of infringement by Align of claims 2, 4, 7, and 13 of the ’248 patent and claims 14 and 15 of the ’409 patent, and dismisses those particular claims of the two patents from the above-captioned matter without prejudice, except that Dental Monitoring may reassert those claims against Align only in this case in the event that the U.S. Court of Appeals for the Federal Circuit reverses or vacates the judgment entered by this Court and remands for further proceedings;
3. Align’s other counterclaims against Dental Monitoring shall be dismissed without prejudice; and
4. Each party shall bear its own costs of suit in this matter.

WHEREFORE, the parties respectfully request that the Court enter Final Judgment on the terms in the attached Proposed Order.

**IT IS SO STIPULATED.**

Dated: July 26, 2024

Respectfully submitted,

/s/ Charlotte Jacobsen
JOSH A. KREVITT (SBN 208552)
jkrevitt@gibsondunn.com
ANDREW ROBB (SBN 291438)
arobb@gibsondunn.com
**GIBSON, DUNN & CRUTCHER LLP**
310 University Avenue
Palo Alto, CA 94301
Telephone: 650.849.5300
Facsimile: 650.849.5333

CHARLOTTE JACOBSEN (*pro hac vice*)
cjacobsen@gibsondunn.com
**GIBSON, DUNN & CRUTCHER LLP**
200 Park Avenue
New York, NY 10166-0193
Telephone: 212.351.3961
Facsimile: 212.716.0781

JAYSEN S. CHUNG (SBN 280708)
jschung@gibsondunn.com
WILLIAM FELDMAN (SBN 339008)
wfeldman@gibsondunn.com
**GIBSON, DUNN & CRUTCHER LLP**
One Embarcadero Center, Suite 2600
San Francisco, CA 94111-3715
Telephone: 415.393.8200
Facsimile: 415.393.8306

Y. AUDREY YANG (*pro hac vice*)
ayang@gibsondunn.com
**GIBSON, DUNN & CRUTCHER LLP**
2001 Ross Avenue
Dallas, TX 75201 Telephone: 214.698.3215
Facsimile: 214.571.2915

NOAHLANI LITWINSELLA (SBN 349942)
nlitwinsella@gibsondunn.com
**GIBSON, DUNN & CRUTCHER LLP**
1801 California St., Suite 4200
Denver, CO 80202 Telephone: 303.298.5715
Facsimile: 303.313.2885

*Attorneys for Plaintiff*
DENTAL MONITORING SAS

/s/ Hari Santhanam
Renée E. Rothauge (SBA 271239)
RRothauge@perkinscoie.com
**PERKINS COIE LLP**
505 Howard Street, Suite 1000
San Francisco, CA 94105
T: (415) 344-7000 / F: (415) 344-7050

Hari Santhanam (*pro hac vice*)
HSanthanam@perkinscoie.com
**PERKINS COIE LLP**
110 North Wacker Drive, Suite 3400
Chicago, IL 60606
T: (312) 324-8400 / F: (312) 324-9400

John Gray (*pro hac vice*)
JHGray@perkinscoie.com
**PERKINS COIE LLP**
2525 E. Camelback Road, Suite 500
Phoenix, AZ 85016-4227
T: (602) 351-8000 / F: (602) 648-7000

Sarah Fowler (SBA 264838)
SFowler@perkinscoie.com
Moeka Takagi (SBA 33326)
MTakagi@perkinscoie.com
**PERKINS COIE LLP**
3150 Porter Drive
Palo Alto, CA 94304
T: (650) 838-4300 / F: (650) 838-4350

Jon Carter (*pro hac vice*)
JCarter@perkinscoie.com
**PERKINS COIE LLP**
1155 Avenue of the Americas
New York, NY 10036
T: (212) 262-6900 / F: (202) 977-1649

Maria Stubbings (*pro hac vice*)
MStubbings@perkinscoie.com
**PERKINS COIE LLP**
700 13th Street, NW, Suite 800
Washington, DC 20005
T: (202) 654-6200 / F: (202) 654-6211

Kaitlin Dryden (*pro hac vice*)
KDryden@perkinscoie.com
**PERKINS COIE LLP**
33 East Main Street, Suite 201
Madison, WI 53703

T: (608) 663-7460 / F: (608) 663-7499

*Attorneys for Defendant*
ALIGN TECHNOLOGY, INC.

**ATTESTATION**

Pursuant to Civil Local Rule 5-1(h)(3), I hereby attest that all signatories to this document concur in its filing.

*/s/ Charlotte Jacobsen*
Charlotte Jacobsen

**~~[PROPOSED]~~ ORDER**

**FINAL JUDGMENT**

The Court's Showdown Order held that four of the asserted claims are not patent-eligible under 35 U.S.C. § 101: dependent claim 14 and its corresponding independent claim 1 of U.S. Patent No. 11,049,248 ("'248 patent") and dependent claim 12 and its corresponding independent claim 1 of U.S. Patent No. 10,755,409 ("'409 patent"). Dkt. 151 at 15. Plaintiff Dental Monitoring SAS ("Dental Monitoring") and Defendant Align Technology, Inc. ("Align") have stipulated that:

1. Dental Monitoring voluntarily withdraws its allegations of infringement by Align of claims 2, 4, 7, and 13 of the '248 patent and claims 14 and 15 of the '409 patent, and dismisses those particular claims of the two patents from the above-captioned matter without prejudice, except that Dental Monitoring may reassert those claims against Align only in this case in the event that the U.S. Court of Appeals for the Federal Circuit reverses or vacates the judgment entered by this Court and remands for further proceedings;
2. Under the Court's reasoning in the Showdown Order with respect to claims 1 and 12 of the '409 patent and the "creation" and "training" limitations of claim 14 of the '248 patent, claim 7 of the '409 patent is not patent-eligible under 35 U.S.C. § 101;
3. Under the Court's reasoning in the Showdown Order, Align is entitled to judgment that claims 1 and 14 of the '248 patent and claims 1, 7, and 12 of the '409 patent are not patent-eligible under 35 U.S.C. § 101, pursuant to Align's Fifth and Sixth Defenses and Fourth and Fifth Counterclaims for invalidity of the '409 and '248 patents (Dkt. 54 at 11-13, 53-54);
4. Align's other counterclaims against Dental Monitoring shall be dismissed without prejudice; and
5. Each party shall bear its own costs of suit in this matter.

Accordingly, pursuant to Federal Rule of Civil Procedure 58, the Court enters Judgment as follows:

Claims 1 and 14 of the '248 patent and claims 1, 7, and 12 of the '409 patent are not patent-

eligible under 35 U.S.C. § 101, pursuant to Align's Fifth and Sixth Defenses and Fourth and Fifth Counterclaims for invalidity of the '409 and '248 patents;

Dental Monitoring shall take nothing from Align with respect to claims 1 and 14 of the '248 patent and claims 1, 7, and 12 of the '409 patent;

Dental Monitoring's allegations of infringement by Align of claims 2, 4, 7, and 13 of the '248 patent and claims 14 and 15 of the '409 patent are dismissed without prejudice, except that Dental Monitoring may reassert those claims against Align only in this case in the event that the U.S. Court of Appeals for the Federal Circuit reverses or vacates the judgment entered by this Court and remands for further proceedings;

Align's other counterclaims are dismissed without prejudice; and

Each party shall bear its own costs of suit in this matter.

**IT IS SO ORDERED.**

Dated: **August 8, 2024**

THE HONORABLE WILLIAM H. ALSUP
UNITED STATES DISTRICT JUDGE

US011049248B2

(12) **United States Patent**
**Salah et al.**

(10) **Patent No.: US 11,049,248 B2**
(45) **Date of Patent: Jun. 29, 2021**

(54) **METHOD FOR ANALYZING AN IMAGE OF A DENTAL ARCH**

(71) Applicant: **DENTAL MONITORING**, Paris (FR)

(72) Inventors: **Philippe Salah**, Bagnolet (FR); **Thomas Pellissard**, Clichy (FR); **Guillaume Ghyselinck**, Cantin (FR); **Laurent Debraux**, Paris (FR)

(73) Assignee: **DENTAL MONITORING**, Paris (FR)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 164 days.

(21) Appl. No.: **16/030,137**

(22) Filed: **Jul. 9, 2018**

(65) **Prior Publication Data**

US 2019/0026893 A1 Jan. 24, 2019

(30) **Foreign Application Priority Data**

Jul. 21, 2017 (FR) ....................................... 1756956

(51) **Int. Cl.**
***G06K 9/00*** (2006.01)
***A61C 3/00*** (2006.01)
(Continued)

(52) **U.S. Cl.**
CPC ............ ***G06T 7/0014*** (2013.01); ***A61C 7/002*** (2013.01); ***A61C 9/0046*** (2013.01); ***A61C 19/04*** (2013.01);
(Continued)

(58) **Field of Classification Search**
USPC ........ 382/100, 103, 106, 128–131, 154–155, 382/162, 168, 173, 181, 199, 219, 224,
(Continued)

(56) **References Cited**

U.S. PATENT DOCUMENTS

8,879,813 B1 11/2014 Solanki et al.
2008/0172386 A1 7/2008 Ammar
(Continued)

FOREIGN PATENT DOCUMENTS

FR 3010629 A1 3/2015
FR 3027505 A1 4/2016
(Continued)

OTHER PUBLICATIONS

Corresponding French Application, Application No. 1756956, French Search Report, dated Mar. 23, 2018, 2 pages.
(Continued)

*Primary Examiner* — Seyed H Azarian
(74) *Attorney, Agent, or Firm* — Cooper Legal Group, LLC; Ronald M. Kachmarik

(57) **ABSTRACT**

A method for assessing the shape of an orthodontic aligner. Acquisition of at least one analysis image at least partially representing the aligner in a service position in which it is worn by a patient. Analysis of the analysis image by means of a deep learning device, trained by means of a learning base, so as to determine a value. For at least one tooth attribute of an analysis tooth zone representing, at least partially, a tooth on the analysis image, the tooth attribute relating to a separation between the tooth represented by the analysis tooth zone, and the aligner represented on the analysis image. For an image attribute of the analysis image, the image attribute relating to a separation between at least one tooth represented on the analysis image, and the aligner represented on the analysis image.

**16 Claims, 11 Drawing Sheets**



(51) **Int. Cl.**

| | |
|---|---|
| ***G06T 7/00*** | (2017.01) |
| ***G06K 9/62*** | (2006.01) |
| ***A61C 9/00*** | (2006.01) |
| ***A61C 19/04*** | (2006.01) |
| ***G06T 7/62*** | (2017.01) |
| ***A61C 7/00*** | (2006.01) |
| ***G06T 17/00*** | (2006.01) |

(52) **U.S. Cl.**
CPC ........... ***G06K 9/624*** (2013.01); ***G06K 9/6256*** (2013.01); ***G06K 9/6273*** (2013.01); ***G06T 7/62*** (2017.01); ***G06T 17/00*** (2013.01); *G06T 2207/20081* (2013.01); *G06T 2207/30036* (2013.01)

(58) **Field of Classification Search**
USPC .... 382/232, 254, 285–291, 395, 318; 705/2; 433/3, 24, 215
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS


| | | | | |
|---|---|---|---|---|
| 2009/0191503 | A1 | 7/2009 | Matov et al. | |
| 2009/0291417 | A1 | 11/2009 | Rubbert et al. | |
| 2013/0230818 | A1* | 9/2013 | Matov | A61C 7/00 433/3 |
| 2015/0132708 | A1* | 5/2015 | Kuo | G06F 19/00 433/24 |
| 2016/0310097 | A1* | 10/2016 | Bae | A61B 6/027 |
| 2017/0049311 | A1* | 2/2017 | Borovinskih | G06T 5/20 |
| 2017/0086943 | A1 | 3/2017 | Mah | |
| 2017/0300207 | A1* | 10/2017 | Wen | A61C 7/002 |
| 2018/0168780 | A1* | 6/2018 | Kopelman | G09B 23/283 |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| JP | 2017094181 A | 6/2017 |
| WO | 2016066651 A1 | 5/2016 |
| WO | 2017182654 A1 | 10/2017 |

OTHER PUBLICATIONS

Miki Yuma et al: "classification of teeth in cone-beam CT using deep convolutional neural network" Computers in Biology and Medicine, New York, NY, US, vol. 80, Nov. 12, 2016 (Nov. 12, 2016), pp. 24-29, XP02991G769, ISSN: 0010-4825, DOI:10.1016/J.COMPBIOMED.2016. 11.003.

Young-Jun Yu: "Machine Learning for Dental Image Analysis", Arxiv Nov. 29, 2016 (Nov. 29, 2016), XP055430578, Extracted from the Internet: URL:https://arxiv.org/ftp/arxiv/papers/1611/1611.09958.pdf [extracted Mar. 20, 2018]; Entire Document.

Kelvvin Fernandez et al: "Teeth/Palate and Interdental Segmentation Using Artificial Neural Networks". Sep. 17, 2012 (Sep. 17, 2012), Artificial Neural Networks in Pattern Recognition, Springer Berlin Heidelberg, Berlin, Heidelberg, pp. 175-185, XP047017215, ISBN: 978-3-642-33211-1.

Lin P L et al: "An effictive classification and numbering system for dental bitewing radiographs using teeth region and contour infonmation", Pattern Recognition, Elsevier, GB, vol. 43, No. 4, Apr. 1, 2010 (Apr. 1, 2010), pp. 1380-1392, XP026870003, ISSN: 0031-3203 [extracted Nov. 11, 2009].

Vinicius Tragante et al: "Knowledge discovery in panoramic X-rays for postmortem identification", Researchgate, Jan. 1, 2010 (Jan. 1, 2010), pp. 1-9, XP055462269, Extracted from the Internet; URL:https://www.researchgate.net/profile/Vinicius_Tragante/publication/267821630_Knowledge_discovery_in_panoramic_X-rays_for_postmortem_identification/links/54f479df0cf299c8d9e77caf/Knowledge-discovery-in-panoramic-X-rays-for-postmortem-identification.pdf; [extracted Mar. 23, 2018].

Anonymous: "Towards a Smart Healthcare System for Orthodontic and Dental Treatment Smart Healthcare System", Jan. 1, 2016 (Jan. 1, 2016), XP055442068, Extracted from the internet URL:http://sc.cmc.oska-u.ac.jp/wp1/wp-content/uploads/2016/11/sc16_poster_part6.pdf [extracted Jan. 18, 2018].

Ben Ali Rarnzi et al: "Detection and Classification of Dental Caries in X-ray Images Using Deep Neural Networks", Proceedings of ICSEA 2016 : The Eleventh International Conference on Software Engineering Advances, Aug. 21, 2016 (Aug. 21, 2016), pp. 223-227, XP055442275, New York, Extracted from the Internet, URL:https://pdfs.semanticscholar.org/4536/de69054143f85bb5089a8957f16be1eb0c3a.pdf?ga=2.60511401.567907993.1516282794-945231696.1516282794, [extracted Jan. 18, 2018].

Miki Yuma et al: "Tooth labeling in cone-beam CT using deep convolutional neural network for forensic identification", Progress in Biomedical Optics and Imaging, SPIE—International Society for Optical Engineering, Bellingham, WA, US, vol. 10134, Mar. 3, 2017 (Mar. 3, 2017), pp. 101343E-101343E, XO060086665, ISSN: 1605-7422, DOI: 10.1117/12.2254332, ISBN: 978-1-5106-0027-0.

Young-Jun Yu: "Machine Learning for Dental Image Analysis", Nov. 29, 2016 (Nov. 29, 2016), XP055430578, Extracted from the Internet: URL:https://arxiv.org/ftp/arxiv/papers/1611/1611.09958.pdf. [extracted Mar. 22, 2018].


* cited by examiner


1) creation of a learning base
2) training of at least one deep learning device
3) submission of the analysis image to the deep learning device
4) determination of the presence of a representation of a tooth on the analysis image, and of the attribute value of said tooth

Fig. 1


A) production of an updated reference model, segmentation of the model into tooth models and assignment of a tooth attribute value to each tooth model
B) acquisition of an updated image
C) search, by observation of the updated reference model, for a reference image with maximal match with the updated image
D) identification of reference tooth zones in the reference image, and consequently, of updated tooth zones in the updated image
E) assignment, to the updated tooth zones, of the tooth attribute values of the tooth models represented on the reference tooth zones
F) addition, in the learning base, of the updated image enriched with a description of the updated tooth zones and of their respective tooth attribute values

Fig. 2


A') production of an initial reference model, segmentation of the model into tooth models and assignment of a tooth attribute value to each tooth model
B') acquisition of an updated image
C') deformation of the initial reference model to obtain the updated reference model, then search, by observation of the updated reference model, for a reference image with maximal match with the updated image
D) identification of reference tooth zones in the reference image, and consequently, of updated tooth zones in the updated image
E) assignment, to the updated tooth zones, of the tooth attribute values of the tooth models represented on the reference tooth zones
F) addition, in the learning base, of the updated image enriched with a description of the updated tooth zones and of their respective tooth attribute values

Fig. 3


1') creation of a learning base comprising historical images each having an image attribute value for an image attribute
2') training of at least one deep learning device by means of the learning base
3') submission of the analysis image to the deep learning device so as to determine an image attribute value of the analysis image

Fig. 4


C1) determination of virtual acquisition conditions to be tested
C2) production of a reference image of the updated reference model in said virtual acquisition conditions to be tested
C3) processing of the reference image to produce at least one reference map representing, at least partially, the discriminating information item
C4) comparison of the updated and reference maps so as to determine a value for an assessment function
C5) as a function of said value, modification of the virtual acquisition conditions to be tested, then return to the step C2).

Fig. 5


a) creation of a historical library of historical tooth models
b) detailed analysis (according to the invention) of an analysis image so as to determine tooth attribute values for analysis tooth zones
c) for each analysis tooth zone, search for an optimal historical tooth model having the same tooth attribute value and exhibiting a maximal match with the analysis image
d) arrangement of the optimal tooth models so as to create an assembled model which exhibits a maximal match with the updated image
e) modification of one or more optimal tooth models and return to the step d) so as to maximize the match between the assembled model and the analysis image

Fig. 6


i) creation of an assembled model according to a modeling method according to the invention
ii) transmission of the assembled model to an orthodontist
iii) analysis of the orthodontic situation of the patient, by the orthodontist, from the assembled model

Fig. 7


a') activation of an image acquisition apparatus so as to acquire an analysis image of the arch
b') global analysis (according to the invention) of the analysis image
b') detailed analysis (according to the invention) of the analysis image so as to determine tooth attribute values for analysis tooth zones
c') determination, for the analysis image, of a value for an image attribute
c') determination, for the analysis image, of a value for an image attribute as a function of said tooth attribute value
d') comparison of said image attribute value with an instruction
e') sending of an information message as a function of said comparison

Fig. 8


a'') acquisition of an analysis image representing the aligner worn by the patient
b'') detailed or global analysis (according to the invention) of the analysis image
c'') assessment of the suitability of the aligner to the patient as a function of the tooth and/or image attribute value determined in the preceding step
d'') sending of an information message as a function of said assessment

Fig. 9



Fig.10



Fig. 11A



Fig. 11B



Fig. 11C



Fig. 11D



Fig. 12A



Fig. 12B



Fig. 12C



Fig. 12D




Fig. 13



Fig. 14



Fig. 15


Production of the initial reference model
Acquisition of an updated image
Production of an updated map from the updated image
Approximation of the real acquisition conditions
Determination of a reference model to be tested
Search for the best approximation of the real acquisition conditions on the basis of the reference model to be tested
Determination of virtual acquisition conditions to be tested
Production of a reference image in said virtual acquisition conditions to be tested
Production of a reference map representing said discriminating information item
Comparison of the updated and reference maps
1st assessment function: score acceptable?
Modification of the virtual acquisition conditions to be tested by virtual displacement of the acquisition apparatus
Change of updated image and/or of discriminating information item
2nd assessment function: score acceptable?
Modification of the reference model to be tested by virtual displacement of at least one tooth model and/or deformation
Last reference model tested = reference model

Fig. 16




Fig. 17A




Fig. 17B




Fig. 17C




Fig. 18

# METHOD FOR ANALYZING AN IMAGE OF A DENTAL ARCH

## TECHNICAL FIELD

The present invention relates to the field of dental arch image analysis.

## STATE OF THE ART

The most recent orthodontic treatments use images to assess the therapeutic situations. This assessment is conventionally performed by an orthodontist, which requires the patient to transmit these images to the orthodontist, even to make an appointment.

There is an ongoing need for a method simplifying the analysis of the images of dental arches of patients.

One aim of the invention is to address this need.

## SUMMARY OF THE INVENTION

The invention proposes a method for analyzing an image, called "analysis image", of a dental arch of a patient, a method in which the analysis image is submitted to a deep learning device, preferably a neural network, in order to determine at least one value of a tooth attribute relating to a tooth represented on the analysis image, and/or at least one value of an image attribute relating to the analysis image.

Analysis by Tooth

The invention proposes in particular a method for detailed analysis of an image called "analysis image" of a dental arch of a patient, said method comprising the following steps:

1) creation of a learning base comprising more than 1000 images of dental arches, or "historical images", each historical image comprising one or more zones each representing a tooth, or "historical tooth zones", to each of which, for at least one tooth attribute, a tooth attribute value is assigned;
2) training of at least one deep learning device, preferably a neural network, by means of the learning base;
3) submission of the analysis image to said at least one deep learning device for it to determine at least one probability relating to an attribute value of at least one tooth represented on a zone representing, at least partially, said tooth in the analysis image, or "analysis tooth zone";
4) determination, as a function of said probability, of the presence of a tooth of said arch at a position represented by said analysis tooth zone, and of the attribute value of said tooth.

A first deep learning device, preferably a neural network, may in particular be implemented to assess a probability relating to the presence, at a location of said analysis image, of an analysis tooth zone.

A second deep learning device, preferably a neural network, may in particular be implemented to assess a probability relating to the type of tooth represented in an analysis tooth zone.

As will be seen in more detail hereinafter in the description, a detailed analysis method according to the invention advantageously makes it possible to immediately recognize the content of the analysis image.

The analysis image may advantageously be classified automatically. It may also be used immediately by a computer program.

The invention relies on the use of a deep learning device, preferably a neural network, the performance of which is



directly linked to the richness of the learning base. There is therefore also a need for a method that makes it possible to rapidly enrich the learning base.

The invention therefore relates also to a method for enriching a learning base, notably intended for the implementation of a detailed analysis method according to the invention, said enrichment method comprising the following steps:

A) at an "updated" instant, production of a model of a dental arch of a patient, or "updated reference model", and segmentation of the updated reference model so as to produce, for each tooth, a "tooth model", and, for at least one tooth attribute, assignment of a tooth attribute value to each tooth model;
B) preferably less than 6 months, preferably less than 2 months, preferably less than 1 month, preferably less than a fortnight, preferably less than 1 week, preferably less than 1 day before or after the updated instant, preferably substantially at the updated instant, acquisition of at least one, preferably at least three, preferably at least ten, preferably at least one hundred images of said arch, or "updated images" in respective real acquisition conditions;
C) for each updated image, search for virtual acquisition conditions suitable for an acquisition of an image of the updated reference model, called "reference image", exhibiting a maximum match with the updated image in said virtual acquisition conditions, and acquisition of said reference image;
D) identification, in the reference image, of at least one zone representing a tooth model, or "reference tooth zone", and, by comparison of the updated image and of the reference image, determination, in the updated image, of a zone representing said tooth model, or "updated tooth zone";
E) assignment, to said updated tooth zone, of the tooth attribute value or values of said tooth model;
F) addition of the updated image enriched with a description of said updated tooth zone and its tooth attribute value or values, or "historical image", in the learning base.

In particular, each execution of the method described in WO 2016/066651 preferably generates more than three, more than ten, preferably more than one hundred updated images which, by an automated processing by means of the updated reference model, may produce as many historical images.

In a particular embodiment, the method for enriching a learning base comprises, in place of the steps A) to C), the following steps:

A') at an initial instant, production of a model of a dental arch of a patient, or "initial reference model", and segmentation of the initial reference model so as to produce, for each tooth, a "tooth model", and, for at least one tooth attribute, assignment of a tooth attribute value to each tooth model;
B') at an updated instant, for example spaced apart by more than a fortnight, preferably more than a month, even more than two months from the initial instant, acquisition of at least one, preferably at least three, preferably at least ten, preferably at least one hundred images of said arch, or "updated images", in respective real acquisition conditions;
C') for each updated image, search, by deformation of the initial reference model, for an updated reference model and virtual acquisition conditions suitable for an acquisition of an image of the updated reference model,

called "reference image", exhibiting a maximum match with the updated image in said virtual acquisition conditions.

This method advantageously makes it possible, after generation of the initial reference model, preferably by means of a scanner, to enrich the learning base at different updated instants, without it being necessary to perform a new scan, and therefore without the patient having to go to the orthodontist. He or she may in fact acquire the updated images him or herself, as described in WO 2016/066651.

A single orthodontic treatment may thus lead to the production of hundreds of historical images.

The invention relates also to a method for training a deep learning device, preferably a neural network, comprising an enrichment of a learning base according to the invention, then the use of said learning base to train the deep learning device.

Global Analysis

The detailed analysis method described above advantageously allows for a fine analysis of the analysis image, the situation of each being preferably assessed.

Alternatively, the deep learning device may be used globally, the learning base containing historical images whose description provides a global attribute value for the image. In other words, the value of the image attribute relates to the whole image and not to part of the image. The attribute is not then a "tooth" attribute, but is an "image" attribute. For example, this image attribute may define whether, in light of the image as a whole or of a part of the image, the dental situation "is pathological" or "is not pathological", without each tooth being examined. The image attribute also makes it possible to detect, for example, whether the mouth is open or closed, or, more generally, whether the image is suitable for a subsequent treatment, for example whether it makes it possible to monitor the occlusion.

The image attribute may in particular relate to

a position and/or an orientation and/or a calibration of an acquisition apparatus used to acquire said analysis image, and/or

a quality of the analysis image, and in particular relating to the brightness, to the contrast or to the sharpness of the analysis image, and/or

the content of the analysis image, for example to the representation of the arches, of the tongue, of the mouth, of the lips, of the jaws, of the gums, of one or more teeth or of a dental, preferably orthodontic, appliance.

When the image attribute refers to the content of the image, the description of the historical images of the learning base specifies a characteristic of this content. For example, it may specify the position of the tongue (for example "retracted") or the opening of the mouth of the patient (for example mouth open or closed) or the presence of a representation of a dental, preferably orthodontic, appliance and/or of its condition (for example appliance intact, broken or damaged).

A tooth attribute value may be used to define a value for an image attribute. For example, if a value of a tooth attribute is "tooth decayed", the value of an image attribute may be "unsatisfactory dental situation".

The image attribute may in particular relate to a therapeutic situation.

The invention proposes a method for global analysis of an analysis image of a dental arch of a patient, said method comprising the following steps:



1') creation of a learning base comprising more than 1000 images of dental arches, or "historical images", each historical image comprising an attribute value for at least one image attribute, or "image attribute value";

2') training of at least one deep learning device, preferably a neural network, by means of the learning base;

3') submission of the analysis image to the deep learning device for it to determine, for said analysis image, at least one probability relating to said image attribute value, and determination, as a function of said probability, of a value for said image attribute for the analysis image.

The image attribute may in particular relate to the orientation of the acquisition apparatus upon the acquisition of the analysis image. It may for example take the values "front photo", "left photo" and "right photo".

The image attribute may also relate to the quality of the image. It may for example take the values "insufficient contrast" and "acceptable contrast".

The image attribute may also relate to the dental situation of the patient, for example relate to the presence of decay or to the condition of a dental, preferably orthodontic, appliance worn by the patient ("degraded" or "in good condition" for example) or to the suitability of the dental, preferably orthodontic, appliance to the treatment of the patient (for example "unsuitable" or "suitable").

The image attribute may also relate to the "presence" or "absence" of a dental, preferably orthodontic, appliance, or to the state of opening of the mouth ("mouth open", "mouth closed" for example).

As will be seen in more detail hereinafter in the description, a global image analysis method according to the invention advantageously makes it possible to immediately and globally assess the content of the analysis image. In particular, it is possible to globally assess a dental situation and, for example, deduce therefrom the need to consult an orthodontist.

## DEFINITIONS

A "patient" is a person for whom a method according to the invention is implemented, independently of whether or not this person is following an orthodontic treatment.

"Orthodontist" should be understood to mean any person qualified to provide dental care services, which also includes a dentist.

A "dental part", in particular "orthodontic part", should be understood to mean all or part of a dental, in particular orthodontic, appliance.

An orthodontic part may in particular be an orthodontic aligner. Such an aligner extends in such a way as to follow the successive teeth of the arch on which it is fixed. It defines a generally "U" shaped channel, the shape of which is determined to ensure the fixing of the aligner onto the teeth, but also as a function of a desired target positioning for the teeth. More specifically, the shape is determined in such a way that, when the aligner is in its service position, it exerts stresses tending to move the teeth being treated to their target positioning, or to hold the teeth in this target positioning.

The "service position" is the position in which the dental or orthodontic part is worn by the patient.

"Model" should be understood to be a digital three-dimensional model. An arrangement of tooth models is therefore a model.

"Image" should be understood to be an image in two dimensions, like a photograph or an image taken from a film. An image is formed by pixels.

A "reference image" is a view of a "reference" model.

"Image of an arch" or "model of an arch" should be understood to be a representation of all or part of said arch. Such a representation is preferably in colors.

The "acquisition conditions" of an image specify position and the orientation in space of an acquisition apparatus acquiring this image in relation to the teeth of the patient (real acquisition conditions) or to a model of teeth of the patient (virtual acquisition conditions), and preferably the calibration of this acquisition apparatus. Acquisition conditions are said to be "virtual" when they correspond to a simulation in which the acquisition apparatus would be in said acquisition conditions (theoretical positioning and preferably calibration of the acquisition apparatus) relative to a model.

In virtual conditions of acquisition of a reference image, the acquisition apparatus may be also qualified as "virtual". The reference image is in fact acquired by a hypothetical acquisition apparatus, having the characteristics of the "real" acquisition apparatus used for the acquisition of the real images, and in particular of the updated images.

The "calibration" of an acquisition apparatus is made up of all the values of the calibration parameters. A "calibration parameter" is a parameter intrinsic to the acquisition apparatus (unlike its position and orientation) whose value influences the image acquired. Preferably, the calibration parameters are chosen from the group formed by the diaphragm aperture, the exposure time, the focal distance and the sensitivity.

A "discriminating information item" is a characteristic feature which may be extracted from an image ("image feature"), conventionally by computer processing of this image.

A discriminating information item may exhibit a variable number of values. For example, a contour feature may be equal to 1 or 0 depending on whether a pixel belongs or does not belong to a contour. A brightness feature may take a large number of values. The processing of the image makes it possible to extract and quantify the discriminating information item.

The discriminating information item may be represented in the form of a "map". A map is thus the result of a processing of an image in order to reveal the discriminating information item, for example the contour of the teeth and of the gums.

"Match" or "fit" between two objects designates a measurement of the difference between these two objects. A match is maximal ("best fit") when it results from an optimization making it possible to minimize said difference.

An object modified to obtain a maximum match may be qualified as "optimal" object.

Two images or "views" which exhibit a maximal match represent substantially at least one same tooth, in the same way. In other words, the representations of the tooth on these two images may be substantially superimposed.

The search for a reference image exhibiting a maximal match with an updated image is performed by searching for the virtual acquisition conditions of the reference image exhibiting a maximal match with the real acquisition conditions of the updated image.

By extension, a model exhibits a maximal match with an image when this model has been chosen from several models because it allows a view exhibiting a maximal match with said image and/or when this image has been chosen from several images because it exhibits a maximal match with a view of said model.

In particular, an updated image is in maximal match with a reference model when a view of this reference model provides a reference image showing a maximal match with the updated image.

The comparison between two images results preferably from the comparison of two corresponding maps. "Distance" is used conventionally to denote a measurement of the difference between two maps or between two images.

The "metaheuristic" methods are known optimization methods. They are preferably chosen from the group formed by

- evolutionary algorithms, preferably chosen from: evolution strategies, genetic algorithms, differential evolution algorithms, distribution estimation algorithms, artificial immunity systems, shuffled complex evolution path recomposition, simulated annealing, ant colony algorithms, particular swarm optimization algorithms, search with taboos, and the GRASP method;
- the kangaroo algorithm,
- the Fletcher and Powell method,
- the sound effects method,
- stochastic tunneling,
- random-restart hill climbing,
- the cross-entropy method, and
- the hybrid methods between the abovementioned metaheuristic methods.

"Description" of an image denotes information particularly relating to the definition of the tooth zones of this image and to the tooth attribute values which are associated with them, and/or relating to an image attribute value of said image. The number of possible values for a tooth attribute or an image attribute is unlimited.

A "historical" image is an image of a dental arch enriched with a description. The tooth zones of a historical image are qualified as "historical tooth zones".

"Comprising" or "including" or "exhibiting" should be interpreted without restriction, unless indicated otherwise.

## BRIEF DESCRIPTION OF THE FIGURES

Other features and advantages of the invention will become more apparent on reading the following detailed description and studying the attached drawing in which:

FIG. **1** represents, schematically, the different steps of a method for detailed analysis of an image, according to the invention;

FIG. **2** represents, schematically, the different steps of a method for enriching a learning base, according to the invention;

FIG. **3** represents, schematically, the different steps of a variant of a method for enriching a learning base, according to the invention;

FIG. **4** represents, schematically, the different steps of a method for global analysis of an image, according to the invention;

FIG. **5** represents, schematically, the different steps of a step C) of a method for enriching a learning base, according to the invention;

FIGS. **6** and **18** represent, schematically, the different steps of a method for modeling the dental arch of a patient, according to the invention;

FIG. **7** represents, schematically, the different steps of a method for assessing a dental situation of a patient, according to the invention;

FIG. **8** represents, schematically, the different steps of a method for acquiring an image of a dental arch of a patient, according to the invention;

FIG. **9** represents, schematically, the different steps of a method for assessing the shape of an orthodontic aligner of a patient, according to the invention;

FIG. **10** represents an example of a reference image of an initial reference model;

FIG. **11** (**11***a*-**11***d*) illustrates a way of processing to determine the tooth models in an initial reference model, as described in WO 2016 066651;

FIG. **12** (**12***a*-**12***d*) illustrates the acquisition of an image by means of a retractor, an operation of cropping of this image, and the processing of an updated image making it possible to determine the contour of the teeth, as described in WO 2016 066651;

FIG. **13** schematically illustrates the relative position of registration marks **12** of a retractor **10** on updated images $\mathbf{14}_1$ and $\mathbf{14}_2$, according to the directions of observation represented by broken lines;

FIGS. **14** and **15** represent an orthodontic aligner, in perspective and plan views, respectively;

FIG. **16** illustrates the step e) described in WO 2016 066651;

FIG. **17** illustrates an enrichment method according to the invention.

## DETAILED DESCRIPTION

A detailed analysis method according to the invention requires the creation of a learning base. This creation preferably implements a method comprising the steps A) to F), or, in one embodiment, in place of the steps A) to C), preferably the steps A') to C').

### First Main Embodiment of the Enrichment Method

The step A) is intended for the production of an updated reference model modeling an arch of the patient. It preferably comprises one or more of the features of the step a) of WO 2016 066651, incorporated by reference, to produce an initial reference model.

The updated reference model is preferably created with a 3D scanner. Such a so-called "3D" model may be observed from any angle. An observation of the model, from a determined angle and distance, is called a "view" or "reference image".

FIG. **11***a* is an example of reference image.

The updated reference model may be prepared from measurements performed on the teeth of the patient or on a molding of his or her teeth, for example a plaster molding.

For each tooth, from the updated reference model, a model of said tooth, or "tooth model", is defined (FIG. **11***d*). This operation, known per se, is called "segmentation" of the updated reference model.

In the updated reference model, a tooth model is preferably delimited by a gingival margin which may be broken down into an interior gingival margin (of the side of the interior of the mouth relative to the tooth), an exterior gingival margin (oriented toward the outside of the mouth relative to the tooth) and two lateral gingival margins.

One or more tooth attributes are associated with the tooth models as a function of the teeth that they model.

The tooth attribute is preferably chosen from a tooth number, a tooth type, a tooth shape parameter, for example a tooth width, in particular a mesio-palatine width, a thickness, a crown height, an index of mesial and distal deflection of the incisive margin, or a level of abrasion, a tooth appearance parameter, in particular a translucency index or a color parameter, a parameter relating to the condition of the tooth, for example "abraded", "broken", "decayed" or "fitted" (that is to say in contact with a dental, preferably orthodontic, appliance), an age for the patient, or a combination of these attributes. A tooth attribute is preferably an attribute which only relates to the tooth modeled by the tooth model.

A tooth attribute value may be assigned to each tooth attribute of a particular tooth model.

For example, the "tooth type" tooth attribute will have the value "incisor", "canine" or "molar" depending on whether the tooth model is that of an incisor, of a canine or of a molar, respectively.

The assignment of the tooth attribute values to the tooth models may be manual or, at least partly, automatic. For example, if the value of a tooth attribute is identical whatever the tooth model, such as for the "age of the patient" tooth attribute, it may be sufficient to assign a value to one tooth model to determine the value of this attribute for the other tooth models.

Similarly, the tooth numbers are conventionally assigned according to a standard rule. It is therefore sufficient to know this rule and the number of a tooth modeled by a tooth model to calculate the numbers of the other tooth models.

In a preferred embodiment, the shape of a particular tooth model is analyzed so as to define its tooth attribute value, for example its number. This shape recognition is preferably performed by means of a deep learning device, preferably a neural network. Preferably, a library of historical tooth models is created, each historical tooth model having a value for the tooth attribute, as described hereinbelow (step a)), the deep learning device is trained with views of the historical tooth models of this library, then one or more views of the particular tooth model are analyzed with the trained deep learning device, so as to determine the tooth attribute value of said particular tooth model.

The allocation of the tooth attribute values may then be performed totally without human intervention.

The step B) is intended for the acquisition of one or preferably several updated images. The step B) preferably comprises one or more of the features of the step b) of WO 2016 066651.

The acquisition of the updated images is performed by means of an image acquisition apparatus, preferably chosen from a cellphone, a so-called "connected" camera, a so-called "smart" watch, a tablet or a personal computer, fixed or portable, comprising an image acquisition system such as a webcam or a camera. Preferably, the image acquisition apparatus is a cellphone.

Also preferably, the image acquisition apparatus is separated from the dental arch by more than 5 cm, more than 8 cm, even more than 10 cm, which avoids the condensation of steam on the optic of the image acquisition apparatus and facilitates the focusing. Furthermore, preferably, the image acquisition apparatus, in particular the cellphone, has no specific optic for the acquisition of the updated images, which is notably possible because of the separation of the dental arch during the acquisition.

Preferably, an updated image is a photograph or an image extracted from a film. It is preferably in color, preferably in real colors.

Preferably, the acquisition of the updated image or images is performed by the patient, preferably without the use of a

support which is bearing on the ground and is immobilizing the image acquisition apparatus, and in particular without tripod.

In one embodiment, the triggering of the acquisition is automatic, that is to say without the action of an operator, as soon as the acquisition conditions are approved by the image acquisition apparatus, in particular when the image acquisition apparatus has determined that it observes a dental arch and/or a retractor and that the conditions of observation are satisfactory (sharpness, brightness, even dimensions of the representation of the dental arch and/or of the retractor).

The time interval between the steps A) and B) is as short as possible in order for the teeth not to be substantially displaced between the production of the updated model and the acquisition of the updated images. Reference images matching with the updated images may then be acquired by observing the updated reference model.

Preferably, a dental retractor **10** is used in the step B), as represented in FIG. **12***a*. The retractor conventionally comprises a support provided with a rim extending around an opening and arranged in such a way that the lips of the patient may rest thereon leaving the teeth of the patient apparent through said opening.

In the step C), the updated reference model is explored to find, for each updated image, a reference image exhibiting a maximal match with the updated image.

The step C) may comprise one or more of the features of the steps c), d) and e) of WO 2016 066651, in as much as they concern such an exploration.

For each updated image, a set of virtual acquisition conditions approximating the real acquisition conditions upon the acquisition of said updated image is preferably determined, roughly. In other words, the position of the image acquisition apparatus is estimated in relation to the teeth at the moment when it took the updated image (position of the acquisition apparatus in space and orientation of this apparatus). This rough assessment advantageously makes it possible to limit the number of tests on virtual acquisition conditions in subsequent operations, and therefore makes it possible to considerably speed up these operations.

To perform this rough assessment, one or more heuristic rules are preferably used. For example, preferably, virtual acquisition conditions likely to be tested in subsequent operations, the conditions which correspond to a position of the image acquisition apparatus behind the teeth or at a distance from the teeth greater than 1 m, are excluded.

In a preferred embodiment, as illustrated in FIG. **13**, registration marks are used that are represented on the updated image, and in particular registration marks **12** of the retractor, to determine a region of the space that is substantially conical delimiting virtual acquisition conditions likely to be tested in subsequent operations, or "test cone".

More specifically, at least three registration marks **12** are preferably positioned non-aligned on the retractor **10**, and their relative positions on the retractor are accurately measured.

The registration marks are then marked on the updated image, as described previously. Simple trigonometric calculations make it possible to determine approximately the direction from which the updated image was taken.

Next, for each updated image, a reference image is sought that exhibits a maximum match with the updated image. This search is preferably performed by means of a metaheuristic method, preferably evolutionist, preferably by simulated annealing.



Preferably, at any instant before the step C4), the updated image is analyzed so as to produce an updated map representing, at least partially, a discriminating information item. The updated map therefore represents the discriminating information item in the reference frame of the updated image.

The discriminating information item is preferably chosen from the group consisting of a contour information item, a color information item, a density information item, a distance information item, a brightness information item, a saturation information item, information on reflections and combinations of these information items.

A person skilled in the art knows how to process an updated image to reveal the discriminating information item.

For example, FIG. **12***d* is an updated map relating to the contour of the teeth obtained from the updated image of FIG. **12***b*.

Said search comprises the following steps:

C1) determination of virtual acquisition conditions "to be tested";

C2) production of a reference image of the updated reference model in said virtual acquisition conditions to be tested;

C3) processing of the reference image to produce at least one reference map representing, at least partially, the discriminating information item;

C4) comparison of the updated and reference maps so as to determine a value for an assessment function, said value for the assessment function depending on the differences between said updated and reference maps and corresponding to a decision to continue or stop the search for virtual acquisition conditions approximating said real acquisition conditions with greater accuracy than said virtual acquisition conditions to be tested determined in the last occurrence of the step C1);

C5) if said value for the assessment function corresponds to a decision to continue said search, modification of the virtual acquisition conditions to be tested, then return to the step C2).

The step C1) begins with a determination of the virtual acquisition conditions to be tested, that is to say a virtual position and orientation likely to correspond to the real position and orientation of the acquisition apparatus upon the capture of the updated image, but also, preferably, a virtual calibration likely to correspond to the real calibration of the acquisition apparatus upon the capture of the updated image.

The first virtual acquisition conditions to be tested are preferably virtual acquisition conditions assessed roughly, as described previously.

In the step C2), the image acquisition apparatus is then virtually configured in the virtual acquisition conditions to be tested in order to acquire a reference image of the updated reference model in these virtual acquisition conditions to be tested. The reference image therefore corresponds to the image that the image acquisition apparatus would have taken if it had been placed, relative to the updated reference model, and optionally calibrated, in the virtual acquisition conditions to be tested.

If the updated image was taken substantially at the same moment as the updated reference model was created by a scan of the teeth of the patient, the position of the teeth on the updated image is substantially identical to that in the updated reference model. If the virtual acquisition conditions to be tested are exactly the real acquisition conditions, the reference image may therefore be exactly superimposed on the updated image. The differences between the updated

image and the reference image result from errors in the assessment of the virtual acquisition conditions to be tested, if they do not correspond exactly to the real acquisition conditions.

In the step C3), the reference image is processed as the updated image so as to produce, from the reference image, a reference map representing the discriminating information item (FIGS. **11***a* and **11***b*). A person skilled in the art knows how to process a reference image to reveal the discriminating information item.

In the step C4), the updated and reference maps, both relating to the same discriminating information item, are compared and the difference or "distance" between these two maps is assessed by means of a score. For example, if the discriminating information item is the contour of the teeth, the mean distance between the points of the contour of the teeth which appears on the reference image and the points of the corresponding contour which appears on the updated image may be compared, the score being all the higher when this distance is small.

The score may for example be a correlation coefficient.

Preferably, the virtual acquisition conditions comprise the calibration parameters of the acquisition apparatus. The score is that much higher when the values of the calibration parameters tested are close to the calibration parameter values of the acquisition apparatus used upon the acquisition of the updated image. For example, if the diaphragm aperture tested is far from that of the acquisition apparatus used upon the acquisition of the updated image, the reference image shows fuzzy regions and sharp regions which do not correspond to the fuzzy regions and to the sharp regions of the updated image. If the discriminating information item is the contour of the teeth, the updated and reference maps will not therefore represent the same contours and the score will be low.

The score is then assessed by means of an assessment function. The assessment function makes it possible to decide whether the cycling on the steps C1) to C5) must be continued or stopped. The assessment function may for example be equal to 0 if the cycling must be stopped or be equal to 1 if the cycling must continue.

The value of the assessment function may depend on the score achieved. For example, a decision may be made to continue the cycling if the score does not exceed a threshold. For example, if an exact match between the updated and reference images leads to a score of 100%, the threshold may be, for example, 95%. Obviously, the higher the threshold, the better will be the accuracy of the assessment of the virtual acquisition conditions if the score manages to exceed this threshold.

The value of the assessment function may also depend on scores obtained with virtual acquisition conditions tested previously.

The value of the assessment function may also depend on random parameters and/or on the number of cycles already performed.

In particular, it is possible, despite the repetition of the cycles, not to manage to find virtual acquisition conditions which are sufficiently close to the real acquisition conditions for the score to reach said threshold. The assessment function may then lead to the decision to exit the cycle even through the best score obtained has not reached said threshold. This decision may result, for example, from a number of cycles greater than a predetermined maximum number.

A random parameter in the assessment function may also authorize the continuation of tests of new virtual acquisition conditions, even though the score appears satisfactory.

The assessment functions conventionally used in the metaheuristic optimization, preferably evolutionist, methods, particularly in the simulated annealing methods, may be used for the assessment function.

In the step C5), if the value of the assessment function indicates a decision to continue the cycling, the virtual acquisition conditions to be tested are modified and the cycling recommences on the steps C1) to C5), consisting in producing a reference image and a reference map, in comparing the reference map with the updated map to determine a score, then in taking a decision as a function of this score.

The modification of the virtual acquisition conditions to be tested corresponds to a virtual displacement in space and/or to a modification of the orientation and/or, preferably, to a modification of the calibration of the acquisition apparatus. This modification may be random, preferably such that the new virtual acquisition conditions to be tested still belong to the set determined upon the rough assessment. The modification is preferably guided by heuristic rules, for example by favoring the modifications which, according to an analysis of the preceding scores obtained, appear most favorable for increasing the score.

The cycling is continued until the value of the assessment function indicates a decision to cease this cycling and to continue to the step D), for example if the score reaches or exceeds said threshold.

The optimization of the virtual acquisition conditions is preferably performed by using a metaheuristic, preferably evolutionist, method, preferably a simulated annealing algorithm. Such an algorithm is well known for nonlinear optimization.

If the cycling has been exited without a satisfactory score having been able to be obtained, for example without the score having been able to reach said threshold, the method may be stopped (failure situation) or a new step C) may be launched, with a new discriminating information item and/or with a new updated image. The method may also be continued with the virtual acquisition conditions corresponding to the best score reached. A warning may be emitted in order to inform the user of the error on the result.

If the cycling has been exited when a satisfactory score has been able to be obtained, for example because the score has reached, even exceeded said threshold, the virtual acquisition conditions correspond substantially to the real acquisition conditions of the updated image.

Preferably, the virtual acquisition conditions comprise the calibration parameters of the acquisition apparatus. The method thus makes it possible to assess the values of these parameters without it being necessary to know the nature of the acquisition apparatus or its setting. The acquisition of the updated images may therefore be performed without any particular precautions, for example by the patient him or herself by means of his or her cellphone.

In addition, the search for the real calibration is performed by comparing an updated image with views of a reference model in virtual acquisition conditions to be tested. Advantageously, it does not require the updated image to show a standard calibration gauge, that is to say a gauge whose characteristics are accurately known making it possible to determine the calibration of the acquisition apparatus.

The step C) therefore culminates in the determination of virtual acquisition conditions exhibiting a maximal match with the real acquisition conditions. The reference image therefore exhibits a maximal match with the updated image, that is to say that these two images may substantially be superimposed.

In one embodiment, said search of the virtual acquisition conditions in the step C) is performed by using a metaheuristic, preferably evolutionist, method, preferably a simulated annealing algorithm.

In the step D), the reference tooth zones are identified on the reference image and they are transferred to the updated image to define corresponding updated tooth zones.

In particular, the reference image is a view of the updated reference model segmented into tooth models. The limits of the representation of each tooth model on the reference image, or "reference tooth zone", may therefore be identified.

The superimposition of the updated and reference images then makes it possible to transfer the limits of the reference tooth zones to the updated image, and thus define the updated tooth zones. Since the reference image exhibits a maximal match with the updated image, the updated tooth zones therefore substantially define the limits of the tooth models represented on the reference image.

In the step E), each updated tooth zone is assigned the tooth attribute value or values of the tooth model which corresponds to it.

In particular, the reference image is a view of the updated reference model in which the tooth models have been assigned respective tooth attribute values for at least one tooth attribute, for example a tooth number. Each reference tooth zone may therefore inherit the tooth attribute value of the tooth model that it represents. Each updated tooth zone may then inherit the tooth attribute value of the reference tooth zone which allowed it to be defined.

At the end of the step E), an updated image and a description of the updated image is therefore obtained that defines one or more updated tooth zones and, for each of these zones, a tooth attribute value for at least one tooth attribute, for example a tooth number.

The updated image enriched with its description is called "historical image".

FIG. **17***a* shows an example of updated image (acquired in the step B)) being analyzed in order to determine the contours of the teeth. FIG. **17***b* shows the reference image exhibiting a maximal match with the updated image (resulting from the step C)). The numbers of the teeth are displayed on the corresponding teeth. FIG. **17***c* illustrates the transfer of the tooth numbers to the updated tooth zones (step D) and E)).

In the step F), the historical image is added to the learning base.

The steps A) to F) are preferably performed for more than 1000, more than 5000, or more than 10 000 different patients, or "historical patients".

As now clearly emerges, the invention provides a method that is particularly effective for creating a learning base.

The invention relates also to a method for training a deep learning device, preferably a neural network, said method comprising an enrichment of a learning base according to a method comprising steps A) to F) so as to acquire a plurality of historical images, then the use of said learning base to train said deep learning device.

### Second Main Embodiment of the Enrichment Method

The invention is not however limited to the embodiments described above.

In particular, the updated reference model is not necessarily the direct result of a scan of the arch of the patient. The updated reference model may in particular be a model obtained by deformation of an initial reference model which is itself resulting directly from such a scan.



The method then comprises, preferably, in place of the steps A) to C), the steps A') to C').

The step A') is identical to the step A). In the step A'), the reference model generated is however intended to be modified. It is therefore qualified as "initial reference model", and not as "updated reference model", as according to the step A).

The initial reference model may in particular be generated at an initial instant preceding an active orthodontic treatment, for example less than 6 months, less than 3 months, or less than 1 month before the start of the treatment. The steps B') to C') may then be implemented to track the trend of the treatment between the initial instant and the updated instant of the step B').

The initial instant may alternatively be an instant at the end of active orthodontic treatment, for example less than 6 months, less than 3 months, or less than 1 month after the end of the treatment. The steps B') to C') may then be implemented to monitor the appearance of any recurrence.

The step B') is identical to the step B). In the step B'), the updated images are however also intended to guide the modification of the initial reference model to define the updated reference model, in the step C').

The time interval between the steps A') and B') is not limited, since, as explained hereinbelow, the initial reference model will be deformed to obtain an updated reference model with maximal match with the updated images. The time interval between the steps A') and B') may for example be greater than 1 week, than 2 weeks, than 1 month, than 2 months or more than 6 months.

The step C') is more complex than the step C) since the search for a reference image exhibiting a maximal match with an updated image is not limited to searching for the optimal virtual acquisition conditions. It also includes a search for an updated reference model, that is to say a reference model in which the teeth have substantially the same position as on the updated image.

The step C') preferably comprises one or more of the features of the steps c), d) and e) of WO 2016 066651, and in particular of the step e) illustrated in FIG. **16**.

The objective is to modify the initial reference model until an updated reference model is obtained which exhibits a maximal match with the updated image. Ideally, the updated reference model is therefore a model of the arch from which the updated image would have been able to be taken if this model had been the arch itself.

A succession of reference models "to be tested" is therefore tested, the choice of a reference model to be tested preferably being dependent on the level of correspondence of the reference models "to be tested" previously tested with the updated image.

Preferably, the search comprises, for an updated image,

- a first optimization operation making it possible to search, in a reference model to be tested determined from the initial reference model, for virtual acquisition conditions best corresponding to the real acquisition conditions of the updated image, and
- a second optimization operation making it possible to search, by testing a plurality of said reference models to be tested, for the reference model best corresponding to the positioning of the teeth of the patient upon the acquisition of the updated image.

Preferably, a first optimization operation is performed for each test of a reference model to be tested during the second optimization operation.

Preferably, the first optimization operation and/or the second optimization operation, preferably the first optimization operation and the second optimization operation, implement a metaheuristic method, preferably evolutionist, preferably a simulated annealing.

The step C') therefore culminates in the determination

of an updated reference model exhibiting a maximal match with the updated image, and

virtual acquisition conditions exhibiting a maximal match with the real acquisition conditions.

A method comprising the steps A') to C') may advantageously be implemented in the context of an active or passive orthodontic treatment, or, more generally, to track any changes to the teeth.

In the different methods according to the invention, the enrichment of the learning base does not necessarily result from an enrichment method according to the invention.

In one embodiment, the learning base is created by an operator. The latter thus analyzes thousands of analysis images. For the learning base to be able to be used for the implementation of a detailed analysis method, it determines the tooth zones, then assigns them tooth attribute values. For the learning base to be able to be used for the implementation of a global analysis method, it assigns image attribute values to each image. It may thus form historical images.

Detailed Image Analysis Method

The method for detailed analysis of an "analysis image" of a dental arch of a patient according to the invention comprises the steps 1) to 4).

Preferably, the analysis image, preferably a photograph or an image extracted from a film, preferably in color, preferably in real color, is acquired with an image acquisition apparatus, preferably a cellphone, separated from the dental arch by more than 5 cm, more than 8 cm, even more than 10 cm, and which, preferably, has no other specific optic.

Preferably, the analysis image represents several teeth, preferably more than 2, more than 3, more than 4 or more than 5 teeth of the patient. FIG. **12***a* or FIG. **12***b* could be examples of analysis images. The arrangement of the teeth is realistic, i.e. it corresponds to the arrangement which is observed by the image acquisition apparatus when it has acquired the analysis image.

Preferably, the acquisition of the analysis image is performed by the patient, preferably without the use of a support which is bearing on the ground and is immobilizing the image acquisition apparatus, and in particular without tripod.

In one embodiment, the triggering of the acquisition of the analysis image is automatic, that is to say without the action of an operator, as soon as the acquisition conditions are approved by the image acquisition apparatus, in particular when the image acquisition apparatus has determined that it observes a dental arch and/or a retractor and that the observation conditions are satisfactory (sharpness, brightness, even dimensions of the representation of the dental arch and/or of the retractor).

In the step 1), a learning base is created comprising more than 1000, preferably more than 5000, preferably more than 10 000, preferably more than 30 000, preferably more than 50 000, preferably more than 100 000 historical images. The greater the number of historical images, the better the analysis performed by the method.

Preferably, a learning base is used that is enriched according to an enrichment method according to the invention.

The learning base may however be constructed according to other methods, for example be created manually. To create a historical image of the learning base, an operator, preferably an orthodontist, identifies one or more "historical" tooth zones on an image, called then assigns, to each identified historical tooth zone, a value for at least one tooth attribute.



In step 2), a deep learning device, preferably a neural network, is trained with the learning base.

A "neural network" or "artificial neural network" is a set of algorithms well known to a person skilled in the art.

The neural network may in particular be chosen from:

the networks specializing in the classification of images, called "CNN" ("convolutional neural network"), for example

AlexNet (2012)

ZF Net (2013)

VGG Net (2014)

GoogleNet (2015)

Microsoft ResNet (2015)

Caffe: BAIR Reference CaffeNet, BAIR AlexNet

Torch:VGG_CNN_S,VGG_CNN_M, VGG_CNN_M_2048,VGG_CNN_M_10 24,VGG_CNN_M_128,VGG_CNN_F,VGG ILSVRC-2014 16-layer,VGG ILSVRC-2014 19-layer,Network-in-Network (Imagenet & CIFAR-10)

Google: Inception (V3, V4).

The networks specializing in the location and detection of objects in an image, the object detection network, for example:

R-CNN (2013)

SSD (Single Shot MultiBox Detector: Object Detection network), Faster R-CNN (Faster Region-based Convolutional Network method: Object Detection network)

Faster R-CNN (2015)

SSD (2015).

The above list is not limiting

In the step 2), the deep learning device is preferably trained by a learning process called "deep learning". By presenting, as input for the deep learning device, historical images (images+descriptions), the deep learning device progressively learns to recognize patterns on an image, and to associate them with tooth zones and with tooth attribute values, for example tooth numbers.

In the step 3), the image that is to be analyzed, or "analysis image", is submitted to the deep learning device.

Through its training in the step 2), the deep learning device is capable of analyzing the analysis image and of recognizing said patterns therein. It may in particular determine a probability relating to:

the presence, at a location in said analysis image, of a zone representing, at least partially, a tooth, or "analysis tooth zone",

the attribute value of the tooth represented on said analysis tooth zone.

For example, it is capable of determining that there is a 95% chance that a form of the analysis image represents an incisor.

Preferably, the deep learning device analyses all the analysis image and determines probabilities for all the analysis tooth zones that it has identified.

In the step 4), the results of the preceding step are analyzed to determine the teeth represented on the analysis image.

When the learning base comprises more than 10 000 historical images, the step 3) gives particularly satisfactory results. In particular, such a learning base makes it possible to establish a probability threshold such that, if a probability

associated with an analysis tooth zone and with a tooth attribute value for this analysis tooth zone exceeds said threshold, the analysis tooth zone effectively represents a tooth having said tooth attribute value.

The step 4) thus leads to the definition of an analysis image enriched with a description defining the analysis tooth zones and, for each analysis tooth zone, the values of the attributes of the tooth represented by the analysis tooth zone.

Global Image Analysis Method

The method for global analysis of an updated image of a dental arch of a patient according to the invention comprises the steps 1') to 3').

The method is similar to the detailed analysis method described above, apart from the fact that, according to the global analysis, it is not necessary to analyze the individual situation of each tooth. The analysis is global to all the image. In other words, the deep learning device determines the value of an "image" attribute without having to previously determine tooth attribute values.

For example, the deep learning device may conclude that, "globally", the dental situation is "satisfactory" or "unsatisfactory", without determining the tooth potentially at the origin of the dissatisfaction.

The step 1') is similar to the step 1). The historical images however include a description specifying an image attribute value for each image.

The step 2') is similar to the step 2).

In the step 3'), the analysis image is submitted to the deep learning device.

Through its training in the step 2'), the deep learning device is capable of analyzing the analysis image and of recognizing said patterns therein. Based on these patterns, it may in particular determine a probability relating to the value of the image attribute considered.

Application to the Modeling of a Dental Arch

A detailed analysis method according to the invention is in particular useful for modeling a dental arch, notably for establishing a remote diagnostic.

It is desirable for each to regularly check his or her dentition, particularly in order to check that the position of his or her teeth is not changing for the worse. In an orthodontic treatment, this change for the worse may in particular lead to the treatment being modified. After an orthodontic treatment, a change for the worse, called "recurrence", may lead to a repeat of a treatment. Finally, more generally and independently of any treatment, each may want to track any displacements of his or her teeth.

Conventionally, the checks are performed by an orthodontist who has appropriate apparatus. These checks are therefore costly. Furthermore, the appointments are restrictive. Finally, some people are apprehensive of a visit to an orthodontist and will fail to make an appointment for a simple check or to assess the feasibility of an orthodontic treatment.

US 2009/0291417 describes a method making it possible to create, then modify, three-dimensional models, particularly for the manufacture of orthodontic appliances.

WO 2016 066651 describes a method for checking the positioning and/or the shape and/or the appearance of teeth of a patient. This method comprises a step of creation of an initial reference model of the teeth, at an initial instant, preferably with a 3D scanner, then, at a subsequent instant, or "updated instant", for example six months after the initial instant, the creation of an updated reference model, by deformation of the initial reference model. This deformation is performed in such a way that the updated reference model allows observation substantially identical to images of the teeth acquired at the updated instant, in particular to photos or images from a video taken by the patient him or herself, with no particular precautions, called "updated images".

The updated images are therefore used to modify the initial, very accurate, reference model. The updated reference model which results from the deformation of the initial reference model, guided by the analysis of the updated images, is therefore also very accurate.

The method described in WO 2016/66651 does however require an appointment with the orthodontist in order to create the initial reference model. This appointment constitutes a brake to prevention. In effect, a patient will not necessarily consult an orthodontist if he or she does not perceive the need therefor. In other words, the method is often implemented only if a malocclusion is found and has to be corrected.

There is therefore a need for a method that addresses this problem, by facilitating prevention.

One aim of the invention is to address this need.

To this end, the invention proposes a method for modeling a dental arch of a patient, said method comprising the following steps:

a) creation of a historical library comprising more than 1000 tooth models, called "historical tooth models", and assignment to each historical tooth model of a value for at least one tooth attribute, or "tooth attribute value";
b) analysis of at least one "analysis image" of the dental arch according to a detailed analysis method according to the invention, so as to determine at least one analysis tooth zone and at least one tooth attribute value associated with said analysis tooth zone;
c) for each analysis tooth zone determined in the preceding step, search, in the historical library, for a historical tooth model exhibiting a maximum proximity with the analysis image or with the analysis tooth zone, or "optimal tooth model";
d) arrangement of all the optimal tooth models so as to create a model which exhibits a maximal match with the updated image, or "assembled model";
e) optionally, replacement of at least one optimal tooth model by another historical tooth model and repeat of the step d) so as to maximize the match between the assembled model and the analysis image;
f) optionally, repeat of the step b) with another analysis image and, in the step d) and/or e), search for a maximal match with all the analysis images used.

The invention thus makes it possible, from a simple analysis image, for example a photograph taken by means of a cellphone, to reconstruct, with a good reliability, a dental arch in the form of an assembled model. In particular, the analysis image may be acquired as described here above at step 1).

Obviously, the analysis of a single analysis image is insufficient to generate an assembled model which accurately corresponds to the arrangement of the teeth of the patient. Such an accuracy is however not generally essential for performing a first diagnosis of the dental situation of the patient.

Moreover, the accuracy of the assembled model may be increased if several analysis images are processed.

The steps b) to c) are preferably implemented for several analysis images and, in the steps d) and e), the optimal tooth models and an assembled model are searched so as to obtain a maximal match in light of all the analysis images (step f)).

The invention also relates to a method for assessing a dental situation of a patient, comprising the following steps:

i) creation of an assembled model according to a modeling method according to the invention;

ii) transmission of the assembled model to a recipient, preferably an orthodontist and/or a computer;

iii) analysis of the orthodontic situation of the patient, by the recipient, from the assembled model;

iv) preferably, informing of the patient of the orthodontic situation, preferably, via his or her cellphone.

The patient may therefore very easily ask an orthodontist to check his or her dental situation, without even having to travel, by simply transmitting one or preferably several photos of his or her teeth.

A modeling method is now described in detail.

In the step a), a historical library **20** (FIG. **18**) is created comprising more than 1000, preferably more than 5000, preferably more than 10 000 historical tooth models **22**. The greater the number of historical tooth models, the more accurate the assembled model.

A historical tooth model can in particular be obtained from a model of a dental arch of a "historical" patient obtained with a scanner. This arch model may be segmented in order to isolate the representations of the teeth, as in FIG. **11***d*. Each of these representations, exhibiting a specific gray shade in FIG. **11***d*, can constitute a historical tooth model.

Preferably, the library is enriched with the tooth models resulting from the implementation of the method described in WO 2016 066651 or of the step A) or A') described above.

One or several tooth attributes, in particular chosen from the list supplied above, are associated with the tooth models. A tooth attribute value is assigned to each tooth attribute of a particular tooth model, as described previously (see the description of the step A)). For example, a tooth model is that of an "incisor", "greatly worn", and whose color parameters are, in the color system L*a*b* according to the standard NF ISO 7724, "a*=2", "b*=1" and "L*=58".

The historical library therefore contains historical tooth models and associated attribute values which facilitate the search in the step c). In FIG. **18**, only historical tooth models **22** representing molars have been represented in the historical library **20**.

In the step b), an analysis image is acquired, as described above for the step B), before analyzing it. In particular, the analysis image is preferably a photo or an image from a film, preferably with a cellphone.

The analysis image can be acquired at any moment after the step a), for example more than one week, more than one month or more than six months after the step a).

The analysis image is analyzed according to a detailed analysis method according to the invention. The optional features of this method are also optional in the step b).

On completion of the step b), an analysis image is obtained that is enriched with a description providing, for each analysis tooth zone, a tooth attribute value for at least one tooth attribute, for example a tooth number.

In the step c), a search is carried out in the historical library, for each analysis tooth zone determined in the preceding step, for a historical tooth model exhibiting a maximal proximity with the analysis tooth zone. This tooth model is qualified as "optimal tooth model".

The "proximity" is a measurement of one or more differences between the historical tooth model and the analysis tooth zone. These differences may include a difference in shape, but also other differences like a difference in translucency or in color. The maximal proximity may be searched for by successively minimizing several differences, or by minimizing a combination of these differences, for example a weighted sum of these differences.



The "proximity" is therefore a broader concept than "match", the match measuring only a shape-related proximity.

The assessment of the proximity of a historical tooth model with an analysis tooth zone preferably comprises a comparison of at least one value of a tooth attribute of the analysis tooth zone with the value of this attribute for the historical tooth model. Such an assessment is advantageously very rapid.

For example, if the description of the analysis tooth zone provides a value for the type or the number of the tooth, the thickness of the tooth represented and/or the height of its crown and/or its mesio palatine width and/or the mesial and distal deflection index of its incisal edge, this value may be compared to the value of the corresponding attribute of each of the historical tooth models.

Preferably, a historical tooth model is sought that has, for at least one tooth attribute, the same value as said analysis tooth zone. The tooth attribute may in particular relate to the tooth type or to the tooth number. In other words, the historical tooth models are filtered to examine in more detail only those which relate to the same type of tooth as the tooth represented on the analysis tooth zone.

Alternatively or, preferably, in addition to this comparison of the attribute values, the shape of the tooth represented on the analysis tooth zone may be compared to the shape of a historical tooth model to be assessed, preferably by means of a metaheuristic method, preferably evolutionist, preferably by simulated annealing.

To this end, the historical tooth model to be assessed is observed from different angles. Each view thus obtained is compared with the analysis image, preferably with the analysis tooth zone, so as to establish a "distance" between this view and said analysis image or, preferably, said analysis tooth zone. The distance thus measures the difference between the view and the analysis tooth zone.

The distance may be determined after a processing of the view and of the analysis image or, preferably, of the analysis tooth zone, so as to reveal, on corresponding maps, one and the same discriminating information item, for example a contour information item, as described above in the step C3) or in WO 2016 066651.

For each historical tooth model tested, a view is thus determined which provides a minimal distance with the analysis image or with the analysis tooth zone. Each historical tooth model examined is thus associated with a particular minimal distance, which measures its proximity of shape with the analysis tooth zone.

The optimal historical tooth model is the one which, in light of the comparison or comparisons performed, is considered to be closest to the analysis tooth zone.

The minimal distances obtained for the different tooth models tested are then compared and, to define the optimal tooth model, the one which exhibits the smallest minimal distance is retained. The optimal tooth model therefore exhibits a maximal match with the analysis image.

The search for the maximal match is preferably performed by means of a metaheuristic method, preferably evolutionist, preferably by simulated annealing.

In a preferred embodiment, a first assessment of the historical tooth models by comparison of the values of at least one tooth attribute, for example the tooth number, with the corresponding values of the analysis tooth zone, then a second assessment by comparison of shape are performed in succession. The first, rapid assessment, advantageously makes it possible to filter the historical tooth models in order

to submit only the historical tooth models retained by the first assessment to the second, slower assessment.

For example, if an analysis tooth zone represents a tooth number 15, the first assessment makes it possible to retain only the tooth models modeling teeth number 15. During the second assessment, a search is conducted, among all the historical tooth models modeling teeth number 15, for the historical tooth model whose shape most approximates that of the tooth represented.

More preferably, several first assessments are performed before performing the second assessment. For example, the first assessments make it possible to filter the historical tooth models so as to retain only the tooth models modeling teeth number 15 and which exhibit a crown height of between 8 and 8.5 mm.

On completion of the step c), an optimal tooth model has thus been associated with each of the analysis tooth zones.

For example, in FIG. **18**, the historical tooth model $\mathbf{22}_1$ can be observed so as to strongly resemble an analysis zone identified on the analysis image. It is considered as optimal for this analysis zone.

In the step d), an assembled model is created by arranging the optimal tooth models.

According to one embodiment, at the start of the step d), a first rough arrangement is created, that is to say that a rough model is produced by assembling optimal tooth models.

To establish the first rough arrangement, the optimal tooth models can be oriented so that their optimal directions of observation are all parallel, the optimal direction of observation of a tooth model being the direction in which said tooth model exhibits a maximum match with the analysis image.

The first rough arrangement may be also established by considering the tooth attribute values of the optimal tooth models. For example, if the tooth numbers of optimal tooth models are those of the canines and of the incisors, these tooth models may be arranged according to an arc **24** (FIG. **18**) corresponding conventionally to the region of the arch which bears these types of teeth.

The shape of this arc may be refined as a function of other tooth attribute values.

The order of the optimal tooth models is that of the corresponding analysis tooth zones.

Moreover, the minimal distance associated with an optimal tooth model results from an observation of the tooth model according to an "optimal" observation direction. In other words, it is probably substantially from this direction that the tooth that this model models is also observed in the analysis image. All the optimal tooth models are thus preferably oriented in such a way that their respective optimal observation directions are all parallel.

It is thus possible to define a first arrangement of the optimal tooth models.

Preferably, the first arrangement of the optimal tooth models is then modified iteratively, so as to exhibit a maximal match with the analysis image.

To assess an arrangement, it is observed according to different angles. Each view thus obtained is compared with the analysis image so as to establish a "distance" between this view and said analysis image. The distance thus measures the difference between the view and the analysis image.

The distance may be determined after a processing of the view and of the analysis image so as to reveal, on one of the corresponding maps, a discriminating information item, for example a contour information item, as described above in the step C3) or in WO 2016 066651.

For each arrangement examined, a view is thus determined that provides a minimal distance with the analysis image. Each arrangement examined is thus associated with a minimal distance.

The minimal distances obtained for the different arrangements tested are then compared and, to define the optimal arrangement, the one which exhibits the smallest minimal distance is retained. The optimal arrangement thus exhibits a maximal match with the analysis image.

The search for the maximal match is performed preferably by means of a metaheuristic method, preferably evolutionist, preferably by simulated annealing.

On completion of the step d), an optimal arrangement of the optimal tooth models, that is to say the assembled model **26**, is obtained.

In the optional step e), one or more optimal tooth models are replaced by other tooth models, then there is a return to the step d) so as to maximize the match between the assembled model and the analysis image.

It is in fact possible for an optimal tooth model, in the "optimal" arrangement, to no longer exhibit a maximal match with the analysis image. In particular, the tooth model might have been observed in an "optimal" direction which provided a view exhibiting a minimal distance with the analysis image (reason why it was considered as optimal), but, in the optimal arrangement, it is no longer oriented according to the optimal direction.

A new search for an assembled model may therefore be performed by modifying the tooth models, for example by replacing the optimal tooth models with close tooth models.

The search for the tooth models to be tested is preferably performed by means of a metaheuristic method, preferably evolutionist, preferably by simulated annealing.

In the preferred embodiment, the method therefore implements a double optimization, on the tooth models and on the arrangement of the tooth models, the assembled model being the arrangement of a set of tooth models which provides the minimal distance with the analysis image, by considering all the possible tooth models and all the possible arrangements.

In the optional and preferred step f), the method implements several analysis images of the arch of the patient, preferably more than 3, more than 5, more than 10, more than 50, preferably more than 100 analysis images. The assembled model is thus more complete.

More preferably, the method implements an optimization such that the assembled model obtained is optimal in light of all of the analysis images. In other words, the assembled model is preferably the one which maximizes the match with all of the analysis images.

In the preferred embodiment, the method therefore implements a double or, preferably a triple optimization, on the tooth models on the one hand, on the arrangement of the tooth models and/or on a plurality of analysis images on the other hand, the assembled model being the arrangement of a set of tooth models which provides the mean minimal distance, over all of the analysis images, by considering all the possible tooth models and, preferably, all the possible arrangements.

According to one embodiment, in the step d) and/or e) and/or f), a metaheuristic, preferably evolutionist, method, preferably by simulated annealing, is used.

As now clearly appears, the invention thus makes it possible to construct an assembled dental arch model from simple analysis images, for example photographs taken by means of a cellphone. Obviously, the accuracy of the

assembled model does not reach that of a scan. In some applications, for example to perform a first diagnosis of the dental situation of the patient, such an accuracy is not however essential.

The assembled model may therefore be used to analyze the orthodontic situation of the patient, according to the steps ii) to iv).

In the step ii), the assembled model is sent to an orthodontist and/or to a computer provided with diagnostic software.

In one embodiment, the assembled model is sent accompanied by a questionnaire filled out by the patient in order to improve the quality of the analysis in the step iv).

In the step iii), the orthodontist and/or the computer examines the assembled model. Unlike an updated image, the assembled model allows an observation from any angle. The analysis is advantageously more accurate.

In the step iv), the orthodontist and/or the computer informs the patient, for example by sending him or her a message on his or her telephone. This message may in particular inform the patient of an unfavorable situation and urge him or her to make an appointment with the orthodontist.

The orthodontist may also compare the assembled model with assembled models received previously for the same patient. The analysis thereof advantageously makes it possible to assess the trend of the situation. The message may thus inform the patient of an unfavorable change of his or her situation, which improves the prevention.

The assembled model may also be compared with one or more models obtained by scanning of the teeth or from a molding of the teeth of the patient, or with an updated reference model resulting from the implementation of a method described in WO 2016 066651.

Application to Embedded Monitoring

An image analysis according to the invention is also useful for guiding the acquisition of an image of a dental arch, in particular for establishing a remote diagnosis.

In particular, WO 2016/066651 describes a method in which an initial reference model is deformed so as to obtain an updated reference model allowing the acquisition of reference images exhibiting a maximal match with the "updated" images of the arch acquired at the updated instant.

The reference images are therefore views of the updated reference model, observed in virtual acquisition conditions which are the closest possible matches with the real acquisition conditions implemented to acquire the updated images of the arch of the patient.

The search for these virtual acquisition conditions is preferably performed by means of metaheuristic methods.

To speed up this search, WO 2016/066651 recommends performing a first rough assessment of the real acquisition conditions. For example, conditions which would correspond to a position of the acquisition apparatus at a distance from the teeth greater than 1 meter are excluded from the search.

There is however an ongoing need to speed up the execution of the method described in WO 2016/066651, and in particular, to search, more rapidly, for the virtual acquisition conditions exhibiting a maximal match with the real acquisition conditions implemented to acquire an updated image of the arch of the patient.

One aim of the invention is to at least partially address this problem.

The invention proposes a method for acquiring an image of a dental arch of a patient, said method comprising the following steps:

a') activation of an image acquisition apparatus so as to acquire an image, called "analysis image", of said arch;

b') analysis of the analysis image by means of a deep learning device, preferably a neural network, trained by means of a learning base, preferably according to a detailed analysis method according to the invention, so as to identify at least one analysis tooth zone representing a tooth on said analysis image, and to determine at least one tooth attribute value for said analysis tooth zone, or according to a global analysis method according to the invention;

c') determination, for the analysis image, of a value for an image attribute, said value being a function of said tooth attribute value if a detailed analysis method according to the invention has been implemented in the preceding step;

d') optionally, comparison of said image attribute value with an instruction;

e') sending of an information message as a function of said comparison.

In one embodiment, in the step b'), all said analysis tooth zones are identified, and at least one tooth attribute value is determined for each analysis tooth zone, and, in the step c'), the value for the image attribute is determined as a function of said tooth attribute values.

In one embodiment, the step b') comprises the following steps:

1) preferably before the step a'), creation of a learning base comprising more than 1 000 dental arch images, or "historical images", each historical image comprising one or more zones each representing a tooth, or "historical tooth zones", to each of which, for said tooth attribute, a tooth attribute value is assigned;

2) training of at least one deep learning device, preferably a neural network, by means of the learning base;

3) submission of the analysis image to the deep learning device so that it determines at least one probability relating to:

the presence, at a location in said analysis image, of a zone representing, at least partially, a tooth, or "analysis tooth zone",

the attribute value of the tooth represented on said analysis tooth zone,

4) determination, as a function of said probability, of the presence of a tooth at a position represented by said analysis tooth zone, and of the attribute value of said tooth.

In one embodiment, the step b') comprises the following steps:

1') creation of a learning base comprising more than 1 000 dental arch images, or "historical images", each historical image comprising an attribute value for at least one image attribute, or "image attribute value";

2') training of at least one deep learning device, preferably a neural network, by means of the learning base;

3') submission of the analysis image to the deep learning device so that it determines, for said analysis image, at least one probability relating to said image attribute value.

In one embodiment, to create a historical image of the learning base, an operator, preferably an orthodontist,

identifies one more "historical" tooth zones on an image, then assigns each identified historical tooth zone a value for at least one tooth attribute, and/or

assigns an image a value for at least one tooth attribute.

In one embodiment, the information message is sent by the acquisition apparatus.

As will be seen in more detail hereinafter in the description, an acquisition method according to the invention therefore makes it possible to check whether an analysis image respects an instruction and, if it does not respect the instruction, to guide the operator in order for him or her to acquire a new analysis image. The method therefore allows an "embedded monitoring", preferably in the image acquisition apparatus.

In particular, to implement the method of WO 2016/066651, there may be a desire to acquire updated images from different acquisition directions, for example a front image, a right image and a left image. These updated images, acquired in succession, may be classified accordingly. The search for the virtual acquisition conditions exhibiting a maximal match with the real acquisition conditions is speeded up thereby.

In effect, the search may begin from virtual acquisition conditions in which the virtual acquisition apparatus is in front, to the left or to the right of the updated reference model, depending on whether the updated image considered is classified as a front, left or right image, respectively.

The operator, generally the patient, may however make a mistake in the acquisition of the updated images. In particular, he or she may forget to take an updated image, for example the front view, or invert two updated images. Typically, the operator may take an image on the right whereas a left image is expected from him or her.

This inversion of the updated images may considerably slow down their processing. For example, if the updated image is assumed to be an image taken on the left but it was in error taken on the right, said search for the optimal virtual acquisition conditions, that is to say those exhibiting a maximal match with the real acquisition conditions, will begin from a starting point offering a left view of the reference model, whereas the optimal virtual acquisition conditions correspond to a right view. The search will therefore be considerably slowed down thereby.

By virtue of the invention, each updated image is an analysis image which may be analyzed and checked, preferably in real time.

For example, the acquisition method makes it possible to determine that the updated image has been "taken on the right" and compare this image attribute value with the instruction which had been given to the operator to take the updated image on the left. Since the attribute value of the updated image (image taken on the right) does not correspond to the instruction (acquire an updated image on the left), the acquisition apparatus may immediately alert the operator in order for him or her to modify the acquisition direction.

An acquisition method is now described in detail.

In the step a'), the operator activates the image acquisition apparatus so as to acquire an analysis image.

In one embodiment, the operator triggers the acquisition apparatus so as to store the analysis image, preferably takes a photo or video of his or her teeth, preferably by means of a cellphone equipped with a camera.

The step a') may be performed like the acquisition of the updated images in the step B) described above.

In another embodiment, the analysis image is not stored. In particular, the analysis image may be the image which, in real time, appears on the screen of the cellphone of the operator, generally the patient.

In a first embodiment, in the step b'), the analysis image is analyzed according to a detailed analysis method according to the invention. This analysis preferably leads to the assignment of a tooth attribute value to each identified analysis tooth zone, for example to assigning a tooth number to each of the analysis tooth zones.

In the step c'), an attribute value of the analysis image is determined as a function of the tooth attribute values. The attribute value of the analysis image may relate to its general orientation and may for example take one of the following three values: "right photo", "left photo" and "front photo". The attribute value of the analysis image may also be the list of the tooth numbers represented, for example, "16, 17 and 18". The attribute value of the analysis image may also be, for example, the "presence" or "absence" of a dental, preferably orthodontic, appliance, or the state of opening of the mouth ("mouth open", "mouth closed").

In another embodiment, a global analysis method according to the invention is implemented in the step b'). Advantageously, such a method makes it possible to directly obtain a value for an image attribute, without having to determine values for a tooth attribute. It is therefore advantageously more rapid. The information resulting from a global analysis may however be less accurate than that resulting from a detailed analysis.

The steps a') to c') thus make it possible to characterize the analysis image.

The characterization of the analysis image makes it possible to guide the operator if the analysis image does not correspond to the expected image, for example because its quality is insufficient or because it does not represent the desired teeth.

In the step d'), the image attribute value of the analysis image is compared with an instruction.

For example, if the instruction was to acquire a right image and the image attribute value is "take on the left", the comparison leads to the conclusion that the image acquired is "unsatisfactory".

In the step e'), a message is sent to the operator, preferably by the acquisition apparatus.

Preferably, the information message relates to the quality of the image acquired and/or to the position of the acquisition apparatus in relation to said arch and/or to the setting of the acquisition apparatus and/or to the opening of the mouth and/or to the wearing of a dental, preferably orthodontic, appliance.

For example, if the image acquired is "unsatisfactory", the acquisition apparatus may emit a light, for example red, and/or ring, and/or generate a voice message, and/or vibrate, and/or display a message on its screen.

For example, if the image has to be acquired while the patient wears his or her dental appliance and this is not the case, the acquisition apparatus may send the message "wear your appliance for this image".

For example, if the image was acquired with the patient not sufficiently opening the mouth or with the mouth closed, the acquisition apparatus may send the message "open your mouth more for this image".

In one embodiment, the steps b') to c') are implemented only if the operator records the analysis image, that is to say he or she presses on the trigger. The message then prompts the operator to acquire a new analysis image. Optionally, the acquisition apparatus deletes the unsatisfactory analysis image.

In one embodiment, the steps b') to c') are implemented permanently when the acquisition apparatus is switched on and the analysis image is an image which appears on a screen of the acquisition apparatus. The acquisition apparatus may thus, for example, emit a red light as long as the analysis image is unsatisfactory, and emit a green light when

the analysis image is satisfactory. Advantageously, the acquisition apparatus then stores only analysis images which are satisfactory.

As now clearly emerges, the invention therefore allows an embedded monitoring upon the acquisition of analysis images. When applied to updated images of the method of WO 2016/066651, the steps a') to e') make it possible to check that these images do indeed conform to the need, and therefore to considerably speed up the execution of this method.

The steps d') and e') are optional. In one embodiment, the analysis image is only associated with its description, which specifies its image attribute value. This description also makes it possible to considerably speed up the execution of the method of WO 2016/066651 since, when the analysis image is used as updated image of this method, it makes it possible to approximately determine the real acquisition conditions of this image, by eliminating the risk of a rough error, for example because of a reversal between two images.

The steps d') and e') are however preferred. They make it possible for example to avoid having the operator forget a left image, or take two redundant right images.

Application to the Monitoring of an Orthodontic Aligner

Conventionally, at the start of an orthodontic treatment, the orthodontist determines the positioning of the teeth that he or she wants to obtain at a so-called "set-up" instant of the treatment. The set-up may be defined by means of an imprint or from a three-dimensional scan of the teeth of the patient. The orthodontist then has manufactured, or manufactures, accordingly, an orthodontic appliance suited to this treatment.

The orthodontic appliance may be an orthodontic aligner. An aligner conventionally takes the form of a removable single-piece appliance, conventionally made of a transparent polymer material, which comprises a channel conformed for several teeth of an arch, generally all the teeth of an arch, to be able to be housed therein.

The form of the channel is adapted to hold the aligner in position on the teeth, while exerting an action of correction of the positioning of certain teeth (FIGS. **14** and **15**).

At the start of the treatment, the shapes that the different aligners have to take at different moments of the treatment are conventionally determined, then the set of corresponding aligners is manufactured. At predetermined instants, the patient changes the aligner.

The treatment by means of aligners is advantageously less stressful for the patient. In particular, the number of appointments with the orthodontist is limited. Furthermore, there is less pain than with a metal orthodontic brace attached to the teeth.

The market for orthodontic aligners is therefore on the increase.

At regular intervals, the patient goes to the orthodontist for a visual inspection, notably to check whether the displacement of the teeth conforms to the expectations and whether the aligner worn by the patient is still suited to the treatment.

If the orthodontist diagnoses an unsuitability to the treatment, he or she takes a new imprint of the teeth, or, in an equivalent manner, a new three-dimensional scan of the teeth, then orders a new series of aligners configured accordingly. It is considered that, on average, the number of aligners finally manufactured is approximately 45, instead of 20 aligners conventionally provided at the start of the treatment.



The need to have to go to the orthodontist is a constraint for the patient. The trust of the patient in his or her orthodontist may also be affected. The inadequacy may be unsightly. Finally, the result thereof is an additional cost.

The number of inspection visits to the orthodontist must therefore be limited.

There is a need for solutions addressing these problems.

One aim of the invention is to at least partially address this need.

The invention provides a method for assessing the shape of an orthodontic aligner, said method comprising the following steps:

a") acquisition of at least one image at least partially representing the aligner in a service position in which it is worn by a patient, called "analysis image";

b") analysis of the analysis image by means of a deep learning device, preferably a neural network, trained by means of a learning base, so as to determine a value for at least one tooth attribute of an "analysis tooth zone" of the analysis image, the tooth attribute relating to a separation between the tooth represented by the analysis tooth zone, and the aligner represented on the analysis image, and/or for an image attribute of the analysis image, the image attribute relating to a separation between at least one tooth represented on the analysis image, and the aligner represented on said analysis image;

c") preferably, assessment of the suitability of the aligner as a function of the value of said tooth or image attribute;

d") preferably, sending of an information message as a function of said assessment.

As will be seen in more detail hereinafter in the description, an assessment method according to the invention considerably simplifies the assessment of the good suitability of the aligner to the treatment, while making this assessment particularly reliable. In particular, the method may be implemented from simple photographs or films, taken with no particular precautions, for example by the patient. The number of appointments with the orthodontist may therefore be limited.

Preferably, in the step b"), all said analysis tooth zones are identified, and the value of said tooth attribute is determined for each analysis tooth zone, and, in the step c"), the suitability of the aligner is determined as a function of said tooth attribute values.

Preferably, said tooth attribute is chosen from the group formed by a maximal separation along the free edge of the tooth, a mean separation along the free edge of the tooth, and said image attribute is chosen from the group formed by a maximal separation along all of the teeth represented, a mean separation along the free edges of all of the teeth represented, an overall acceptability of the separation of the teeth represented.

The tooth attribute relating to a separation may in particular be the existence of a separation, this attribute being able to take the tooth attribute values "yes" or "no"; or a value measuring the scale of the separation, for example an observed maximal separation or an assessment in relation to a scale.

In the step b"), a detailed analysis method according to the invention is preferably implemented, a tooth attribute of each historical tooth zone of each historical image of the learning base relating to a separation between the tooth represented by the historical tooth zone, and an aligner worn by said tooth and represented on said historical image.

Preferably, the step b") comprises the following steps:

b"1) preferably before the step a"), creation of a learning base comprising more than 1000, preferably more than 5000, preferably more than 10 000 images of dental arches, or "historical images", each historical image representing an aligner worn by a "historical" patient and comprising one or more zones each representing a tooth, or "historical tooth zones", to each of which is assigned, for at least one tooth attribute relating to a separation between the tooth represented by the historical tooth zone considered, and the aligner represented, a tooth attribute value;

b"2) learning of a deep learning device, preferably a neural network, by means of the learning base;

b"3) submission of the analysis image to the deep learning device for the deep learning device to determine at least one probability relating to

the presence, at a location of said analysis image, of an analysis tooth zone, and

the tooth attribute value of the tooth represented on said analysis tooth zone;

b"4) determination, as a function of said probability, of the presence of a separation between the aligner and the tooth represented by said analysis tooth zone, and/or of an amplitude of said separation.

The steps b"1) to b"4) may comprise one or more of the features, possibly optional, of the steps 1) to 4) described above, respectively.

In one embodiment, in the step b"), a global analysis method according to the invention is implemented, an image attribute of each historical image of the learning base relating to a separation between at least one tooth represented on the historical image, and an aligner worn by said tooth and represented on said historical image.

Preferably, the step b") comprises the following steps:

b"1') creation of a learning base comprising more than 1000 images of dental arches, or "historical images", each historical image comprising an attribute value for at least one image attribute, or "image attribute value", relating to a separation between at least one tooth represented on the analysis image, and the aligner represented on said analysis image;

b"2') training of at least one deep learning device, preferably a neural network, by means of the learning base;

b"3') submission of the analysis image to the deep learning device for it to determine, for said analysis image, at least one probability relating to said image attribute value, and determination, as a function of said probability, of the presence of a separation between the aligner and the tooth or teeth represented on the analysis image, and/or of an amplitude of said separation.

The steps b" 1') to b"3') may comprise one or more of the features, possibly optional, of the steps 1') to 3') described above, respectively.

The method is now described when a detailed analysis is implemented in the step b").

Prior to the step a"), the learning base must be enriched, preferably according to an enrichment method according to the invention, in order to contain historical images whose description specifies, for each of the historical tooth zones, a value for the tooth attribute relating to the separation.

This information may be input manually. For example, an image representing one or more so-called "historical" tooth zones may be presented to an operator, preferably an orthodontist, and he or she may be asked to identify these historical tooth zones and indicate, for each historical tooth zone, whether there is a separation or not and/or assess the amplitude of this separation.

A historical image may be a photo representing an aligner worn by a historical patient. Alternatively, a historical image may be the result of a processing of an image representing a naked dental arch (that is to say without aligner) and of an image representing the same arch bearing the aligner. The image representing the naked arch may in particular be a view of a model of the arch deformed to obtain a maximal match with the image representing the arch bearing the aligner. Such a processing may in particular be useful for better revealing the outline of the teeth and of the aligner when the teeth are not very visible through the aligner.

In the step a"), the acquisition of the analysis image may be performed like the acquisition of the updated images in the step B) described above.

Preferably, at least one reminder informing the patient of the need to create an analysis image is addressed to the patient. This reminder may be in paper form or, preferably, in electronic form, for example in the form of an email, of an automatic alert from a dedicated mobile device or an SMS. Such a reminder may be sent by the orthodontic practice or laboratory or by the dentist or by the dedicated mobile application of the patient, for example.

The step a") is performed at the moment when the assessment of the shape of an aligner is desired, for example more than 1 week after the start of the treatment with the aligner.

The analysis image is an image representing the aligner worn by the teeth of the patient.

In the step b"), the analysis image is analyzed according to a detailed analysis method according to the invention.

The deep learning device has been trained by means of a learning base containing historical images whose description specifies, for at least one, preferably each historical tooth zone, a value for a tooth attribute relating to a separation between the tooth represented by the historical tooth zone and the aligner worn by said tooth and represented on said historical image.

The value for this tooth attribute therefore provides an information item relating to the shape of the aligner relative to the shape of the teeth of the patient.

The value for this tooth attribute can be a measurement of the separation, for example a measurement of the maximum separation, or of the mean separation for the tooth represented by the historical tooth zone.

The deep learning device is therefore capable of analyzing the analysis image to determine, preferably for each of the "analysis tooth zones", the existence, even the extent, of a separation of the aligner of the tooth represented on the analysis tooth zone.

In the step c"), an assessment is made, as a function of the results of the preceding step, as to the compatibility the aligner. For example, a search is conducted to see if the separation of the aligner with at least one tooth exceeds an acceptability threshold and, in this case, a decision is made as to the replacement of the aligner by a better suited aligner.

The suitability of the aligner can be assessed in the context of an orthodontic treatment (separation compatible or not with the orthodontic treatment) but also in the context of a non-therapeutic, in particular esthetic, treatment. Aligners can indeed be used to displace teeth for purely esthetic purposes, without this displacement modifying the state of health of the patient. The suitability of the aligner can also be assessed in the context of a research program concerning

the effectiveness of the aligner, for example to assess a new material for the aligner, on a human being or on another animal.

In the step d"), an information item relating to the assessment in the preceding step is sent, in particular to the patient and/or the orthodontist.

The orthodontist can then use this information, possibly in combination with additional information, for example the age of the patient or the duration for which the aligner has been worn, to establish a diagnosis and, if necessary, decide on a suitable treatment.

In one embodiment, the method comprises, in the step b"), a global analysis according to the invention. The other steps are unchanged.

The analysis of the analysis image and of the historical images is then performed globally, without identification of the individual situation of each of the teeth represented and the image attribute relates to the image as a whole.

For example, the image attribute relating to the separation may relate to the acceptability of a dental situation, the cause of one or more separations, or relate to the global scale of the separation or separations of the teeth. For example, the value of the image attribute may be "globally acceptable" or "globally unacceptable". The value of the image attribute can also, for example, be a measurement of the separation, for example a measurement of the maximum separation, or of the mean separation between the teeth represented on the analysis image and the aligner.

As now clearly emerges, a method according to the invention makes it possible, from simple photos or a simple film, to determine whether the aligner is abnormally detached, even, if a detailed analysis was performed in the step b"), to determine the regions in which the aligner is separated from the teeth and assess the scale of this separation.

The invention also relates to a method for adapting an orthodontic treatment, a method in which a method for assessing the shape of an orthodontic aligner according to the invention is implemented, then, as a function of the result of said assessment, a new aligner is manufactured and/or the patient is counseled, for example for him or her to improve the conditions of use of his or her orthodontic aligner, in particular the positioning and/or the time bands when it should be worn and/or the maintenance of his or her orthodontic aligner, in order to optimize the treatment.

The use of aligners is not limited to therapeutic treatments. In particular, an assessment method may be implemented to assess an aligner exclusively used for esthetic purposes.

The method may also be used to assess other dental, in particular orthodontic, parts or appliances.

Computer Program

The invention relates also:

- to a computer program, and in particular a dedicated application for cellphones, comprising program code instructions for the execution of one or more steps of any method according to the invention, when said program is run by a computer,
- to a computer medium on which such a program is stored, for example a memory or a CD-ROM.

Obviously, the invention is not limited to the embodiments described above and represented.

In particular, the patient is not necessarily a human being. A method according to the invention may be used for another animal.



The patient could be alive or dead. He is preferably alive.

The methods of the invention may be used for an orthodontic treatment, but also out of any orthodontic treatment, and even out of any therapeutic treatment.

The invention claimed is:

1. A method for assessing the shape of an orthodontic aligner, said method comprising the following steps:

a") more than 1 week after the start of the treatment with the aligner, acquisition of at least one image at least partially representing the aligner in a service position in which it is worn by a patient, called "analysis image", the analysis image being a photograph, or an image extracted from a film;

b") analysis of the analysis image by means of a deep learning device, trained by means of a learning base, so as to determine a value

for at least one tooth attribute of an "analysis tooth zone" representing, at least partially, a tooth on said analysis image, the tooth attribute relating to a separation between the tooth represented by the analysis tooth zone, and the aligner represented on the analysis image,

in the step a"), a cellphone is used to acquire the analysis image.

2. The method as claimed in claim 1, comprising, after the step b"), step c") as follows:

c") assessment of the suitability of the aligner as a function of the value of said tooth attribute.

3. The method as claimed in claim 2, in which, in the step b"), all said analysis tooth zones are identified, and the tooth attribute value is determined for each analysis tooth zone, and, in the step c"), the suitability of the aligner is determined as a function of said tooth attribute values.

4. The method as claimed in claim 2, comprising, after the step c"), a step d") as follows:

d") sending of an information message as a function of said assessment.

5. The method as claimed in claim 2, in which, as a function of the result of said assessment, a new aligner is manufactured.

6. The method as claimed in claim 1, in which said tooth attribute is chosen from a tooth number, a tooth type, a tooth shape parameter, a tooth appearance parameter, a parameter relating to the state of the tooth, an age for the patient, or a combination of these attributes.

7. The method as claimed in claim 1, in which the step b") comprises the following steps:

1) creation of a learning base comprising more than 1000 images of dental arches, or "historical images", each historical image representing an aligner worn by a "historical" patient and comprising one or more zones each representing a tooth, or "historical tooth zones", to each of which, for at least one tooth attribute relating to a separation between the tooth represented by the historical tooth zone considered, and the aligner represented, a tooth attribute value is assigned;

2) training of at least one deep learning device, by means of the learning base;

3) submission of the analysis image to the deep learning device for it to determine at least one probability relating to:

the presence, in a location of said analysis image, of an analysis tooth zone, and

the attribute value of the tooth represented on said analysis tooth zone;

4) determination, as a function of said probability, of the presence of a separation of the aligner and of the tooth represented by said analysis tooth zone.

**8**. The method as claimed in claim **1**, in which the step b") comprises the following steps:

1') creation of a learning base comprising more than 1000 images of dental arches, or "historical images", each historical image comprising an attribute value for at least one image attribute, or "image attribute value", the image attribute relating to a separation between the tooth or teeth and the aligner represented on the historical image;

2') training of at least one deep learning device, by means of the learning base;

3') submission of the analysis image to the deep learning device for it to determine, for said analysis image, at least one probability relating to said image attribute value.

**9**. The method as claimed in claim **1**, in which the learning base is constructed according to the following steps:

A) at an "updated" instant, production of a model of a dental arch of a patient, or "updated reference model", and segmentation of the updated reference model so as to produce, for each tooth, a "tooth model", and, for at least one tooth attribute, assignment of a tooth attribute value to each tooth model;

B) acquisition of at least one image of said arch, or "updated image", in real acquisition conditions;

C) for each updated image, search for virtual acquisition conditions suitable for an acquisition of an image of the updated reference model, called "reference image", exhibiting a maximum match with the updated image in said virtual acquisition conditions, and acquisition of said reference image;

D) identification, in the reference image, of at least one zone representing a tooth model, or "reference tooth zone" and, by comparison of the updated image and of the reference image, determination, in the updated image, of a zone representing said tooth model, or "updated tooth zone";

E) assignment, to said updated tooth zone, of the tooth attribute value of said tooth model;

F) addition of the updated image enriched with a description of said updated tooth zone and its tooth attribute value, or "historical image", in the learning base.

**10**. The method as claimed in claim **1**, in which the learning base is constructed according to the following steps:

A') at an initial instant, production of a model of a dental arch of a patient, or "initial reference model", and segmentation of the initial reference model so as to produce, for each tooth, a "tooth model", and, for at least one tooth attribute, assignment of a tooth attribute value to each tooth model;

B') at an updated instant, acquisition of at least one image of said arch, or "updated image", in real acquisition conditions;

C') search, by deformation of the initial reference model, for an updated reference model and virtual acquisition conditions suitable for an acquisition of an image of the updated reference model, called "reference image", exhibiting a maximum match with the updated image in said virtual acquisition conditions;

D) identification, in the reference image, of at least one zone representing a tooth model, or "reference tooth zone" and, by comparison of the updated image and the reference image, determination, in the updated image, of a zone representing said tooth model, or "updated tooth zone";

E) assignment, to said updated tooth zone, of the tooth attribute value of said tooth model;

F) addition of the updated image enriched with a description of said updated tooth zone and its tooth attribute value, or "historical image", in the learning base.

**11**. The method as claimed in claim **1**, in which, to create a historical image of the learning base, an operator,

identifies one or more "historical" tooth zones on an image, called then assigns, to each identified historical tooth zone, a value for at least one tooth attribute, and/or

assigns to an image a value for at least one tooth attribute.

**12**. The method as claimed in claim **1**, in which, in the step a"), a cellphone is used to acquire the analysis image.

**13**. The method as claimed in claim **1**, in which in step b"), the deep learning device is a neural network.

**14**. The method as claimed in claim **1**, in which the step b") comprises the following steps:

1) creation of a learning base comprising more than 1000 images of dental arches, or "historical images", each historical image representing an aligner worn by a "historical" patient and comprising one or more zones each representing a tooth, or "historical tooth zones", to each of which, for at least one tooth attribute relating to a separation between the tooth represented by the historical tooth zone considered, and the aligner represented, a tooth attribute value is assigned;

2) training of at least one deep learning device, by means of the learning base;

3) submission of the analysis image to the deep learning device for it to determine at least one probability relating to:

the presence, in a location of said analysis image, of an analysis tooth zone; and

the attribute value of the tooth represented on said analysis tooth zone;

4) determination, as a function of said probability, of an amplitude of said separation.

**15**. A method for assessing the shape of an orthodontic aligner, said method comprising the following steps:

a") more than 1 week after the start of the treatment with the aligner, acquisition of at least one image at least partially representing the aligner in a service position in which it is worn by a patient, called "analysis image" the analysis image being a photograph, or an image extracted from a film;

b") analysis of the analysis image by means of a deep learning device, trained by means of a learning base, so as to determine a value for an image attribute of the analysis image, the image attribute relating to a separation between at least one tooth represented on the analysis image, and the aligner represented on said analysis image.

**16**. The method as claimed in claim **15**, comprising, after the step b"), step c") as follows:

c") assessment of the suitability of the aligner as a function of the value of said image attribute.

* * * * *

US010755409B2

(12) **United States Patent**
**Salah et al.**

(10) **Patent No.: US 10,755,409 B2**
(45) **Date of Patent: Aug. 25, 2020**

(54) **METHOD FOR ANALYZING AN IMAGE OF A DENTAL ARCH**

(71) Applicant: **DENTAL MONITORING**, Paris (FR)

(72) Inventors: **Philippe Salah**, Bagnolet (FR); **Thomas Pellissard**, Clichy (FR); **Guillaume Ghyselinck**, Cantin (FR); **Laurent Debraux**, Paris (FR)

(73) Assignee: **DENTAL MONITORING**, Paris (FR)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 81 days.

(21) Appl. No.: **16/031,201**

(22) Filed: **Jul. 10, 2018**

(65) **Prior Publication Data**

US 2019/0026889 A1 Jan. 24, 2019

(30) **Foreign Application Priority Data**

Jul. 21, 2017 (FR) ..................................... 17 56947

(51) **Int. Cl.**
***A61C 3/00*** (2006.01)
***G06K 9/00*** (2006.01)
(Continued)

(52) **U.S. Cl.**
CPC ............ ***G06T 7/0012*** (2013.01); ***A61C 7/002*** (2013.01); ***G06T 7/143*** (2017.01); ***G06T 7/55*** (2017.01);
(Continued)

(58) **Field of Classification Search**
USPC ................ 382/100, 103, 106, 128, 131–132, 382/154–155, 162, 168, 173, 181, 199,
(Continued)

(56) **References Cited**

U.S. PATENT DOCUMENTS

8,879,813 B1 * 11/2014 Solanki .................. G16H 30/20 382/128
2005/0192835 A1 * 9/2005 Kuo ....................... G16H 50/20 705/2
(Continued)

FOREIGN PATENT DOCUMENTS

FR 3010629 A1 3/2015
FR 3027505 A1 4/2016
(Continued)

OTHER PUBLICATIONS

U.S. Appl. No. 15/952,635.
(Continued)

*Primary Examiner* — Seyed H Azarian
(74) *Attorney, Agent, or Firm* — Cooper Legal Group, LLC; Ronald M. Kachmarik

(57) **ABSTRACT**

A method for acquiring an image of a dental arch of a patient. Activation of an image acquisition apparatus so as to acquire an analysis image of the arch. Analysis of the analysis image by a deep learning device trained by a learning base. Determination, for the analysis image, as a function of the results of the analysis, of a value for an image attribute. Comparison of the image attribute value with a setpoint. Sending of an information message as a function of the comparison, the information message being related to the quality of the image acquired and/or to the position of the acquisition apparatus in relation to said arch and/or to the setting of the acquisition apparatus and/or to the opening of the mouth and/or to the wearing of a dental appliance.

**15 Claims, 11 Drawing Sheets**



(51) **Int. Cl.**

| | |
|---|---|
| ***G06T 7/00*** | (2017.01) |
| ***G06T 7/73*** | (2017.01) |
| ***G06T 7/55*** | (2017.01) |
| ***A61C 7/00*** | (2006.01) |
| ***G06T 7/143*** | (2017.01) |

(52) **U.S. Cl.**
CPC ...... ***G06T 7/75*** (2017.01); *G06T 2207/10024* (2013.01); *G06T 2207/30036* (2013.01); *G06T 2207/30168* (2013.01)

(58) **Field of Classification Search**
USPC ....... 382/219, 224, 232, 254, 285–291, 305, 382/318; 433/24, 215; 705/2
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 2008/0172386 A1 | 7/2008 | Ammar et al. | | |
| 2009/0191503 A1 | 7/2009 | Matov et al. | | |
| 2009/0291417 A1* | 11/2009 | Rubbert | A61C 7/146 433/215 | |
| 2015/0132708 A1* | 5/2015 | Kuo | A61C 7/08 433/24 | |
| 2017/0049311 A1* | 2/2017 | Borovinskih | G06T 5/20 | |
| 2017/0086943 A1 | 3/2017 | Mah | | |
| 2018/0168780 A1* | 6/2018 | Kopelman | A61C 19/04 | |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| JP | 2017094181 A | 6/2017 |
| WO | 2016066651 A1 | 5/2016 |
| WO | 2017182654 A1 | 10/2017 |

OTHER PUBLICATIONS

U.S. Appl. No. 15/953,561.
U.S. Appl. No. 15/953,744.
U.S. Appl. No. 15/990,950.
U.S. Appl. No. 16/001,049.
U.S. Appl. No. 16/030,032.
U.S. Appl. No. 16/030,137.
U.S. Appl. No. 16/031,125.
U.S. Appl. No. 16/031,172.
U.S. Appl. No. 16/031,201.
U.S. Appl. No. 15/522,554.
Corresponding French Application, Application No. 1756947, French Search Report, dated Jan. 18, 2018, 2 pages.
Miki Yuma et al: "classification of teeth in cone-beam CT using deep convolutional neural network" Computers in Biology and Medicine, New York, NY, US, vol. 80, Nov. 12, 2016 (Nov. 12, 2016), pp. 24-29.
Young-Jun Yu: "Machine Learning for Dental Image Analysis", Arxiv Nov. 29, 2016 (Nov. 29, 2016), XP055430578, Extracted from the Internet: URL:https://arxiv.org/ftp/arxiv/papers/1611/1611.09958.pdf [extracted Mar. 20, 2018].
Kelwin Fernandez et al: "Teeth/Palate and Interdental Segmentation Using Artificial Neural Networks", Sep. 17, 2012 (Sep. 17, 2012), Artificial Neural Networks in Pattern Recognition, Springer Berling Heidelberg, Berlin, Heidelberg, pp. 175-185, XP047017215, ISBN: 978-3-642-33211-1.
Lin P L et al: "An effective classification and numbering system for dental bitewing radiographs using teeth region and contour infonmation", Pattern Recognition, Elsevier, GB, vol. 43, No. 4, Apr. 1, 2010 (Apr. 1, 2010), pp. 1380-1392, XP026870003, ISSN: 0031-3203 [extracted Nov. 11, 2009].
Vinicius Tragante et al: "Knowledge discovery in panoramic X-rays for postmortem identification", Researchgate, Jan. 1, 2010 (Jan. 1, 2010), pp. 1-9, XP055462269, Extracted from the Internet; URL:https://www.researchgate.net/profile/Vinicius_Tragante/publication/267821630_Knowledge_discovery_in_panoramic_X-rays_for_postmortem_identification/links/54f479df0cf299c8d9e77caf/Knowledge-discovery-in-panoramic-X-rays-for-postmortem-identification.pdf; [extracted Mar. 23, 2018].
Anonymous: "Towards a Smart Healthcare System for Orthodontic and Dental Treatment Smart Healthcare System", Jan. 1, 2016 (Jan. 1, 2016), XP055442068, Extracted from the internet URL:http://sc.cmc.osaka-u.ac.jp/wp1/wp-content/uploads/2016/11/sc16_poster_part6.pdf [extracted Jan. 18, 2018]; Entire Document.
Ben Ali Ramzi et al: "Detection and Classification of Dental Caries in X-ray Images Using Deep Neural Networks", Proceedings of ICSEA 2016 : The Eleventh International Conference on Software Engineering Advances, Aug. 21, 2016 (Aug. 21, 2016), pp. 223-227, XP055442275, New York, Extracted from the Internet, URL:https://pdfs.semanticscholar.org/4536/de69054143f85bb5089a8957f16be1eb0c3a.pdf?ga=2.60511401.567907993.1516282794-945231696.1516282794, [extracted Jan. 18, 2018]; Abstract; Figs. 1-3.
Miki Yuma et al: "Tooth labeling in cone-beam CT using deep convolutional neural network for forensic identification", Progress in Biomedical Optics and Imaging, SPIE—International Society for Optical Engineering, Bellingham, WA, US, vol. 10134, Mar. 3, 2017 (Mar. 3, 2017), pp. 101343E-101343E, XP060086665, ISSN: 1605-7422, DOI: 10.1117/12.2254332, ISBN: 978-1-5106-0027-0; Entire Document.
Young-Jun Yu: "Machine Learning for Dental Image Analysis", Nov. 29, 2016 (Nov. 29, 2016); XP055430578, Extracted from the Internet: URL:https://arxiv.org/ftp/arxiv/papers/1611/1611.09958.pdf [extracted Mar. 22, 2018].

* cited by examiner


1) creation of a learning base
2) training of at least one deep learning device
3) submission of the analysis image to the deep learning device
4) determination of the presence of a representation of a tooth on the analysis image, and of the attribute value of said tooth

Fig. 1


A) production of an updated reference model, segmentation of the model into tooth models and assignment of a tooth attribute value to each tooth model
B) acquisition of an updated image
C) search, by observation of the updated reference model, for a reference image with maximal match with the updated image
D) identification of reference tooth zones in the reference image, and consequently, of updated tooth zones in the updated image
E) assignment, to the updated tooth zones, of the tooth attribute values of the tooth models represented on the reference tooth zones
F) addition, in the learning base, of the updated image enriched with a description of the updated tooth zones and of their respective tooth attribute values

Fig. 2


A') production of an initial reference model, segmentation of the model into tooth models and assignment of a tooth attribute value to each tooth model
B') acquisition of an updated image
C') deformation of the initial reference model to obtain the updated reference model, then search, by observation of the updated reference model, for a reference image with maximal match with the updated image
D) identification of reference tooth zones in the reference image, and consequently, of updated tooth zones in the updated image
E) assignment, to the updated tooth zones, of the tooth attribute values of the tooth models represented on the reference tooth zones
F) addition, in the learning base, of the updated image enriched with a description of the updated tooth zones and of their respective tooth attribute values

Fig. 3


1') creation of a learning base comprising historical images each having an image attribute value for an image attribute
2') training of at least one deep learning device by means of the learning base
3') submission of the analysis image to the deep learning device so as to determine an image attribute value of the analysis image

Fig. 4


C1) determination of virtual acquisition conditions to be tested
C2) production of a reference image of the updated reference model in said virtual acquisition conditions to be tested
C3) processing of the reference image to produce at least one reference map representing, at least partially, the discriminating information item
C4) comparison of the updated and reference maps so as to determine a value for an assessment function
C5) as a function of said value, modification of the virtual acquisition conditions to be tested, then return to the step C2).

Fig. 5


a) creation of a historical library of historical tooth models
b) detailed analysis (according to the invention) of an analysis image so as to determine tooth attribute values for analysis tooth zones
c) for each analysis tooth zone, search for an optimal historical tooth model having the same tooth attribute value and exhibiting a maximal match with the analysis image
d) arrangement of the optimal tooth models so as to create an assembled model which exhibits a maximal match with the updated image
e) modification of one or more optimal tooth models and return to the step d) so as to maximize the match between the assembled model and the analysis image

Fig. 6


i) creation of an assembled model according to a modeling method according to the invention
ii) transmission of the assembled model to an orthodontist
iii) analysis of the orthodontic situation of the patient, by the orthodontist, from the assembled model

Fig. 7


a') activation of an image acquisition apparatus so as to acquire an analysis image of the arch
b') global analysis (according to the invention) of the analysis image
b') detailed analysis (according to the invention) of the analysis image so as to determine tooth attribute values for analysis tooth zones
c') determination, for the analysis image, of a value for an image attribute
c') determination, for the analysis image, of a value for an image attribute as a function of said tooth attribute value
d') comparison of said image attribute value with an instruction
e') sending of an information message as a function of said comparison

Fig. 8


a'') acquisition of an analysis image representing the aligner worn by the patient
b'') detailed or global analysis (according to the invention) of the analysis image
c'') assessment of the suitability of the aligner to the patient as a function of the tooth and/or image attribute value determined in the preceding step
d'') sending of an information message as a function of said assessment

Fig. 9



Fig.10



Fig. 11A



Fig. 11B



Fig. 11C



Fig. 11D



Fig. 12A



Fig. 12B



Fig. 12C



Fig. 12D




Fig. 13




Fig. 14




Fig. 15


Production of the initial reference model
Acquisition of an updated image
Production of an updated map from the updated image
Approximation of the real acquisition conditions
Determination of a reference model to be tested
Search for the best approximation of the real acquisition conditions on the basis of the reference model to be tested
Determination of virtual acquisition conditions to be tested
Production of a reference image in said virtual acquisition conditions to be tested
Production of a reference map representing said discriminating information item
Comparison of the updated and reference maps
1st assessment function: score acceptable?
Modification of the virtual acquisition conditions to be tested by virtual displacement of the acquisition apparatus
Change of updated image and/or of discriminating information item
2nd assessment function: score acceptable?
Modification of the reference model to be tested by virtual displacement of at least one tooth model and/or deformation
Last reference model tested = reference model

Fig. 16




Fig. 17A




Fig. 17B




Fig. 17C




Fig. 18

# METHOD FOR ANALYZING AN IMAGE OF A DENTAL ARCH

## TECHNICAL FIELD

The present invention relates to the field of dental arch image analysis.

## STATE OF THE ART

The most recent orthodontic treatments use images to assess the therapeutic situations. This assessment is conventionally performed by an orthodontist, which requires the patient to transmit these images to the orthodontist, even to make an appointment.

There is an ongoing need for a method simplifying the analysis of the images of dental arches of patients.

One aim of the invention is to address this need.

## SUMMARY OF THE INVENTION

The invention proposes a method for analyzing an image, called "analysis image", of a dental arch of a patient, a method in which the analysis image is submitted to a deep learning device, preferably a neural network, in order to determine at least one value of a tooth attribute relating to a tooth represented on the analysis image, and/or at least one value of an image attribute relating to the analysis image.

Analysis by Tooth

The invention proposes in particular a method for detailed analysis of an image called "analysis image" of a dental arch of a patient, said method comprising the following steps:

1) creation of a learning base comprising more than 1000 images of dental arches, or "historical images", each historical image comprising one or more zones each representing a tooth, or "historical tooth zones", to each of which, for at least one tooth attribute, a tooth attribute value is assigned;
2) training of at least one deep learning device, preferably a neural network, by means of the learning base;
3) submission of the analysis image to said at least one deep learning device for it to determine at least one probability relating to an attribute value of at least one tooth represented on a zone representing, at least partially, said tooth in the analysis image, or "analysis tooth zone";
4) determination, as a function of said probability, of the presence of a tooth of said arch at a position represented by said analysis tooth zone, and of the attribute value of said tooth.

A first deep learning device, preferably a neural network, may in particular be implemented to assess a probability relating to the presence, at a location of said analysis image, of an analysis tooth zone.

A second deep learning device, preferably a neural network, may in particular be implemented to assess a probability relating to the type of tooth represented in an analysis tooth zone.

As will be seen in more detail hereinafter in the description, a detailed analysis method according to the invention advantageously makes it possible to immediately recognize the content of the analysis image.

The analysis image may advantageously be classified automatically. It may also be used immediately by a computer program.

The invention relies on the use of a deep learning device, preferably a neural network, the performance of which is directly linked to the richness of the learning base. There is therefore also a need for a method that makes it possible to rapidly enrich the learning base.



The invention therefore relates also to a method for enriching a learning base, notably intended for the implementation of a detailed analysis method according to the invention, said enrichment method comprising the following steps:

A) at an "updated" instant, production of a model of a dental arch of a patient, or "updated reference model", and segmentation of the updated reference model so as to produce, for each tooth, a "tooth model", and, for at least one tooth attribute, assignment of a tooth attribute value to each tooth model;
B) preferably less than 6 months, preferably less than 2 months, preferably less than 1 month, preferably less than a fortnight, preferably less than 1 week, preferably less than 1 day before or after the updated instant, preferably substantially at the updated instant, acquisition of at least one, preferably at least three, preferably at least ten, preferably at least one hundred images of said arch, or "updated images" in respective real acquisition conditions;
C) for each updated image, search for virtual acquisition conditions suitable for an acquisition of an image of the updated reference model, called "reference image", exhibiting a maximum match with the updated image in said virtual acquisition conditions, and acquisition of said reference image;
D) identification, in the reference image, of at least one zone representing a tooth model, or "reference tooth zone", and, by comparison of the updated image and of the reference image, determination, in the updated image, of a zone representing said tooth model, or "updated tooth zone";
E) assignment, to said updated tooth zone, of the tooth attribute value or values of said tooth model;
F) addition of the updated image enriched with a description of said updated tooth zone and its tooth attribute value or values, or "historical image", in the learning base.

In particular, each execution of the method described in WO 2016/066651 preferably generates more than three, more than ten, preferably more than one hundred updated images which, by an automated processing by means of the updated reference model, may produce as many historical images.

In a particular embodiment, the method for enriching a learning base comprises, in place of the steps A) to C), the following steps:

A') at an initial instant, production of a model of a dental arch of a patient, or "initial reference model", and segmentation of the initial reference model so as to produce, for each tooth, a "tooth model", and, for at least one tooth attribute, assignment of a tooth attribute value to each tooth model;
B') at an updated instant, for example spaced apart by more than a fortnight, preferably more than a month, even more than two months from the initial instant, acquisition of at least one, preferably at least three, preferably at least ten, preferably at least one hundred images of said arch, or "updated images", in respective real acquisition conditions;
C') for each updated image, search, by deformation of the initial reference model, for an updated reference model and virtual acquisition conditions suitable for an acquisition of an image of the updated reference model,

called "reference image", exhibiting a maximum match with the updated image in said virtual acquisition conditions.

This method advantageously makes it possible, after generation of the initial reference model, preferably by means of a scanner, to enrich the learning base at different updated instants, without it being necessary to perform a new scan, and therefore without the patient having to go to the orthodontist. He or she may in fact acquire the updated images him or herself, as described in WO 2016/066651.

A single orthodontic treatment may thus lead to the production of hundreds of historical images.

The invention relates also to a method for training a deep learning device, preferably a neural network, comprising an enrichment of a learning base according to the invention, then the use of said learning base to train the deep learning device.

Global Analysis

The detailed analysis method described above advantageously allows for a fine analysis of the analysis image, the situation of each being preferably assessed.

Alternatively, the deep learning device may be used globally, the learning base containing historical images whose description provides a global attribute value for the image. In other words, the value of the image attribute relates to the whole image and not to part of the image. The attribute is not then a "tooth" attribute, but is an "image" attribute. For example, this image attribute may define whether, in light of the image as a whole or of a part of the image, the dental situation "is pathological" or "is not pathological", without each tooth being examined. The image attribute also makes it possible to detect, for example, whether the mouth is open or closed, or, more generally, whether the image is suitable for a subsequent treatment, for example whether it makes it possible to monitor the occlusion.

The image attribute may in particular relate to

- a position and/or an orientation and/or a calibration of an acquisition apparatus used to acquire said analysis image, and/or
- a quality of the analysis image, and in particular relating to the brightness, to the contrast or to the sharpness of the analysis image, and/or
- the content of the analysis image, for example to the representation of the arches, of the tongue, of the mouth, of the lips, of the jaws, of the gums, of one or more teeth or of a dental, preferably orthodontic, appliance.

When the image attribute refers to the content of the image, the description of the historical images of the learning base specifies a characteristic of this content. For example, it may specify the position of the tongue (for example "retracted") or the opening of the mouth of the patient (for example mouth open or closed) or the presence of a representation of a dental, preferably orthodontic, appliance and/or of its condition (for example appliance intact, broken or damaged).

A tooth attribute value may be used to define a value for an image attribute. For example, if a value of a tooth attribute is "tooth decayed", the value of an image attribute may be "unsatisfactory dental situation".

The image attribute may in particular relate to a therapeutic situation.

The invention proposes a method for global analysis of an analysis image of a dental arch of a patient, said method comprising the following steps:



1') creation of a learning base comprising more than 1000 images of dental arches, or "historical images", each historical image comprising an attribute value for at least one image attribute, or "image attribute value";

2') training of at least one deep learning device, preferably a neural network, by means of the learning base;

3') submission of the analysis image to the deep learning device for it to determine, for said analysis image, at least one probability relating to said image attribute value, and determination, as a function of said probability, of a value for said image attribute for the analysis image.

The image attribute may in particular relate to the orientation of the acquisition apparatus upon the acquisition of the analysis image. It may for example take the values "front photo", "left photo" and "right photo".

The image attribute may also relate to the quality of the image. It may for example take the values "insufficient contrast" and "acceptable contrast".

The image attribute may also relate to the dental situation of the patient, for example relate to the presence of decay or to the condition of a dental, preferably orthodontic, appliance worn by the patient ("degraded" or "in good condition" for example) or to the suitability of the dental, preferably orthodontic, appliance to the treatment of the patient (for example "unsuitable" or "suitable").

The image attribute may also relate to the "presence" or "absence" of a dental, preferably orthodontic, appliance, or to the state of opening of the mouth ("mouth open", "mouth closed" for example).

As will be seen in more detail hereinafter in the description, a global image analysis method according to the invention advantageously makes it possible to immediately and globally assess the content of the analysis image. In particular, it is possible to globally assess a dental situation and, for example, deduce therefrom the need to consult an orthodontist.

## Definitions

A "patient" is a person for whom a method according to the invention is implemented, independently of whether or not this person is following an orthodontic treatment.

"Orthodontist" should be understood to mean any person qualified to provide dental care services, which also includes a dentist.

A "dental part", in particular "orthodontic part", should be understood to mean all or part of a dental, in particular orthodontic, appliance.

An orthodontic part may in particular be an orthodontic aligner. Such an aligner extends in such a way as to follow the successive teeth of the arch on which it is fixed. It defines a generally "U" shaped channel, the shape of which is determined to ensure the fixing of the aligner onto the teeth, but also as a function of a desired target positioning for the teeth. More specifically, the shape is determined in such a way that, when the aligner is in its service position, it exerts stresses tending to move the teeth being treated to their target positioning, or to hold the teeth in this target positioning.

The "service position" is the position in which the dental or orthodontic part is worn by the patient.

"Model" should be understood to be a digital three-dimensional model. An arrangement of tooth models is therefore a model.

"Image" should be understood to be an image in two dimensions, like a photograph or an image taken from a film. An image is formed by pixels.

A "reference image" is a view of a "reference" model.

"Image of an arch" or "model of an arch" should be understood to be a representation of all or part of said arch. Such a representation is preferably in colors.

The "acquisition conditions" of an image specify position and the orientation in space of an acquisition apparatus acquiring this image in relation to the teeth of the patient (real acquisition conditions) or to a model of teeth of the patient (virtual acquisition conditions), and preferably the calibration of this acquisition apparatus. Acquisition conditions are said to be "virtual" when they correspond to a simulation in which the acquisition apparatus would be in said acquisition conditions (theoretical positioning and preferably calibration of the acquisition apparatus) relative to a model.

In virtual conditions of acquisition of a reference image, the acquisition apparatus may be also qualified as "virtual". The reference image is in fact acquired by a hypothetical acquisition apparatus, having the characteristics of the "real" acquisition apparatus used for the acquisition of the real images, and in particular of the updated images.

The "calibration" of an acquisition apparatus is made up of all the values of the calibration parameters. A "calibration parameter" is a parameter intrinsic to the acquisition apparatus (unlike its position and orientation) whose value influences the image acquired. Preferably, the calibration parameters are chosen from the group formed by the diaphragm aperture, the exposure time, the focal distance and the sensitivity.

A "discriminating information item" is a characteristic feature which may be extracted from an image ("image feature"), conventionally by computer processing of this image.

A discriminating information item may exhibit a variable number of values. For example, a contour feature may be equal to 1 or 0 depending on whether a pixel belongs or does not belong to a contour. A brightness feature may take a large number of values. The processing of the image makes it possible to extract and quantify the discriminating information item.

The discriminating information item may be represented in the form of a "map". A map is thus the result of a processing of an image in order to reveal the discriminating information item, for example the contour of the teeth and of the gums.

"Match" or "fit" between two objects designates a measurement of the difference between these two objects. A match is maximal ("best fit") when it results from an optimization making it possible to minimize said difference.

An object modified to obtain a maximum match may be qualified as "optimal" object.

Two images or "views" which exhibit a maximal match represent substantially at least one same tooth, in the same way. In other words, the representations of the tooth on these two images may be substantially superimposed.

The search for a reference image exhibiting a maximal match with an updated image is performed by searching for the virtual acquisition conditions of the reference image exhibiting a maximal match with the real acquisition conditions of the updated image.

By extension, a model exhibits a maximal match with an image when this model has been chosen from several models because it allows a view exhibiting a maximal match with said image and/or when this image has been chosen from several images because it exhibits a maximal match with a view of said model.



In particular, an updated image is in maximal match with a reference model when a view of this reference model provides a reference image showing a maximal match with the updated image.

The comparison between two images results preferably from the comparison of two corresponding maps. "Distance" is used conventionally to denote a measurement of the difference between two maps or between two images.

The "metaheuristic" methods are known optimization methods. They are preferably chosen from the group formed by

- evolutionary algorithms, preferably chosen from: evolution strategies, genetic algorithms, differential evolution algorithms, distribution estimation algorithms, artificial immunity systems, shuffled complex evolution path recomposition, simulated annealing, ant colony algorithms, particular swarm optimization algorithms, search with taboos, and the GRASP method;
- the kangaroo algorithm,
- the Fletcher and Powell method,
- the sound effects method,
- stochastic tunneling,
- random-restart hill climbing,
- the cross-entropy method, and
- the hybrid methods between the abovementioned metaheuristic methods.

"Description" of an image denotes information particularly relating to the definition of the tooth zones of this image and to the tooth attribute values which are associated with them, and/or relating to an image attribute value of said image. The number of possible values for a tooth attribute or an image attribute is unlimited.

A "historical" image is an image of a dental arch enriched with a description. The tooth zones of a historical image are qualified as "historical tooth zones".

"Comprising" or "including" or "exhibiting" should be interpreted without restriction, unless indicated otherwise.

## BRIEF DESCRIPTION OF THE FIGURES

Other features and advantages of the invention will become more apparent on reading the following detailed description and studying the attached drawing in which:

FIG. **1** represents, schematically, the different steps of a method for detailed analysis of an image, according to the invention;

FIG. **2** represents, schematically, the different steps of a method for enriching a learning base, according to the invention;

FIG. **3** represents, schematically, the different steps of a variant of a method for enriching a learning base, according to the invention;

FIG. **4** represents, schematically, the different steps of a method for global analysis of an image, according to the invention;

FIG. **5** represents, schematically, the different steps of a step C) of a method for enriching a learning base, according to the invention;

FIGS. **6** and **18** represent, schematically, the different steps of a method for modeling the dental arch of a patient, according to the invention;

FIG. **7** represents, schematically, the different steps of a method for assessing a dental situation of a patient, according to the invention;

FIG. **8** represents, schematically, the different steps of a method for acquiring an image of a dental arch of a patient, according to the invention;

FIG. **9** represents, schematically, the different steps of a method for assessing the shape of an orthodontic aligner of a patient, according to the invention;

FIG. **10** represents an example of a reference image of an initial reference model;

FIG. **11** (**11**A-**11**D) illustrates a way of processing to determine the tooth models in an initial reference model, as described in WO 2016 066651, with FIG. **11**A representing a reference image, FIG. **11**B representing a corresponding reference map, FIG. **11**C representing a map relating to the contour of the teeth, and FIG. **11**D representing a segmented reference model;

FIG. **12** (**12**A-**12**D) illustrates the acquisition of an image by means of a retractor, an operation of cropping of this image, and the processing of an updated image making it possible to determine the contour of the teeth, as described in WO 2016 066651, with FIG. **12**A illustrating the use of a dental retractor, FIGS. **12**B and **12**C representing an updated image, and FIG. **12**D representing an updated map relating to the contour of the teeth obtained from the updated image of FIG. **12**C;

FIG. **13** schematically illustrates the relative position of registration marks **12** of a retractor **10** on updated images **141** and **142**, according to the directions of observation represented by broken lines;

FIGS. **14** and **15** represent an orthodontic aligner, in perspective and plan views, respectively;

FIG. **16** illustrates the step e) described in WO 2016 066651;

FIG. **17** (**17**A-**17**C) illustrates an enrichment method according to the invention, with FIG. **17**A showing an example of updated image, FIG. **17**B showing the reference image exhibiting a maximal match with the updated image, and FIG. **17**C illustrating the transfer of the tooth numbers to the updated tooth zones; and

FIG. **18** is described above with FIG. **6**.

## DETAILED DESCRIPTION

A detailed analysis method according to the invention requires the creation of a learning base. This creation preferably implements a method comprising the steps A) to F), or, in one embodiment, in place of the steps A) to C), preferably the steps A') to C').

First Main Embodiment of the Enrichment Method

The step A) is intended for the production of an updated reference model modeling an arch of the patient. It preferably comprises one or more of the features of the step a) of WO 2016 066651, incorporated by reference, to produce an initial reference model.

The updated reference model is preferably created with a 3D scanner. Such a so-called "3D" model may be observed from any angle. An observation of the model, from a determined angle and distance, is called a "view" or "reference image".

FIG. **11**A is an example of reference image.

The updated reference model may be prepared from measurements performed on the teeth of the patient or on a molding of his or her teeth, for example a plaster molding.

For each tooth, from the updated reference model, a model of said tooth, or "tooth model", is defined (FIG. **11**D). This operation, known per se, is called "segmentation" of the updated reference model.

In the updated reference model, a tooth model is preferably delimited by a gingival margin which may be broken down into an interior gingival margin (of the side of the interior of the mouth relative to the tooth), an exterior gingival margin (oriented toward the outside of the mouth relative to the tooth) and two lateral gingival margins.

One or more tooth attributes are associated with the tooth models as a function of the teeth that they model.

The tooth attribute is preferably chosen from a tooth number, a tooth type, a tooth shape parameter, for example a tooth width, in particular a mesio-palatine width, a thickness, a crown height, an index of mesial and distal deflection of the incisive margin, or a level of abrasion, a tooth appearance parameter, in particular a translucency index or a color parameter, a parameter relating to the condition of the tooth, for example "abraded", "broken", "decayed" or "fitted" (that is to say in contact with a dental, preferably orthodontic, appliance), an age for the patient, or a combination of these attributes. A tooth attribute is preferably an attribute which only relates to the tooth modeled by the tooth model.

A tooth attribute value may be assigned to each tooth attribute of a particular tooth model.

For example, the "tooth type" tooth attribute will have the value "incisor", "canine" or "molar" depending on whether the tooth model is that of an incisor, of a canine or of a molar, respectively.

The assignment of the tooth attribute values to the tooth models may be manual or, at least partly, automatic. For example, if the value of a tooth attribute is identical whatever the tooth model, such as for the "age of the patient" tooth attribute, it may be sufficient to assign a value to one tooth model to determine the value of this attribute for the other tooth models.

Similarly, the tooth numbers are conventionally assigned according to a standard rule. It is therefore sufficient to know this rule and the number of a tooth modeled by a tooth model to calculate the numbers of the other tooth models.

In a preferred embodiment, the shape of a particular tooth model is analyzed so as to define its tooth attribute value, for example its number. This shape recognition is preferably performed by means of a deep learning device, preferably a neural network. Preferably, a library of historical tooth models is created, each historical tooth model having a value for the tooth attribute, as described hereinbelow (step a)), the deep learning device is trained with views of the historical tooth models of this library, then one or more views of the particular tooth model are analyzed with the trained deep learning device, so as to determine the tooth attribute value of said particular tooth model.

The allocation of the tooth attribute values may then be performed totally without human intervention.

The step B) is intended for the acquisition of one or preferably several updated images.

The step B) preferably comprises one or more of the features of the step b) of WO 2016 066651.

The acquisition of the updated images is performed by means of an image acquisition apparatus, preferably chosen from a cellphone, a so-called "connected" camera, a so-called "smart" watch, a tablet or a personal computer, fixed or portable, comprising an image acquisition system such as a webcam or a camera. Preferably, the image acquisition apparatus is a cellphone.

Also preferably, the image acquisition apparatus is separated from the dental arch by more than 5 cm, more than 8 cm, even more than 10 cm, which avoids the condensation of steam on the optic of the image acquisition apparatus and

facilitates the focusing. Furthermore, preferably, the image acquisition apparatus, in particular the cellphone, has no specific optic for the acquisition of the updated images, which is notably possible because of the separation of the dental arch during the acquisition.

Preferably, an updated image is a photograph or an image extracted from a film. It is preferably in color, preferably in real colors.

Preferably, the acquisition of the updated image or images is performed by the patient, preferably without the use of a support which is bearing on the ground and is immobilizing the image acquisition apparatus, and in particular without tripod.

In one embodiment, the triggering of the acquisition is automatic, that is to say without the action of an operator, as soon as the acquisition conditions are approved by the image acquisition apparatus, in particular when the image acquisition apparatus has determined that it observes a dental arch and/or a retractor and that the conditions of observation are satisfactory (sharpness, brightness, even dimensions of the representation of the dental arch and/or of the retractor).

The time interval between the steps A) and B) is as short as possible in order for the teeth not to be substantially displaced between the production of the updated model and the acquisition of the updated images. Reference images matching with the updated images may then be acquired by observing the updated reference model.

Preferably, a dental retractor **10** is used in the step B), as represented in FIG. **12**A. The retractor conventionally comprises a support provided with a rim extending around an opening and arranged in such a way that the lips of the patient may rest thereon leaving the teeth of the patient apparent through said opening.

In the step C), the updated reference model is explored to find, for each updated image, a reference image exhibiting a maximal match with the updated image.

The step C) may comprise one or more of the features of the steps c), d) and e) of WO 2016 066651, in as much as they concern such an exploration.

For each updated image, a set of virtual acquisition conditions approximating the real acquisition conditions upon the acquisition of said updated image is preferably determined, roughly. In other words, the position of the image acquisition apparatus is estimated in relation to the teeth at the moment when it took the updated image (position of the acquisition apparatus in space and orientation of this apparatus). This rough assessment advantageously makes it possible to limit the number of tests on virtual acquisition conditions in subsequent operations, and therefore makes it possible to considerably speed up these operations.

To perform this rough assessment, one or more heuristic rules are preferably used. For example, preferably, virtual acquisition conditions likely to be tested in subsequent operations, the conditions which correspond to a position of the image acquisition apparatus behind the teeth or at a distance from the teeth greater than 1 m, are excluded.

In a preferred embodiment, as illustrated in FIG. **13**, registration marks are used that are represented on the updated image, and in particular registration marks **12** of the retractor, to determine a region of the space that is substantially conical delimiting virtual acquisition conditions likely to be tested in subsequent operations, or "test cone".

More specifically, at least three registration marks **12** are preferably positioned non-aligned on the retractor **10**, and their relative positions on the retractor are accurately measured.

The registration marks are then marked on the updated image, as described previously. Simple trigonometric calculations make it possible to determine approximately the direction from which the updated image was taken.

Next, for each updated image, a reference image is sought that exhibits a maximum match with the updated image. This search is preferably performed by means of a metaheuristic method, preferably evolutionist, preferably by simulated annealing.

Preferably, at any instant before the step C4), the updated image is analyzed so as to produce an updated map representing, at least partially, a discriminating information item. The updated map therefore represents the discriminating information item in the reference frame of the updated image.

The discriminating information item is preferably chosen from the group consisting of a contour information item, a color information item, a density information item, a distance information item, a brightness information item, a saturation information item, information on reflections and combinations of these information items.

A person skilled in the art knows how to process an updated image to reveal the discriminating information item.

For example, FIG. **12**D is an updated map relating to the contour of the teeth obtained from the updated image of FIG. **12**B.

Said search comprises the following steps:

C1) determination of virtual acquisition conditions "to be tested";

C2) production of a reference image of the updated reference model in said virtual acquisition conditions to be tested;

C3) processing of the reference image to produce at least one reference map representing, at least partially, the discriminating information item;

C4) comparison of the updated and reference maps so as to determine a value for an assessment function, said value for the assessment function depending on the differences between said updated and reference maps and corresponding to a decision to continue or stop the search for virtual acquisition conditions approximating said real acquisition conditions with greater accuracy than said virtual acquisition conditions to be tested determined in the last occurrence of the step C1);

C5) if said value for the assessment function corresponds to a decision to continue said search, modification of the virtual acquisition conditions to be tested, then return to the step C2).

The step C1) begins with a determination of the virtual acquisition conditions to be tested, that is to say a virtual position and orientation likely to correspond to the real position and orientation of the acquisition apparatus upon the capture of the updated image, but also, preferably, a virtual calibration likely to correspond to the real calibration of the acquisition apparatus upon the capture of the updated image.

The first virtual acquisition conditions to be tested are preferably virtual acquisition conditions assessed roughly, as described previously.

In the step C2), the image acquisition apparatus is then virtually configured in the virtual acquisition conditions to be tested in order to acquire a reference image of the updated reference model in these virtual acquisition conditions to be tested. The reference image therefore corresponds to the image that the image acquisition apparatus would have taken

if it had been placed, relative to the updated reference model, and optionally calibrated, in the virtual acquisition conditions to be tested.

If the updated image was taken substantially at the same moment as the updated reference model was created by a scan of the teeth of the patient, the position of the teeth on the updated image is substantially identical to that in the updated reference model. If the virtual acquisition conditions to be tested are exactly the real acquisition conditions, the reference image may therefore be exactly superimposed on the updated image. The differences between the updated image and the reference image result from errors in the assessment of the virtual acquisition conditions to be tested, if they do not correspond exactly to the real acquisition conditions.

In the step C3), the reference image is processed as the updated image so as to produce, from the reference image, a reference map representing the discriminating information item (FIGS. **11**A and **11**B). A person skilled in the art knows how to process a reference image to reveal the discriminating information item.

In the step C4), the updated and reference maps, both relating to the same discriminating information item, are compared and the difference or "distance" between these two maps is assessed by means of a score. For example, if the discriminating information item is the contour of the teeth, the mean distance between the points of the contour of the teeth which appears on the reference image and the points of the corresponding contour which appears on the updated image may be compared, the score being all the higher when this distance is small.

The score may for example be a correlation coefficient.

Preferably, the virtual acquisition conditions comprise the calibration parameters of the acquisition apparatus. The score is that much higher when the values of the calibration parameters tested are close to the calibration parameter values of the acquisition apparatus used upon the acquisition of the updated image. For example, if the diaphragm aperture tested is far from that of the acquisition apparatus used upon the acquisition of the updated image, the reference image shows fuzzy regions and sharp regions which do not correspond to the fuzzy regions and to the sharp regions of the updated image. If the discriminating information item is the contour of the teeth, the updated and reference maps will not therefore represent the same contours and the score will be low.

The score is then assessed by means of an assessment function. The assessment function makes it possible to decide whether the cycling on the steps C1) to C5) must be continued or stopped. The assessment function may for example be equal to 0 if the cycling must be stopped or be equal to 1 if the cycling must continue.

The value of the assessment function may depend on the score achieved. For example, a decision may be made to continue the cycling if the score does not exceed a threshold. For example, if an exact match between the updated and reference images leads to a score of 100%, the threshold may be, for example, 95%. Obviously, the higher the threshold, the better will be the accuracy of the assessment of the virtual acquisition conditions if the score manages to exceed this threshold.

The value of the assessment function may also depend on scores obtained with virtual acquisition conditions tested previously.

The value of the assessment function may also depend on random parameters and/or on the number of cycles already performed.



In particular, it is possible, despite the repetition of the cycles, not to manage to find virtual acquisition conditions which are sufficiently close to the real acquisition conditions for the score to reach said threshold. The assessment function may then lead to the decision to exit the cycle even through the best score obtained has not reached said threshold. This decision may result, for example, from a number of cycles greater than a predetermined maximum number.

A random parameter in the assessment function may also authorize the continuation of tests of new virtual acquisition conditions, even though the score appears satisfactory.

The assessment functions conventionally used in the metaheuristic optimization, preferably evolutionist, methods, particularly in the simulated annealing methods, may be used for the assessment function.

In the step C5), if the value of the assessment function indicates a decision to continue the cycling, the virtual acquisition conditions to be tested are modified and the cycling recommences on the steps C1) to C5), consisting in producing a reference image and a reference map, in comparing the reference map with the updated map to determine a score, then in taking a decision as a function of this score.

The modification of the virtual acquisition conditions to be tested corresponds to a virtual displacement in space and/or to a modification of the orientation and/or, preferably, to a modification of the calibration of the acquisition apparatus. This modification may be random, preferably such that the new virtual acquisition conditions to be tested still belong to the set determined upon the rough assessment. The modification is preferably guided by heuristic rules, for example by favoring the modifications which, according to an analysis of the preceding scores obtained, appear most favorable for increasing the score.

The cycling is continued until the value of the assessment function indicates a decision to cease this cycling and to continue to the step D), for example if the score reaches or exceeds said threshold.

The optimization of the virtual acquisition conditions is preferably performed by using a metaheuristic, preferably evolutionist, method, preferably a simulated annealing algorithm. Such an algorithm is well known for nonlinear optimization.

If the cycling has been exited without a satisfactory score having been able to be obtained, for example without the score having been able to reach said threshold, the method may be stopped (failure situation) or a new step C) may be launched, with a new discriminating information item and/or with a new updated image. The method may also be continued with the virtual acquisition conditions corresponding to the best score reached. A warning may be emitted in order to inform the user of the error on the result.

If the cycling has been exited when a satisfactory score has been able to be obtained, for example because the score has reached, even exceeded said threshold, the virtual acquisition conditions correspond substantially to the real acquisition conditions of the updated image.

Preferably, the virtual acquisition conditions comprise the calibration parameters of the acquisition apparatus. The method thus makes it possible to assess the values of these parameters without it being necessary to know the nature of the acquisition apparatus or its setting. The acquisition of the updated images may therefore be performed without any particular precautions, for example by the patient him or herself by means of his or her cellphone.

In addition, the search for the real calibration is performed by comparing an updated image with views of a reference model in virtual acquisition conditions to be tested.

Advantageously, it does not require the updated image to show a standard calibration gauge, that is to say a gauge whose characteristics are accurately known making it possible to determine the calibration of the acquisition apparatus.

The step C) therefore culminates in the determination of virtual acquisition conditions exhibiting a maximal match with the real acquisition conditions. The reference image therefore exhibits a maximal match with the updated image, that is to say that these two images may substantially be superimposed.

In one embodiment, said search of the virtual acquisition conditions in the step C) is performed by using a metaheuristic, preferably evolutionist, method, preferably a simulated annealing algorithm.

In the step D), the reference tooth zones are identified on the reference image and they are transferred to the updated image to define corresponding updated tooth zones.

In particular, the reference image is a view of the updated reference model segmented into tooth models. The limits of the representation of each tooth model on the reference image, or "reference tooth zone", may therefore be identified.

The superimposition of the updated and reference images then makes it possible to transfer the limits of the reference tooth zones to the updated image, and thus define the updated tooth zones. Since the reference image exhibits a maximal match with the updated image, the updated tooth zones therefore substantially define the limits of the tooth models represented on the reference image.

In the step E), each updated tooth zone is assigned the tooth attribute value or values of the tooth model which corresponds to it.

In particular, the reference image is a view of the updated reference model in which the tooth models have been assigned respective tooth attribute values for at least one tooth attribute, for example a tooth number. Each reference tooth zone may therefore inherit the tooth attribute value of the tooth model that it represents. Each updated tooth zone may then inherit the tooth attribute value of the reference tooth zone which allowed it to be defined.

At the end of the step E), an updated image and a description of the updated image is therefore obtained that defines one or more updated tooth zones and, for each of these zones, a tooth attribute value for at least one tooth attribute, for example a tooth number.

The updated image enriched with its description is called "historical image".

FIG. **17**A shows an example of updated image (acquired in the step B)) being analyzed in order to determine the contours of the teeth. FIG. **17**B shows the reference image exhibiting a maximal match with the updated image (resulting from the step C)). The numbers of the teeth are displayed on the corresponding teeth. FIG. **17**C illustrates the transfer of the tooth numbers to the updated tooth zones (step D) and E)).

In the step F), the historical image is added to the learning base.

The steps A) to F) are preferably performed for more than 1000, more than 5000, or more than 10 000 different patients, or "historical patients".

As now clearly emerges, the invention provides a method that is particularly effective for creating a learning base.

The invention relates also to a method for training a deep learning device, preferably a neural network, said method comprising an enrichment of a learning base according to a method comprising steps A) to F) so as to acquire a plurality of historical images, then the use of said learning base to train said deep learning device.

Second Main Embodiment of the Enrichment Method

The invention is not however limited to the embodiments described above.

In particular, the updated reference model is not necessarily the direct result of a scan of the arch of the patient. The updated reference model may in particular be a model obtained by deformation of an initial reference model which is itself resulting directly from such a scan.

The method then comprises, preferably, in place of the steps A) to C), the steps A') to C').

The step A') is identical to the step A). In the step A'), the reference model generated is however intended to be modified. It is therefore qualified as "initial reference model", and not as "updated reference model", as according to the step A).

The initial reference model may in particular be generated at an initial instant preceding an active orthodontic treatment, for example less than 6 months, less than 3 months, or less than 1 month before the start of the treatment. The steps B') to C') may then be implemented to track the trend of the treatment between the initial instant and the updated instant of the step B').

The initial instant may alternatively be an instant at the end of active orthodontic treatment, for example less than 6 months, less than 3 months, or less than 1 month after the end of the treatment. The steps B') to C') may then be implemented to monitor the appearance of any recurrence.

The step B') is identical to the step B). In the step B'), the updated images are however also intended to guide the modification of the initial reference model to define the updated reference model, in the step C').

The time interval between the steps A') and B') is not limited, since, as explained hereinbelow, the initial reference model will be deformed to obtain an updated reference model with maximal match with the updated images. The time interval between the steps A') and B') may for example be greater than 1 week, than 2 weeks, than 1 month, than 2 months or more than 6 months.

The step C') is more complex than the step C) since the search for a reference image exhibiting a maximal match with an updated image is not limited to searching for the optimal virtual acquisition conditions. It also includes a search for an updated reference model, that is to say a reference model in which the teeth have substantially the same position as on the updated image.

The step C') preferably comprises one or more of the features of the steps c), d) and e) of WO 2016 066651, and in particular of the step e) illustrated in FIG. **16**.

The objective is to modify the initial reference model until an updated reference model is obtained which exhibits a maximal match with the updated image. Ideally, the updated reference model is therefore a model of the arch from which the updated image would have been able to be taken if this model had been the arch itself.

A succession of reference models "to be tested" is therefore tested, the choice of a reference model to be tested preferably being dependent on the level of correspondence of the reference models "to be tested" previously tested with the updated image.

Preferably, the search comprises, for an updated image,

a first optimization operation making it possible to search, in a reference model to be tested determined from the initial reference model, for virtual acquisition conditions best corresponding to the real acquisition conditions of the updated image, and

- a second optimization operation making it possible to search, by testing a plurality of said reference models to be tested, for the reference model best corresponding to the positioning of the teeth of the patient upon the acquisition of the updated image.

Preferably, a first optimization operation is performed for each test of a reference model to be tested during the second optimization operation.

Preferably, the first optimization operation and/or the second optimization operation, preferably the first optimization operation and the second optimization operation, implement a metaheuristic method, preferably evolutionist, preferably a simulated annealing.

The step C') therefore culminates in the determination

- of an updated reference model exhibiting a maximal match with the updated image, and
- virtual acquisition conditions exhibiting a maximal match with the real acquisition conditions.

A method comprising the steps A') to C') may advantageously be implemented in the context of an active or passive orthodontic treatment, or, more generally, to track any changes to the teeth.

In the different methods according to the invention, the enrichment of the learning base does not necessarily result from an enrichment method according to the invention.

In one embodiment, the learning base is created by an operator. The latter thus analyzes thousands of analysis images. For the learning base to be able to be used for the implementation of a detailed analysis method, it determines the tooth zones, then assigns them tooth attribute values. For the learning base to be able to be used for the implementation of a global analysis method, it assigns image attribute values to each image. It may thus form historical images.

Detailed Image Analysis Method

The method for detailed analysis of an "analysis image" of a dental arch of a patient according to the invention comprises the steps 1) to 4).

Preferably, the analysis image, preferably a photograph or an image extracted from a film, preferably in color, preferably in real color, is acquired with an image acquisition apparatus, preferably a cellphone, separated from the dental arch by more than 5 cm, more than 8 cm, even more than 10 cm, and which, preferably, has no other specific optic.

Preferably, the analysis image represents several teeth, preferably more than 2, more than 3, more than 4 or more than 5 teeth of the patient. FIG. **12**A or FIG. **12**B could be examples of analysis images. The arrangement of the teeth is realistic, i.e. it corresponds to the arrangement which is observed by the image acquisition apparatus when it has acquired the analysis image.

Preferably, the acquisition of the analysis image is performed by the patient, preferably without the use of a support which is bearing on the ground and is immobilizing the image acquisition apparatus, and in particular without tripod.

In one embodiment, the triggering of the acquisition of the analysis image is automatic, that is to say without the action of an operator, as soon as the acquisition conditions are approved by the image acquisition apparatus, in particular when the image acquisition apparatus has determined that it observes a dental arch and/or a retractor and that the observation conditions are satisfactory (sharpness, brightness, even dimensions of the representation of the dental arch and/or of the retractor).

In the step 1), a learning base is created comprising more than 1000, preferably more than 5000, preferably more than 10 000, preferably more than 30 000, preferably more than 50 000, preferably more than 100 000 historical images. The greater the number of historical images, the better the analysis performed by the method.



Preferably, a learning base is used that is enriched according to an enrichment method according to the invention.

The learning base may however be constructed according to other methods, for example be created manually. To create a historical image of the learning base, an operator, preferably an orthodontist, identifies one or more "historical" tooth zones on an image, called then assigns, to each identified historical tooth zone, a value for at least one tooth attribute.

In step 2), a deep learning device, preferably a neural network, is trained with the learning base.

A "neural network" or "artificial neural network" is a set of algorithms well known to a person skilled in the art.

The neural network may in particular be chosen from:

- the networks specializing in the classification of images, called "CNN" ("convolutional neural network"), for example
  - AlexNet (2012)
  - ZF Net (2013)
  - VGG Net (2014)
  - GoogleNet (2015)
  - Microsoft ResNet (2015)
  - Caffe: BAIR Reference CaffeNet, BAIR AlexNet
  - Torch: VGG_CNN_S, VGG_CNN_M, VGG_CNN_M_2048, VGG_CNN_M_10 24, VGG_CNN_M_128, VGG_CNN_F, VGG ILSVRC-2014 16-layer, VGG ILSVRC-2014 19-layer, Network-in-Network (Imagenet & CIFAR-10)
  - Google: Inception (V3, V4).
- The networks specializing in the location and detection of objects in an image, the object detection network, for example:
  - R-CNN (2013)
  - SSD (Single Shot MultiBox Detector: Object Detection network), Faster R-CNN (Faster Region-based Convolutional Network method: Object Detection network)
  - Faster R-CNN (2015)
  - SSD (2015).

The above list is not limiting

In the step 2), the deep learning device is preferably trained by a learning process called "deep learning". By presenting, as input for the deep learning device, historical images (images+descriptions), the deep learning device progressively learns to recognize patterns on an image, and to associate them with tooth zones and with tooth attribute values, for example tooth numbers.

In the step 3), the image that is to be analyzed, or "analysis image", is submitted to the deep learning device.

Through its training in the step 2), the deep learning device is capable of analyzing the analysis image and of recognizing said patterns therein. It may in particular determine a probability relating to:

- the presence, at a location in said analysis image, of a zone representing, at least partially, a tooth, or "analysis tooth zone",
- the attribute value of the tooth represented on said analysis tooth zone.

For example, it is capable of determining that there is a 95% chance that a form of the analysis image represents an incisor.

Preferably, the deep learning device analyses all the analysis image and determines probabilities for all the analysis tooth zones that it has identified.

In the step 4), the results of the preceding step are analyzed to determine the teeth represented on the analysis image.

When the learning base comprises more than 10 000 historical images, the step 3) gives particularly satisfactory results. In particular, such a learning base makes it possible to establish a probability threshold such that, if a probability associated with an analysis tooth zone and with a tooth attribute value for this analysis tooth zone exceeds said threshold, the analysis tooth zone effectively represents a tooth having said tooth attribute value.

The step 4) thus leads to the definition of an analysis image enriched with a description defining the analysis tooth zones and, for each analysis tooth zone, the values of the attributes of the tooth represented by the analysis tooth zone.

Global Image Analysis Method

The method for global analysis of an updated image of a dental arch of a patient according to the invention comprises the steps 1') to 3').

The method is similar to the detailed analysis method described above, apart from the fact that, according to the global analysis, it is not necessary to analyze the individual situation of each tooth. The analysis is global to all the image. In other words, the deep learning device determines the value of an "image" attribute without having to previously determine tooth attribute values.

For example, the deep learning device may conclude that, "globally", the dental situation is "satisfactory" or "unsatisfactory", without determining the tooth potentially at the origin of the dissatisfaction.

The step 1') is similar to the step 1). The historical images however include a description specifying an image attribute value for each image.

The step 2') is similar to the step 2).

In the step 3'), the analysis image is submitted to the deep learning device.

Through its training in the step 2'), the deep learning device is capable of analyzing the analysis image and of recognizing said patterns therein. Based on these patterns, it may in particular determine a probability relating to the value of the image attribute considered.

Application to the Modeling of a Dental Arch

A detailed analysis method according to the invention is in particular useful for modeling a dental arch, notably for establishing a remote diagnostic.

It is desirable for each to regularly check his or her dentition, particularly in order to check that the position of his or her teeth is not changing for the worse. In an orthodontic treatment, this change for the worse may in particular lead to the treatment being modified. After an orthodontic treatment, a change for the worse, called "recurrence", may lead to a repeat of a treatment. Finally, more generally and independently of any treatment, each may want to track any displacements of his or her teeth.

Conventionally, the checks are performed by an orthodontist who has appropriate apparatus. These checks are therefore costly. Furthermore, the appointments are restrictive. Finally, some people are apprehensive of a visit to an orthodontist and will fail to make an appointment for a simple check or to assess the feasibility of an orthodontic treatment.

US 2009/0291417 describes a method making it possible to create, then modify, three-dimensional models, particularly for the manufacture of orthodontic appliances.

WO 2016 066651 describes a method for checking the positioning and/or the shape and/or the appearance of teeth of a patient. This method comprises a step of creation of an



initial reference model of the teeth, at an initial instant, preferably with a 3D scanner, then, at a subsequent instant, or "updated instant", for example six months after the initial instant, the creation of an updated reference model, by deformation of the initial reference model. This deformation is performed in such a way that the updated reference model allows observation substantially identical to images of the teeth acquired at the updated instant, in particular to photos or images from a video taken by the patient him or herself, with no particular precautions, called "updated images".

The updated images are therefore used to modify the initial, very accurate, reference model. The updated reference model which results from the deformation of the initial reference model, guided by the analysis of the updated images, is therefore also very accurate.

The method described in WO 2016/66651 does however require an appointment with the orthodontist in order to create the initial reference model. This appointment constitutes a brake to prevention. In effect, a patient will not necessarily consult an orthodontist if he or she does not perceive the need therefor. In other words, the method is often implemented only if a malocclusion is found and has to be corrected.

There is therefore a need for a method that addresses this problem, by facilitating prevention.

One aim of the invention is to address this need.

To this end, the invention proposes a method for modeling a dental arch of a patient, said method comprising the following steps:

a) creation of a historical library comprising more than 1000 tooth models, called "historical tooth models", and assignment to each historical tooth model of a value for at least one tooth attribute, or "tooth attribute value";
b) analysis of at least one "analysis image" of the dental arch according to a detailed analysis method according to the invention, so as to determine at least one analysis tooth zone and at least one tooth attribute value associated with said analysis tooth zone;
c) for each analysis tooth zone determined in the preceding step, search, in the historical library, for a historical tooth model exhibiting a maximum proximity with the analysis image or with the analysis tooth zone, or "optimal tooth model";
d) arrangement of all the optimal tooth models so as to create a model which exhibits a maximal match with the updated image, or "assembled model";
e) optionally, replacement of at least one optimal tooth model by another historical tooth model and repeat of the step d) so as to maximize the match between the assembled model and the analysis image;
f) optionally, repeat of the step b) with another analysis image and, in the step d) and/or e), search for a maximal match with all the analysis images used.

The invention thus makes it possible, from a simple analysis image, for example a photograph taken by means of a cellphone, to reconstruct, with a good reliability, a dental arch in the form of an assembled model. In particular, the analysis image may be acquired as described here above at step 1).

Obviously, the analysis of a single analysis image is insufficient to generate an assembled model which accurately corresponds to the arrangement of the teeth of the patient. Such an accuracy is however not generally essential for performing a first diagnosis of the dental situation of the patient.

Moreover, the accuracy of the assembled model may be increased if several analysis images are processed.

The steps b) to c) are preferably implemented for several analysis images and, in the steps d) and e), the optimal tooth models and an assembled model are searched so as to obtain a maximal match in light of all the analysis images (step f)).

The invention also relates to a method for assessing a dental situation of a patient, comprising the following steps:

i) creation of an assembled model according to a modeling method according to the invention;

ii) transmission of the assembled model to a recipient, preferably an orthodontist and/or a computer;

iii) analysis of the orthodontic situation of the patient, by the recipient, from the assembled model;

iv) preferably, informing of the patient of the orthodontic situation, preferably, via his or her cellphone.

The patient may therefore very easily ask an orthodontist to check his or her dental situation, without even having to travel, by simply transmitting one or preferably several photos of his or her teeth.

A modeling method is now described in detail.

In the step a), a historical library **20** (FIG. **18**) is created comprising more than 1000, preferably more than 5000, preferably more than 10 000 historical tooth models **22**. The greater the number of historical tooth models, the more accurate the assembled model.

A historical tooth model can in particular be obtained from a model of a dental arch of a "historical" patient obtained with a scanner. This arch model may be segmented in order to isolate the representations of the teeth, as in FIG. **11**D. Each of these representations, exhibiting a specific gray shade in FIG. **11**D, can constitute a historical tooth model.

Preferably, the library is enriched with the tooth models resulting from the implementation of the method described in WO 2016 066651 or of the step A) or A') described above.

One or several tooth attributes, in particular chosen from the list supplied above, are associated with the tooth models. A tooth attribute value is assigned to each tooth attribute of a particular tooth model, as described previously (see the description of the step A)). For example, a tooth model is that of an "incisor", "greatly worn", and whose color parameters are, in the color system L*a*b* according to the standard NF ISO 7724, "a*=2", "b*=1" and "L*=58".

The historical library therefore contains historical tooth models and associated attribute values which facilitate the search in the step c). In FIG. **18**, only historical tooth models **22** representing molars have been represented in the historical library **20**.

In the step b), an analysis image is acquired, as described above for the step B), before analyzing it. In particular, the analysis image is preferably a photo or an image from a film, preferably with a cellphone.

The analysis image can be acquired at any moment after the step a), for example more than one week, more than one month or more than six months after the step a).

The analysis image is analyzed according to a detailed analysis method according to the invention. The optional features of this method are also optional in the step b).

On completion of the step b), an analysis image is obtained that is enriched with a description providing, for each analysis tooth zone, a tooth attribute value for at least one tooth attribute, for example a tooth number.

In the step c), a search is carried out in the historical library, for each analysis tooth zone determined in the preceding step, for a historical tooth model exhibiting a maximal proximity with the analysis tooth zone. This tooth model is qualified as "optimal tooth model".

The "proximity" is a measurement of one or more differences between the historical tooth model and the analysis tooth zone. These differences may include a difference in shape, but also other differences like a difference in translucency or in color. The maximal proximity may be searched for by successively minimizing several differences, or by minimizing a combination of these differences, for example a weighted sum of these differences.

The "proximity" is therefore a broader concept than "match", the match measuring only a shape-related proximity.

The assessment of the proximity of a historical tooth model with an analysis tooth zone preferably comprises a comparison of at least one value of a tooth attribute of the analysis tooth zone with the value of this attribute for the historical tooth model. Such an assessment is advantageously very rapid.

For example, if the description of the analysis tooth zone provides a value for the type or the number of the tooth, the thickness of the tooth represented and/or the height of its crown and/or its mesio palatine width and/or the mesial and distal deflection index of its incisal edge, this value may be compared to the value of the corresponding attribute of each of the historical tooth models.

Preferably, a historical tooth model is sought that has, for at least one tooth attribute, the same value as said analysis tooth zone. The tooth attribute may in particular relate to the tooth type or to the tooth number. In other words, the historical tooth models are filtered to examine in more detail only those which relate to the same type of tooth as the tooth represented on the analysis tooth zone.

Alternatively or, preferably, in addition to this comparison of the attribute values, the shape of the tooth represented on the analysis tooth zone may be compared to the shape of a historical tooth model to be assessed, preferably by means of a metaheuristic method, preferably evolutionist, preferably by simulated annealing.

To this end, the historical tooth model to be assessed is observed from different angles. Each view thus obtained is compared with the analysis image, preferably with the analysis tooth zone, so as to establish a "distance" between this view and said analysis image or, preferably, said analysis tooth zone. The distance thus measures the difference between the view and the analysis tooth zone.

The distance may be determined after a processing of the view and of the analysis image or, preferably, of the analysis tooth zone, so as to reveal, on corresponding maps, one and the same discriminating information item, for example a contour information item, as described above in the step C3) or in WO 2016 066651.

For each historical tooth model tested, a view is thus determined which provides a minimal distance with the analysis image or with the analysis tooth zone. Each historical tooth model examined is thus associated with a particular minimal distance, which measures its proximity of shape with the analysis tooth zone.

The optimal historical tooth model is the one which, in light of the comparison or comparisons performed, is considered to be closest to the analysis tooth zone.

The minimal distances obtained for the different tooth models tested are then compared and, to define the optimal tooth model, the one which exhibits the smallest minimal distance is retained. The optimal tooth model therefore exhibits a maximal match with the analysis image.

The search for the maximal match is preferably performed by means of a metaheuristic method, preferably evolutionist, preferably by simulated annealing.

In a preferred embodiment, a first assessment of the historical tooth models by comparison of the values of at least one tooth attribute, for example the tooth number, with the corresponding values of the analysis tooth zone, then a second assessment by comparison of shape are performed in succession. The first, rapid assessment, advantageously makes it possible to filter the historical tooth models in order to submit only the historical tooth models retained by the first assessment to the second, slower assessment.

For example, if an analysis tooth zone represents a tooth number **15**, the first assessment makes it possible to retain only the tooth models modeling teeth number **15**. During the second assessment, a search is conducted, among all the historical tooth models modeling teeth number **15**, for the historical tooth model whose shape most approximates that of the tooth represented.

More preferably, several first assessments are performed before performing the second assessment. For example, the first assessments make it possible to filter the historical tooth models so as to retain only the tooth models modeling teeth number **15** and which exhibit a crown height of between 8 and 8.5 mm.

On completion of the step c), an optimal tooth model has thus been associated with each of the analysis tooth zones.

For example, in FIG. **18**, the historical tooth model **221** can be observed so as to strongly resemble an analysis zone identified on the analysis image. It is considered as optimal for this analysis zone.

In the step d), an assembled model is created by arranging the optimal tooth models.

According to one embodiment, at the start of the step d), a first rough arrangement is created, that is to say that a rough model is produced by assembling optimal tooth models.

To establish the first rough arrangement, the Optimal tooth models can be oriented so that their optimal directions of observation are all parallel, the optimal direction of observation of a tooth model being the direction in which said tooth model exhibits a maximum match with the analysis image.

The first rough arrangement may be also established by considering the tooth attribute values of the optimal tooth models. For example, if the tooth numbers of optimal tooth models are those of the canines and of the incisors, these tooth models may be arranged according to an arc **24** (FIG. **18**) corresponding conventionally to the region of the arch which bears these types of teeth.

The shape of this arc may be refined as a function of other tooth attribute values.

The order of the optimal tooth models is that of the corresponding analysis tooth zones.

Moreover, the minimal distance associated with an optimal tooth model results from an observation of the tooth model according to an "optimal" observation direction. In other words, it is probably substantially from this direction that the tooth that this model models is also observed in the analysis image. All the optimal tooth models are thus preferably oriented in such a way that their respective optimal observation directions are all parallel.

It is thus possible to define a first arrangement of the optimal tooth models.

Preferably, the first arrangement of the optimal tooth models is then modified iteratively, so as to exhibit a maximal match with the analysis image.

To assess an arrangement, it is observed according to different angles. Each view thus obtained is compared with the analysis image so as to establish a "distance" between this view and said analysis image. The distance thus measures the difference between the view and the analysis image.

The distance may be determined after a processing of the view and of the analysis image so as to reveal, on one of the corresponding maps, a discriminating information item, for example a contour information item, as described above in the step C3) or in WO 2016 066651.

For each arrangement examined, a view is thus determined that provides a minimal distance with the analysis image. Each arrangement examined is thus associated with a minimal distance.

The minimal distances obtained for the different arrangements tested are then compared and, to define the optimal arrangement, the one which exhibits the smallest minimal distance is retained. The optimal arrangement thus exhibits a maximal match with the analysis image.

The search for the maximal match is performed preferably by means of a metaheuristic method, preferably evolutionist, preferably by simulated annealing.

On completion of the step d), an optimal arrangement of the optimal tooth models, that is to say the assembled model **26**, is obtained.

In the optional step e), one or more optimal tooth models are replaced by other tooth models, then there is a return to the step d) so as to maximize the match between the assembled model and the analysis image.

It is in fact possible for an optimal tooth model, in the "optimal" arrangement, to no longer exhibit a maximal match with the analysis image. In particular, the tooth model might have been observed in an "optimal" direction which provided a view exhibiting a minimal distance with the analysis image (reason why it was considered as optimal), but, in the optimal arrangement, it is no longer oriented according to the optimal direction.

A new search for an assembled model may therefore be performed by modifying the tooth models, for example by replacing the optimal tooth models with close tooth models.

The search for the tooth models to be tested is preferably performed by means of a metaheuristic method, preferably evolutionist, preferably by simulated annealing.

In the preferred embodiment, the method therefore implements a double optimization, on the tooth models and on the arrangement of the tooth models, the assembled model being the arrangement of a set of tooth models which provides the minimal distance with the analysis image, by considering all the possible tooth models and all the possible arrangements.

In the optional and preferred step f), the method implements several analysis images of the arch of the patient, preferably more than 3, more than 5, more than 10, more than 50, preferably more than 100 analysis images. The assembled model is thus more complete.

More preferably, the method implements an optimization such that the assembled model obtained is optimal in light of all of the analysis images. In other words, the assembled model is preferably the one which maximizes the match with all of the analysis images.

In the preferred embodiment, the method therefore implements a double or, preferably a triple optimization, on the tooth models on the one hand, on the arrangement of the tooth models and/or on a plurality of analysis images on the other hand, the assembled model being the arrangement of a set of tooth models which provides the mean minimal

distance, over all of the analysis images, by considering all the possible tooth models and, preferably, all the possible arrangements.

According to one embodiment, in the step d) and/or e) and/or f), a metaheuristic, preferably evolutionist, method, preferably by simulated annealing, is used.

As now clearly appears, the invention thus makes it possible to construct an assembled dental arch model from simple analysis images, for example photographs taken by means of a cellphone. Obviously, the accuracy of the assembled model does not reach that of a scan. In some applications, for example to perform a first diagnosis of the dental situation of the patient, such an accuracy is not however essential.

The assembled model may therefore be used to analyze the orthodontic situation of the patient, according to the steps ii) to iv).

In the step ii), the assembled model is sent to an orthodontist and/or to a computer provided with diagnostic software.

In one embodiment, the assembled model is sent accompanied by a questionnaire filled out by the patient in order to improve the quality of the analysis in the step iv).

In the step iii), the orthodontist and/or the computer examines the assembled model. Unlike an updated image, the assembled model allows an observation from any angle. The analysis is advantageously more accurate.

In the step iv), the orthodontist and/or the computer informs the patient, for example by sending him or her a message on his or her telephone. This message may in particular inform the patient of an unfavorable situation and urge him or her to make an appointment with the orthodontist.

The orthodontist may also compare the assembled model with assembled models received previously for the same patient. The analysis thereof advantageously makes it possible to assess the trend of the situation. The message may thus inform the patient of an unfavorable change of his or her situation, which improves the prevention.

The assembled model may also be compared with one or more models obtained by scanning of the teeth or from a molding of the teeth of the patient, or with an updated reference model resulting from the implementation of a method described in WO 2016 066651.

Application to Embedded Monitoring

An image analysis according to the invention is also useful for guiding the acquisition of an image of a dental arch, in particular for establishing a remote diagnosis.

In particular, WO 2016/066651 describes a method in which an initial reference model is deformed so as to obtain an updated reference model allowing the acquisition of reference images exhibiting a maximal match with the "updated" images of the arch acquired at the updated instant.

The reference images are therefore views of the updated reference model, observed in virtual acquisition conditions which are the closest possible matches with the real acquisition conditions implemented to acquire the updated images of the arch of the patient.

The search for these virtual acquisition conditions is preferably performed by means of metaheuristic methods.

To speed up this search, WO 2016/066651 recommends performing a first rough assessment of the real acquisition conditions. For example, conditions which would correspond to a position of the acquisition apparatus at a distance from the teeth greater than 1 meter are excluded from the search.

There is however an ongoing need to speed up the execution of the method described in WO 2016/066651, and in particular, to search, more rapidly, for the virtual acquisition conditions exhibiting a maximal match with the real acquisition conditions implemented to acquire an updated image of the arch of the patient.

One aim of the invention is to at least partially address this problem.

The invention proposes a method for acquiring an image of a dental arch of a patient, said method comprising the following steps:

a') activation of an image acquisition apparatus so as to acquire an image, called "analysis image", of said arch;

b') analysis of the analysis image by means of a deep learning device, preferably a neural network, trained by means of a learning base, preferably according to a detailed analysis method according to the invention, so as to identify at least one analysis tooth zone representing a tooth on said analysis image, and to determine at least one tooth attribute value for said analysis tooth zone, or according to a global analysis method according to the invention;

c') determination, for the analysis image, of a value for an image attribute, said value being a function of said tooth attribute value if a detailed analysis method according to the invention has been implemented in the preceding step;

d') optionally, comparison of said image attribute value with an instruction;

e') sending of an information message as a function of said comparison.

In one embodiment, in the step b'), all said analysis tooth zones are identified, and at least one tooth attribute value is determined for each analysis tooth zone, and, in the step c'), the value for the image attribute is determined as a function of said tooth attribute values.

In one embodiment, the step b') comprises the following steps:

1) preferably before the step a'), creation of a learning base comprising more than 1 000 dental arch images, or "historical images", each historical image comprising one or more zones each representing a tooth, or "historical tooth zones", to each of which, for said tooth attribute, a tooth attribute value is assigned;

2) training of at least one deep learning device, preferably a neural network, by means of the learning base;

3) submission of the analysis image to the deep learning device so that it determines at least one probability relating to:

the presence, at a location in said analysis image, of a zone representing, at least partially, a tooth, or "analysis tooth zone",

the attribute value of the tooth represented on said analysis tooth zone,

4) determination, as a function of said probability, of the presence of a tooth at a position represented by said analysis tooth zone, and of the attribute value of said tooth.

In one embodiment, the step b') comprises the following steps:

1') creation of a learning base comprising more than 1 000 dental arch images, or "historical images", each historical image comprising an attribute value for at least one image attribute, or "image attribute value";

2') training of at least one deep learning device, preferably a neural network, by means of the learning base;

3') submission of the analysis image to the deep learning device so that it determines, for said analysis image, at least one probability relating to said image attribute value.

In one embodiment, to create a historical image of the learning base, an operator, preferably an orthodontist,

identifies one more "historical" tooth zones on an image, then assigns each identified historical tooth zone a value for at least one tooth attribute, and/or

assigns an image a value for at least one tooth attribute.

In one embodiment, the information message is sent by the acquisition apparatus.

As will be seen in more detail hereinafter in the description, an acquisition method according to the invention therefore makes it possible to check whether an analysis image respects an instruction and, if it does not respect the instruction, to guide the operator in order for him or her to acquire a new analysis image. The method therefore allows an "embedded monitoring", preferably in the image acquisition apparatus.

In particular, to implement the method of WO 2016/066651, there may be a desire to acquire updated images from different acquisition directions, for example a front image, a right image and a left image. These updated images, acquired in succession, may be classified accordingly. The search for the virtual acquisition conditions exhibiting a maximal match with the real acquisition conditions is speeded up thereby.

In effect, the search may begin from virtual acquisition conditions in which the virtual acquisition apparatus is in front, to the left or to the right of the updated reference model, depending on whether the updated image considered is classified as a front, left or right image, respectively.

The operator, generally the patient, may however make a mistake in the acquisition of the updated images. In particular, he or she may forget to take an updated image, for example the front view, or invert two updated images. Typically, the operator may take an image on the right whereas a left image is expected from him or her.

This inversion of the updated images may considerably slow down their processing. For example, if the updated image is assumed to be an image taken on the left but it was in error taken on the right, said search for the optimal virtual acquisition conditions, that is to say those exhibiting a maximal match with the real acquisition conditions, will begin from a starting point offering a left view of the reference model, whereas the optimal virtual acquisition conditions correspond to a right view. The search will therefore be considerably slowed down thereby.

By virtue of the invention, each updated image is an analysis image which may be analyzed and checked, preferably in real time.

For example, the acquisition method makes it possible to determine that the updated image has been "taken on the right" and compare this image attribute value with the instruction which had been given to the operator to take the updated image on the left. Since the attribute value of the updated image (image taken on the right) does not correspond to the instruction (acquire an updated image on the left), the acquisition apparatus may immediately alert the operator in order for him or her to modify the acquisition direction.

An acquisition method is now described in detail.

In the step a'), the operator activates the image acquisition apparatus so as to acquire an analysis image.

In one embodiment, the operator triggers the acquisition apparatus so as to store the analysis image, preferably takes a photo or video of his or her teeth, preferably by means of a cellphone equipped with a camera.

The step a') may be performed like the acquisition of the updated images in the step B) described above.

In another embodiment, the analysis image is not stored. In particular, the analysis image may be the image which, in real time, appears on the screen of the cellphone of the operator, generally the patient.

In a first embodiment, in the step b'), the analysis image is analyzed according to a detailed analysis method according to the invention. This analysis preferably leads to the assignment of a tooth attribute value to each identified analysis tooth zone, for example to assigning a tooth number to each of the analysis tooth zones.

In the step c'), an attribute value of the analysis image is determined as a function of the tooth attribute values. The attribute value of the analysis image may relate to its general orientation and may for example take one of the following three values: "right photo", "left photo" and "front photo". The attribute value of the analysis image may also be the list of the tooth numbers represented, for example, "16, 17 and 18". The attribute value of the analysis image may also be, for example, the "presence" or "absence" of a dental, preferably orthodontic, appliance, or the state of opening of the mouth ("mouth open", "mouth closed").

In another embodiment, a global analysis method according to the invention is implemented in the step b'). Advantageously, such a method makes it possible to directly obtain a value for an image attribute, without having to determine values for a tooth attribute. It is therefore advantageously more rapid. The information resulting from a global analysis may however be less accurate than that resulting from a detailed analysis.

The steps a') to c') thus make it possible to characterize the analysis image.

The characterization of the analysis image makes it possible to guide the operator if the analysis image does not correspond to the expected image, for example because its quality is insufficient or because it does not represent the desired teeth.

In the step d'), the image attribute value of the analysis image is compared with an instruction.

For example, if the instruction was to acquire a right image and the image attribute value is "take on the left", the comparison leads to the conclusion that the image acquired is "unsatisfactory".

In the step e'), a message is sent to the operator, preferably by the acquisition apparatus.

Preferably, the information message relates to the quality of the image acquired and/or to the position of the acquisition apparatus in relation to said arch and/or to the setting of the acquisition apparatus and/or to the opening of the mouth and/or to the wearing of a dental, preferably orthodontic, appliance.

For example, if the image acquired is "unsatisfactory", the acquisition apparatus may emit a light, for example red, and/or ring, and/or generate a voice message, and/or vibrate, and/or display a message on its screen.

For example, if the image has to be acquired while the patient wears his or her dental appliance and this is not the case, the acquisition apparatus may send the message "wear your appliance for this image".

For example, if the image was acquired with the patient not sufficiently opening the mouth or with the mouth closed, the acquisition apparatus may send the message "open your mouth more for this image".

In one embodiment, the steps b') to c') are implemented only if the operator records the analysis image, that is to say he or she presses on the trigger. The message then prompts the operator to acquire a new analysis image. Optionally, the acquisition apparatus deletes the unsatisfactory analysis image.

In one embodiment, the steps b') to c') are implemented permanently when the acquisition apparatus is switched on and the analysis image is an image which appears on a screen of the acquisition apparatus. The acquisition apparatus may thus, for example, emit a red light as long as the analysis image is unsatisfactory, and emit a green light when the analysis image is satisfactory. Advantageously, the acquisition apparatus then stores only analysis images which are satisfactory.

As now clearly emerges, the invention therefore allows an embedded monitoring upon the acquisition of analysis images. When applied to updated images of the method of WO 2016/066651, the steps a') to e') make it possible to check that these images do indeed conform to the need, and therefore to considerably speed up the execution of this method.

The steps d') and e') are optional. In one embodiment, the analysis image is only associated with its description, which specifies its image attribute value. This description also makes it possible to considerably speed up the execution of the method of WO 2016/066651 since, when the analysis image is used as updated image of this method, it makes it possible to approximately determine the real acquisition conditions of this image, by eliminating the risk of a rough error, for example because of a reversal between two images.

The steps d') and e') are however preferred. They make it possible for example to avoid having the operator forget a left image, or take two redundant right images.

Application to the Monitoring of an Orthodontic Aligner

Conventionally, at the start of an orthodontic treatment, the orthodontist determines the positioning of the teeth that he or she wants to obtain at a so-called "set-up" instant of the treatment. The set-up may be defined by means of an imprint or from a three-dimensional scan of the teeth of the patient. The orthodontist then has manufactured, or manufactures, accordingly, an orthodontic appliance suited to this treatment.

The orthodontic appliance may be an orthodontic aligner. An aligner conventionally takes the form of a removable single-piece appliance, conventionally made of a transparent polymer material, which comprises a channel conformed for several teeth of an arch, generally all the teeth of an arch, to be able to be housed therein.

The form of the channel is adapted to hold the aligner in position on the teeth, while exerting an action of correction of the positioning of certain teeth (FIGS. **14** and **15**).

At the start of the treatment, the shapes that the different aligners have to take at different moments of the treatment are conventionally determined, then the set of corresponding aligners is manufactured. At predetermined instants, the patient changes the aligner.

The treatment by means of aligners is advantageously less stressful for the patient. In particular, the number of appointments with the orthodontist is limited. Furthermore, there is less pain than with a metal orthodontic brace attached to the teeth.

The market for orthodontic aligners is therefore on the increase.

At regular intervals, the patient goes to the orthodontist for a visual inspection, notably to check whether the displacement of the teeth conforms to the expectations and whether the aligner worn by the patient is still suited to the treatment.

If the orthodontist diagnoses an unsuitability to the treatment, he or she takes a new imprint of the teeth, or, in an equivalent manner, a new three-dimensional scan of the teeth, then orders a new series of aligners configured accordingly. It is considered that, on average, the number of aligners finally manufactured is approximately 45, instead of 20 aligners conventionally provided at the start of the treatment.

The need to have to go to the orthodontist is a constraint for the patient. The trust of the patient in his or her orthodontist may also be affected. The inadequacy may be unsightly. Finally, the result thereof is an additional cost.

The number of inspection visits to the orthodontist must therefore be limited.

There is a need for solutions addressing these problems.

One aim of the invention is to at least partially address this need.

The invention provides a method for assessing the shape of an orthodontic aligner, said method comprising the following steps:

- a") acquisition of at least one image at least partially representing the aligner in a service position in which it is worn by a patient, called "analysis image";
- b") analysis of the analysis image by means of a deep learning device, preferably a neural network, trained by means of a learning base, so as to determine a value for at least one tooth attribute of an "analysis tooth zone" of the analysis image, the tooth attribute relating to a separation between the tooth represented by the analysis tooth zone, and the aligner represented on the analysis image, and/or for an image attribute of the analysis image, the image attribute relating to a separation between at least one tooth represented on the analysis image, and the aligner represented on said analysis image;
- c") preferably, assessment of the suitability of the aligner as a function of the value of said tooth or image attribute;
- d") preferably, sending of an information message as a function of said assessment.

As will be seen in more detail hereinafter in the description, an assessment method according to the invention considerably simplifies the assessment of the good suitability of the aligner to the treatment, while making this assessment particularly reliable. In particular, the method may be implemented from simple photographs or films, taken with no particular precautions, for example by the patient. The number of appointments with the orthodontist may therefore be limited.

Preferably, in the step b"), all said analysis tooth zones are identified, and the value of said tooth attribute is determined for each analysis tooth zone, and, in the step c"), the suitability of the aligner is determined as a function of said tooth attribute values.

Preferably, said tooth attribute is chosen from the group formed by a maximal separation along the free edge of the tooth, a mean separation along the free edge of the tooth, and said image attribute is chosen from the group formed by a maximal separation along all of the teeth represented, a mean separation along the free edges of all of the teeth represented, an overall acceptability of the separation of the teeth represented.

The tooth attribute relating to a separation may in particular be the existence of a separation, this attribute being

able to take the tooth attribute values "yes" or "no"; or a value measuring the scale of the separation, for example an observed maximal separation or an assessment in relation to a scale.

In the step b"), a detailed analysis method according to the invention is preferably implemented, a tooth attribute of each historical tooth zone of each historical image of the learning base relating to a separation between the tooth represented by the historical tooth zone, and an aligner worn by said tooth and represented on said historical image.

Preferably, the step b") comprises the following steps:

b"1) preferably before the step a"), creation of a learning base comprising more than 1000, preferably more than 5000, preferably more than 10 000 images of dental arches, or "historical images", each historical image representing an aligner worn by a "historical" patient and comprising one or more zones each representing a tooth, or "historical tooth zones", to each of which is assigned, for at least one tooth attribute relating to a separation between the tooth represented by the historical tooth zone considered, and the aligner represented, a tooth attribute value;

b"2) learning of a deep learning device, preferably a neural network, by means of the learning base;

b"3) submission of the analysis image to the deep learning device for the deep learning device to determine at least one probability relating to

the presence, at a location of said analysis image, of an analysis tooth zone, and

the tooth attribute value of the tooth represented on said analysis tooth zone;

b"4) determination, as a function of said probability, of the presence of a separation between the aligner and the tooth represented by said analysis tooth zone, and/or of an amplitude of said separation.

The steps b"1) to b"4) may comprise one or more of the features, possibly optional, of the steps 1) to 4) described above, respectively.

In one embodiment, in the step b"), a global analysis method according to the invention is implemented, an image attribute of each historical image of the learning base relating to a separation between at least one tooth represented on the historical image, and an aligner worn by said tooth and represented on said historical image.

Preferably, the step b") comprises the following steps:

b"1') creation of a learning base comprising more than 1000 images of dental arches, or "historical images", each historical image comprising an attribute value for at least one image attribute, or "image attribute value", relating to a separation between at least one tooth represented on the analysis image, and the aligner represented on said analysis image;

b"2') training of at least one deep learning device, preferably a neural network, by means of the learning base;

b"3') submission of the analysis image to the deep learning device for it to determine, for said analysis image, at least one probability relating to said image attribute value, and determination, as a function of said probability, of the presence of a separation between the aligner and the tooth or teeth represented on the analysis image, and/or of an amplitude of said separation.

The steps b"1') to b"3') may comprise one or more of the features, possibly optional, of the steps 1') to 3') described above, respectively.

The method is now described when a detailed analysis is implemented in the step b").



Prior to the step a"), the learning base must be enriched, preferably according to an enrichment method according to the invention, in order to contain historical images whose description specifies, for each of the historical tooth zones, a value for the tooth attribute relating to the separation.

This information may be input manually. For example, an image representing one or more so-called "historical" tooth zones may be presented to an operator, preferably an orthodontist, and he or she may be asked to identify these historical tooth zones and indicate, for each historical tooth zone, whether there is a separation or not and/or assess the amplitude of this separation.

A historical image may be a photo representing an aligner worn by a historical patient. Alternatively, a historical image may be the result of a processing of an image representing a naked dental arch (that is to say without aligner) and of an image representing the same arch bearing the aligner. The image representing the naked arch may in particular be a view of a model of the arch deformed to obtain a maximal match with the image representing the arch bearing the aligner. Such a processing may in particular be useful for better revealing the outline of the teeth and of the aligner when the teeth are not very visible through the aligner.

In the step a"), the acquisition of the analysis image may be performed like the acquisition of the updated images in the step B) described above.

Preferably, at least one reminder informing the patient of the need to create an analysis image is addressed to the patient. This reminder may be in paper form or, preferably, in electronic form, for example in the form of an email, of an automatic alert from a dedicated mobile device or an SMS. Such a reminder may be sent by the orthodontic practice or laboratory or by the dentist or by the dedicated mobile application of the patient, for example.

The step a") is performed at the moment when the assessment of the shape of an aligner is desired, for example more than 1 week after the start of the treatment with the aligner.

The analysis image is an image representing the aligner worn by the teeth of the patient.

In the step b"), the analysis image is analyzed according to a detailed analysis method according to the invention.

The deep learning device has been trained by means of a learning base containing historical images whose description specifies, for at least one, preferably each historical tooth zone, a value for a tooth attribute relating to a separation between the tooth represented by the historical tooth zone and the aligner worn by said tooth and represented on said historical image.

The value for this tooth attribute therefore provides an information item relating to the shape of the aligner relative to the shape of the teeth of the patient.

The value for this tooth attribute can be a measurement of the separation, for example a measurement of the maximum separation, or of the mean separation for the tooth represented by the historical tooth zone.

The deep learning device is therefore capable of analyzing the analysis image to determine, preferably for each of the "analysis tooth zones", the existence, even the extent, of a separation of the aligner of the tooth represented on the analysis tooth zone.

In the step c"), an assessment is made, as a function of the results of the preceding step, as to the compatibility the aligner. For example, a search is conducted to see if the separation of the aligner with at least one tooth exceeds an acceptability threshold and, in this case, a decision is made as to the replacement of the aligner by a better suited aligner.

The suitability of the aligner can be assessed in the context of an orthodontic treatment (separation compatible or not with the orthodontic treatment) but also in the context of a non-therapeutic, in particular esthetic, treatment. Aligners can indeed be used to displace teeth for purely esthetic purposes, without this displacement modifying the state of health of the patient. The suitability of the aligner can also be assessed in the context of a research program concerning the effectiveness of the aligner, for example to assess a new material for the aligner, on a human being or on another animal.

In the step d"), an information item relating to the assessment in the preceding step is sent, in particular to the patient and/or the orthodontist.

The orthodontist can then use this information, possibly in combination with additional information, for example the age of the patient or the duration for which the aligner has been worn, to establish a diagnosis and, if necessary, decide on a suitable treatment.

In one embodiment, the method comprises, in the step b"), a global analysis according to the invention. The other steps are unchanged.

The analysis of the analysis image and of the historical images is then performed globally, without identification of the individual situation of each of the teeth represented and the image attribute relates to the image as a whole.

For example, the image attribute relating to the separation may relate to the acceptability of a dental situation, the cause of one or more separations, or relate to the global scale of the separation or separations of the teeth. For example, the value of the image attribute may be "globally acceptable" or "globally unacceptable". The value of the image attribute can also, for example, be a measurement of the separation, for example a measurement of the maximum separation, or of the mean separation between the teeth represented on the analysis image and the aligner.

As now clearly emerges, a method according to the invention makes it possible, from simple photos or a simple film, to determine whether the aligner is abnormally detached, even, if a detailed analysis was performed in the step b"), to determine the regions in which the aligner is separated from the teeth and assess the scale of this separation.

The invention also relates to a method for adapting an orthodontic treatment, a method in which a method for assessing the shape of an orthodontic aligner according to the invention is implemented, then, as a function of the result of said assessment, a new aligner is manufactured and/or the patient is counseled, for example for him or her to improve the conditions of use of his or her orthodontic aligner, in particular the positioning and/or the time bands when it should be worn and/or the maintenance of his or her orthodontic aligner, in order to optimize the treatment.

The use of aligners is not limited to therapeutic treatments. In particular, an assessment method may be implemented to assess an aligner exclusively used for esthetic purposes.

The method may also be used to assess other dental, in particular orthodontic, parts or appliances.

Computer Program

The invention relates also:

to a computer program, and in particular a dedicated application for cellphones, comprising program code instructions for the execution of one or more steps of any method according to the invention, when said program is run by a computer,



to a computer medium on which such a program is stored, for example a memory or a CD-ROM.

Obviously, the invention is not limited to the embodiments described above and represented.

In particular, the patient is not necessarily a human being. A method according to the invention may be used for another animal.

The patient could be alive or dead. He is preferably alive.

The methods of the invention may be used for an orthodontic treatment, but also out of any orthodontic treatment, and even out of any therapeutic treatment.

The invention claimed is:

**1**. A method for acquiring an image of a dental arch of a patient, said method comprising the following steps:

a') activation of an image acquisition apparatus so as to acquire an image, called "analysis image", of said arch;

b') analysis of the analysis image by means of a deep learning device trained by means of a learning base;

c') determination, for the analysis image, as a function of the results of the analysis in the preceding step, of a value for an image attribute;

d') comparison of said image attribute value with a setpoint;

e') sending of an information message as a function of said comparison, the information message being related to the quality of the image acquired or to the position of the acquisition apparatus in relation to said arch or to the setting of the acquisition apparatus or to the opening of the mouth or to the wearing of a dental appliance, or to a combination thereof,

to check whether the analysis image respects the setpoint and, if it does not respect the setpoint, to guide the operator in order for him or her to acquire a new analysis image.

**2**. The method as claimed in claim **1**, in which, in the step b'), at least one analysis tooth zone is identified that represents, at least partially, a tooth on said analysis image, and at least one value of a tooth attribute is determined for said at least one analysis tooth zone, and, in the step c'), the value for the image attribute is determined as a function of said tooth attribute value.

**3**. The method as claimed in claim **2**, in which the step b') comprises the following steps:

1) creation of a learning base comprising more than 1000 images of dental arches, or "historical images", each historical image comprising one or more zones each representing a tooth, or "historical tooth zones", to each of which, for said tooth attribute, a tooth attribute value is assigned;

2) training of at least one deep learning device by means of the learning base;

3) submission of the analysis image to the deep learning device for it to determine at least one probability relating to:

the presence, at a location in said analysis image, of a zone representing, at least partially, a tooth, or "analysis tooth zone",

the attribute value of the tooth represented on said analysis tooth zone,

4) determination, as a function of said probability, of the presence of a tooth at a position represented by said analysis tooth zone, and of the attribute value of said tooth.

**4**. The method as claimed in claim **3**, in which said tooth attribute is chosen from a tooth number, a tooth type, a tooth shape parameter, a tooth appearance parameter, a parameter relating to the state of the tooth, an age for the patient, or a combination of these attributes.

5. The method as claimed in claim 3, in which, in the step 1) or 1'), a learning base is created comprising more than 10 000 historical images.

6. The method as claimed in claim 1, in which, in the step b'), all said analysis tooth zones are identified, and at least one tooth attribute value is determined for each analysis tooth zone, and, in the step c'), the value for the image attribute is determined as a function of said tooth attribute values.

7. The method as claimed in claim 1, in which the step b') comprises the following steps:

1') creation of a learning base comprising more than 1000 images of dental arches, or "historical images", each historical image comprising an attribute value for at least one image attribute, or "image attribute value";

2') training of at least one deep learning device by means of the learning base;

3') submission of the analysis image to the deep learning device for it to determine, for said analysis image, at least one probability relating to said image attribute value.

8. The method as claimed in claim 1, in which the learning base is composed according to the following steps:

A) at an "updated" instant, production of a model of a dental arch of a patient, or "updated reference model", and segmentation of the updated reference model so as to produce, for each tooth, a "tooth model", and, for at least one tooth attribute, assignment of a tooth attribute value to each tooth model;

B) acquisition of at least one image of said arch, or "updated image", in real acquisition conditions;

C) for each updated image, search for virtual acquisition conditions suitable for an acquisition of an image of the updated reference model, called "reference image", exhibiting a maximum match with the updated image in said virtual acquisition conditions, and acquisition of said reference image;

D) identification, in the reference image, of at least one zone representing a tooth model, or "reference tooth zone" and, by comparison of the updated image and the reference image, determination, in the updated image, of a zone representing said tooth model, or "updated tooth zone";

E) assignment, to said updated tooth zone, of the tooth attribute value of said tooth model;

F) addition of the updated image enriched with a description of said updated tooth zone and its tooth attribute value, or "historical image", in the learning base.

9. The method as claimed in claim 1, in which the learning base is composed according to the following steps:

A') at an initial instant, production of a model of a dental arch of a patient, or "initial reference model", and segmentation of the initial reference model so as to produce, for each tooth, a "tooth model", and, for at least one tooth attribute, assignment of a tooth attribute value to each tooth model;



B') at an updated instant, acquisition of at least one image of said arch, or "updated image", in real acquisition conditions;

C') search, by deformation of the initial reference model, for an updated reference model and virtual acquisition conditions suitable for an acquisition of an image of the updated reference model, called "reference image", exhibiting a maximum match with the updated image in said virtual acquisition conditions;

D) identification, in the reference image, of at least one zone representing a tooth model, or "reference tooth zone" and, by comparison of the updated image and the reference image, determination, in the updated image, of a zone representing said tooth model, or "updated tooth zone";

E) assignment, to said updated tooth zone, of the tooth attribute value of said tooth model;

F) addition of the updated image enriched with a description of said updated tooth zone and its tooth attribute value, or "historical image", in the learning base.

10. The method as claimed in claim 1, in which, to create a historical image of the learning base,

identifies one or more "historical" tooth zones on an image, called then assigns, to each identified historical tooth zone, a value for at least one tooth attribute, and/or

assigns to an image a value for at least one tooth attribute.

11. The method as claimed in claim 1, in which the acquisition apparatus is a cellphone.

12. The method as claimed in claim 1, in which the information message is sent by the acquisition apparatus.

13. The method as claimed in claim 1, in which said image attribute relates to

a position or an orientation or a calibration of an acquisition apparatus used to acquire said analysis image, or a combination thereof, and/or

a quality of the analysis image, and in particular relating to the brightness, to the contrast or to the sharpness of the analysis image, and/or

the content of the analysis image, in particular to the representation of the arches, of the tongue, of the mouth, of the lips, of the jaws, of the gums, of one or more teeth or of an orthodontic appliance.

14. The method as claimed in claim 1, in which said analysis image is analyzed and checked in real time.

15. The method as claimed in claim 1, in which the deep learning device is a neural network.

* * * * *

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitation of Federal Circuit Rule 32(b)(1) because it contains 13,991 words, excluding the parts of the brief exempted by Federal Circuit Rule 32(b)(2) and Rule 32(f) of the Federal Rules of Appellate Procedure.

2. This brief complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 32(a)(5) and 32(a)(6) because it has been prepared in a monospaced typeface using Microsoft Word 2019 in 14-point, Times New Roman font.

Dated: November 27, 2024

*/s/ Jaysen S. Chung*

Jaysen S. Chung
GIBSON, DUNN & CRUTCHER LLP
One Embarcadero Center, Suite 2600
San Francisco, CA 94111
(415) 393-8271

## CERTIFICATE OF SERVICE

I hereby certify that on November 27, 2024, I served a copy of the foregoing brief on all counsel of record via this Court's CM/ECF system.

Dated: November 27, 2024

*/s/ Jaysen S. Chung*

Jaysen S. Chung, *Principal Attorney*
GIBSON, DUNN & CRUTCHER LLP
One Embarcadero Center, Suite 2600
San Francisco, CA 94111
(415) 393-8271