2024–2270

# United States Court of Appeals for the Federal Circuit

Dental Monitoring SAS,

*Plaintiff–Appellant*

v.

Align Technology, Inc.,

*Defendant–Appellee*

Appeal from the United States District Court for the Northern District of California in case no. 3:22-cv-07335-WHA, Judge William H. Alsup

## Response Brief of Appellee Align Technology, Inc.


Dan L. Bagatell
Perkins Coie LLP
3 Weatherby Road
Hanover, New Hampshire 03755
(602) 351–8250
DBagatell@perkinscoie.com

Hari Santhanam
Perkins Coie LLP
110 N. Wacker Drive, Suite 3400
Chicago, Illinois 60606
(312) 324–8400
HSanthanam@perkinscoie.com

John H. Gray
Perkins Coie LLP
2525 E. Camelback Road
Phoenix, Arizona 85016
(602) 351–8000
JHGray@perkinscoie.com

Kaitlin Dryden
Perkins Coie LLP
33 E. Main Street, Suite 101
Madison, Wisconsin 53703
(608) 535–3050
KDryden@perkinscoie.com

Counsel for Appellee Align Technology, Inc.


February 20, 2025

## CLAIMS 1 AND 14 OF U.S. PATENT NO. 11,049,248

1. A method for assessing the shape of an orthodontic aligner, said method comprising the following steps:

a") more than 1 week after the start of the treatment with the aligner, acquisition of at least one image at least partially representing the aligner in a service position in which it is worn by a patent, called "analysis image", the analysis image being a photograph, or an image extracted from a film;

b") analysis of the analysis image by means of a deep learning device, trained by means of a learning base so as to determine a value

for at least one tooth attribute of an "analysis tooth zone" representing, at least partially, a tooth on said analysis image, the tooth attribute relating to a separation between the tooth represented by the analysis tooth zone, and the aligner represented on the analysis image

in the step a"), a cellphone is used to acquire the analysis image.

14. The method as claimed in claim 1, in which the step b") comprises the following steps:

1) creation of a learning base comprising more than 1000 images of dental arches, or "historical images", each historical image representing an aligner worn by a "historical" patient and comprising one or more zones each representing a tooth, or "historical tooth zones", to each of which, for at least one tooth attribute relating to a separation between the tooth represented by the historical tooth zone considered, and the aligner represented, a tooth attribute value is assigned;

2) training of at least one deep learning device, by means of the learning base;

3) submission of the analysis image to the deep learning device for it to determine at least one probability relating to:

the presence, in a location of said analysis image, of an analysis tooth zone; and

the attribute value of the tooth represented on said analysis tooth zone;

4) determination, as a function of said probability, of an amplitude of said separation.

Appx52 ('248(32:6-23)); Appx53 (34:21-42).

## CLAIMS 1, 7, AND 12 OF U.S. PATENT NO. 10,755,409

1. A method for acquiring an image of a dental arch of a patient, said method comprising the following steps:

a') activation of an image acquisition apparatus so as to acquire an image, called "analysis image", of said arch;

b') analysis of the analysis image by means of a deep learning device trained by means of a learning base;

c') determination, for the analysis image, as a function of the results of the analysis in the preceding step, of a value for an image attribute;

d') comparison of said image attribute value with a setpoint;

e') sending of an information message as a function of said comparison, the information message being related to the quality of the image acquired or to the position of the acquisition apparatus in relation to said arch or to the setting of the acquisition apparatus or to the opening of the mouth or to the wearing of a dental appliance, or to a combination thereof,

to check whether the analysis image respects the setpoint and, if it does not respect the setpoint, to guide the operator in order for him or her to acquire a new analysis image.

7. The method as claimed in claim 1, in which the step b′) comprises the following steps:

1′) creation of a learning base comprising more than 1000 images of dental arches, or "historical images", each historical image comprising an attribute value for at least one image attribute, or "image attribute value";

2′) training of at least one deep learning device by means of the learning base;

3′) submission of the analysis image to the deep learning device for it to determine, for said analysis image, at least one probability relating to said image attribute value.

12. The method as claimed in claim 1, in which the information message is sent by the acquisition apparatus.

Appx82 (′409(32:13-33)); Appx83 (33:10-21, 34:34-35).

## Certificate of Interest

I certify that the information below is complete to the best of my knowledge.

Date: February 20, 2025

Signature: */s/Dan L. Bagatell*

Name: Dan L. Bagatell

| 1. Represented Entity | 2. Real Party in Interest | 3. Parent Corporations and 10% Stockholders |
|---|---|---|
| Align Technology, Inc. | none | Blackrock, Inc. |

| 4. Other Legal Representatives | |
|---|---|
| Perkins Coie LLP: | Jon R. Carter, Sarah E. Fowler, Renée E. Rothauge, Douglas L. Sawyer (no longer with the firm), Maria A. Stubbings, Moeka Takagi |
| Turner Boyd LLP: | Keeley Irene Vega |

| 5. Related Cases |
|---|
| See Notice of Related Case Information, Dkt. 4 |

| 6. Organizational Victims and Bankruptcy Cases |
|---|
| None |

## TABLE OF CONTENTS


Certificate of Interest .......... i

Table of Authorities .......... iv

Table of Abbreviations .......... viii

Related Cases .......... ix

Introduction .......... 1

Statement of Issues .......... 2

Statement of the Case .......... 4

A. Technical Background .......... 4

1. Aligner Treatment and Related Dental Practices .......... 4

2. Deep Learning .......... 8

B. The ’248 and ’409 Patents .......... 9

C. Procedural History .......... 13

Summary of Argument .......... 17

Standards of Review .......... 20

Argument .......... 21

I. The district court correctly invalidated claim 14 of the ’248 patent under § 101 .......... 21

A. Claim 14 is directed to an abstract idea .......... 22

1. The focus of claim 14 is abstract .......... 22

2. DM’s arguments that claim 14 reflects a technological improvement lack merit .......... 27

3. The district court properly analyzed *Alice* step one .......... 36

B. Claim 14 lacks a saving inventive concept .......... 40

1. Claim 14 merely recites using a generic deep-learning device to automate routine dental practices .................... 40

2. DM's inventive-concept arguments lack merit ............... 43

3. DM's "additional" evidence did not preclude summary judgment ......................................................... 45

II. The district court correctly invalidated claims 7 and 12 of the '409 patent under § 101.................................................................. 47

A. Claims 7 and 12 are directed to an abstract idea ...................... 47

1. The focus of claims 7 and 12 is abstract........................... 47

2. DM's arguments that claims 7 and 12 reflect a technological improvement lack merit.............................51

3. The district court properly analyzed *Alice* step one......... 56

B. Claims 7 and 12 lack a saving inventive concept .................... 58

1. Claims 7 and 12 merely recite using a generic deep-learning device to automate routine dental practices..... 58

2. DM's inventive-concept arguments lack merit ................61

3. DM's "additional" evidence did not preclude summary judgment ......................................................... 62

III. The claims are also invalid under Section 112 for lack of written description and indefiniteness........................................... 63

A. The claims cover a "deep learning device" that purportedly does not use neural networks without describing what such a device could be .................................. 64

B. The limitations reciting a "deep learning device" (no further defined) performing "analysis of the analysis image" (no further specified) are indefinite ............................ 68

Conclusion...................................................................................... 69

Certificate of Compliance with Type-Volume Limitation ............................ 70

## TABLE OF AUTHORITIES

**Cases** **Pages**

*AbbVie Deutschland GmbH & Co. v. Janssen Biotech, Inc.*,
759 F.3d 1285 (Fed. Cir. 2014) .................... 65

*Accenture Global Servs., GmbH v. Guidewire Software, Inc.*,
728 F.3d 1336 (Fed. Cir. 2013).................... 22, 47

*AI Visualize, Inc. v. Nuance Commc'ns, Inc.*,
97 F.4th 1371 (Fed. Cir. 2024).................... 23, 47

*Alice Corp. Pty. Ltd. v. CLS Bank Int'l*,
573 U.S. 208 (2014) .................... *passim*

*Angel Techs. Grp. LLC v. Facebook Inc.*,
No. 21-CV-8459, 2022 WL 3093232 (C.D. Cal. June 30, 2022)........... 26, 51

*Aspex Eyewear, Inc. v. Marchon Eyewear, Inc.*,
672 F.3d 1335 (Fed. Cir. 2012).................... 67

*BSG Tech LLC v. Buyseasons, Inc.*,
899 F.3d 1281 (Fed. Cir. 2018) .................... 40, 41, 44, 58, 62

*CardioNet, LLC v. InfoBionic, Inc.*,
955 F.3d 1358 (Fed. Cir. 2020) .................... 35, 38, 39

*Credit Acceptance Corp. v. Westlake Servs.*,
859 F.3d 1044 (Fed. Cir. 2017).................... 44

*Customedia Techs., LLC v. Dish Network Corp.*,
951 F.3d 1359 (Fed. Cir. 2020) .................... 33

*Elec. Power Grp., LLC v. Alstom S.A.*,
830 F.3d 1350 (Fed. Cir. 2016).................... *passim*

*Enco Sys., Inc. v. DaVincia, LLC*,
845 F. App'x 953 (Fed. Cir. 2021).................... 33

*Exmark Mfg. Co. v. Briggs & Stratton Corp.*,
830 F. App'x 305 (Fed. Cir. 2020) ............................................................ 67

*Finjan, Inc. v. Blue Coat Sys., Inc.*,
879 F.3d 1299 (Fed. Cir. 2018) ............................................................ 34

*Hawk Tech. Sys., LLC v. Castle Retail, LLC*,
60 F.4th 1349 (Fed. Cir. 2023) ............................................... 31, 52, 58

*Hyper Search, LLC v. Facebook, Inc.*,
No. 17-CV-1387, 2018 WL 6617143 (D. Del. Dec. 17, 2018) ..................27, 51

*ICU Med., Inc. v. Alaris Med. Sys., Inc.*,
558 F.3d 1368 (Fed. Cir. 2009)............................................................ 65

*Int'l Rectifier Corp. v. IXYS Corp.*,
361 F.3d 1363 (Fed. Cir. 2004)............................................................ 67

*Intell. Ventures I LLC v. Cap. One Bank (USA), N.A.*,
792 F.3d 1363 (Fed. Cir. 2015).................................. 25, 27, 43, 50, 51, 61, 62

*Jaffke v. Dunham*,
352 U.S. 280 (1957).............................................................................64

*Koninklijke KPN N.V. v. Gemalto M2M GmbH*,
942 F.3d 1143 (Fed. Cir. 2019) ............................................................ 33

*LizardTech, Inc. v. Earth Res. Mapping, Inc.*,
424 F.3d 1336 (Fed. Cir. 2005)............................................................ 65

*Lorkovic, In Re*,
712 F. App'x 997 (Fed. Cir. 2017)................................................... 22, 47

*McRO, Inc. v. Bandai Namco Games Am. Inc.*,
837 F.3d 1299 (Fed. Cir. 2016) ............................................................ 35

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
572 U.S. 898 (2014) ............................................................................68

*People.ai, Inc. v. Clari Inc.*,
No. 2022-1364, 2023 WL 2820794 (Fed. Cir. Apr. 7, 2023)........................44

*Power Analytics Corp. v. Operation Tech., Inc.*,
No. 16-CV-01955, 2017 WL 5468179 (C.D. Cal. July 13, 2017),
*aff'd*, 748 F. App'x 334 (Fed. Cir. 2019)....................................... 26, 51

*Recentive Analytics, Inc. v. Fox Corp.*,
692 F. Supp. 3d 438 (D. Del. 2023)..............................26, 28, 50, 57

*Rexnord Indus., LLC v. Kappos*,
705 F.3d 1347 (Fed. Cir. 2013) ................................................64

*Rivera v. ITC*,
857 F.3d 1315 (Fed. Cir. 2017)................................................ 65

*Sage Prods., Inc. v. Devon Indus., Inc.*,
126 F.3d 1420 (Fed. Cir. 1997) ................................................54

*SAP Am., Inc. v. InvestPic, LLC*,
898 F.3d 1161 (Fed. Cir. 2018) ........................23, 24, 40, 47, 49, 58

*Simio, LLC v. FlexSim Software Prods., Inc.*,
983 F.3d 1353 (Fed. Cir. 2020)............................................ 22, 55

*Travel Sentry, Inc. v. Tropp*,
No. 2021-1908, 2022 WL 443202 (Fed. Cir. Feb. 14, 2022)....................54

*Trinity Info Media, LLC v. Covalent, Inc.*,
72 F.4th 1355 (Fed. Cir. 2023).................................21, 31, 52, 58

*Ultramercial, Inc. v. Hulu, LLC*,
772 F.3d 709 (Fed. Cir. 2014) ............................................ 41, 58

*Visual Memory LLC v. NVIDIA Corp.*,
867 F.3d 1253 (Fed. Cir. 2017)................................................34

**Statutes & Rules**

35 U.S.C. § 101 ........................................... 1, 3, 14, 16, 21, 47, 64

35 U.S.C. § 112.........................................................................64

35 U.S.C. § 112(a) ........................................................2, 3, 14, 20, 64, 65

35 U.S.C. § 112(b) .......... 2, 3, 14, 64, 68

35 U.S.C. § 112(f) .......... 14

35 U.S.C. § 271(a) .......... 14

35 U.S.C. § 271(g) .......... 13

Fed. R. Civ. P. 56(a) .......... 21

## Table of Abbreviations

| | |
|---|---|
| AI | artificial intelligence |
| Align | defendant–appellee Align Technology, Inc. |
| Appx___ | joint appendix page ___ |
| BlueBr___ | DM's opening brief page ___ |
| DM | plaintiff–appellant Dental Monitoring SAS |
| IPR | *inter partes* review |
| (*x*:*y*-*z*) | column *x*, lines *y*-*z* |
| '248 patent | U.S. Patent No. 11,049,248 |
| '409 patent | U.S. Patent No. 10,755,409 |

Unless otherwise specified, all "§" references refer to Title 35 U.S.C.

## RELATED CASES

No appeal from the same civil action has previously been before this or any other appellate court. This Court's decision in this appeal may, however, directly affect or be directly affected by the following cases:

- *Align Tech., Inc. v. Dental Monitoring SAS*, IPR2023-01369 (PTAB), an instituted *inter partes* review ("IPR") of U.S. Patent No. 10,755,409 ("the '409 patent"), one of the two patents at issue here. A final written decision is expected by March 5, 2025.
- *Align Tech., Inc. v. Dental Monitoring SAS*, IPR2024-00052 (PTAB), an instituted IPR of U.S. Patent No. 11,049,248, ("the '248 patent"), the other patent at issue here. A final written decision is expected by April 19, 2025.
- *Align Tech., Inc. v. Dental Monitoring SAS*, IPR2024-00110 (PTAB), an instituted IPR of U.S. Patent No. 11,109,945, which claims similar subject matter. A final written decision is expected by April 19, 2025.
- *Dental Monitoring SAS v. Get-Grin, Inc.*, No. 22-CV-647-WCB (D. Del.), in which Dental Monitoring has sued third party Get-Grin for infringing the '409 patent (among other patents). The case has been stayed pending reexamination proceedings and IPR2023-01369.

## Introduction

The district court correctly invalidated claim 14 of the ’248 patent and claims 7 and 12 of the ’409 patent—the only claims at issue in this appeal—under 35 U.S.C. § 101 and *Alice Corp. Pty. Ltd. v. CLS Bank Int’l*, 573 U.S. 208 (2014). The claims are directed to the abstract ideas of collecting, analyzing, and displaying information to automate longstanding dentistry practices—assessing the shape of an orthodontic aligner and guiding an operator to take pictures of a patient’s teeth. And the claims do not recite any saving inventive concept. They merely apply conventional machine-learning principles in another field, calling for use of a generic “deep learning device” trained by a generic “learning base” to conduct unspecified “analysis of [an] analysis image” to make a “determination” and automate conventional dentistry tasks.

Seeking to resurrect the claims on appeal, Dental Monitoring (“DM”) contends that no one had previously trained a “deep learning device” to perform these specific dentistry tasks, so the claimed “deep learning device” is a “specially trained” device. It is well settled, however, that an abstract idea is no less abstract simply because the patentee was the first to apply it in a particular field. Indeed, if DM’s logic were adopted, it would render *Alice* a

dead letter when it comes to new applications of machine learning or artificial intelligence ("AI") more broadly. Just as the Supreme Court held in *Alice* that "apply it with a computer" claims are not patent-eligible, this Court should hold that "apply it with AI" claims are not, either.

Alternatively, the Court should affirm the judgment of invalidity because the claims lack written-description support for their full scope under § 112(a) and are indefinite under § 112(b). Although all known forms of deep learning use neural networks, the patents say the claimed "deep learning device" is "preferably," but not necessarily, a neural network, without explaining what else it could be. Even if DM were entitled to claim the abstract concept of using deep-learning techniques in this field, it was not entitled to claim a broad, vague class of "deep learning devices" that the named inventors did not possess and that skilled artisans cannot fathom even today.

## Statement of Issues

1. Claim 14 of the '248 patent is directed to the abstract idea of collecting, analyzing, and presenting information to "assess[ ] the shape of an orthodontic aligner" using a generic "deep learning device," and it contains no inventive concept because it merely uses generic computer components

applying well-known precepts of machine learning to automate the conventional process used by dental practitioners to assess aligner shape. Did the district court correctly invalidate claim 14 under § 101?

2. Claims 7 and 12 of the ’409 patent are directed to the abstract idea of collecting, analyzing, and presenting information to guide a camera operator to take a picture of teeth using a generic "deep learning device," and they contain no inventive concept because they merely use generic computer components applying well-known precepts of machine learning to automate the conventional process for capturing dental images. Did the district court correctly invalidate claims 7 and 12 under § 101?

3. Although all known forms of deep learning use neural networks, DM’s patent claims purport to cover unspecified "deep learning devices" that do not use a neural network without explaining what those are. Should the district court’s judgment of invalidity be affirmed for the alternative, independent reason that the asserted claims lack written-description support for their full scope under § 112(a) and are indefinite under § 112(b)?

## STATEMENT OF THE CASE

### A. Technical Background

#### 1. Aligner Treatment and Related Dental Practices

In 1997, Align first introduced its revolutionary Invisalign® system, which treats misaligned teeth using clear plastic aligners instead of conventional metal braces. Appx178 ¶10. Align also pioneered digital dentistry by introducing 3D intraoral scanners and modeling software for designing a custom treatment plan for each patient based on the patient's current tooth arrangement and the desired result. Appx178-79 ¶¶10-11.

Aligner treatment typically requires a patient to wear a series of aligners, switching from one to the next. Appx50 ('248(27:25-47)); Appx80 ('409(27:36-58)). A dental practitioner periodically evaluates treatment progress by, among other things, assessing the fit of the aligner the patient is currently wearing and determining whether the patient should proceed to the next aligner. Appx37 ('248(1:11-15)), Appx50 (27:25-47); Appx67 ('409(1:11-15)), Appx80 (27:36-58); Appx526 ¶20. Since the introduction of Invisalign® aligners, dental practitioners have routinely performed this assessment by visually evaluating the space between an aligner and a patient's teeth, generally to within a millimeter. Appx526 ¶20; Appx966 (46:21-47:7).

By 2003, Align had even published clinical guidance for performing this assessment, using a photograph of a patient wearing an aligner to explain that spacings greater than a millimeter reflected poor aligner seating:




Appx582; *see also* Appx485-86 ¶¶ 64-66; Appx1090.

Consistent with this practice, Align's expert, Dr. Maureen Valley, an orthodontist for more than 25 years, explained that in "our world every day, every patient, most everything we do is in millimeters, from anywhere from three millimeters, all down to fractions of millimeters, that we visually assess." Appx966 (46:21-47:7). DM's dental expert, Dr. Budi Kusnoto, concurred that orthodontists would visually assess aligner spaces "generally within a millimeter" and that he had provided "quality orthodontic care" to patients through such assessments. Appx963-64 (90:20-25, 92:11-93:17).

Dental practitioners conventionally performed these visual assessments at in-person appointments with patients or by remote means such as

videoconferences or evaluations of "selfie" photographs of teeth taken and sent by patients. Appx525-30 ¶¶ 18-23, 30; Appx37 ('248(1:11-15)) ("This assessment is conventionally performed by an orthodontist, which requires the patient to transmit these images to the orthodontist[.]"). By 2017, it was well recognized that "[p]hotographs captured by smart phones c[ould] be used for screening, diagnosis consultation, referral, documentation of disease and treatment provided." Appx525-26 ¶ 18 (citation omitted)). And the practice of taking, reviewing, and even editing selfie photos was routine for anyone with access to a cellphone. Appx526 ¶ 19.

Dr. Valley explained that as early as 2015, she had remotely treated Invisalign® patients by asking them to email her photographs of their teeth (with and without aligners) taken using their cellphones. Appx527-28 ¶¶ 22-23). She had also taught patients how to take these photos and their desired composition. *Id.* If a certain photo did not capture the information needed, for example because it was too blurry, taken at the wrong angle or magnification, or taken of the wrong teeth or area of the dental arch, she instructed the patient on how to retake the photo. *Id.* Dr. Valley's experience was consistent with that of other orthodontists who similarly recognized before 2017

that aligner spacing could be assessed remotely by conducting videoconferences with patients or evaluating selfie photos captured and sent by patients using their cellphones. Appx530-31 ¶¶ 30, 32; Appx540-41 (33:15-34:18).

By 2017, cellphone apps for assisting patients in capturing selfie photos of their teeth had been developed. For example, Align's U.S. Patent Publication No. 2021/0068923 ("Carrier"), which claims priority back to 2016, described a cellphone app that guided a user to take a series of high-quality images of their teeth by displaying an overlay (e.g., an image or outline of teeth) on the phone screen that the user could use to adjust the position of the phone camera. Appx482 ¶ 53 (citing Appx577-79 ¶¶ 32, 99-100). The app then used edge-detection and image-recognition techniques to measure the distance between teeth and the overlay to determine the alignment between the two. *Id.* (citing Appx578-79 ¶¶ 33, 108); *see also* Appx529 ¶¶ 27-28.

DM's PCT Publication No. WO2016/066651 ("Salah"), which is admitted prior art to the '248 and '409 patents, similarly described a cellphone app that provided feedback to guide patients in taking selfie photos of their teeth, including visual prompts and audio messages that informed the patient regarding the positioning of the camera and the acceptability of images. Appx567-70 (2:21-27, 27:19-28:2); Appx482-83 ¶¶ 55-56; Appx530-31 ¶ 31. By

2015, DM had translated this basic concept into a commercial app, which DM's CEO and named inventor, Philippe Salah, touted as part of a remote "a dental care solution" allowing "continuous[] and precise[] monitor[ing], from outside the orthodontist's practice, as often as you wish, and with no tool more complicated than a smartphone or tablet equipped with a camera and the Dental Monitoring [app]." Appx531 ¶ 31 (citations omitted).

#### 2. Deep Learning

Deep learning is a subset of a broader category of AI known as machine learning. Appx738 (45:10-22). All known forms of deep learning use neural networks that can be trained to perform tasks. Appx497 ¶ 98, Appx508 ¶ 132; Appx953 (27:18-28:6); Appx960-61 (171:18-20, 172:24-173:6). A typical application of deep learning involves using a training dataset (referred to in the DM patents as a "learning base") of thousands or even millions of labeled images (e.g., an image of a bird that is labeled as a "bird") to adjust the parameters (weights) of a neural network that computes the classification of an image. Appx478-79 ¶ 45. Using optimization principles, the neural network can adapt and progressively tune its weights to minimize error. *Id.*

As DM's technical expert, Dr. John Mongan, explained, "[c]omputer vision underwent a revolution in 2012, when deep learning approaches …

halved the error rates in standard image classification challenges compared to other best competitors." Appx953 (26:1-27:17 (quoting Appx968)). By 2016, he explained, "it was known that deep neural networks could be trained and optimized for fast and efficient classification of images" and that "high performing deep neural networks required training with large numbers of images." Appx953 (27:18-28:19); Appx969. By that time, Dr. Mongan's own research group had created a learning base of over 1,000 labeled images and used it to train a neural network to classify medical images. Appx954 (29:16-24, 31:1-32:18); Appx969. Noting that deep-learning applications to medical images were "rapidly expanding," he identified at least seven earlier examples. Appx955-57 (33:10-40:15, 43:8-21); Appx969. Deep-learning applications to dental images also were known before the claimed inventions here. Appx479-94 ¶¶ 47, 55, 86.

### B. The '248 and '409 Patents

DM's patents relate to the standard, commonplace dentistry practices of taking pictures of a patient's teeth (the '409 patent) and assessing the shape of an aligner (the '248 patent). DM supposedly developed "proprietary and customized [AI] technology" to improve these practices. Appx110-12

¶¶ 9, 11. But the patents do not identify, much less describe or claim, any particular proprietary technology or software implementation.

The images discussed in DM's patents are taken with a camera, which the patents call an "image acquisition apparatus." Appx40 ('248(8:47-53)); Appx70 ('409(8:57-63)). For these patents, any camera-enabled device will do. The patents explain that the "image acquisition apparatus" is "preferably chosen from a cellphone, a so-called 'connected' camera, a so-called 'smart' watch, a tablet or a personal computer, fixed or portable, comprising an image acquisition system such as a webcam or a camera." Appx40 ('248(8:47-53)); Appx70 ('409(8:57-63)).

The patents admit that use of camera-enabled devices was well known in dentistry, explaining that patients would "conventionally" take pictures of their teeth and send them to dental practitioners, who would perform a "visual inspection." Appx37 ('248(1:11-15)), Appx50 (27:55-59); Appx67 ('409(1:11-15)), Appx80 (27:66-28:3); *see* Appx6. Indeed, as discussed above, dental practitioners had visually assessed the separation of teeth and aligners ever since Align introduced clear aligners decades earlier. Appx526 ¶ 20; Appx532-33 ¶ 35; Appx582.

The patents also incorporate by reference the prior-art Salah reference. Appx40 ('248(7:38-42)); Appx70 ('409(7:50-54)). Salah described remote-monitoring methods in which patients took images of their teeth using a cellphone or other "image acquisition apparatus." Appx568 (25:14-19), Appx574 (47:21-24). Salah also described a cellphone app that provided feed-back to guide patients in acquiring such images:

> The user can be guided through the acquisition process by written and/or voice prompts. … For example, the personal device may announce "take a photo from the front", emit a signal to inform the user that the photo is acceptable or that, on the contrary, he/she must take another photo, announce "take a photo from the right", preferably displaying an arrow to orient the user, etc. The completion of the acquisition process may also be announced by the device. The device can also help with positioning, for example by visual prompts (e.g. by displaying arrows), and/or audio messages (such as a series of beeps, the frequency of which increases as the device's positioning improves), and/or written and/or vocal prompts ("higher", "lower", etc.).

Appx569-70 (27:21-28:2). The captured images were then analyzed by a generic computer using "image processing software" to assess tooth shape and displacement. Appx567 (2:12-27), Appx571 (34:11-14). As Salah explained, such image analysis could apply deep-learning techniques. Appx571-72 (34:11-14, 36:14); Appx482-83 ¶ 55.

The ’409 patent claims the same method of guiding an operator to take pictures of teeth that Salah described, while the ’248 patent claims dental practitioners’ conventional practice of performing visual inspections of aligner shape. The only significant difference is that the claims purport to apply a generic “deep learning device” trained using a generic “learning base” to perform unspecified “analysis of [an] analysis image.” Appx52 (’248 claim 1); Appx82 (’409 claim 1).

The patents’ specifications describe the “deep learning device” only in generic terms. They say it is “preferably,” but not necessarily, a “neural network,” which they admit was “well known to a person skilled in the art,” and they list nonlimiting examples of known neural networks. Appx44 (’248(16:5-36)); Appx74 (’409(16:13-43)). They neither describe nor claim any particular algorithm by which the “deep learning device” performs the claimed “analysis.” Appx495-96 ¶¶ 90-95.

The patents similarly describe the required “learning base” only in generic terms. They say it should include some generically large number of images (“more than 1000”) labeled with some sort of “tooth attribute” or “image attribute.” Appx37 (’248(1:30-38)); Appx68 (’409(4:1-4)). A tooth attribute, they say, may be anything from “a tooth number, a tooth type, a tooth

shape parameter, a tooth appearance parameter, a parameter relating to the state of the tooth, an age for the patient, [to] a combination of these attributes." Appx52 ('248 claim 6); *see also* Appx40 ('248(7:64-8:9)). And an "image attribute," they say, may be anything from the position, orientation, or calibration of the camera, the quality or content of an image, to a listing of individual tooth attributes. Appx68 ('409(3:38-59)), Appx79 (26:21-23).

### C. Procedural History

In 2022, DM filed suit against Align, alleging infringement of three patents including the '248 and '409 patents. Appx107-08 ¶1.[1] Align moved to dismiss DM's complaint on various grounds, and the district court granted the motion in part and denied it in part in a ruling DM has not appealed. Appx1391-1403. Among other things, the court agreed with Align that DM failed to plead a plausible claim of infringement under § 271(g) because "[p]racticing each step of the claimed methods … leads only to abstract information" that is not cognizable as a product "made by a process patented in the United States." Appx1393-95. But the court allowed DM to proceed

[1] DM also asserted but later dismissed claims alleging infringement of U.S. Patent No. 11,109,945. Appx248.

with its claim under § 271(a) and set the case for a "patent showdown," a procedure in which the parties each select one claim from the asserted patents, undertake fact and expert discovery, and file summary-judgment motions on those claims. Appx1403; Appx241-42.

DM selected claim 14 of the '248 patent, and Align selected claim 12 of the '409 patent. Appx17. DM moved for summary judgment of infringement. Appx4. Align moved for summary judgment on several grounds, including that the showdown claims are invalid for patent ineligibility under § 101, lacking sufficient written description under § 112(a), and indefiniteness under §§ 112(b) and 112(f), and that Align had not infringed. *Id.*; Appx439. After full briefing and a hearing, the district court held both showdown claims invalid under § 101 and denied all other pending motions as moot. Appx1.

As to the '248 patent, the district court held at *Alice* step one that claim 14 is directed to the abstract concept of "collecting information, analyzing it, and displaying certain results of the collection and analysis" to assess aligner shape, a practice "conventionally performed by an orthodontist, via in-person visual inspection or through review of patient-provided images." Appx6 (citing Appx37 ('248(1:11-15)), Appx50 (27:55-59)). The court rejected DM's assertions that claim 14 reflects "a specific technological solution,"

explaining that the patent "concedes that neural networks, the patent's preferred species of a deep learning device, are ... 'well known'" and that "[n]either claim nor specification details a novel (or any) algorithm or otherwise discloses an improvement to extant deep learning devices." Appx7 (citing Appx44 ('248(16:5-36)). The "learning base" limitations, the court explained, "are not *improvements* to the training or operation of deep learning devices," but rather "field-of-use limitations describing the configuration of a deep learning device to perform the abstract idea at issue in the field at issue." Appx8. At step two, the court held that claim 14 lacks an inventive concept, explaining that it "invoke[s] no more than the performance of an abstract idea in a particular field of use (dental aligner assessment) via generic and functional hardware (a deep learning device)." Appx12.

Turning to the '409 patent, the district court held at *Alice* step one that claim 12 is also directed to an abstract idea: "the acquisition of an image, the analysis of the contents of that image, and the presentation of information regarding the quality and composition of the image to the camera operator, intended to guide them in the acquisition of a new, better image." Appx10. The court noted that the patent "concedes that orthodontists 'conventionally performed' assessments of aligner treatment via images transmitted to

them by patients" and that DM itself had conceded that "'[i]f a patient sent poor-quality or incorrect photos,' the treatment provider would 'ask[ ] the patient to send new ones.'" *Id.* (quoting Appx67 ('409(1:10-15)); Appx776). Providing an "'information message' relating to the quality or composition of the subpar image, and guidance as to the acquisition of a better one," the court explained, was "[c]ommon sense" and "a dialogue as old as photography itself." Appx10-11. The court further explained that "[n]either claim nor specification provides any specific algorithm or other improvement to the deep learning device." Appx10. At *Alice* step two, the court held that claim 12 lacks an inventive concept, explaining that the recited limitations were either well known or unavailing field-of-use limitations. Appx14.

The district court's summary-judgment order was limited to the showdown claims. Align proposed that the court have the parties brief the representativeness of the showdown claims. Appx1075. DM initially agreed but later recanted, prompting the court to schedule a trial date. Appx1408; Appx1416. DM eventually stipulated, however, to entry of final judgment that claims 1 and 14 of the '248 patent and claims 1, 7, and 12 of the '409 patent are invalid under § 101 and to dismissal of all remaining claims.

Appx17-18.[2] Although the summary-judgment order did not address claim 7 of the ’409 patent, DM stipulated that it “is not patent-eligible under the [c]ourt’s reasoning … with respect to claims 1 and 12 of the ’409 patent and the ‘creation’ and ‘training’ limitations of claim 14 of the ’248 patent.” *Id.* The district court entered final judgment accordingly. Appx22-23.

## Summary of Argument

I. The district court correctly held that claim 14 of the ’248 patent is invalid under § 101. Claim 14 is directed to the abstract idea of collecting, analyzing, and presenting information to assess aligner shape. The patent admits that dental practitioners conventionally assessed aligner shape by performing a visual inspection, either in person or by reviewing patient-captured images. Through claim 1, claim 14 purports to automate this process by performing image “analysis” using a generic “deep learning device” to “determine a value” for a “tooth attribute.” And it recites concepts basic to almost all deep-learning applications, such as “creation of a learning base,”

[2] Align had asserted counterclaims alleging that DM infringed four Align patents, but the district court stayed those counterclaims pending resolution of DM’s infringement claims. Appx162. As part of the stipulation, Align dismissed its counterclaims without prejudice. Appx18.

"training" a deep-learning device using the learning base, and using the trained device to make a "determination."

The recited "deep learning device" is simply a generic computer, as confirmed by the lack of specificity in the claim language and the specification's listing of various well-known, off-the-shelf neural networks that could serve that function. The "learning base" is similarly generic, comprising some large number of images ("more than 1000") labeled with some "tooth attribute."

Claim 14 also lacks a saving inventive concept. It merely applies well-known deep-learning techniques to carry out the admittedly conventional dentistry task of assessing aligner shape. Application of deep learning to this particular field is in itself an abstract idea and merely reflects the collection, analysis, and display of information. Even if applying deep-learning techniques had not been conventional in this field before July 2017, and even if DM had been the first to do so, the claims still would not be patent-eligible because "do it with AI" is no more inventive than "do it with a computer."

II. The district court correctly invalidated claims 7 and 12 of the '409 patent under § 101. These claims are directed to the abstract idea of collecting, analyzing, and presenting information to guide a camera operator to

take a picture of teeth. The patent admits that using camera-enabled devices was well known and that patients would conventionally acquire dental images and transmit them to orthodontists for assessment. The patent also incorporates admitted prior art describing a cellphone app that provided guidance to patients in acquiring such images, similar to the guidance that dental practitioners routinely provided.

Through claim 1, claims 7 and 12 recite this same prior-art process of providing image-acquisition guidance. The only significant difference is that they purport to do so "by means of a deep learning device trained by means of a learning base." Claim 12 adds that the guidance is provided by the cellphone ("acquisition apparatus") used to acquire the images. Claim 7 adds concepts basic to almost all deep-learning applications, such as "creation of a learning base," "training" of a deep learning device," and using the trained device to make a "determin[ation]." As in the '248 patent, the claims and specification set forth the "deep learning device," "learning base" and "training" only in generic terms, and the specification admits that various well-known, off-the-shelf neural networks would suffice.

The claims also lack a saving inventive concept. They merely apply well-known deep-learning techniques to carry out the admittedly conventional dentistry task of providing guidance on acquiring a dental image. Again, even if that had not been widely done previously, and even if DM had been the first to do so, teaching to "do it with AI" is no more inventive than teaching to "do it with a computer."

III. Alternatively, this Court may affirm the judgment on the grounds that the claims are invalid for lack of written description under § 112(a) and indefiniteness under § 112(b). DM's claims require a "deep learning device" that performs "analysis of [an] analysis image." All known forms of "deep learning" used neural networks, but DM overreached by insisting that the "deep learning device" need not be or comprise a neural network, without explaining what else it could be. The claims thus lack written-description support for the full scope of the term "deep learning device," and the meaning of that term is indefinite.

## Standards of Review

Applying the procedural law of the regional circuit, here the Ninth Circuit, this Court reviews a district court's grant of summary judgment de novo. *Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1352 (Fed. Cir.

2016). Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

Patent-eligibility under § 101 is a "question of law that may involve underlying questions of fact," but not "not every § 101 determination contains genuine disputes over the underlying facts material to the § 101 inquiry." *Trinity Info Media, LLC v. Covalent, Inc.*, 72 F.4th 1355, 1363-64 (Fed. Cir. 2023) (cleaned up). This Court reviews a "district court's ultimate patent-eligibility conclusion de novo." *Id.* at 1360 (citation omitted).

## Argument

### I. The district court correctly invalidated claim 14 of the '248 patent under § 101

A patent claim is invalid under § 101 when (1) it is directed to an abstract idea, and (2) the claim elements, considered individually and as an ordered combination, do not add an "inventive concept" to that abstract idea. *Alice*, 573 U.S. at 217. Claim 14 fails at both steps.

As a threshold matter, the district court entered final judgment that both claims 1 and 14 are invalid under § 101. Appx22-23. On appeal, DM challenges only the judgment as to claim 14 (*see* BlueBr4) and has waived any

argument that claim 1 standing alone is patent-eligible. *See Accenture Global Servs., GmbH v. Guidewire Software, Inc.*, 728 F.3d 1336, 1341-42 (Fed. Cir. 2013) (arguments waived as to claims covered by judgment of invalidity under § 101 but not addressed in opening brief); *see also In re Lorkovic*, 712 F. App'x 997, 1000 (Fed. Cir. 2017). This brief nevertheless addresses claim 1 in case the Court elects to consider it.

### A. Claim 14 is directed to an abstract idea

At *Alice* step one, the district court correctly concluded that claim 14 of the '248 patent is directed to the abstract idea of collecting, analyzing, and presenting information to perform the conventional dentistry practice of assessing aligner shape. Appx6-7; Appx447.

#### 1. The focus of claim 14 is abstract

Step one considers "the focus of the claimed advance over the prior art to determine whether the claim's 'character as a whole' is directed to ineligible subject matter." *Simio, LLC v. FlexSim Software Prods., Inc.*, 983 F.3d 1353, 1359 (Fed. Cir. 2020) (citations omitted). As this Court has often explained, "collecting information, analyzing it, and displaying certain results of the collection and analysis" are abstract concepts—especially when claimed at a high level of generality. *Elec. Power*, 830 F.3d at 1353-54; *see also*

*AI Visualize, Inc. v. Nuance Commc'ns, Inc.*, 97 F.4th 1371, 1378 (Fed. Cir. 2024); *SAP Am., Inc. v. InvestPic, LLC*, 898 F.3d 1161, 1167 (Fed. Cir. 2018).

Here, to the extent claim 1 is still at issue, its alleged advance and focus is merely collecting, analyzing, and displaying information to conduct the conventional process of "assessing the shape of an orthodontic aligner." The '248 patent admits that dental practitioners conventionally assessed the shape of an orthodontic aligner by a "visual inspection" of a patient's teeth and the aligner, either in person or by reviewing images of the patient's dental arch sent by the patient. Appx37 ('248(1:11-15)), Appx50 (27:55-59). Indeed, dental practitioners have been visually assessing aligner shape for decades and were performing such assessments based on photos sent to them by patients long before July 2017. Appx525-30 ¶¶ 18-23, 30; Appx582.

Claim 1 purports to automate this process by "acquir[ing]" an image using a cellphone (collection) and "analy[zing]" that image using a generic "deep learning device" (analysis) to "determine a value" for a "tooth attribute" (display). The fact that the claim does not specify any particular—much less new or improved—technique for performing the required image analysis confirms the abstractness of these steps.

At most, claim 1 recites that the "analysis" is performed "by means of a deep learning device, trained by means of a learning base." But the recited "deep learning device" is simply a generic computer, as confirmed by the lack of specificity in the claim language and the specification's listing of numerous, well-known, off-the-shelf neural networks that could perform this role. Appx44 ('248(16:5-36)); Appx500-01 ¶¶107-109; *cf. SAP*, 898 F.3d at 1169 (noting that "off-the-shelf computer technology" sufficed for claimed method). The specification states that the "deep learning device" is "preferably a neural network" but does not require it to be or comprise a neural network. Appx44 ('248(16:5-6)); Appx501 ¶109. The fact that claim 1 of DM's other asserted patent recites identical language in the context of a method for providing guidance on acquiring dental images confirms the generic nature of the claimed "deep learning device." *See* Appx82 ('409 claim 1).

Claim 14 of the '248 patent goes only slightly further, reciting basic concepts that could be used in almost any deep-learning application, such as "creation of a learning base" having more than 1,000 images, "training of [a] … deep learning device" using the learning base, and using it to make a "determination." Appx53; *see* Appx501 ¶111; Appx953-54 (27:18-28:19, 31:1-32:18) (DM's expert agreeing these were known steps of deep-learning

applications). Tellingly, claim 7 of the ’409 patent recites nearly identical steps in the context of a different method. Appx83. Albeit couched as “deep learning,” these generic steps merely reflect the sort of collection, analysis, and display of information that this Court has long held to be abstract. *See, e.g.*, *Elec. Power*, 830 F.3d at 1353-54.

Claim 14 purports to limit these abstract concepts to the particular field of use of aligner assessment, but “[a]n abstract idea does not become nonabstract by limiting the invention to a particular field of use or technological environment.” *Intell. Ventures I LLC v. Cap. One Bank (USA), N.A.*, 792 F.3d 1363, 1366 (Fed. Cir. 2015); *see also Elec. Power*, 830 F.3d at 1355. Indeed, in *Alice*, the patentee argued that no one had previously used a computer to perform the specific steps recited in the claimed method (e.g., “‘creating’ shadow records,” “‘obtaining’ start-of-day balances,” etc.), but the Supreme Court nonetheless held that the claimed method was directed to an abstract concept. 573 U.S. at 223-24. Just as instructing to apply an abstract idea with a computer does not confer patent-eligibility, *id.* at 223, neither does “apply it with AI” or “apply it with deep learning.”

Although this Court has not addressed the patent-eligibility of machine-learning claims in a precedential opinion, district courts have consistently invalidated similar claims as abstract when they failed to recite technical details of any improved technique. For example, the District of Delaware held that claims directed to receiving information, training a machine-learning algorithm (model), and using the trained model to make determinations were abstract because they failed to set forth "a specific machine learning technique" and instead claimed "a broad application of machine learning to perform predictive analytics in a field." *Recentive Analytics, Inc. v. Fox Corp.*, 692 F. Supp. 3d 438, 444-46, 451-58 (D. Del. 2023).

Other district courts have concurred. *E.g.*, *Power Analytics Corp. v. Operation Tech., Inc.*, No. 16-CV-01955, 2017 WL 5468179, at *4-6 (C.D. Cal. July 13, 2017) (claims applying machine-learning engine were abstract where they "d[id] not specify how the engine is configured" or "recite[ ] a particular structure"), *aff'd*, 748 F. App'x 334 (Fed. Cir. 2019); *Angel Techs. Grp. LLC v. Facebook Inc.*, No. 21-CV-8459, 2022 WL 3093232, at *4 (C.D. Cal. June 30, 2022) (claim "applying artificial intelligence algorithms" to image analysis was abstract because it lacked "details on how to implement these algorithms, how they [would] work, or how [p]laintiff improved upon it"); *Hyper*

*Search, LLC v. Facebook, Inc.*, No. 17-CV-1387, 2018 WL 6617143, at *6, *10 (D. Del. Dec. 17, 2018) (claims applying "neural network module" were abstract where they "use[d] a wholly generic computer system to obtain functional results" "with no technical detail [regarding] how to achieve those results").

#### 2. DM's arguments that claim 14 reflects a technological improvement lack merit

DM asserts (at 24) that claim 14 of the '248 patent embodies two technological improvements: (a) "the claim requires training a deep learning device with a specifically constructed learning base, which allows the device to perform a method it could not previously implement"; and (b) "the trained device must perform that method [of] assessing aligner fit by quantitatively measuring the separation between an aligner and teeth on a tooth-by-tooth basis." Both assertions are meritless.

*a*. DM argues (at 25) that "as of July 2017, there were no deep learning devices that could perform" the claimed method of aligner assessment. But that simply repackages the "first-to-a-field" argument that the Supreme Court and this Court have repeatedly rejected. *See Alice*, 573 U.S. at 224; *Intell. Ventures*, 792 F.3d at 1366; *Elec. Power*, 830 F.3d at 1354; Appx7-8. DM also essentially argues that although deep-learning techniques were well

known in computer science and assessing aligner shape was well known in dentistry, it was not common to use deep-learning computerization in dentistry. But the concept of applying deep-learning techniques in dentistry is in itself an abstract idea, reflecting the collection, analysis, and display of information. *See Recentive*, 692 F. Supp. 3d at 456 (reasoning that "applying machine learning to optimization" is abstract).

In arguing that claim 14 recites a "specifically constructed learning base," DM emphasizes (at 24, 26) the claim's recitation of creating a learning base of "more than 1000 images of dental arches" and using it to train a "deep learning device" to "associate them with tooth zones and with tooth attribute values" and determine a tooth separation. But again, absent the limitation to the field of use of aligner assessment, those are generic concepts that would apply to almost any deep-learning application. *See* Appx8 (explaining learning-base and training limitations are "not *improvements* to the training or operation of deep learning devices[;] they are field-of-use limitations describing the configuration of a deep learning device to perform the abstract idea at issue in the field at issue"). The notion that claim 14 recites a "specifically constructed learning base" is also undermined by the fact that

claim 7 of the ’409 patent recites nearly identical requirements for creating and using a learning base in the context of a different method. Appx82.

DM relies (at 26-27) on its expert Dr. Mongan’s opinion that as of July 2017, skilled artisans “would not have known how to construct the learning base,” going so far as to say that they would not have known “how large the dataset should be, what images it would need to contain, or how those images would have to be labeled.” But Dr. Mongan himself conceded that *before* July 2017, “it was known that deep neural networks could be trained and optimized for fast and efficient classification of images” and that it was “typically a requirement” to train such neural networks with “large numbers of images.” Appx953 (28:2-19). He further explained that by that time, his own group had created and used a learning base of over 1000 images to train a deep neural network to classify medical images. Appx954 (30:19-22, 31:1-32:19). And he identified at least at least seven earlier examples of such deep-learning applications. Appx955-57 (33:10-40:15, 43:8-21); Appx969.

Contrary to DM’s suggestion (at 25), the claimed invention also did not disclose a learning base that a skilled artisan otherwise was unable to create. Claim 14 does not limit itself to a particular kind of learning base: it merely requires a generically large number of historical images (“more than

1000") and says that they should be labeled with some sort of "tooth attribute." Claim 14 also does not specify what that "tooth attribute" is, and the patent suggests elsewhere that it may include anything from "a tooth type, a tooth shape parameter, a tooth appearance parameter, a parameter relating to the state of the tooth, an age for the patient, [to] a combination of these attributes." Appx52 ('248 claim 6). Thus, claim 14 at most tells a skilled artisan to go out and create a learning base having certain generic elements; neither the claim nor the patent provides a specific learning base.

*b.* DM's second assertion—that the claimed method "quantitatively measur[es] the separation between an aligner and teeth on an objective, tooth-by-tooth basis"—fares no better. DM asserts (at 28-29) that Align's dental expert had conceded that the use of a "deep learning device" was not part of the "standard of care." And it argues (at 29) that "there is no evidence that anyone in the orthodontics or AI fields had considered creating or using a deep learning device for aligner assessment." But even if that were correct, DM does not explain how it matters to the step-one inquiry whether claim 14 is directed to an abstract concept. At most, DM repackages the oft-rejected "first-to-a-field" argument.

Struggling to identify a technological improvement, DM asserts (at 29) that "conventional methods … were limited to in-person, subjective visual and manual inspections." It further argues (at 30) that the claimed "invention allowed for a previously unattainable level of precision by 'measur[ing] such separations to a degree that a dental professional could not and did not previously determine with their naked eye (*e.g.*, spaces less than one mm) even during in-person patient visits.'" These alleged improvements, however, are not tethered to the claims. *Trinity*, 72 F.4th at 1363-64; *Hawk Tech. Sys., LLC v. Castle Retail, LLC*, 60 F.4th 1349, 1357 (Fed. Cir. 2023).

Improvements need not be expressly recited, but as DM acknowledges (at 33), they must "'flow' directly from the claimed invention" (citations omitted). Here, DM's expert agreed that even though a cellphone could be used to carry out the claimed method remotely, claim 14 is *not limited* to remote applications and also covers circumstances when images of a patient's teeth are acquired and analyzed in person at a doctor's office. Appx744 (73:11-74:4). DM also does not identify anything in the claim that requires or guarantees any "level of precision," much less on the order of "less than one millimeter." And although claim 14 recites determining an "amplitude" of separation, it does not specify that the amplitude must be a quantitative

or numerical value, or even just "small" or "large." DM elsewhere highlights other alleged improvements that are equally untethered to claim 14, including a "fine analysis" that provides "particularly reliable" assessments that "avoid[s] 'costly' and 'restrictive' *in-person* visits to a dental practitioner's office." BlueBr32-33.

Even assuming claim 14 requires quantitative measurements, DM understates the capabilities of dental practitioners, who had been making such assessments for decades. Appx526-27 ¶¶ 20-23; Appx582. Align's dental expert, Dr. Valley, explained that orthodontists routinely made visual assessments "down to fractions of millimeters." Appx966 (46:21-47:7). That point was undisputed: DM's dental expert similarly explained that orthodontists could visually assess aligner spaces "generally within a millimeter" and that he himself had provided "quality orthodontic care" to patients through such assessments. Appx963 (90:20-25), Appx964 (92:11-93:19). By 2003, Align had issued clinical guidance for carrying such aligner assessments. Appx582; *see also* Appx485-86 ¶¶ 64-66; Appx1090.

DM dismisses such visual assessments as "subjective" (at 25) and characterizes the claimed method as "objective" (at 28). But to create the "learning base" of images used to train the "deep learning device," one

would need to visually assess and label the images in a similarly subjective manner. *See* BlueBr26-27. And if the inputs to training the "deep learning device" are subjective estimates, so too are the outputs.

In any event, an alleged improvement that is "inherent [in] applying the abstract idea on a computer" is insufficient to confer patent-eligibility. *Customedia Techs., LLC v. Dish Network Corp.*, 951 F.3d 1359, 1364 (Fed. Cir. 2020) (citation omitted); *see also Enco Sys., Inc. v. DaVincia, LLC*, 845 F. App'x 953, 957 (Fed. Cir. 2021). As the district court recognized, "[t]he assertion that a computer can perceive more granular aligner separations than the naked eye" is at most "an improvement inherent to applying the abstract idea on a [deep] learning device," evidenced by the fact that the patent "presum[es] that just about *any* off-the-shelf device will suffice." Appx7.

*c.* The cases DM touts do not suggest a different result. If anything, they highlight the generic, abstract nature of claim 14.

In *Koninklijke KPN N.V. v. Gemalto M2M GmbH*, 942 F.3d 1143, 1150-51 (Fed. Cir. 2019), this Court held that claims to an error-checking device for data transmissions were non-abstract because they recited "a specific implementation of varying the way check data is generated that improves the ability of prior art error detection systems to detect systematic errors."

In *Finjan, Inc. v. Blue Coat Sys., Inc.*, 879 F.3d 1299, 1304-05 (Fed. Cir. 2018), this Court held that claims to a computer-security method were non-abstract because they employed "a new kind of file that enable[d] a computer" to perform "behavior-based" virus scanning to look for "potentially dangerous or unwanted operations," not just "known viruses."

And in *Visual Memory LLC v. NVIDIA Corp.*, 867 F.3d 1253, 1254, 1261-62 (Fed. Cir. 2017), this Court held that claims to a memory system were non-abstract because they applied "programmable operational characteristics that can be tailored for use with multiple different processors without the accompanying reduction in performance" of prior-art systems.

In each case, the claims recited and focused on specific improvements to computer functionality, not "uses of existing computers as tools in aid of processes focused on 'abstract ideas.'" *Elec. Power*, 830 F.3d at 1353-54. Here, by contrast, claim 14 focuses not on improvements to "deep learning devices," but on the use of a generic "deep learning device" as a tool to computerize conventional aligner assessment.

DM's other cases are even further afield because they were premised on a lack of record evidence that the claims at issue computerized conventional processes. In *McRO, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d

1299, 1307, 1314 (Fed. Cir. 2016), the claims recited a "method for automatically animating lip synchronization and facial expression of three-dimensional characters" using "rules of a particular type." This Court held that the claims were directed to a non-abstract improvement that "allow[ed] computers to produce accurate and realistic lip synchronization and facial expressions in animated characters that previously could only be produced by human animators." *Id.* at 1313 (cleaned up). The Court emphasized that there was no record evidence that "the process previously used by animators [wa]s the same as the [rules-based] process required by the claims," and the available evidence showed otherwise. *Id.* at 1314.

Similarly, in *CardioNet, LLC v. InfoBionic, Inc.*, 955 F.3d 1358, 1362, 1369 (Fed. Cir. 2020), the claims recited a cardiac-monitoring device that applied a specific method to "distinguish atrial fibrillation and atrial flutter from other … cardiac arrythmia." This Court held that the claims were directed to a non-abstract improvement, emphasizing that "there [wa]s no suggestion in [the patent] that doctors were 'previously employing' the techniques performed on the claimed device" or that the "claims merely computerize[d] [such] pre-existing techniques." *Id.* at 1370. Here, claim 14 merely automates the visual assessment of aligner shape that the '248 patent

admits that orthodontists conventionally performed during in-person visits or by review of patient-provided images. Appx37 ('248(1:11-15)), Appx50 (27:55-59); *see also* Appx525-30 ¶¶ 18-23, 30.

### 3. The district court properly analyzed *Alice* step one

DM asserts (at 33-34) that the district court made three errors: "(1) oversimplifying the claim language and thus ignoring key claim limitations to arrive at an abstract idea; (2) concluding that the specially trained deep learning device is merely a 'generic' computer; and (3) requiring that the claim or patent disclose a novel algorithm." DM is mistaken.

As to the first two points, DM makes similar arguments. It contends (at 34-35) that "[t]he district overgeneralized claim 14 as merely directed to basic data analysis, collection, and presentation" and that claim 14 is instead "narrowly tailored to a specific process for training a deep learning device according to a specific learning base to perform a specific method." The "deep learning device," DM says (at 37-38), must be specially trained and "not just any deep learning device" or "generic computer" will do.

But *any* application of deep learning requires training some device with some learning base to perform some specific task. The problem here is that claim 14 and the patent specification set out the "deep learning device," the

"learning base," and the "training" only in generic terms. As discussed above, the lack of specificity in claim 14 and the specification confirm that the "deep learning device" is a generic computer. Again, the specification does not even commit to what the "deep learning device" is; the patent says it is "preferably," though not necessarily, a neural network and lists numerous, well-known, off-the-shelf neural networks that could serve in that role. Appx44 ('248(16:5-36)); Appx500-01 ¶¶ 107-109. The "learning base" used to train the "deep learning device" is similarly generic: claim 14 merely requires some generically large number of historical images ("more than 1000") that are labeled with some generic "tooth attribute."

Contrary to DM's assertion (at 36), the district court did not disregard claim limitations. DM points to claim 14's recitation of the "creation of a learning base" and using it in "training" a "deep learning device" to perform aligner assessment. But the district court correctly concluded that these limitations "merely describe[ ] how a generic deep learning device is applied (or limited) to a particular field of use" of aligner assessment. Appx8. Apart from the field-of-use limitation, these are basic concepts applicable to almost any deep-learning application. Appx501-02 ¶ 111; Appx953-54 (27:18-28:19, 31:1-32:18).

DM's reliance on *CardioNet* is similarly unavailing. As explained above, in holding that the claimed cardiac-monitoring device was non-abstract, this Court emphasized the lack of record evidence that "doctors were 'previously employing' the techniques performed on the claimed device" for diagnosing atrial fibrillation and atrial flutter or that the "claims merely computerize[d] [such] pre-existing techniques." 955 F.3d at 1370. DM argues (at 35) that the record here similarly does not show that doctors were "previously employing" the "specially trained deep learning device of claim 14" and instead shows that "using deep learning devices w[as] *not* 'part of the standard of care' for aligner assessment" (citation omitted). But that misses the point of *CardioNet*: the relevant consideration is whether doctors were previously employing the *techniques* performed on the claimed device, not whether they were previously employing the claimed device itself.[3]

---

[3] To the extent DM asserts that dental practitioners did not previously use a "deep learning device" to perform aligner assessment, that again repackages the "first-to-a-field" argument and ignores that the concept of applying deep-learning techniques in dentistry is in itself an abstract idea.

Unlike in *CardioNet*, the ’248 patent admits that “recent orthodontic treatments use images to assess the therapeutic situations,” that “[t]his assessment is conventionally performed by an orthodontist,” and that orthodontists conventionally assessed aligner shape by performing a “visual inspection.” Appx37 (’248(1:11-15)), Appx50 (27:55-59). As discussed above, dental practitioners have been visually assessing aligner shape for decades. Appx526-27 ¶¶ 20-23; Appx582. Claim 14 merely purports to automate that practice using a “deep learning device.”

DM argues (at 39, citing Appx7) that the district court committed a third error by requiring a novel algorithm. But in the cited passage, the district court merely responded to DM’s assertion that claim 14 is directed to a “specific technological solution,” explaining that “[n]either claim nor specification details a novel (or any) algorithm or *otherwise discloses an improvement to extant deep learning devices*.” Appx7 (emphasis added). DM ignores the latter part of this statement, which confirms that the district court applied a standard consistent with this Court’s precedent. Indeed, at step one, this Court has often looked to “whether the ‘focus of the claims’ is on a ‘specific asserted improvement in computer capabilities’” or “instead, on a process that qualifies as an ‘abstract idea’ for which computers are invoked

merely as a tool." *BSG Tech LLC v. Buyseasons, Inc.*, 899 F.3d 1281, 1286 (Fed. Cir. 2018) (citation omitted); *see also Elec. Power*, 830 F.3d at 1354. To the extent the district court considered whether the claim or specification detailed a specific algorithm, that too was consistent with this Court's repeated emphasis that a claim must "ha[ve] the specificity required to transform [it] from one claiming only a result to one claiming a way of achieving it" to avoid ineligibility. *SAP*, 898 F.3d at 1167–68 (collecting cases).

### B. Claim 14 lacks a saving inventive concept

Because claim 14 is directed to an abstract idea, the district court correctly turned to *Alice* step two and correctly concluded that claim 14 lacks a saving inventive concept. Appx12-13.

#### 1. Claim 14 merely recites using a generic deep-learning device to automate routine dental practices

Step two asks whether the claim elements, considered individually and as an ordered combination, add an inventive concept to the abstract ideas. *Elec. Power*, 830 F.3d at 1353. "Stating an abstract idea while adding the words 'apply it with a computer'" does not transform an abstract idea into a patent-eligible invention. *Alice*, 573 U.S. at 223. Instead, the claims must sup-

ply additional steps or features that are not well understood, routine, or conventional. *Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 715 (Fed. Cir. 2014); *BSG*, 899 F.3d at 1290-91.

Here, the ’248 patent acknowledges that it was well understood, routine, and conventional for dental practitioners to perform a “visual inspection” to assess aligner shape during in-person appointments or by evaluating photos of teeth taken and sent by patients. Appx37 (’248(1:11-15)), Appx50 (27:55-59). Indeed, patients routinely used cellphones to take and send such photos. Appx526-31 ¶¶ 20-24, 30, 32; Appx540 (33:18-34:12). Dental practitioners, in turn, routinely assessed separations between teeth and aligner in such photos. Appx526-528 ¶¶ 20-24; Appx541 (34:13-18); Appx582 (teaching, via photo, the assessment of such separations).

Applying deep learning to analyze images also was well understood, routine, and conventional as of July 2017. Claim 14 recites a generic “deep learning device” to carry out the image analysis, and the specification explains that this device is “preferably a neural network” and that neural networks were “well known to a person skilled in the art.” Appx74 (’248(16:13-43)). The specification proceeds to list various well-known, off-the-shelf neural networks. *Id.*; *see also* Appx482-84 ¶¶ 55, 58, 60.

That was consistent with the experience of DM's expert, Dr. Mongan, who explained that the use of deep learning in computer vision "underwent a revolution in 2012" and that by 2016, deep-learning applications in medical imaging were "rapidly expanding." Appx954-55 (32:24-33:9); Appx968. Dr. Mongan identified at least seven earlier examples of such deep-learning applications. Appx955-57 (33:10-40:15, 43:8-21); Appx968-69. By July 2017, deep learning had been used in myriad applications, including analysis of dental images. Appx479-94 ¶¶ 47, 55, 86. Salah, for example, described using deep learning to analyze teeth images. Appx571-72 (34:11-14, 36:14); Appx482-83 ¶ 55.

The other limitations of claim 14 and their ordered combination also do not supply an inventive concept. As discussed above, the steps of "creat[ing] a learning base" with over 1000 images, "training" the deep-learning device using the learning base, and using the trained device to make a "determination" reflect basic concepts that were routinely implemented in deep-learning applications. Appx53; *see* Appx501-05 ¶¶ 111, 116-122.

Even if DM had been the first to call for applying well-known deep-learning techniques to aligner assessment, claim 14 would still be ineligible because it merely calls for using generic computerized AI techniques in yet

another application. *See Alice*, 573 U.S. at 224; *Intell. Ventures*, 792 F.3d at 1366. Just as the Supreme Court rejected "computerize-this" claims in *Alice*, this Court should reject the "AI-that" claims here. "Apply it with deep learning" is no more inventive than "apply it with a computer."

### 2. DM's inventive-concept arguments lack merit

In asserting an inventive concept, DM repeats much of its step-one analysis. It points (at 42) to the purported concession by Align's expert that "using [a] deep learning device was not 'part of the standard of care' for aligner assessment" to assert that the step-two inquiry should end there (emphasis and citation omitted). It also contends (at 42) that claim 14 includes a "specific technological improvement" that "is grounded in [a] … 'specific set of ordered steps': creating a specific learning base, training the deep learning device according to that learning base, and using the trained deep learning device to measure the separation between an aligner and teeth on a tooth-by-tooth basis" (citations omitted). And it argues (at 43-45) that Align did not identify any prior art specifically disclosing all claimed steps.

DM misapprehends the inquiry at *Alice* step two, which focuses on whether the claim is salvaged by elements *other than the abstract idea itself*. As this Court has explained:

> [T]he relevant inquiry is not whether the claimed invention as a whole is unconventional or non-routine. At step two, we "search for an 'inventive concept' … that is 'sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself.'" After identifying an ineligible concept at step one, we ask at step two "[w]hat else is there in the claims before us?" It has been clear since *Alice* that a claimed invention's use of the ineligible concept to which it is directed cannot supply the inventive concept that renders the invention "significantly more" than that ineligible concept.

*BSG,* 899 F.3d at 1290 (citations omitted). DM cannot contend that applying deep-learning techniques to perform image analysis in a particular field is an inventive concept because, as discussed above, that simply reflects the abstract idea of collecting, analyzing, and presenting data. *See Elec. Power*, 830 F.3d at 1353-54.

Moreover, using conventional computer techniques to automate existing manual methods does not constitute an inventive concept. *Credit Acceptance Corp. v. Westlake Servs.*, 859 F.3d 1044, 1056 (Fed. Cir. 2017); *see also People.ai, Inc. v. Clari Inc.*, No. 2022-1364, 2023 WL 2820794, at *7 (Fed. Cir. Apr. 7, 2023). It makes no difference that the computer techniques claimed here are "deep-learning" techniques because those techniques too were well known, routine, and conventional even if they were not yet widely used in

this particular application. As discussed above, the steps of creating a learning base, training a deep learning device, and analyzing images to make determinations were basic to any deep-learning application. Appx501-05 ¶¶ 111, 116-122; Appx953-54 (27:18-28:19, 31:1-32:18).

### 3. DM's "additional" evidence did not preclude summary judgment

DM separately argues (at 45) that the district court failed to address certain "additional" evidence. But none of it raised a genuine dispute as to any material fact that could preclude summary judgment.

Pointing to Dr. Mongan's opinions, DM repeats (at 45-46) its assertions that claim 14 recites "a skilled artisan would not have known precisely how to construct the specific learning base of claim 14" or whether "training would necessarily be successful." And it argues (at 46) that the process is complicated by the "unique nature of teeth and aligners, *e.g.*, the small size, similar color, and arrangement of teeth, the transparency of an aligner on a patient's teeth, and distortions of view caused by the aligner and moisture in the mouth."

But again, claim 14 and the specification set forth the "deep learning device," the "learning base," and the "training" only in generic terms; they

do not identify any specific or inventive technological solution to these alleged concerns. The specification says that the "deep learning device" is "preferably," but not necessarily, one of many well-known and off-the-shelf neural networks. Appx44 ('248(16:5-36)); Appx500-01 ¶¶107-109. The "learning base" is similarly generic: it comprises some generically large number of historical images ("more than 1000") that are labeled with some generic "tooth attribute."

As other "evidence," DM says (at 47-48) that Align introduced a remote aligner assessment tool in 2020 that did not have "AI functionality," and it points to statements in a 2022 Align press release regarding aligner assessment providing an important clinical indicator. But DM does not explain how this is relevant to the step-two analysis, which focuses on claim elements *other than the abstract idea itself*. Applying deep learning to perform image analysis in a particular field is itself an abstract idea that does not supply an inventive concept. To the extent DM argues that the named inventors were the first to apply this abstract idea to the field of use of aligner assessment, that too is "insufficient to transform [the claim] into [a] patent-eligible application[ ]." *Elec. Power*, 830 F.3d at 1353-54.

## II. The district court correctly invalidated claims 7 and 12 of the ’409 patent under § 101

The district court also correctly invalidated claims 1, 7, and 12 of the ’409 patent under § 101. Appx22-23. DM challenges the judgment only as to claims 7 and 12.

Because DM does not appeal the judgment as to claim 1, it has waived any argument that claim 1 is patent-eligible. *See Accenture*, 728 F.3d at 1341-42; *Lorkovic*, 712 F. App’x at 1000. This brief nevertheless addresses claim 1 in case the Court elects to consider it.

### A. Claims 7 and 12 are directed to an abstract idea

#### 1. The focus of claims 7 and 12 is abstract

Claims 7 and 12 are directed to the abstract idea of collecting, analyzing, and presenting information to guide a camera operator to take a picture of teeth. *See Elec. Power*, 830 F.3d at 1353-54; *AI Visualize*, 97 F.4th at 1378; *SAP*, 898 F.3d at 1167.

Taking pictures of teeth has long been a common dental practice, and before the claimed invention, dental practitioners routinely used pictures to assist in delivering orthodontic care. Appx525-30 ¶¶ 18-23, 30; Appx582-84. The ’409 patent admits that using camera-enabled devices was well known

and that in "conventional[ ]" orthodontic assessments patients would capture images of their dental arches and transmit them to orthodontists for assessment. Appx67 ('409(1:11-15)), Appx70 (8:57-63).

The patent also incorporates the prior-art Salah reference, Appx70 ('409(7:50-54)), which described known methods in which patients used an "image acquisition apparatus" such as a cellphone to acquire images of their dental arches, Appx568 (25:14-19), Appx574 (47:21-24), that were then processed and analyzed to "monitor the progress of an orthodontic treatment," Appx566 (1:2-4), Appx573 (46:15-19). Salah also described a cellphone app that guided patients in acquiring images by providing visual or audible messages that informed them whether the images were "acceptable" or if the camera "positioning" needed to be adjusted. Appx569-70 (27:19-28:2).

Claim 1 of the '409 patent recites the same abstract method described in the prior-art Salah reference of "acquir[ing]" an image using an "image acquisition apparatus" such as a cellphone (collection) and "analy[zing]" the image (analysis) to "send[ ] … an information message" to "guide the operator … to acquire a new analysis image" (display). Appx82. The only significant difference is that claim 1 requires performing image analysis "by means of a deep learning device trained by means of a learning base." *Id.*

The recited "deep learning device," however, is simply a generic computer, as confirmed by the lack of specificity in the claim language and the specification's listing of numerous, well-known, and off-the-shelf neural networks that would suffice. Appx74 ('409(16:13-43)); Appx490-91 ¶¶ 77-78; *cf*. *SAP*, 898 F.3d at 1169. The generic nature of the "deep learning device" is also clear from the fact that claim 1 of the '248 patent similarly requires image analysis to be performed "by means of a deep learning device, trained by means of a learning base" in the context of a method for assessing aligner shape. Appx52.

Claim 7 of the '409 patent goes only slightly further, reciting concepts basic to almost all deep-learning applications such as "creation of a learning base" having more than 1,000 images, "training of [a] deep learning device," and using the trained device to "determine" a value. Appx83; *see* Appx501 ¶ 111; Appx953-54 (27:18-28:19, 31:1-32:18) (DM's expert agreeing that these were known steps of deep-learning applications). Tellingly, claim 14 of the '248 patent recites nearly identical steps in claiming a method of performing a different function. Appx53.

Although couched as "deep learning," these steps merely reflect the sort of data-collection, analysis, and presentation steps that this Court repeatedly held are abstract. *E.g.*, *Elec. Power*, 830 F.3d at 1353-54. Claim 7 recites these steps in a particular field of use (acquiring dental images), but "[a]n abstract idea does not become nonabstract by limiting the invention to a particular field of use or technological environment." *Intell. Ventures*, 792 F.3d at 1366; *see also Alice*, 573 U.S. at 223-24.

Claim 12 depends from claim 1 and adds that the information message is sent by the cellphone (acquisition apparatus) that acquired the image. But it does not add any specificity to the "deep learning device" or the "analysis" performed by it. Notably, DM does not contend that the language of claim 12 confers patent-eligibility and instead principally focuses its arguments on claim 7.

As discussed above, although this Court has not addressed the patent-eligibility of machine-learning claims in a precedential opinion, district courts that have considered similar machine-learning claims have consistently held them patent-ineligible when they fail to recite technical details of an improved technique or algorithm. *E.g.*, *Recentive*, 692 F. Supp. 3d at 444-

46, 451-58; *Power Analytics*, 2017 WL 5468179, at *4-6; *Angel Techs.*, 2022 WL 3093232, at *4; *Hyper Search*, 2018 WL 6617143, at *6, *10.

#### 2. DM's arguments that claims 7 and 12 reflect a technological improvement lack merit

In challenging the district court's step-one analysis, DM repeats many of the same arguments it makes regarding claim 14 of the '248 patent. Those arguments fare no better here.

Characterizing the claims as providing "a specific technological advance," DM asserts (at 50-51) that before July 2017, "there was no technology, much less specially trained deep learning devices, that allowed for remotely obtaining dental images suitable for aligner assessment" and that "there is no evidence that anyone in the orthodontics or AI fields had even considered creating or using a deep learning device for this purpose." But again, being the first to apply an abstract concept to a given field does not confer patent-eligibility. *E.g.*, *Alice*, 573 U.S. at 223; *Intell. Ventures*, 792 F.3d at 1366; *Elec. Power*, 830 F.3d at 1355.

DM asserts (at 50-52) that the "claimed invention" provides various benefits, including facilitating "remote dental treatment," providing "immediate feedback to users when a submitted image does not conform to [an]

'expected image,'" thereby providing "quality control 'in real time,'" and permitting "medically untrained patients" to acquire "images suitable for aligner assessment." These alleged benefits, however, are not tethered to the claims. *See Trinity*, 72 F.4th at 1363-64; *Hawk Tech.*, 60 F.4th at 1357. Nothing in the claim language requires or guarantees that medically untrained patients be able to acquire images of any particular quality, much less in a remote setting as opposed to in-person at a doctor's office. *See* Appx744 (73:11-74:4). As Dr. Mongan acknowledged, the claim language does not specify what setpoint must be met, what types of images must be acquired, what quality the images must have, or even that the images be clinically useful. Appx749-50 (165:22-170:1).

DM argues (at 51) that claim 7 of the '409 patent requires "a specific learning base ... to train the deep learning device" that includes "more than 1000 images of dental arches" with image "attribute value[s]." But again, apart from the field-of-use requirement, those are generic concepts that would apply to almost any deep-learning application. Appx8; Appx501 ¶ 111. The notion that claim 7 recites a "specific learning base" is also undermined by the fact that claim 14 of the '248 patent recites nearly identical steps for

creating and using a learning base in the context of a method for assessing aligner shape. Appx53.

Moreover, claim 7 is not even limited to a particular kind of learning base: it merely requires a generically large number of historical images ("more than 1000") and says they should be labeled with some generic "image attribute." The claim does not specify what that "image attribute" is, and the patent suggests elsewhere that it may include anything from the position, orientation, or calibration of the camera, the quality or content of an image, to a listing of individual tooth attributes. Appx68 ('409(3:38-59)), Appx79 (26:21-23).

In short, claim 7 at most tells a skilled artisan to go out and create a learning base having certain generic elements. Neither the claim nor the patent more generally provides a specific learning base.

DM relies on Dr. Mongan's opinions in arguing (at 52) that "a skilled artisan would not have known that training a deep learning device with such a learning base to perform the claimed method would have been successful without the patent's teachings." Again, however, Dr. Mongan conceded that *before* July 2017, "it was known that deep neural networks could be trained and optimized for fast and efficient classification of images" and that it was

"typically a requirement" to train such neural networks with "large numbers of images." Appx953 (28:2-19). He also explained that by that time, his own research group had created and used a learning base of more than 1000 images to train a deep neural network to classify radiological images. Appx954 (30:19-22, 31:1-32:19). And he identified at least at least seven earlier examples of such deep-learning applications. Appx955-57 (33:10-40:15, 43:8-21); Appx969.

On appeal, DM presents a new argument that claim 7 "provides a 'global analysis' that 'makes it possible to immediately and globally assess a dental situation' (*e.g.*, whether the mouth is open or closed) 'without having to determine values for' each individual tooth," which DM says is "advantageously more rapid." BlueBr52 (quoting Appx68 (4:36-39); Appx79 (26:27-32); Appx75 (17:16-30)). But with few exceptions, "appellate courts do not consider a party's new theories, lodged first on appeal." *Sage Prods., Inc. v. Devon Indus., Inc.*, 126 F.3d 1420, 1426 (Fed. Cir. 1997). "If a litigant seeks to show error in a trial court's overlooking an argument, it must first present that argument to the trial court." *Id.*; *see also Travel Sentry, Inc. v. Tropp*, No. 2021-1908, 2022 WL 443202, at *2 (Fed. Cir. Feb. 14, 2022) (declining to consider new patent-eligibility arguments). Here, DM not only

failed to raise any argument based on claim 7's purported "global analysis"; it stipulated that "claim 7 of the '409 patent is not patent-eligible under the [district court's] reasoning … with respect to claims 1 and 12 of the '409 patent and the 'creation' and 'training' limitations of claim 14 of the '248 patent." Appx17-18. DM should not be heard to argue otherwise now.

Regardless, nothing in claim 7 requires a "global analysis" "'without having to determine values for' each individual tooth," as DM suggests (at 52). The claim merely refers to an "image attribute value," which the specification explains may be a list of individual tooth attributes such as "the tooth numbers represented [in an image], for example, '16, 17 and 18,'" Appx79 ('409(26:21-23)). Moreover, the step-one analysis considers "the focus of the claimed advance *over the prior art*." *Simio*, 983 F.3d at 1359 (emphasis added). As the specification explains, an "image attribute" may relate to "a position and/or an orientation … of an acquisition apparatus" and may simply be a notation that an image is a "right photo," "left photo," or "front photo." Appx68 ('409(3:38-1, 4:14-17)). And the prior-art Salah reference described just that: a cellphone app that guides a user in acquiring photos of teeth by announcing whether the photo is acceptable or whether the user must instead "take a photo from the front" or "the right," or move the phone

camera "higher" or "lower," with visual or audible messages indicating when the camera's "positioning improves." Appx569 (27:19-28:2).

### 3. The district court properly analyzed *Alice* step one

DM contends (at 53) that the district court made "the same categories of errors" as it did with the '248 patent. Those arguments fare no better here.

According to DM, the district court "oversimplified claims 7 and 12" as merely the collection, analysis, and presentation of information and ignored "the claims' requirements that the 'deep learning device trained by means of a learning base' 'determin[es]' a 'value for an image attribute,' which is then compared to a 'setpoint' to 'guide the operator' if the analysis image does not 'respect[ ] the setpoint.'" BlueBr53-55 (citations omitted). But these limitations merely reflect automation via "a deep learning device" of the manual process one goes through in capturing a photo, determining whether it meets some expectation, and if necessary capturing another photo. As the district court aptly put it, "'capture, analysis, critique, recapture' is a dialogue as old as photography itself." Appx11.

It makes no difference that this process is conducted using a "deep learning device trained by means of a learning base." The concept of apply-

ing deep-learning techniques in dentistry is in itself an abstract idea. *See Recentive*, 692 F. Supp. 3d at 456. And even if DM had been the first to call for using deep-learning techniques in this field or application, that would not confer patent-eligibility. *See Elec. Power*, 830 F.3d at 1353-54.

*Any* application of deep learning requires training some device with some learning base to perform some task. The problem here is that the "deep learning device," the "learning base," and the "training" are claimed only in generic terms. The specification explains that numerous, well-known, and off-the-shelf neural networks may serve as the "deep learning device." Appx74 ('409(16:13-43)); Appx490-91 ¶¶ 76-78. The "learning base" is similarly generic: claim 7, which recites the most detail, merely requires a generically large number of historical images ("more than 1000") labeled with some sort of "image attribute."

Although the '409 patent admits it was conventional for dental practitioners to evaluate images captured and sent to them by patients, DM argues (at 56) that the patent does not concede that it was conventional for "medically untrained patients" to capture images "suitable for aligner assessment." But the claims recite no such limitation. *See Trinity*, 72 F.4th at 1363-64; *Hawk Tech.*, 60 F.4th at 1357. Moreover, contrary to DM's assertion

(at 56), the patent *does* "discuss the process of providing feedback about the content and quality of the images to a user to guide the acquisition of dental images"—it incorporates the prior-art Salah reference's description of a cell-phone app that provides such feedback, consistent with the guidance that dental practitioners routinely provided. Appx569 (27:19-28:2).

DM again asserts (at 57) that the district court erred by requiring a specific or novel algorithm. But as discussed above, the district court properly considered whether the claims set forth a specific improvement in computer capabilities. *See BSG*, 899 F.3d at 1286; *SAP*, 898 F.3d at 1167-68.

### B. Claims 7 and 12 lack a saving inventive concept

#### 1. Claims 7 and 12 merely recite using a generic deep-learning device to automate routine dental practices

To the extent claims 7 and 12 recite anything more than an abstract idea, the '409 patent admits that these features and their ordered combination were well understood, routine, and conventional. *See Elec. Power*, 830 F.3d at 1353; *Ultramercial*, 772 F.3d at 715; *BSG*, 899 F.3d at 1290-91.

The patent admits at the outset that using camera-enabled devices was well known and that patients "conventionally" would capture images (photos) of their dental arches and transmit them to orthodontists for assessment.

Appx67 ('409(1:11-15)), Appx70 (8:57-63). The patent also incorporates by reference the Salah prior-art reference's disclosure of a cellphone app that provided guidance to patients in acquiring dental images, Appx70 ('409(7:50-54)). That prior-art app allowed patients to take pictures of their teeth using their cellphones and provided guidance or feedback through the phone about the content and acceptability of acquired dental images, including whether the image was "acceptable" or if the "positioning" of the phone camera needed to be adjusted, Appx569-70 (27:21-28:10); Appx483 ¶ 56—similar to the guidance that dental practitioners routinely provided, Appx526-28 ¶¶ 21-24; Appx540-41 (33:15-34:18). Salah further described using deep learning to analyze teeth images and perform contour detection. Appx571-72 (34:11-14, 36:14); Appx482-83 ¶ 55.[4]

Claims 7 and 12 purport to carry out the conventional process of providing guidance on acquiring dental images by performing an unspecified image "analysis" using "a deep learning device trained by means of a

[4] The Carrier reference similarly disclosed a prior-art cellphone app that provided guidance on acquiring images of a patient's teeth using the phone camera by displaying an overlay (e.g., image or outline of teeth) on the phone screen. Appx577-79 ¶¶ 32, 99-100; Appx482 ¶ 53.

learning base." Appx82 ('409 claim 1). But applying deep learning to analyze images was also well understood, routine, and conventional. Again, the specification describes the "deep learning device" generically, explaining that it is "preferably a neural network" and that such neural networks were "well known." Appx74 ('409(16:13-43)). And it lists numerous off-the-shelf neural networks that would suffice. *Id.*; *see also* Appx482-84 ¶¶ 55, 58, 60. That was consistent with the experience of Dr. Mongan, who explained that the use of deep learning in computer vision "underwent a revolution in 2012" and that by 2016, deep-learning applications in medical imaging were "rapidly expanding." Appx954-55 (32:24-33:9); Appx968-69. By July 2017, deep learning had been used in myriad applications, including analysis of dental images. Appx479-94 ¶¶ 47, 55, 86.

The other limitations in claims 7 and 12 and their ordered combination do not supply an inventive concept. Claim 12 merely adds that the information message is sent by the cellphone (acquisition apparatus) that acquired the image, which prior-art apps such as those described in Salah and Carrier already did. Claim 7 recites additional steps of "creat[ing] a learning base" with over 1000 images, "training" the deep-learning device using the learning base, and using the trained device to "determine" a value. But

again, those steps reflect basic concepts that were routinely implemented in almost every deep-learning application. Appx501-05 ¶¶ 111, 116-122.

Even if DM had been the first to call for applying well-known deep-learning techniques to provide guidance on acquiring dental images, claims 7 and 12 would still be ineligible because they merely call for using generic computerized AI techniques in yet another application. *See Alice*, 573 U.S. at 224; *Intell. Ventures*, 792 F.3d at 1366. Recitation of "deep learning" is not a talisman that can ward off patent-ineligibility.

### 2. DM's inventive-concept arguments lack merit

DM argues (at 57) that "attempts to use then-existing technology for remote dental treatment purposes, such as having patients send images solely of their teeth or dental practitioners seeking to perform visual examinations over video calls" had all failed. But that ignores the '409 patent's admission that orthodontists "conventionally performed" assessments based on images captured and sent to them by patients, Appx67 (1:11-15), consistent with the record evidence that orthodontists had successfully treated patents through assessments made on photos and video calls, Appx526-30 ¶¶ 21-24, 30. It also ignores that prior-art cellphone apps such as those described in Salah (incorporated into the '409 patent) and Carrier

had already automated the acquisition of dental images. Appx569-70 (27:21-28:10); Appx577-79 ¶¶ 32, 99-100; Appx482-83 ¶¶ 53, 56.

DM points (at 58) to a purported concession by Align's expert that "using deep learning devices, including for 'image analysis,' was not 'part of the standard of care' for aligner assessment" as of 2017 (emphasis and citation omitted). But that misapprehends the legal standard at step two, which looks to whether the claims recite elements other than the abstract idea itself that "ensure that the patent in practice amounts to significantly more than a patent upon the [abstract idea] itself.'" *BSG*, 899 F.3d at 1290 (citations omitted). Applying deep-learning techniques to the particular field of use of dental practice is itself an abstract idea. *See Elec. Power*, 830 F.3d at 1353-54. Even if that had not been widely done before July 2017, and even if DM had been the first to do so, that would not constitute a saving inventive concept. *See Intell. Ventures*, 792 F.3d at 1366.

### 3. DM's "additional" evidence did not preclude summary judgment

As with the '248 patent, DM points to the opinions of its expert and repeats (at 59-60) its assertions that "the specially trained deep learning device of the claims did not exist as of July 2017" and that there were "unique

complications that dental images present[ed].” Again, however, the asserted claims and the specification merely set forth the “deep learning device,” the “learning base,” and the “training” in generic terms. They do not identify any specific or inventive technological solution to the alleged problems.

DM repeats (at 60) its assertion that Align introduced a remote aligner assessment tool in 2020 that did not have “AI functionality” and points to a statement in an Align press release that “many doctors *began using* video calls, texts, and patient-submitted photos” as a result of the COVID-19 pandemic (citation omitted). But none of that is inconsistent with the ’409 patent’s admission that “conventional[ ]” orthodontic assessments “require[d] the patient to transmit these images to the orthodontist.” Appx67 (’409(1:11-15)). And incanting familiar computerization concepts like “AI” and “deep learning” cannot transform the claimed abstract ideas into patent-eligible inventions.

## III. The claims are also invalid under Section 112 for lack of written description and indefiniteness

Align independently moved for summary judgment of, among other things, invalidity for lack of written description under § 112(a) and indefiniteness under § 112(b). The district court concluded that those grounds

were moot in light of its § 101 ruling, but this Court may consider them as alternative grounds supporting the district court's invalidity judgment. *See Jaffke v. Dunham*, 352 U.S. 280, 281 (1957); *Rexnord Indus., LLC v. Kappos*, 705 F.3d 1347, 1356 (Fed. Cir. 2013).

Simply put, DM dug its own grave. It applied for and obtained claims that require a "deep learning device" that performs "analysis of [an] analysis image." All existing deep learning devices required a neural network. DM overreached by claiming unknown, unspecified, and yet-to-be-developed forms of deep learning that do not use any neural network. It insisted in both patents that a "deep learning device" is "preferably," but not necessarily, a neural network—with no explanation of what else it could be. Because a "deep learning device" must perform some form of deep learning, claims 7 and 12 of the '409 patent and claim 14 of the '248 patent are invalid for lack of written description of their full scope and for indefiniteness.

### A. The claims cover a "deep learning device" that purportedly does not use neural networks without describing what such a device could be

Section 112(a)'s written-description requirement reflects a patentee's "bargain with the public" and ensures that the scope of what a patent claims is commensurate with what the patent describes and discloses to the public.

*AbbVie Deutschland GmbH & Co. v. Janssen Biotech, Inc.*, 759 F.3d 1285, 1298 (Fed. Cir. 2014). This Court has consistently invalidated patent claims for lack of written description when the specification fails to convey that the "patentee possessed the full scope of the [claimed] invention." *LizardTech, Inc. v. Earth Res. Mapping, Inc.*, 424 F.3d 1336, 1344-45 (Fed. Cir. 2005) (claim purporting to cover all methods of creating a seamless "discrete wavelet transform" lacked written description of full scope because patent disclosed only one such method and did not "contemplate[ ] a more generic way"); *accord*, *Rivera v. ITC*, 857 F.3d 1315, 1316, 1321 (Fed. Cir. 2017) (claims covering a coffee cartridge with an integrated filter lacked written description of full scope because patent disclosed only separate cartridges and filters); *ICU Med., Inc. v. Alaris Med. Sys., Inc.*, 558 F.3d 1368, 1376-78 (Fed. Cir. 2009) (claims covering medical valves without spikes lacked written description of full scope because patent described only valves with spikes).

Here, the parties agreed, based on the specification, that the "deep learning device" in both patents covers devices that do not include any neural network. Appx497-509 ¶¶ 98-100, 104, 127, 132-135, 139; Appx828-29 ¶ 93; Appx959-61 (150:21-24; 170:22-171:1, 174:5-8). DM also did not dispute that the patents do not describe any form of deep learning that does not use

a neural network—and, indeed, that no such forms of deep learning were (or are) known. Appx497 ¶ 98, Appx508 ¶ 132; Appx960 (171:18-20, 172:24-173:6). Dr. Mongan acknowledged that "outside the context of the patents, [he is] not aware of any deep learning that does not use a neural network," and the "patents have not made [him] aware of anything that [he] would categorize as deep learning … that does not involve something that's formally a neural network as a principal component." Appx960-61 (172:24-173:6, 175:23-176:16).

Lacking written-description support for a "deep learning device" without any neural networks, DM argued to the district court that the claimed "deep learning device" need not do any deep learning and may include things like support vector machines (SVMs) that are described in the art as "shallow learning."[5] Appx783; Appx738-40 (47:22-55:1); Appx971-73 (describing "support vector machine" as a form of "shallow learning");

[5] Per DM's expert, SVMs are another form of machine learning that does not include neural networks and that "would not generally be included by [skilled artisans] in the category of deep learning." Appx738-39 (48:6-49:17). The patents do not mention SVMs anywhere and at most reference an "R-CNN" device that includes *both* a neural network and an SVM. Appx 44 ('248 (16:29-34)); Appx74 ('409 (16:36-42)); Appx718 ¶ 94.

Appx975-77 (comparing deep learning with "widely popular shallow methods [such as] … support vector machines"). But that interpretation impermissibly reads out the "deep learning" capability inherent in a "deep learning device." *See Aspex Eyewear, Inc. v. Marchon Eyewear, Inc.*, 672 F.3d 1335, 1348 (Fed. Cir. 2012); *Exmark Mfg. Co. v. Briggs & Stratton Corp.*, 830 F. App'x 305, 310 (Fed. Cir. 2020).

DM's reasoning also makes no sense. The patents say that a "deep learning device" need not include a neural network, and the only known forms of deep learning used neural networks. The patents do not say that "deep learning" is optional or that it encompasses the broader category of "machine learning," which includes "shallow learning." Skilled artisans in 2017 were familiar with the broader concept of machine learning. Appx738 (45:10-18, 47:22-24). If DM wanted to claim both deep- and shallow-learning devices, it knew how, and it would not have limited the claims to a "deep learning device" and would not have repeated that term 82 times across the two patents. *See Int'l Rectifier Corp. v. IXYS Corp.*, 361 F.3d 1363, 1372 (Fed. Cir. 2004) (explaining that patentee "could have claimed … more broadly" and the "district court was not free to attribute new meaning to the term or to excuse the patentee from the consequences of its own word choice").

The inevitable conclusion is that DM overreached and failed to uphold its bargain with the public by claiming "deep learning devices" that do not use a neural network without describing what those are and showing that it had possession of such devices. Claims 7 and 12 of the '409 patent and claim 14 of the '248 patent are invalid because they lack written-description support for the full scope of the claimed "deep learning devices."

### B. The limitations reciting a "deep learning device" (no further defined) performing "analysis of the analysis image" (no further specified) are indefinite

A patent claim is indefinite under § 112(b) when it fails to inform a person of ordinary skill with reasonable certainty about the scope of the invention when read in light of the specification and the prosecution history. *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014).

Here, claims 7 and 12 of the '409 patent and claim 14 of the '248 patent require "analysis of [an] analysis image by means of a deep learning device trained by means of a learning base." *E.g.*, Appx82 ('409 claim 1). The full scope of this limitation, however, is not reasonably certain because, as discussed above, the patents purport to cover "deep learning devices" that do not use a neural network without identifying what those are. Appx497-98 ¶¶ 98-100, Appx508-09 ¶¶ 132-135; Appx828-29 ¶ 93; Appx960-61 (171:18-

20, 172:24-173:6, 175:23-176:16). Skilled artisans should not have to guess about what non-neural-network-based "deep learning devices" DM purported to claim—especially when those devices are central to the claimed invention.

## Conclusion

The judgment of invalidity should be affirmed. If it is not, this Court should remand for the district court to resolve the remaining issues on summary judgment, including Align's assertions that it does not infringe and that patents are invalid for other reasons.

Dated: February 20, 2025

Respectfully submitted,

/s/*Dan L. Bagatell*

Dan L. Bagatell
Perkins Coie LLP
3 Weatherby Road
Hanover, New Hampshire 03755
(602) 351-8250
DBagatell@perkinscoie.com

Hari Santhanam
Perkins Coie LLP
110 N. Wacker Drive, Suite 3400
Chicago, Illinois 60606
(312) 324-8400
HSanthanam@perkinscoie.com

John H. Gray
Perkins Coie LLP
2525 E. Camelback Road
Phoenix, Arizona 85016
(602) 351-8000
JHGray@perkinscoie.com

Kaitlin Dryden
Perkins Coie LLP
33 E. Main Street, Suite 101
Madison, Wisconsin 53703
(608) 535-3050
KDryden@perkinscoie.com

Counsel for Appellee Align Technology, Inc.

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION

This brief complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it has been prepared using a proportionally spaced typeface and includes 13,890 words (excluding portions excludable by the rules).

Dated: February 20, 2025

*/s/Dan L. Bagatell*
Dan L. Bagatell