Perkins Coie

April 24, 2025

Dan L. Bagatell
DBagatell@perkinscoie.com
3 Weatherby Road
Hanover, New Hampshire 03755
D. +1.602.351.8250

**VIA CM/ECF**

Jarrett B. Perlow
Circuit Executive and Clerk of Court
United States Court of Appeals for the Federal Circuit
717 Madison Place, N.W.
Washington, DC 2043

**Re: Citation of Supplemental Authority in *Dental Monitoring SAS v. Align Technology, Inc.*, No. 2024-2270**

Dear Mr. Perlow:

I write to apprise the Court of several newly issued decisions (attached).

***First***, this Court's decision in *Recentive Analytics, Inc. v. Fox Corp.*, No. 2023-2437, 2025 WL 1142021 (Fed. Cir. Apr. 18, 2025), further undermines DM's patent-eligibility arguments. Like DM's patents, Recentive's patents purported to apply well-known machine-learning techniques to a new field of use, in that case optimizing network maps. *Id.* at *1-2, *6. The claims recited similar steps of collecting historical data to create a learning base and using that data to train a machine-learning model to identify relationships. *Id.* at *1-2. And the claims "employ[ed] only generic computing machines and processors" without reciting any improved algorithm or machine-learning model. *Id.* at *4 n.4.

This Court held the claims invalid under Section 101, rejecting many of the same arguments DM makes here. In particular, the Court rejected Recentive's assertion that the claims recited a "unique application of machine learning … based on training the machine learning model" that supplied an inventive concept. *Id.* at *3, *7. The Court recognized that applying "generic machine learning technology" to a new field of use is in itself an abstract idea and that "[i]terative training using selected training material … [is] incident to the very nature of machine learning." *Id.* at *5, *7. The Court held that "patents that do no more than claim the application of generic machine learning to new data environments, without disclosing

improvements to the machine learning models to be applied, are patent ineligible." *Id.* at *8. That is all DM's patents do.

***Second***, the Patent Trial and Appeal Board has issued final written decisions in IPR2023-01369 and IPR2024-00052 holding all challenged claims—including all claims at issue here—invalid for obviousness. In so ruling, the Board recognized that DM's claims apply only generic machine-learning techniques and do not "require a particular type of neural network that is trained by a particular learning base in a particular way," and further that the improvements DM asserted were "not commensurate with the scope of the claim[s]." IPR2023-01369, Paper 42 at 42, 50; *see also* IPR2024-00052, Paper 42 at 59-60.

Respectfully submitted,

/s/Dan L. Bagatell

Dan L. Bagatell

Counsel for Defendant–Appellee Align Technology, Inc.

Attachments

cc: all counsel of record (by CM/ECF)

# Attachment A

*Recentive Analytics, Inc. v. Fox Corp.*,
No. 2023-2437, 2025 WL 1142021 (Fed. Cir. Apr. 18, 2025)

# United States Court of Appeals for the Federal Circuit

---

**RECENTIVE ANALYTICS, INC.,**
*Plaintiff-Appellant*

**v.**

**FOX CORP., FOX BROADCASTING COMPANY, LLC, FOX SPORTS PRODUCTIONS, LLC,**
*Defendants-Appellees*

---

2023-2437

---

Appeal from the United States District Court for the District of Delaware in No. 1:22-cv-01545-GBW, Judge Gregory Brian Williams.

---

Decided: April 18, 2025

---

ROBERT FREDERICKSON, III, Goodwin Procter LLP, Boston, MA, argued for plaintiff-appellant. Also represented by JESSE LEMPEL; ALEXANDRA D. VALENTI, New York, NY.

RANJINI ACHARYA, Pillsbury Winthrop Shaw Pittman LLP, Palo Alto, CA, argued for defendants-appellees. Also represented by MICHAEL ZELIGER; EVAN FINKEL, MICHAEL SHIGEYORI HORIKAWA, Los Angeles, CA.

---

Before DYK, and PROST, *Circuit Judges*, and GOLDBERG, *Chief District Judge*.[1]

DYK, *Circuit Judge*.

This case presents the question of patent eligibility of four patents directed to the use of machine learning. The patents claim the use of machine learning for the generation of network maps and schedules for television broadcasts and live events.

Appellant Recentive Analytics, Inc. ("Recentive"), the owner of the patents, sued appellees Fox Corp., Fox Broadcasting Company, LLC, and Fox Sports Productions, LLC (collectively, "Fox") for infringement. The district court dismissed, concluding that the patents were directed to ineligible subject matter under 35 U.S.C. § 101. We affirm because the patents are directed to the abstract idea of using a generic machine learning technique in a particular environment, with no inventive concept.

## BACKGROUND

### I

Recentive is the owner of U.S. Patent Nos. 10,911,811 ("'811 patent"), 10,958,957 ("'957 patent"), 11,386,367 ("'367 patent"), and 11,537,960 ("'960 patent"). The patents purport to solve problems confronting the entertainment industry and television broadcasters: how to optimize the scheduling of live events and how to optimize "network maps," which determine the programs or content displayed by a broadcaster's channels within certain geographic markets at particular times. The patents fall

---

[1] Honorable Mitchell S. Goldberg, Chief District Judge, United States District Court for the Eastern District of Pennsylvania, sitting by designation.

into two groups that the parties refer to as the "Machine Learning Training" patents and the "Network Map" patents.

### A. The Machine Learning Training Patents

The '367 and '960 patents are the "Machine Learning Training" patents. Both are titled "Systems and Methods for Determining Event Schedules." They share a specification and concern the scheduling of live events. Claim 1 of the '367 patent is representative of the Machine Learning Training patents and recites a method containing: (i) a collecting step (receiving event parameters and target features); (ii) an iterative training step for the machine learning model (identifying relationships within the data); (iii) an output step (generating an optimized schedule); and (iv) an updating step (detecting changes to the data inputs and iteratively generating new, further optimized schedules).[2]

---

[2] Claim 1 of the '367 patent recites:

A computer-implemented method of dynamically generating an event schedule, the method comprising:

> receiving one or more event parameters for series of live events, wherein the one or more event parameters comprise at least one of venue availability, venue locations, proposed ticket prices, performer fees, venue fees, scheduled performances by one or more performers, or any combination thereof;
>
> receiving one or more event target features associated with the series of live events, wherein the one or more event target features comprise at least one of event attendance, event profit, event revenue, event expenses, or any combination thereof;
>
> providing the one or more event parameters and the one or more target features to a machine learning

Case: 24-2430 Document: 21 Page: 4 Filed: 04/28/2025



---

> (ML) model, wherein the ML model is at least one of a neural network ML model and a support vector ML model;
>
> iteratively training the ML model to identify relationships between different event parameters and the one or more event target features using historical data corresponding to one or more previous series of live events, wherein such iterative training improves the accuracy of the ML model;
>
> receiving, from a user, one or more user-specific event parameters for a future series of live events to be held in a plurality of geographic regions;
>
> receiving, from the user, one or more user-specific event weights representing one or more prioritized event target features associated with the future series of live events;
>
> providing the one or more user-specific event parameters and the one or more user-specific event weights to the trained ML model;
>
> generating, via the trained ML model, a schedule for the future series of live events that is optimized relative to the one or more prioritized event target features;
>
> detecting a real-time change to the one or more user-specific event parameters;
>
> providing the real-time change to the trained ML model to improve the accuracy of the trained ML model; and
>
> updating, via the trained ML model, the schedule for the future series of live events such that the schedule remains optimized relative to the one or more prioritized event target features in view of the real-time change to the one or more user-specific event parameters.

’367 patent, col. 14 ll. 2–49.

The specification teaches that the machine learning model may be "trained using a set of training data," which can include "historical data from previous live events or series of live events." *Id.* col. 6 ll. 5–8. That historical data may include prior event dates, venue locations, and ticket sales. *Id.* col. 6 ll. 6–11. In operating the machine learning model, users enter "target features," which are a user's selected results, such as maximizing event attendance, revenue, or ticket sales. *Id.* col. 6 ll. 12–15. The machine learning model may "be trained to recognize how to optimize, maximize, or minimize one or more of the target features based on a given set of input parameters." *Id.* Eventually, the machine learning model will "generate the optimized schedule[] and provide the schedule . . . as output." *Id.* col. 6 ll. 16–17.

The specification also makes clear that the patented method employs "any suitable machine learning technique[,] . . . such as, for example: a gradient boosted random forest, a regression, a neural network, a decision tree, a support vector machine, a Bayesian network, [or] other type of technique." *Id.* col. 6 ll. 1–5. The schedules are generated "dynamically, in response to real-time changes in data," allowing "input parameters and target features [to] be processed and considered more efficiently and accurately[] compared to prior approaches." *Id.* col. 9 ll. 20–25.

### B. The Network Map Patents

The '811 and '957 patents are the Network Map patents. Both are titled "Systems and Methods for Automatically and Dynamically Generating a Network Map." They share a specification and concern the creation of network maps for broadcasters. Claim 1 of the '811 patent is representative of the Network Map patents and recites a method containing: (i) a collecting step (receiving current broadcasting schedules); (ii) an analyzing step (creating a network map); (iii) an updating step

(incorporating real-time changes to the data inputs); and (iv) a using step (determining program broadcasts using the optimized network map).[3]

---

[3] Claim 1 of the ’811 patent recites:

A computer-implemented method for dynamically generating a network map, the method comprising:

> receiving a schedule for a first plurality of live events scheduled to start at a first time and a second plurality of live events scheduled to start at a second time;
>
> generating, based on the schedule, a network map mapping the first plurality of live events and the second plurality of live events to a plurality of television stations for a plurality of cities,
>
> > wherein each station from the plurality of stations corresponds to a respective city from the plurality of cities,
> >
> > wherein the network map identifies for each station (i) a first live event from the first plurality of live events that will be displayed at the first time, and (ii) a second live event from the second plurality of live events that will be displayed at the second time, and
> >
> > wherein generating the network map comprises using a machine learning technique to optimize an overall television rating across the first plurality of live events and the second plurality of live events;
>
> automatically updating the network map on demand and in real time based on a change to at least one of (i) the schedule and (ii) underlying criteria;
>
> > wherein updating the network map comprises updating the mapping of the first plurality of live events and the second plurality of live events to the plurality of television stations; and

The Network Map patents use training data in conjunction with a machine learning model to generate optimized network maps. The training data may include "weather data, news data, and/or gambling data," but is not limited to such categories. *Id.* col. 3 ll. 26–30. In operating the machine learning model, users may input target features to achieve a selected result. For example, in the context of National Football League broadcasts, users may select a target feature that maximizes "overall ratings for the NFL across all games, ratings for the NFL with a particular affiliate (CBS or FOX), ratings for the NFL in a particular market, with a particular audience, or at a particular time." *Id.* col. 3 ll. 12–15. The specification clarifies that the disclosed method uses generic computing equipment in conjunction with "any suitable machine learning technique." *Id.* col. 3 ll. 22–26.

II

On November 29, 2022, Recentive sued Fox, alleging infringement of the four patents. Fox moved to dismiss for failure to state a claim on the ground that the patents are ineligible under § 101.

In opposing Fox's motion, Recentive acknowledged that "the concept of preparing network maps[] [had] existed for a long time," and that prior to computers, "networks were preparing these network maps with human beings." Transcript of Motion to Dismiss Hearing at 28:19–29:06, *Recentive Analytics, Inc. v. Fox Corp.*,

---

> using the network map to determine for each station (i) the first live event from the first plurality of live events that will be displayed at the first time and (ii) the second live event from the second plurality of live events that will be displayed at the second time.

'811 patent, col. 9 ll. 66–col. 10, ll. 32.

692 F. Supp. 3d 438 (D. Del. 2023) (No. 22-cv-1545), ECF No. 39 ("Transcript"). Recentive also recognized that "the patents do not claim the machine learning technique itself," *id.* at 26:14–15, but instead "claim[] the application of the machine learning technique to the specific context[s]" of event scheduling and network map creation, *id.* at 26:15–21.

Recentive asserted that its patents claim eligible subject matter because they involve "the unique application of machine learning to generate customized algorithms, based on training the machine learning model, that can then be used to automatically create . . . event schedules that are updated in real-time." Plaintiff's Opposition to Defendants' Motion to Dismiss at 2, *Recentive Analytics, Inc. v. Fox Corp.*, 692 F. Supp. 3d 438 (D. Del. 2023) (No. 22-cv-1545), ECF No. 20 ("Opposition Br."). According to Recentive, this includes using iterative training for its machine learning model on "different event parameters and . . . event target features" to "identify relationships" within the data. *Id.* at 9 (alteration in original) (quoting '367 patent, col. 14 ll. 21–23).

Recentive acknowledged that "the way machine learning works is the inputs are defined, the model is trained[;] and then the algorithm is actually updated and improved over time based on the input," Transcript at 26:21–24; that "[t]he process of training the machine learning model[] . . . is required for any machine learning model," Opposition Br. at 16; and that "'using a machine learning technique[]' . . . necessarily includes [an] 'iterative[] training' step," *id.* at 9 (quoting '811 patent, col. 3 ll. 26–28). Recentive characterized its patents as introducing "the application of machine learning models to the unsophisticated, and equally niche, prior art field of generating network maps for broadcasting live events and live event schedules." *Id.* at 1.

The district court granted Fox's motion to dismiss, concluding that the patents were ineligible under the two-step inquiry of *Alice Corporation v. CLS Bank International*, 573 U.S. 208 (2014). The court first found that the asserted claims were "directed to the abstract ideas of producing network maps and event schedules, respectively, using known generic mathematical techniques." *Recentive*, 692 F. Supp. 3d at 451. The court then found at step two of *Alice* that the patents' claims were not directed to an "inventive concept" that would "amount[] to significantly more than a patent upon the [ineligible concept] itself," *id.* at 456 (second alteration in original) (quoting *Alice*, 573 U.S. at 217–18), because the machine learning limitations were no more than "broad, functionally described, well-known techniques" and claimed "only generic and conventional computing devices," *id.* at 457 (footnote omitted). Finally, the district court denied Recentive's request for leave to amend. *See id.* In the district court's view, any amendment to Recentive's complaint would have been futile. *Id.*

Recentive appealed. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(1).

## DISCUSSION

We review challenges to a district court's dismissal of a complaint for failure to state a claim de novo. *Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n*, 776 F.3d 1343, 1346 (Fed. Cir. 2014); *Sands v. McCormick*, 502 F.3d 263, 267 (3d Cir. 2007). We likewise review a district court's determination of patent eligibility under § 101 de novo. *Content Extraction*, 776 F.3d at 1346; *Dealertrack, Inc. v. Huber*, 674 F.3d 1315, 1333 (Fed. Cir. 2012).

An invention is patent eligible if it claims a "new and useful process, machine, manufacture, or composition of matter." 35 U.S.C. § 101. The Supreme Court has interpreted this language to exclude "[l]aws of nature, natural

phenomena, and abstract ideas" from patent eligibility. *Alice*, 573 U.S. at 216; *Mayo Collab. Servs. v. Prometheus Lab'ys, Inc.*, 566 U.S. 66, 70 (2012).

Under *Alice*, courts perform a two-step analysis to determine patent eligibility under § 101. "First, we determine whether the claims at issue are directed to one of those patent-ineligible concepts." *Alice*, 573 U.S. at 217. If the claims are directed to a patent-ineligible concept, we assess the "elements of each claim both individually and 'as an ordered combination'" to determine whether they possess an "inventive concept" that is "sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself." *Id.* at 217–18 (alteration in original) (quoting *Mayo*, 566 U.S. at 72).

This case presents a question of first impression: whether claims that do no more than apply established methods of machine learning to a new data environment are patent eligible. We hold that they are not.

I

Under the first step of the *Alice* inquiry, "we 'look at the focus of the claimed advance over the prior art to determine if the claim's character as a whole is directed to excluded subject matter.'" *Koninklijke KPN N.V. v. Gemalto M2M GmbH*, 942 F.3d 1143, 1149 (Fed. Cir. 2019) (quoting *Affinity Labs of Tex., LLC v. DIRECTV, LLC*, 838 F.3d 1253, 1257 (Fed. Cir. 2016)). In the context of software patents (which includes machine learning patents), the step-one inquiry determines "whether the claims focus on 'the specific asserted improvement in computer capabilities . . . or, instead, on a process that qualifies as an abstract idea for which computers are invoked merely as a tool.'" *Id.* (alteration in original) (quoting *Finjan, Inc. v. Blue Coat Sys., Inc.*, 879 F.3d 1299, 1303 (Fed. Cir. 2018)).

Considering the focus of the disputed claims, *Alice*, 573 U.S. at 217, it is clear that they are directed to ineligible, abstract subject matter. Recentive has repeatedly conceded that it is not claiming machine learning itself. *See* Appellant's Br. 45; Transcript at 26:14–15. Both sets of patents rely on the use of generic machine learning technology in carrying out the claimed methods for generating event schedules and network maps. *See, e.g.*, '367 patent, col. 6 ll. 1–5, col. 11–12; '811 patent, col. 3, l. 23, col. 5 l. 4. The machine learning technology described in the patents is conventional, as the patents' specifications demonstrate. *See, e.g.*, '367 patent, col. 6 ll. 1–5 (requiring "any suitable machine learning technology . . . such as, for example: a gradient boosted random forest, a regression, a neural network, a decision tree, a support vector machine, a Bayesian network, [or] other type of technique"); '811 patent, col. 3 l. 23 (requiring the application of "any suitable machine learning technique.").[4]

[4] The patents additionally employ only generic computing machines and processors. *See, e.g.*, '367 patent, col. 11 ll. 50–62 ("The processes and logic flows described in this specification can be performed by one or more programmable processors executing one or more computer programs to perform actions by operating on input data and generating output . . . . Processors suitable for the execution of a computer program include . . . both general and special purpose microprocessors, and any one or more processors of any kind of digital computer."); '811 patent, col. 5 ll. 4–6 ("FIG. 4 shows an example of a generic computing device 450, which may be used with the techniques described in this disclosure"). As we have explained, "generic steps of implementing and processing calculations with a regular computer do not

The requirements that the machine learning model be "iteratively trained" or dynamically adjusted in the Machine Learning Training patents do not represent a technological improvement. Recentive's own representations about the nature of machine learning vitiate this argument: Iterative training using selected training material and dynamic adjustments based on real-time changes are incident to the very nature of machine learning. *See, e.g.*, Opposition Br. 9 ("[U]sing a machine learning technique[] . . . necessarily includes [an] iterative[] training step . . . ." (internal quotation marks and citation omitted)); Transcript at 26:21–24 ("[T]he way machine learning works is the inputs are defined, the model is trained, and then the algorithm is actually updated and improved over time based on the input").

Recentive argues in its briefs that its application of machine learning is not generic because "Recentive worked out how to make the algorithms function dynamically, so the maps and schedules are automatically customizable and updated with real-time data," Appellant's Reply Br. 2, and because "Recentive's methods unearth 'useful patterns' that had previously been buried in the data, unrecognizable to humans," *id.* (internal citation omitted). But Recentive also admits that the patents do not claim a specific method for "improving the mathematical algorithm or making machine learning better." Oral Arg. at 4:40–4:44.

Even if Recentive had not conceded the lack of a technological improvement, neither the claims nor the specifications describe how such an improvement was

---

change the character of [the claim] from an abstract idea into a practical application." *In re Bd. of Trs. of Leland Stanford Junior Univ.*, 991 F.3d 1245, 1250 (Fed. Cir. 2021).

accomplished. That is, the claims do not delineate steps through which the machine learning technology achieves an improvement. *See, e.g.*, *IBM v. Zillow Grp., Inc.*, 50 F.4th 1371, 1381 (Fed. Cir. 2022) (holding abstract a claim that "d[id] not sufficiently describe how to achieve [its stated] results in a non-abstract way," because "[s]uch functional claim language, without more, is insufficient for patentability under our law." (quoting *Two-Way Media Ltd v. Comcast Cable Commc'ns, LLC*, 874 F.3d 1329, 1337 (Fed. Cir. 2017))); *see also Intell. Ventures I LLC v. Capital One Fin. Corp.*, 850 F.3d 1332, 1342 (Fed. Cir. 2017) (similar); *Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1356 (Fed. Cir. 2016) (similar). "[T]he patent system represents a carefully crafted bargain that encourages both the creation and the public disclosure of new and useful advances in technology, in return for an exclusive monopoly for a limited period of time." *Pfaff v. Wells Elecs.*, 525 U.S. 55, 63 (1998); *Sanho Corp. v. Kaijet Tech. Int'l Ltd.*, 108 F.4th 1376, 1382 (Fed. Cir. 2024). Allowing a claim that functionally describes a mere concept without disclosing how to implement that concept risks defeating the very purpose of the patent system. In this respect, the patents' claims are materially different from those in *McRO, Inc. v. Bandai Namco Games America Inc.*, 837 F.3d 1299 (Fed. Cir. 2016), and *Koninklijke*, the cases on which Recentive relies.

Instead of disclosing "a specific implementation of a solution to a problem in the software arts," *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1339 (Fed. Cir. 2016), or "a specific means or method that solves a problem in an existing technological process," *Koninklijke*, 942 F.3d at 1150, the only thing the claims disclose about the use of machine learning is that machine learning is used in a new environment. This new environment is event scheduling and the creation of network maps.

As Recentive acknowledges, before the introduction of machine learning, event planners looked to what the

Machine Learning Training patents describe as "event parameters" such as prior ticket sales, weather forecasts, and other data to determine when and where to schedule a particular event or series of events. *See* Appellant's Br. 4 (describing prior methods as "entirely manual, static[,] and incapable of responding to changing conditions" (quoting '811 patent, col. 1 l. 25)). The patents recognize this. *See, e.g.*, '367 patent, col. 1 ll. 13–26. The same goes for the creation of network maps, which have been "manual[ly]" created by humans to determine "which content will be displayed on which channel at a certain time." '811 patent, col. 1 ll. 16–17, 25.

We see no merit to Recentive's argument that its patents are eligible because they apply machine learning to this new field of use. We have long recognized that "[a]n abstract idea does not become nonabstract by limiting the invention to a particular field of use or technological environment." *Intell. Ventures I LLC v. Capital One Bank (USA)*, 792 F.3d 1363, 1366 (Fed. Cir. 2015); *see also Alice*, 573 U.S. at 222; *Parker v. Flook*, 437 U.S. 584, 593 (1978); *Stanford*, 989 F.3d at 1373 (rejecting argument that a claim was not abstract where patentee contended "the specific application of the steps [was] novel and enable[d] scientists to ascertain more haplotype information than was previously possible").

We have also held the application of existing technology to a novel database does not create patent eligibility. *See, e.g.*, *SAP Am., Inc. v. InvestPic, LLC*, 898 F.3d 1161, 1168 (Fed. Cir. 2018); *Elec. Power*, 830 F.3d at 1353 ("[W]e have treated collecting information, including when limited to particular content (which does not change its character as information), as within the realm of abstract ideas." (citing *Internet Pats. Corp. v. Active Network, Inc.*, 790 F.3d 1343, 1349 (Fed. Cir. 2015); *OIP Techs., Inc. v. Amazon.com, Inc.*, 788 F.3d 1359, 1363 (Fed. Cir. 2015); *Content Extraction*, 776 F.3d at 1347; *Digitech Image Techs., LLC v. Elecs. for Imaging, Inc.*,

758 F.3d 1344, 1351 (Fed. Cir. 2014); *CyberSource Corp. v. Retail Decisions, Inc.*, 654 F.3d 1366, 1370 (Fed. Cir. 2011))). Stated differently, patents may be directed to abstract ideas where they disclose the use of an "already available [technology], with [its] already available basic functions, to use as [a] tool[] in executing the claimed process." *SAP Am.*, 898 F.3d at 1169–70. We think those cases are equally applicable in the machine learning context. Recentive's argument that its patents are eligible simply because they introduce machine learning techniques to the fields of event planning and creating network maps directly conflicts with our § 101 jurisprudence.

Finally, the claimed methods are not rendered patent eligible by the fact that (using existing machine learning technology) they perform a task previously undertaken by humans with greater speed and efficiency than could previously be achieved. We have consistently held, in the context of computer-assisted methods, that such claims are not made patent eligible under § 101 simply because they speed up human activity. *See, e.g.*, *Content Extraction*, 776 F.3d at 1347; *DealerTrack*, 674 F.3d at 1333. Whether the issue is raised at step one or step two, the increased speed and efficiency resulting from use of computers (with no improved computer techniques) do not themselves create eligibility. *See, e.g.*, *Trinity Info Media, LLC v. Covalent, Inc.*, 72 F.4th 1355, 1363 (Fed. Cir. 2023) (rejecting argument that "humans could not mentally engage in the 'same claimed process' because they could not perform 'nanosecond comparisons' and aggregate 'result values with huge numbers of polls and members'") (internal citation omitted); *Customedia Techs., LLC v. Dish Network Corp.*, 951 F.3d 1359, 1365 (Fed. Cir. 2020) (holding claims abstract where "[t]he only improvements identified in the specification are generic speed and efficiency improvements inherent in applying the use of a computer to any task"); *compare McRo*, 837 F.3d at 1314–

16 (finding eligibility of claims to use specific computer techniques different from those humans use on their own to produce natural-seeming lip motion for speech).

The district court correctly concluded that the Machine Learning Training and Network Map patents are directed to abstract ideas at step one of *Alice*.

II

At *Alice* step two, we "consider the elements of [the] claim both individually and 'as an ordered combination' to determine whether the additional elements 'transform the nature of the claim' into a patent-eligible application." 573 U.S. at 217 (quoting *Mayo*, 566 U.S. at 79). Transforming the nature of a claim "into a patent-eligible application requires more than simply stating the abstract idea while adding the words 'apply it.'" *Trinity*, 72 F.4th at 1365 (quoting *Alice*, 573 U.S. at 221); *see also SAP Am.*, 898 F.3d at 1167. "[T]he claim must include 'an inventive concept sufficient to transform the claimed abstract idea into a patent-eligible application.'" *Trinity*, 72 F.4th at 1365 (quoting *Alice*, 573 U.S. at 221); *Broadband iTV, Inc. v. Amazon.Com, Inc.*, 113 F.4th 1359, 1370 (Fed. Cir. 2024) ("[W]e must determine whether the claims include 'an element or combination of elements' that transforms the claims into something 'significantly more' than a claim on the patent-ineligible concept itself." (quoting *Alice*, 573 U.S. at 217–18)).

Recentive claims that the inventive concept in its patents is "using machine learning to dynamically generate optimized maps and schedules based on real-time data and update them based on changing conditions." Appellant's Br. 44. As the district court correctly recognized, *see Recentive*, 692 F. Supp. 3d at 456, this is no more than claiming the abstract idea itself. Such a position plainly fails to identify anything in the claims that would "'transform' the claimed abstract idea into a patent-eligible

application." *Alice*, 573 U.S. at 221 (quoting *Mayo*, 566 U.S. at 71).

In short, we perceive nothing in the claims, whether considered individually or in their ordered combination, that would transform the Machine Learning Training and Network Map patents into something "significantly more" than the abstract idea of generating event schedules and network maps through the application of machine learning. *See SAP Am.*, 898 F.3d at 1169–70; *Broadband iTV*, 113 F.4th at 1372. Recentive has also failed to identify any allegation in its complaint that would suffice to plausibly allege an inventive concept to defeat Fox's motion to dismiss. *Trinity*, 72 F.4th at 1365.

The district court did not err in concluding that Recentive's claims fail to satisfy step two of the *Alice* inquiry.

III

We additionally reject Recentive's argument that the district court should have granted it leave to amend, a determination that is committed to the sound discretion of the district court. *See Celgene Corp. v. Mylan Pharms., Inc.*, 17 F.4th 1111, 1130 (Fed. Cir. 2021); *In re Allergan ERISA Litig.*, 975 F.3d 348, 356 n.13 (3d Cir. 2020). Here, the court determined further amendment would be futile. *See Recentive*, 692 F. Supp. 3d at 457. Recentive failed to propose any amendments or identify any factual issues that would alter the § 101 analysis. In light of this failure and our holding with respect to the ineligibility of Recentive's patents, we discern no error in the district court's conclusion.[5]

---

[5] Recentive additionally suggests that the district court erred by resolving claim-construction disputes at

## CONCLUSION

Machine learning is a burgeoning and increasingly important field and may lead to patent-eligible improvements in technology. Today, we hold only that patents that do no more than claim the application of generic machine learning to new data environments, without disclosing improvements to the machine learning models to be applied, are patent ineligible under § 101.

**AFFIRMED**

---

the pleading stage. We are not convinced. The district court correctly recognized that "[d]ismissal is appropriate" where, as here, "a plaintiff has failed to identify claim terms requiring a construction that could affect the patent-ineligibility analysis." *Recentive*, 692 F. Supp. 3d at 448; *Trinity*, 72 F.4th at 1360–61 ("[A] patentee must propose a specific claim construction or identify specific facts that need development and explain why those circumstances must be resolved before the scope of the claims can be understood for § 101 purposes.").

# Attachment B

Final Written Decision,
*Align Technology, Inc. v. Dental Monitoring SAS*,
IPR2023-01369, Paper 42 (Mar. 3, 2025)

Trials@uspto.gov
571-272-7822

Paper 42
Entered: March 3, 2025

UNITED STATES PATENT AND TRADEMARK OFFICE

---

BEFORE THE PATENT TRIAL AND APPEAL BOARD

---

ALIGN TECHNOLOGY, INC.,
Petitioner,

v.

DENTAL MONITORING SAS,
Patent Owner.

---

IPR2023-01369
Patent 10,755,409 B2

---

Before JEAN R. HOMERE, MICHAEL R. ZECHER, and KARA L. SZPONDOWSKI, *Administrative Patent Judges*.

HOMERE, *Administrative Patent Judge*.

JUDGMENT
Final Written Decision
Determining All Challenged Claims Unpatentable
*35 U.S.C. § 318(a)*
Denying Patent Owner's Motion to Exclude
*37 C.F.R. § 42.64(c)*

# I. INTRODUCTION

## *A. Background*

Align Technology, Inc. ("Petitioner") filed a Petition for *inter partes* review of claims 1–15 of U.S. Patent No. 10,755,409 (Ex. 1001, "the '409 patent"). Paper 2 ("Pet."), 1. Dental Monitoring SAS ("Patent Owner") filed a Preliminary Response. Paper 8 ("Prelim. Resp."). Upon consideration of the parties' contentions and supporting evidence, we instituted an *inter partes* review pursuant to 35 U.S.C. § 314, as to all the challenged claims of the '409 patent with respect to the sole ground set forth in the Petition. Paper 10 ("Inst. Dec.").

After institution of trial, Patent Owner filed a Response (Paper 19, "PO Resp."); Petitioner filed a Reply to Patent Owner's Response (Paper 23, "Pet. Reply"); and Patent Owner filed a Sur-Reply to Petitioner's Reply (Paper 29, "PO Sur-Reply"). In addition, Patent Owner filed a Motion to Exclude certain evidence (Paper 34, "PO Mot. Excl."); Petitioner filed an Opposition to Patent Owner's Motion to Exclude (Paper 35, "Pet. Opp. Mot. Excl."); and Patent Owner filed a Reply to Petitioner's Opposition (Paper 38, "PO Reply Opp. Mot. Excl."). At the request of both parties, we held an oral hearing on December 3, 2004. A transcript of the hearing has been entered into the record. Paper 41 ("Tr.").

We have jurisdiction under 35 U.S.C. § 6. This is a Final Written Decision under 35 U.S.C. § 318(a) as to the patentability of all the challenged claims of the '409 patent. For the reasons discussed below, we determine that Petitioner has demonstrated by a preponderance of the evidence that challenged claims 1–15 of the '409 patent are unpatentable. We also *deny* Patent Owner's Motion to Exclude.

*B. Real Parties in Interest*

Petitioner identifies itself as the sole real party in interest. Pet. 73.

Patent Owner identifies itself as the sole real party in interest. Paper 4, 2.

*C. Related Matters*

The parties indicate that the ’409 patent is the subject of the following district court proceeding: *Dental Monitoring SAS v. Align Technology, Inc.*, Case No. 3:22-cv-07335-WHA (N.D. Cal.). Pet. 73; Paper 4, 2. Patent Owner indicates that the ’409 patent is also subject of the following district court proceeding: *Dental Monitoring v. Get-Grin Inc.*, Case No. 1:22-cv-00647-WCB (D. Del.). Paper 4, 2.

*D. The Challenged ’409 Patent*

The ’409 patent relates to a method for acquiring and analyzing an image of a dental arch of a patient for orthodontic treatment of the patient. Ex. 1001, codes (54), (57). Conventional orthodontic treatments require the patient to make an appointment and transmit captured dental images to the orthodontist, who subsequently uses the images to assess the patient’s conditions to devise a treatment plan accordingly. *Id.* at 1:11–15. The ’409 patent purports to provide an improved method employing a deep learning device specifically trained to assess a simple image of the patient’s dental arch to reconstruct, with a good reliability, a dental arch in the form of an assembled model. *Id.* at 3:13–17, 18:56–59, 23:7–10.

In particular, upon being activated to acquire an image of the patient’s arch (“analysis image”), an acquisition apparatus (e.g., cell phone) acquires

the analysis image, which it submits to a deep learning device (preferably, a neural network) trained by a learning base to determine at least one probability relating to an attribute value of at least one tooth represented on a zone in the analysis image "analysis tooth zone," and/or at least one probability relating to an image attribute value of the tooth. *Id.* at 1:23–50, 8:62–63. According the '409 patent,

> [T]his image attribute may define whether, in light of the image as a whole or of a part of the image, the dental situation "is pathological" or "is not pathological", without each tooth being examined. The image attribute also makes it possible to detect, for example, whether the mouth is open or closed, or, more generally, whether the image is suitable for a subsequent treatment, for example whether it makes it possible to monitor the occlusion.

*Id.* at 3:29–37.

The deep learning device subsequently assesses the probability relating to the location and/or the type of tooth represented in the analysis of the tooth zone. *Id.* at 1:51–58. More particularly, the '409 patent states the following:

> In a preferred embodiment, the shape of a particular tooth model is analyzed so as to define its tooth attribute value, for example its number. This shape recognition is preferably performed by means of a deep learning device, preferably a neural network. Preferably, a library of historical tooth models is created, each historical tooth model having a value for the tooth attribute, as described hereinbelow (step a)), the deep learning device is trained with views of the historical tooth models of this library, then one or more views of the particular tooth model are analyzed with the trained deep learning device, so as to determine the tooth attribute value of said particular tooth model.

*Id.* at 8:39–50. The ’409 patent describes a neural network as follows:

> A “neural network” or “artificial neural network” is a set of algorithms well known to a person skilled in the art. The neural network may in particular be chosen from:
> the networks specializing in the classification of images, called “CNN” (“convolutional neural network”), for example
> AlexNet (2012)
> ZF Net (2013)
> VGG Net (2014)
> GoogleNet (2015)
> Microsoft ResNet (2015)
> Caffe: BAIR Reference CaffeNet, BAIR AlexNet
> Torch: VGG_CNN_S, VGG_CNN_M, VGG_CNN_M_2048, VGG_CNN_M_10 24, VGG_CNN_M_128, VGG_CNN_F, VGG_ILSVRC-2014 16-layer, VGG ILSVRC-2014 19-layer, Network-in-Network (Imagenet & CIFAR-10)
> Google: Inception (V3, V4).
> The networks specializing in the location and detection of objects in an image, the object detection network, for example:
> R-CNN (2013)
> SSD (Single Shot MultiBox Detector: Object Detection network), Faster R-CNN (Faster Region-based Convolutional Network method: Object Detection network)
> Faster R-CNN (2015)
> SSD (2015).
> The above list is not limiting.

*Id.* at 16:15–43.

Further, the ’409 patent also discusses an “embedded monitoring” wherein the image analysis is useful for guiding the image acquisition of a dental arch for remote diagnosis. *Id.* at 23:46–49. Figures 12A–12D, reproduced below, further illustrate the subject matter of the ’409 patent:



Fig. 12A Fig. 12B

FIG. 12A and FIG. 12B above illustrate how a dental retractor is used to facilitate the acquisition of an image, which is cropped, processed, and updated as in FIG. 12B making it possible to determine the contour of the patient's teeth. Ex. 1001, 7:16–20.



Fig. 12C Fig. 12D

FIG. 12C above depicts an updated image, and FIG. 12D represents an updated map relating to the contour of the teeth obtained from the updated image of FIG. 12C. Ex. 1001, 7:22–25.

Additionally, the '409 patent discloses determining whether the quality or another characteristic of an acquired image (e.g., "mouth open" "mouth closed" or "orthodontic appliance") meets a particular "setpoint" for such an image, requiring adjustments if that "setpoint" is not met, and "guid[ing]" a patient to make the correct adjustments to acquire the correct image. *Id.* at 26:16–26, 28:27–43.

*E. The Challenged Claims*

Petitioner challenges claims 1–15 of the ’409 patent. Pet. 1. Claim 1 is independent. Claim 1 is illustrative of the challenged claims and is reproduced below.

> 1. A method for acquiring an image of a dental arch of a patient, said method comprising the following steps:
>
> a') activation of an image acquisition apparatus so as to acquire an image, called “analysis image”, of said arch;
>
> b') analysis of the analysis image by means of a deep learning device trained by means of a learning base;
>
> c') determination, for the analysis image, as a function of the results of the analysis in the preceding step, of a value for an image attribute;
>
> d') comparison of said image attribute value with a setpoint;
>
> e') sending of an information message as a function of said comparison, the information message being related to the quality of the image acquired or to the position of the acquisition apparatus in relation to said arch or to the setting of the acquisition apparatus or to the opening of the mouth or to the wearing of a dental appliance, or to a combination thereof, to check whether the analysis image respects the setpoint and, if it does not respect the setpoint, to guide the operator in order for him or her to acquire a new analysis image.

Ex. 1001, 32:13–33.

*F. Prior Art and Asserted Grounds of Unpatentability*

The Petition relies on the following prior art references:

| Name | Reference | Exhibit |
|---|---|---|
| Salah | WO 2016/066651 A1, published May 6, 2016 | 1008 |
| Carrier | US 2021/0068923 A1, published March 11, 2021 | 1005 |

| Name | Reference | Exhibit |
|---|---|---|
| Maninis | *Convolutional Oriented Boundaries: From Image Segmentation to High-Level Tasks*, published April 28, 2017 | 1007 |

Petitioner asserts that claims 1–15 are unpatentable based on the following ground:

| Claim(s) Challenged | 35 U.S.C. § | Reference(s)/Basis |
|---|---|---|
| 1–15 | 103[1] | Salah, Carrier, Maninis |

Pet. 15.

In support of its contentions, Petitioner submits Declarations by Dr.Hassan Foroosh (Exs. 1002 1048), Nathaniel E. Frank-Wright (Exs. 1030, 1031), and Dr. Maureen Valley (Ex. 1035). Likewise, Petitioner submits Deposition Transcripts by Dr. John Mongan (Ex. 1037), Dr. Budi Kusnoto (Ex. 1038); and Dr. Hassan Foroosh (Ex. 1049).

In response, Patent Owner submits Declarations by Dr. John Mongan (Ex. 2028) and Dr. Budi Kusnoto (Ex. 2030). Further, Patent Owner submits Deposition Transcripts of Dr. Hassan Foroosh (Exs. 2048, 2054), and Dr. Maureen Valley (Ex. 2053).

[1] The application resulting in the ’409 patent does not claim priority to a date prior to the date when the Leahy-Smith America Invents Act (“AIA”), Pub. L. No. 112–29, 125 Stat. 284 (2011), took effect. Thus, we refer to the AIA version of § 103.

## II. PATENTABILITY ANALYSIS

### *A. Principles of Law*

#### *1. Inter Partes Review*

"In an [*inter partes* review], the petitioner has the burden from the onset to show with particularity why the patent it challenges is unpatentable." *Harmonic Inc. v. Avid Tech., Inc.*, 815 F.3d 1356, 1363 (Fed. Cir. 2016) (citing 35 U.S.C. § 312(a)(3) (requiring *inter partes* review petitions to identify "with particularity . . . the evidence that supports the grounds for the challenge to each claim")). Petitioner bears the burden of persuasion to prove unpatentability of each challenged claim by a preponderance of the evidence. 35 U.S.C. § 316(e). This burden of persuasion never shifts to Patent Owner. *Dynamic Drinkware, LLC v. Nat'l Graphics, Inc.*, 800 F.3d 1375, 1378 (Fed. Cir. 2015).

#### *2. Obviousness*

A patent claim is unpatentable under 35 U.S.C. § 103 if the differences between the claimed invention and the prior art are such that the claimed invention, as a whole, would have been obvious before the effective filing date of the claimed invention to a person having ordinary skill in the art to which the claimed invention pertains. *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007). The question of obviousness is resolved on the basis of underlying factual determinations including (1) the scope and content of the prior art, (2) any differences between the claimed subject matter and the prior art, (3) the level of skill in the art, and (4) when in

evidence, any objective evidence of nonobviousness.[2] *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966).

*B. Level of Ordinary Skill in the Art*

The level of ordinary skill in the art is "a prism or lens" through which we view the prior art and the claimed invention. *Okajima v. Bourdeau*, 261 F.3d 1350, 1355 (Fed. Cir. 2001). The person of ordinary skill in the art ("POSITA") is a hypothetical person presumed to have known the relevant art at the time of the invention. *In re GPAC Inc.*, 57 F.3d 1573, 1579 (Fed. Cir. 1995). In determining the level of ordinary skill in the art, we may consider certain factors, including: "(1) the educational level of the inventor; (2) type of problems encountered in the art; (3) prior art solutions to those problems; (4) rapidity with which innovations are made; (5) sophistication of the technology; and (6) educational level of active workers in the field." *Best Med. Int'l, Inc. v. Elekta Inc.*, 46 F.4th 1346, 1353 (Fed. Cir. 2022). "The patent's purpose can also be informative." *Id.*

Petitioner contends that a POSITA at the time of the invention "would typically have an advanced degree, such as a Masters' Degree or Ph.D. in computer science, computer engineering, electrical engineering, or a related field, with at least two years of work in computer vision, image analysis, medical imaging, or related areas." Pet. 14. Petitioner asserts that such an artisan "could have less education but significant professional experience in one or more of these fields," or "could be a member of an interdisciplinary team including persons with backgrounds such as electrical engineering,

[2] During trial, the parties have not directed us to any such objective evidence.

computer science, optical imaging, and dentistry or orthodontics, and could call upon the knowledge of other team members as appropriate." *Id.* at 14–15 (citing Ex. 1002 ¶¶ 69–70).

Patent Owner offers a slightly different definition of the level of ordinary skill in the art. PO Resp. 4–5. Patent Owner contends that:

> [A] person of ordinary skill in the relevant field as of July 21, 2017 would have had a bachelor's degree or higher in computer science, bioinformatics, or a related engineering discipline, and several years of work experience relating to the development of machine learning or artificial intelligence models or algorithms. A [POSITA] ***would*** have also worked as part of a multi-disciplinary team, which ***would have included individuals familiar with medical imaging, dental imaging, dentistry, and/or orthodontics***.

*Id.* (quoting Ex. 2002 ¶ 47; citing Ex. 2028 ¶¶ 48–51, Ex. 2030 ¶¶ 27–30) (emphasis and alteration in original).

In light of its proposed definition of the POSITA, Patent Owner asserts that Dr. Foroosh has no professional training or experience with dentistry or orthodontics, and did not consult with such a person to form his opinions. *Id.* at 6 (citing Ex. 2048, 11:9–12; 12:19–22; 13:12–23). According to Patent Owner, although Dr. Foroosh once had an industrial engagement to analyze dental images (not with neural networks), he had no contact with the dental experts engaged by the company leading the project. *Id.* (citing Ex. 2048, 19:20–20:11). Consequently, Patent Owner asserts that Dr. Foroosh's lack of relevant experience or understanding of the "orthodontics standards" for acquiring dental photographs led him to misinterpret Carrier and Salah (e.g., reading into Carrier a "tooth counting" technique that is not disclosed). *Id.*

It is undisputed that the definitions between the parties' descriptions of a POSITA are "not materially different." PO Resp. 5, Pet. Reply 1; Ex. 1048 ¶ 9; Ex. 2028 ¶ 50. As correctly noted by Patent Owner, "the parties agree that a [POSITA] is a member of an interdisciplinary team including dental expertise where 'appropriate'" "to rely on dental expertise when addressing them." PO Sur-Reply 3 (citing Ex. 1048 ¶ 3). We therefore find Petitioner's description of POSITA to be consistent with the problems and solutions disclosed in the '409 patent and prior art of record, and adopt it as our own for purposes of this Decision, albeit without the one instance of "at least," which introduces ambiguity as to the appropriate level of work experience. *See, e.g.*, *In re GPAC Inc.*, 57 F.3d at 1579 (approving the determination of the level of ordinary skill in the art by appeal to the references of record). The qualifier "at least" expands the range of work experience without an upper bound, and does not meaningfully indicate the level of skill in the art.

The record before us indicates that Dr. Foroosh has the requisite educational background coupled with the appropriate level of work experience as part of a dental expert team to analyze dental images, and he called upon the Declaration testimony of Dr. Maureen Valley, a dental professional, to inform his analysis. Ex. 1002 ¶¶ 1–13; Ex. 1003; Pet Reply 2 (citing Ex. 1048 ¶¶ 1–9; Ex. 1035 ¶¶ 1–10; Ex. 1036). As one example of relevant work experience, Dr. Foroosh testifies that he "conducted extensive research in the field of 3D computer vision and computer modeling" throughout 2006 and 2007, where he "developed algorithms for 3D registration, modeling and visualization of maxilla and mandible of patients for dental surgery using Computer Aided Tomography (CAT) scanning."

Ex. 1002 ¶ 6; Ex. 1003, 12–13; *see also* Ex. 1002 ¶ 7 (describing a project that "was directed to the registration/alignment of dental CT scans of patients over a period of time during the treatment of a patient, with the purpose of improving the quality of 3D models, e.g., corrections and noise removal in 3D CT scans"). Therefore, we find on this record that Dr. Foroosh qualifies to testify from or about the perspective of a POSITA, and further meets the requisite qualifications to opine on the prior art relied upon in the challenge of the '409 patent. Accordingly, we disagree with Patent Owner's assertion that Dr. Valley's testimony regarding the dental nature of the references in the Petitioner's challenge includes disclosures that Dr. Foroosh did not understand when forming his opinions. PO Sur-Reply 3–4 (citing Ex. 1035 ¶¶ 34, 41–44; Ex. 2053, 38:18–39:6, 64:5–67:19; Ex. 2048, 130:8–11, 143:22–145:10, 149:19–22).

*C. Claim Construction*

In an *inter partes* review, claims are construed using the same claim construction standard that would be used to construe the claims in a civil action under 35 U.S.C. § 282(b), including construing the claims in accordance with the ordinary and customary meaning of such claims as would have been understood by one of ordinary skill in the art in view of the specification and the prosecution history pertaining to the patent. *See* 37 C.F.R. § 42.100(b). "[T]he ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention" and "after reading the entire patent." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313, 1321 (Fed. Cir. 2005) (en banc). In addition to the specification and prosecution history, we also

consider use of the terms in other claims and extrinsic evidence, including expert and inventor testimony, dictionaries, and learned treatises, although extrinsic evidence is less significant than the intrinsic record. *Id.* at 1312–17. Usually, the specification is dispositive, and it is the single best guide to the meaning of a disputed term. *Id.* at 1315.

"The Board is required to construe 'only those terms . . . that are in controversy, and only to the extent necessary to resolve the controversy.'" *Realtime Data, LLC v. Iancu*, 912 F.3d 1368, 1375 (Fed. Cir. 2019) (alteration in original) (quoting *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999)).

In the Petition, Petitioner contends that three claim terms require construction. *See* Pet. 15–18. First, Petitioner contends that the claim term "image attribute" should be construed to "include[] an attribute having a value (which may be a set of values for multiple teeth) relating to an image as a whole, including an attribute related to" position and/or orientation and/or calibration of the apparatus used to acquire the analysis image, a quality relating to brightness, contrast, or sharpness of the analysis image, or the content of the analysis image. *Id.* at 15–16 (citing Ex. 1001, 3:38–49, 26:16–26).

Second, Petitioner contends that the claim term "tooth attribute" should be construed to "include[] any attribute related to a tooth," including tooth type, tooth number, and tooth shape parameter. *Id.* at 16–17 (citing Ex. 1001, 1:22–28, 3:23–37, 3:59–62, 28:58–65).

Third, Petitioner contends that the claimed "analysis of the analysis image by means of a deep learning device trained by means of a learning base" should be construed to include "analyzing an image and the structure

to encompass a device comprising a deep learning neural network trained with a learning base." *Id.* at 17–18 (citing Ex. 1001, 1:24–25, 1:39–40, 1:51–2:3, 3:14–18, 4:5–6, 8:41–50, 13:64–65, 16:13–50, 24:14–15, 24:46–47, 24:66–25:4, 28:27–29, 29:24–25, 29:54–55).

In the Patent Owner Response, Patent Owner contends that three different claim terms require construction. *See* PO Resp. 13–17. Patent Owner contends that the claim term "deep learning device" refers to "a device that, through training, is capable of analyzing an image and recognizing patterns therein." *Id.* at 13–15 (citing Ex. 1001, 16:53–56; 17:37–39, 24:38–59; Ex. 2028 ¶¶ 150–153; Ex. 2048, 209:24–210:5). According to Patent Owner, the deep learning device is preferably a neural network, which is described as an algorithm or a set of algorithms (i.e., a program written in computer code) with values that are updated through the training process such that the layers in its architecture are not hardware on which the algorithm runs. *Id.* Petitioner does not dispute Patent Owner's assertion, but notes nonetheless that image analysis software (e.g., neural network architecture) runs on a physical device. Pet. Reply 2. Petitioner therefore concludes that, because the claims do not require the deep learning device to run on the image acquisition device, but instead encompass a separate device performing the image analysis steps, such distinctions are immaterial. *Id.* at 2–3 (citing Ex. 1048 ¶¶ 13–16).

Further, Patent Owner contends that the claim term "real time" means "immediately" or while the image acquisition process is still underway. PO Resp. 15 (citing Ex. 1001, 25:50–62; Ex. 2028 ¶¶ 154–155; Ex. 2048, 71:6–73:19). Petitioner does not dispute Patent Owner's assertion that "real time" denotes "immediately." Pet. Reply 3 (citing Ex. 1037, 62:10–63:11; Ex.

1048 ¶ 17). Petitioner notes, however, that "immediately" does not establish a specific time duration; it merely requires that the feedback be provided "soon enough to be part of the acquisition process." *Id.*

Furthermore, Patent Owner asserts that, because a POSITA would have understood the claim term "tooth shape parameter" as relating to one type of "tooth attribute" (e.g., tooth width, thickness, crown height, level of abrasion) associated with a distinct tooth zone, it should be therefore construed as an attribute of a tooth depicted within the boundary of a tooth zone. PO Resp. 16 (citing Ex. 1001, 8:9–21; Ex. 2028 ¶¶ 156–158). Petitioner does not dispute Patent Owner's assertion, but notes that "tooth shape parameter" is one alternative in the list of tooth attributes (e.g., tooth number/type). Pet Reply 3.

Because Petitioner's application of the asserted references to the challenged claims does not turn on an express construction of any one of the claim terms identified above, we determine that we do not need to expressly construe any term for purposes of this Decision. *See Realtime Data*, 912 F.3d at 1375.

*D. Overview of the Asserted Prior Art*

*1. Salah (Ex. 1008)*

Salah relates to "a method for monitoring the positioning and/or shape and/or appearance of a patient's teeth and a computer program for implementing this method." Ex. 1008, 1:4–6. Salah recognizes that a patient may wish to monitor any possible movement/change in the shape and/or appearance of their teeth because dental checks carried out by an orthodontist or a dentist can be quite expensive. *Id.* at 1:15–18. Salah

therefore provides a method that allows a patient to self-monitor his/her dental condition. *Id.* at 1:25–26. In particular, Salah discloses creating a three-dimensional (3D) digital reference model of the patient's arch ("tooth model"), and acquiring a two-dimensional (2D) image of the patient's arch ("updated image") such that the 2D image can be compared with the 3D reference image to assess any deformation/displacement since the initial tooth model was produced. *Id.* at 1:26–2:26.

Figures 4a and 4b, reproduced below, illustrate Salah's dental arch monitoring method:



Fig. 4a



Fig. 4b

Figure 4a shows a view of the initial reference model processed to reveal changes in the direction of the normal to the modeled surface. Figure 4b shows the inner gingival margin that can be extracted by analyzing the image in figure 4a. Ex. 1008, 22:18–20. "The initial reference model [IRM] may correspond to the position of the patient's teeth prior to treatment, or to the positioning of the patient's teeth that the treatment is designed to achieve." *Id.* at 20:2–3. The IRM can be prepared by an orthodontic professional using a 3D scanner "from measurements taken on the teeth or on a physical model of the patient's teeth, such as a plaster model." *Id.* at 20:13–17. The IRM is then stored in a centralized database. *Id.* at 23:9.

Figures 5a through 5d, reproduced below, further illustrate Salah's dental arch monitoring method:




Fig. 5a Fig. 5b



Fig. 5c Fig. 5d

Figure 5 (5a–5d) illustrates the acquisition of updated images by the patient or an assistant using a cell phone with the aid of retractor 10 to improve teeth visibility. Ex. 1008, 23:24–26, 26:19–22. Retractor 10 may include registration marks 12 to help "guide the positioning of the image acquisition apparatus at the time of image acquisition, by means of corresponding references appearing on the acquisition apparatus display." *Id.* at 32:26–29. Registration marks 12 also "allow the approximate virtual acquisition conditions approaching the actual acquisition conditions to be determined, which allows data processing to be accelerated." *Id.* at 33:3–5.

The image-acquisition apparatus is equipped with a verification means including references or marks on a viewfinder to guide alignment by way of audio-visual prompts to facilitate its approximate positioning relative to the patient prior to acquiring the image. *Id.* at 27:19–28:10. In particular,

> The references [that appear on the viewfinder] may, for example, comprise a line intended to be aligned with the general direction of the juncture between the upper and lower teeth when the teeth are clenched by the patient, and/or a vertical line intended to be aligned with the joint between the two upper incisors. The references can also refer to other parts of the patient. For example, they may take the form of marks corresponding to the position of the eyes, or take the form of a shape in which the patient's mouth or face is to be positioned.

*Id.* at 28:5–10. The apparatus may also provide feedback informing the user regarding whether the quality of the image is acceptable or not, and whether to take another photo from a different position or angle. *Id.* at 27:19–26.

The first updated image is created preferably around the same time as the initial reference image or shortly thereafter. *Id.* at 25:1–2. It is stored on a universal serial bus drive, and subsequently downloaded. *Id.* at 27:5–7. The updated image can then be subsequently cropped, processed and filtered accordingly to reveal discriminant information (e.g., contour detection, convexity points) upon which deep learning can be applied. *Id.* at 33:13–36:14. "Comparison of Figures 5a and 5b, or 5c and 5d, shows the effect of cropping on an updated image." *Id.* at 34:1–2. "By identifying the registration marks on the updated image, it is possible to identify the area of the updated image containing the elements that were the subject of the initial reference model, i.e., the teeth and gums." *Id.* at 33:27–34:2. According to Salah, a POSITA knows how to use well-known processes (e.g., by applying various masks/filters, contour detection of a binary image, searching contour convexity points, checking points in a contour, and/or performing deep learning) in image processing software to detect discriminant information

(e.g., high contrast regions, contours) in an updated image. *Id.* at 34:6–36:14.

*2. Carrier (Ex. 1005)*

Carrier relates to a method and apparatus for capturing various images of a patient's teeth at predetermined viewing angles for remotely pre-screening the patient for possible orthodontic treatment. Ex. 1005, code (57), ¶ 6. In particular, Carrier discloses a telecommunications device (e.g., a cell phone) having a camera equipped with a processor that guides a user to take a series of images of the patient's teeth in each of a plurality of predetermined views by sequentially displaying, on a screen of the cell phone, each captured image from the camera along with an overlay including an outline of teeth (displayed atop the camera's view) such that the overlay's outline approximately matches the patient's teeth during the acquisition of the dental image. *Id.* ¶¶ 7, 63. Subsequently, the cell phone transmits the captured images to a remote location such that the orthodontist can determine whether the patient is a suitable candidate for the orthodontic treatment. *Id.* ¶ 63.

Figures 5A and 5B, reproduced below, illustrate Carrier's method of acquiring a patient's dental images:




FIG. 5A




FIG. 5B

Figure 5A above illustrates an example of a user interface in a cell phone camera that enables a user viewing on the camera screen the image of a patient's teeth (with or without a retractor) to select one of a plurality of overlays for capturing the patient's dental images in a plurality of predetermined views when the teeth are aligned with the overlay outline. Ex. 1005 ¶¶ 63, 72. Figure 5B above illustrates an on-screen message to guide the user to take dental images. *Id.* ¶ 73.

Figures 6B, reproduced below, further illustrates Carrier's method of acquiring a patient's dental images:




Figure 6B above depicts an example of a poor quality image of the teeth. *Id.* ¶ 77.

The disclosed camera may also include an indicator, which is triggered when the overlay approximately matches with the patient's teeth. The trigger may be visual (including changing the color of the overlay, displaying or flashing an image/icon/color/symbol on the screen, etc.) and/or audible (emitting a ping, tone, etc.), and/or tactile (e.g., vibrating), etc. Ex. 1005 ¶¶ 68–70, 73. The telecommunications device may also include a machine learning feature recognition to assess the quality of the picture by estimating the quality of contour matching between the outline of the overlay and the teeth of the patient. *Id.* ¶¶ 111, 113. Carrier states that the disclosed method is for "increasing the accuracy of the alignment of the

camera lenses with teeth of the patient" to produce "[h]igh quality dental images." *Id.* ¶ 102. More particularly, Carrier indicates that machine learning techniques may be used to detect the presence of teeth when photos are taken so as to automatically detect variations in the patient's teeth, which may improve the photo quality. *Id.* ¶ 154. The user may be alerted to take corrective measures (correct angle, move closer or away) when the patient's teeth are not fully visible. *Id.*

Upon uploading the images from the mobile telecommunications device to a remote location (e.g., a server), the images may be processed manually, automatically or semi-automatically to determine if the patient is a candidate for the orthodontic procedure. *Id.* ¶ 156.

*3. Maninis (Ex. 1007)*

Maninis is titled "Convolutional Oriented Boundaries [COB]: From Image Segmentation to High Level Tasks." Ex. 1007, Title. Maninis relates to using "Convolutional Neural Networks (CNNs)" to "produce[] multiscale oriented contours and region hierarchies starting from generic image classification." *Id.*, Abstr. Maninis indicates that the "latest wave of contour detectors takes advantage of deep learning to obtain state-of-the-art results," thereby providing "an end-to-end deep framework to boost the efficiency and accuracy of contour detection, using convolutional feature maps and a novel loss function." Ex. 1007, 2. Figure 2 of Maninis, reproduced below, further illustrates using a deep learning device for performing contour and edge detection in images. *Id.* at 3.




Figure 2 above illustrates a deep learning architecture depicting connections between different stages used to generate the multiscale contours using multiple feature map layers in a CNN to detect image contents at different scales (fine and coarse detections) as well as different orientations. *Id.*

Maninis uses a training dataset of 10,103 images with "localized pixel-wise semantic annotations," meaning pixel-by-pixel indications of each object's location in each image. *Id.* at 5–6. For training and optimization purposes, Maninis divides these images into "train, validation, and test sets" to train and validate the deep learning device. *Id.*

*E. Whether Carrier and Maninis Qualify as Prior Art*

Whether a reference qualifies as a "printed publication" is a legal conclusion based on underlying factual findings. *Jazz Pharm., Inc. v. Amneal Pharm., LLC*, 895 F.3d 1347, 1356 (Fed. Cir. 2018). The underlying factual findings include whether a reference was publicly accessible. *Id.* (citing *In re NTP, Inc.*, 654 F.3d 1279, 1296 (Fed. Cir. 2011)). We look to the underlying facts to make a legal determination as to whether a reference is a printed publication. *Suffolk Techs., LLC v. AOL Inc.*, 752 F.3d 1358, 1364 (Fed. Cir. 2014). In an *inter partes* review, the

petitioner bears the burden of establishing that a particular document is a prior art printed publication. *Jazz Pharm.*, 895 F.3d at 1356 (citing *Medtronic, Inc. v. Barry*, 891 F.3d 1368, 1380 (Fed. Cir. 2018)). The determination of whether a given reference qualifies as a prior art "printed publication" involves "a case-by-case inquiry into the facts and circumstances surrounding the reference's disclosure to members of the public." *In re Klopfenstein*, 380 F.3d 1345, 1350 (Fed. Cir. 2004) (citation omitted).

Public accessibility is a key question in determining whether a document is a prior art printed publication and is determined on a case-by-case basis. *Suffolk Techs.,* 752 F.3d at 1364 ; *see also In re Lister*, 583 F.3d 1307, 1311 (Fed. Cir. 2009) (To qualify as a printed publication, a document "must have been sufficiently accessible to the public interested in the art."). "A reference will be considered publicly accessible if it was disseminated or otherwise made available to the extent that persons interested and ordinarily skilled in the subject matter or art exercising reasonable diligence can locate it." *Medtronic*, 891 F.3d at 1380 (internal quotation marks and omissions). The key inquiry is whether the reference was made "sufficiently accessible to the public interested in the art" before the critical date. *In re Cronyn*, 890 F.2d 1158, 1160 (Fed. Cir. 1989); *see In re Wyer*, 655 F.2d 221, 226 (CCPA 1981). "A given reference is 'publicly accessible' upon a satisfactory showing that such document has been disseminated or otherwise made available to the extent that persons interested and ordinarily skilled in the subject matter or art exercising reasonable diligence, can locate it." *Bruckelmyer v. Ground Heaters, Inc.*, 445 F.3d 1374, 1378 (Fed. Cir. 2006).

*1. Carrier*

Patent Owner argues that, because Carrier[3] is not entitled to the priority date of the Carrier Provisional,[4] it does not qualify as prior art under *Dynamic Drinkware*[5] to support Petitioner's proposed challenge of the '409 patent.[6] PO Resp. 24. According to Patent Owner, "Petitioner is only entitled to the priority date of the Carrier Provisional if Petitioner can demonstrate that the Carrier Provisional provides written description support for at least one claim of Carrier." *Id.* (citing Pet. 9–10; Ex. 1002 ¶¶ 51–61); *see also id.* at 20 (citing Ex. 1002 ¶¶ 50, 51, Ex. 2048, 127:16–23, *Penumbra, Inc. v. RapidPulse, Inc.*, IPR2021-01466, Paper 34 (PTAB Mar. 10, 2023) (Final Written Decision) (precedential as to § II.E.3) ("Penumbra"), Ex. 2004 (redline of Carrier Provisional)). Patent Owner therefore submits that, because none of Petitioner's citations to the Carrier Provisional describes a method using "a mobile application on a mobile device associated ***with a patient***" or the "guiding ***the patient***" limitations of Carrier's claim 1, Carrier does not benefit from the priority date of the

---

[3] Ex. 1005, codes (21), (22), (63) (indicating that Carrier was filed on November 18, 2020, as a continuation of application No. 16/827,594, filed on March 23, 2020, which is a continuation of application No. 15/803,718, filed on November 3, 2017, now U.S. Patent No. 10,595,966).

[4] Ex. 1005, code (60) (indicating that the provisional application was filed on November 4, 2016).

[5] *Dynamic Drinkware, LLC v. Nat'l Graphics, Inc.*, 800 F.3d 1375, 1380 (Fed. Cir. 2015).

[6] Ex. 1001, code (22) (indicating that the application that issued as the '609 patent was filed on July 10, 2018); *id.* at code (65) (indicating a claim of priority on US 2019/0026889 A1, filed on January 24, 2019); *id.* at code (30) (indicating a claim of priority on foreign application FR 17 56947 filed on July 21, 2017).

Carrier Provisional. *Id.* at 25 (citing Ex. 2028 ¶¶ 104–109; Ex. 2030 ¶¶ 24, 72–75) (emphasis altered). Patent Owner contends that a POSITA "would have understood that the Carrier Provisional is directed to method for dental professionals to capture dental images using a mobile device, whereas Carrier itself is directed to a method wherein the patient uses the mobile device to capture dental images. *Id.* (citing Ex. 1006 ¶¶ 4, 51, 56, 57, 81, 95; Ex. 1005 ¶¶ 4, 96, 101, 102, 128, 172; Ex. 2028 ¶ 106; Ex. 2030 ¶¶ 72–75); PO Sur-Reply 5–6 (arguing the same).

Petitioner counters that Patent Owner's argument fails as a matter of law because under the holding in "*Penumbra, Inc. v. RapidPulse, Inc.*, a patent document is prior art under AIA §102 as of its provisional application's filing date so long as it meets 'the "ministerial requirements" of §§ 119 and 120' and the provisional application "'describe[s] the subject matter' relied upon in the reference patent document." Pet Reply 4 (citing *Penumbra*, precedential as to §II.E.3) (alteration in original).

We agree with Petitioner. At the outset, we note that *Penumbra* is a precedential decision that is binding on us. *Penumbra* states, in relevant-part, the following:

> [F]or prior-art determinations under AIA § 102, "there is no need to evaluate whether any claim of [a reference] patent document is *actually entitled to priority* or benefit under 35 U.S.C. 119, 120." MPEP § 2154.01(b) (emphasis added). Rather, under the AIA, a reference patent document need only meet the "ministerial requirements" of §§ 119 and 120, and the provisional or other earlier application(s) to which the reference patent document claims a right of priority must "describe[] the subject matter" relied upon in the reference patent document as prior art. 35 U.S.C. § 102(d)(2).

*Penumbra,* Paper 34 at 32 (second and third alterations in original).

In other words, when determining whether a reference qualifies as prior art under AIA § 102, we only need to determine whether the provisional application describes the subject matter in the non-provisional application relied upon by Petitioner. Stated differently, the holding in *Dynamic Drinkware* as to whether a claim in the non-provisional has sufficient written description support in the provisional application does not apply to an AIA § 102 reference, such as Carrier. *Id.* at 31–33. Accordingly, we do not agree with Patent Owner that "the reasoning and statutory interpretation in *Dynamic Drinkware* still controls." PO Sur-Reply 4. Because Petitioner provides in the Petition citations to where the Carrier Provisional describes the subject matter relied upon in Carrier (Pet. 10), and Patent Owner does not persuasively argue in the Response or the Sur-Reply that Petitioner's proffered support is deficient, we agree on this record that the subject matter of Carrier that Petitioner relies upon for its challenge, which also appears in the Carrier Provisional, is prior art to the claims of the '409 patent. Consequently, we disagree with Patent Owner's argument regarding the alleged lack of written description support in the Carrier provisional for a user (as opposed to a dental professional) using a mobile device to capture dental images (PO Resp. 24; Sur-Reply 5–6) because Petitioner does not rely on Carrier for such a feature, which is not even recited in the challenged claims. Accordingly, on the record before us, we determine that the subject matter from Carrier upon which Petitioner's challenge is based qualifies as prior art to challenged claims of the '409 patent.

*2. Maninis*

Patent Owner argues that Maninis does not qualify as prior art to support Petitioner's proposed challenge of the '409 patent. PO Resp. 35. In particular, Patent Owner argues that, although Petitioner downloaded a copy of Maninis from the website arXiv.org that purportedly was submitted on April 28, 2017, Petitioner has not sufficiently shown that it was publicly available to a POSITA at that date. *Id.* at 35–37 (citing Ex. 1007, 1; Ex. 1002 ¶ 64; Ex. 2048, 236:17–24). Patent Owner contends that Petitioner has not identified the date on which Maninis was published, but offers two pieces of circumstantial evidence to suggest that it was published sometime between April 28, 2017, and the July 21, 2017, priority date of the '409 patent. *Id.* at 35. Further, Patent Owner contends that Petitioner produces archived copies of the arXiv.org website from 2016 and 2017 reflecting the "policy" of arXiv.org to endeavor to publish articles shortly after they are submitted. *Id.* at 35–36 (citing Ex. 1022; Ex. 1023; Ex. 1026; Ex. 1002 ¶¶ 63–66). Patent Owner argues, however, that those submissions by Petitioner are unauthenticated hearsay without testimony from an individual with personal knowledge of those policies or how the Maninis paper was handled. *Id.* at 36 (citing Ex. 2048, 231:2–234:24).

According to Patent Owner, aside from Petitioner's declarant, Mr. Foroosh's, anecdotal suggestion that his own papers were published quickly, Petitioner does not account for the submission review time of the Maninis paper. *Id.* (citing Ex. 1002 ¶ 63; Ex. 2048, 232:1–15). Further, Patent Owner argues that Petitioner solely relies upon the later date (i.e., July 21, 2017) when a different version of the Maninis paper was submitted for publication, whereas both the earlier and later versions of Maninis share the

same uniform resource locator ("URL"), and Petitioner fails to provide any evidence to substantiate the actual publication date of the version of Maninis relied upon in the challenge. *Id.* (citing Ex. 1002 ¶¶ 62, 67; Ex. 1024; Ex. 2048, 235:5–236:8).

Petitioner counters that, contrary to Patent Owner's assertions, the production of a Wayback Machine archive of an arXiv.org search page is evidence to confirm Dr. Foroosh's personal knowledge of arXiv.org's routine business practice at the time and an express intent to publish Maninis. Pet. Reply 6 (citing Ex. 1002 ¶¶ 62–67; Ex.1022; Ex. 1023; Ex. 1026; Ex. 1030; Ex. 1031). Petitioner asserts that Patent Owner does not address the Wayback Machine archive of an arXiv.org search page providing a direct download link for the Maninis PDF prior to July 21, 2017, or Dr. Foroosh's testimony that metadata indicates a creation date consistent with publication according to arXiv's policies. *Id.* (citing Ex. 1002 ¶ 66; Ex. 1025; Ex. 1031).

Based on the fully developed record, Petitioner presents sufficient evidence establishing that Maninis is prior art to the '409 patent. Based on the indicia on the face of Maninis itself, it is undisputed that it was submitted for publication on arXiv.org on April 28, 2017. Ex. 1007 (the first page bears the indicia "arXiv:1701.04658v2 [cs.CV] 28 Apr. 2017"). Petitioner produces a Declaration by Dr. Foroosh testifying subject to penalty for perjury about his personal knowledge of arXiv.org's routine business practice in the 2017 timeframe and arXiv.org's express intent to publish submitted documents. Ex. 1002 ¶¶ 62–67, 234, 235. According to Dr. Foroosh's Declaration,

> [I]t was the established policy of arXiv.org in 2017 to publish submitted papers within about one business day of the date of submission . . . . As the arXiv.org website explains, a submitted paper will be announced about one day after being submitted, and it will then be mailed to all arXiv.org subscribers (who would typically be persons interested in the paper's relevant field) shortly thereafter . . . . Regarding Maninis, with a submission date of April 28, 2017, it would have been announced on Sunday April 30, 2017, or Monday May 1, 2017, and would have been transmitted to subscribers no later than Tuesday May 2, 2017.
>
> Once a paper is announced, it was arXiv.org's stated policy that the paper may not be modified without creating a new version. EX1023 (archived July 18, 2017); EX1026 (archived September 8, 2016). Maninis itself reflects this practice, as the document indicates that it is the second version (with v2 as part of the stamp on the left side of the document), meaning that it was a revision made on April 28, 2017, to an earlier version (that had been submitted on January 17, 2017, see EX1021). Thus, under arXiv.org's standard practice, the version of Maninis submitted on April 28, 2017, would not have been changed after its announcement (on or about April 30, 2017). I have reviewed metadata contained in a copy of Maninis downloaded from the download link (https://arxiv.org/pdf/1701.04658), and this metadata indicates that the document was created and last modified on April 30, 2017. This is consistent with Maninis being placed in final form by arXiv.org as of an announcement date of April 30, 2017, with the version of Maninis that was published at that time being the same as the document provided as EX1007. This is also consistent with my experience with arXiv.org regular practice from early 2017 until today.
>
> The public availability of Maninis to interested persons prior to July 21, 2017, is also corroborated by archived webpages of both arXiv.org and the authors of Maninis. As of May 3, 2017, the university website featuring the author's Convolutional Oriented Boundaries software included a link (to https://arxiv.org/abs/1701.04658) for downloading a PDF copy of Maninis from arXiv.org. EX1024 (archived May 3, 2017). Additionally, as of July 8, 2017, the arXiv.org author search webpage for Prof. Luc Van Gool, the last author listed on Maninis, listed Maninis as one of his recent papers that was available on arXiv.org,

> providing links to both the abstract page (https://arxiv.org/abs/1701.04658) and a link to directly download Maninis (https://arxiv.org/pdf/1701.04658). EX1025 (archived July 8, 2017). Thus, Maninis was disseminated to interested persons in the scientific community prior to July 21, 2017. Accordingly, I understand that Maninis may be considered in evaluating the patentability of the claims of the '409 patent.

*Id.* ¶¶ 65–67.

Petitioner also produces an additional declaration by Dr. Foroosh attesting that he had "reviewed metadata contained in a copy of Maninis downloaded from the download link (https://arxiv.org/pdf/1701.04658)" that "indicates that the document was created and last modified on April 30, 2017." Ex. 1029 ¶ 3, Ex. 1002 ¶ 66. Further, Dr. Foroosh indicates that he had downloaded a copy of the Maninis PDF file (Ex. 1007) from the link reproduced above. *Id.*

Furthermore, Petitioner produces archived copies of the arXiv.org website from 2016 and 2017 reflecting the "policy" of arXiv.org to endeavor to publish articles shortly after submission. Ex. 1022; Ex. 1023; Ex. 1026.[7] Additionally, Petitioner produced a Declaration from Mr. Frank-White, the Records Request Processor at the Internet Archive, explaining the functioning of the Internet Archive's Wayback Machine and further explaining how each archived web page's URL reflects its archiving date. Ex. 1031.[8]

---

[7] We determine in the "Motion to Exclude" analysis section *infra* that these Exhibits were timely submitted, that they are authenticated, and that they are not inadmissible hearsay.

[8] We likewise determine in the "Motion to Exclude" analysis section *infra* that Exhibit 1031 was timely submitted as reply evidence, that Petitioner has

On this record, we do not agree with Patent Owner that Petitioner has provided no evidence that the arXiv.org's policies were applied to Maninis or that the arXiv.org website was operating properly. PO Sur-Reply 6–7. As noted above, "[a] reference will be considered publicly accessible if it was disseminated or otherwise made available to the extent that persons interested and ordinarily skilled in the subject matter or art exercising reasonable diligence can locate it." *Medtronic*, 891 F.3d at 1380 (internal quotation marks and omissions omitted). In light of the foregoing Declarations and supporting Exhibits filed by Petitioner, we find that, given the ordinary course of business of arXiv.org, a person who exercises reasonable diligence would have been apprised of the availability of the Maninis reference at least before July 17, 2017, which is the earliest effective filing date of the '409 patent.

Accordingly, based on the weight of the evidence on the record before us, we determine that Maninis qualifies as prior art to support Petitioner's proposed challenge of the '409 patent.

*F. Asserted Obviousness Based on Salah, Carrier, and Maninis*

Petitioner argues that claims 1–15 are rendered obvious based on the combined teachings of Salah, Carrier, and Maninis. Pet. 18–70. Patent Owner opposes. PO Resp. 37–67. Upon consideration of Petitioner's explanations and supporting evidence on the record before us, we are persuaded that Petitioner has demonstrated by a preponderance of the

---

established proper foundation for paragraphs 62 through 67 of Exhibit 1002, and that they constitute proper opinion testimony by Dr. Foroosh.

evidence that the challenged claims would have been obvious over the combination of Salah, Carrier, and Maninis. Our analysis below focuses on the disputed claim elements.

*1. The Preamble*

Independent claim 1 recites "[a] method for acquiring an image of a dental arch of a patient, said method comprising the following steps." Ex. 1001, 32:13–14.

Petitioner argues that, to the extent the preamble is limiting, Salah teaches these limitations. Pet. 24–25 (citing Ex. 1008, code (57), 12:20–24) (asserting "Salah teaches acquiring images of patients' dental arches"). Further, Petitioner argues that Carrier likewise teaches these limitations. *Id.* (citing Ex. 1005 ¶ 9; Ex. 1006 ¶ 7) (asserting that Carrier "teaches methods of obtaining images of patients' teeth 'for therapeutic use.'"). According to Petitioner, "both references teach using a mobile device that guides users to acquire dental images." *Id.* (citing Ex. 1008, 27:21–28:2, Figs. 5A–D; Ex. 1006 ¶¶ 59, 96, Figs. 2A–3B, 5C–7C; Ex. 1005 ¶¶ 104, 173, Figs. 2A–3B, 5C–7C; Ex. 1002 ¶¶ 89–93).

Patent Owner does not specifically respond to these arguments. *See generally* PO Resp. Nonetheless, the burden of persuasion remains on Petitioner to demonstrate unpatentability. *See Dynamic Drinkware, LLC*, 800 F.3d at 1378.

Without determining whether the preamble is limiting, we have reviewed Petitioner's unrebutted arguments and the underlying evidence, and we find that Petitioner has shown by a preponderance of the evidence

that combination of Salah and Carrier (and, thus, the combination of Salah with Carrier and Maninis) teaches the subject matter of the preamble.

*2. Step 1a') activation of an image acquisition apparatus*

Independent claim 1 further recites "activation of an image acquisition apparatus so as to acquire an image, called 'analysis image', of said arch." Ex. 1001, 32:15–16.

Petitioner argues that Salah teaches these limitations. Pet. 25 (citing Ex. 1008, 27:11–13, 31:4–7; Ex. 1002 ¶ 94) (asserting "Salah teaches that a user . . . may acquire dentition images using . . . a cellphone . . . that includes a viewfinder or screen to aid in alignment" "to acquire images displayed on a viewfinder or screen when aligning the apparatus constitutes the recited 'activation' to acquire an 'analysis image'"). Further, Petitioner argues that Carrier likewise teaches these limitations. *Id.* at 25–27 (citing Ex. 1002 ¶¶ 95–97; Ex. 1005 ¶¶ 8, 104, 107, 108, 171, Figures 3A–B, Figure 7B; Ex. 1006 ¶¶ 7, 59, 62, 63, 94, Figs. 3A–B, Figure 7B) (asserting that Carrier teaches a mobile device (e.g., a smart phone) for acquiring images of a patient's teeth when they are aligned with an outline of teeth in an overlay displayed on the screen of the mobile device). According to Petitioner, both Salah and Carrier teach a mobile phone to acquire an image of a dental arch displayed on the screen during alignment. *Id.* at 27 (citing Ex. 1002 ¶ 98).

Patent Owner does not specifically respond to these arguments. *See generally* PO Resp.

We have reviewed Petitioner's unrebutted arguments and the underlying evidence, and we find that Petitioner has shown by a preponderance of the evidence that the combination of Salah and Carrier

(and, thus, the combination of Salah with Carrier and Maninis) teaches the limitations in step 1a'.

*3. Step 1b') analysis of the analysis image*

Independent claim 1 further recites "analysis of the analysis image by means of a deep learning device trained by means of a learning base." Ex. 1001, 32:17–18.

Petitioner argues that the combination of Salah, Carrier and Maninis teaches these limitations. Pet. 27–31. In particular, Petitioner argues that Salah's disclosure of an acquisition apparatus that includes a verification means to guide a user (1) in positioning the camera to acquire an image of a patient's dental arch, (2) in determining whether the image is acceptable, and (3) in subsequently employing deep learning to analyze the captured image to detect the contour of teeth teaches "the analysis of the image." *Id.* at 27–28 (citing Ex. 1002 ¶¶ 99–101; Ex. 1008, 27:21–28:2, 34:5–36:14, Figs 6b). Further, Petitioner argues that Carrier's disclosure of using contour/object detection to assess image alignment and to guide users to acquire an image of a patient's dental arch such that all teeth are visible to detect the positions of tooth edges relative to an overlay teaches analyzing an acquired image. *Id.* at 28 (citing Ex. 1002 ¶¶ 102, 103; Ex. 1005 ¶¶ 108, 128; Ex. 1006 ¶¶ 63, 81).

Furthermore, Petitioner argues that, "[a]lthough Carrier does not expressly disclose that its image analysis techniques employ 'a deep learning device trained by means of a learning base,' Carrier invites the use of 'any appropriate technique[s] (e.g., edge detection image processing, etc.),' and Salah expressly identifies *deep learning* as an option for detecting tooth

contours." *Id.* at 28–29 (citing Ex. 1002 ¶ 104; Ex. 1005 ¶ 108; Ex. 1006 ¶ 63; Ex. 1008, 34:5–36:14).

Additionally, Petitioner proposes to modify Salah-Carrier's system to use Maninis's deep learning techniques for detecting contours/edges to perform image analysis, a process referred as "Convolutional Oriented Boundaries (COB)." *Id.* at 29 (citing Ex. 1002 ¶ 105; Ex. 1007, Abstr., 3–5, Figures 3–5). According to Petitioner, Maninis's disclosure of using a deep learning architecture to perform image analysis would enable both "detection of tooth edges and recognition of individual teeth as taught by Carrier." *Id.* at 30 (citing Ex. 1002 ¶ 106). Petitioner then asserts, "[t]hus, Salah, Carrier, and Maninis teach 'analysis of the analysis image' (to determine values for tooth presence and edges, as taught by Carrier) 'by means of a deep learning device trained by means of a learning base' (a device comprising a deep learning neural network trained with a learning base, as taught by Salah and Maninis)." *Id.* at 31 (citing Ex. 1002 ¶ 109).

Patent Owner disagrees that the proposed combination of Salah, Carrier and Maninis teaches limitation 1b'. PO Resp. 37–59. We address Patent Owner's arguments *seriatim* as they are presented in Patent Owner's Response.

*4. Carrier's Alignment Techniques Are Unsuitable for Salah's Image Acquisition Process/Device that use Registration Marks*

Patent Owner argues that the proposed combination of Salah, Carrier, and Maninis is fatally flawed because Salah, as acknowledged by Petitioner, does not disclose using a deep learning device to determine image attribute values to guide the image acquisition. PO Resp. 37 (citing Ex. 1002 ¶¶ 47, 77–82; Ex. 2028 ¶¶ 161–162). Further, Patent Owner argues that

Petitioner's reliance upon Carrier's alignment techniques falls short of remedying Salah's deficiencies. *Id.* In particular, Patent Owner submits that Carrier's first technique of using an on-screen overlay that assesses alignment by checking whether identified contours of the patient's teeth are within a threshold distance of the overlay ("overlay technique") misses the mark. *Id.* Likewise, Patent Owner asserts that Carrier's second technique of using an image recognition algorithm to identify which teeth by number are present in an image ("tooth counting technique"), thereby ensuring all required teeth are visible, is similarly deficient. *Id.* at 37–38.

Furthermore, Patent Owner argues that, although Petitioner asserts that Carrier's alignment techniques would help to guide users of Salah's image acquisition device by providing them with feedback as they are acquiring the image, Petitioner has not identified any deficiency in Salah's existing technique that Carrier's techniques might provide. *Id.* at 45 (citing Ex. 1002 ¶¶ 81–82; Ex. 2028 ¶¶ 173–181). Patent Owner also argues that Carrier's techniques would be detrimental to Salah's disclosure of adding "registration marks" (with known size, orientation, and optical character) to retractors to automatically align a mobile phone in relation to a patient's teeth to meet "target acquisition conditions" to provide real time guidance to users of the mobile device during the acquisition of dental images. *Id.* at 46 (citing Ex. 2028 ¶¶ 78, 79, 95, 178; Ex. 1008, 29:18–23). According to Patent Owner, because Salah's registration marks are not amenable to teeth variability or movability, which occurs over time during treatment of a patient, Salah discourages alignment techniques such as those disclosed by Carrier. *Id.* at 47 (citing Ex. 2028 ¶¶ 179–181). Therefore, Patent Owner submits that a POSITA would have recognized that Carrier's alignment

techniques are computationally more challenging than Salah's standardized geometric mark or symbol. *Id.* (citing Ex. 2028 ¶179; Ex. 1008, 12:6–16, 28:27–29:2). Accordingly, Patent Owner asserts that, "when evaluating [Petitioner's] alleged motivation, [we] should consider the negative impacts that such a modification would have on Salah's methods of monitoring the positioning, shape, and/or appearance of a patient's teeth." *Id.* at 47 n.5 (citing *Intelligent Bio-Sys., Inc. v. Illumina Cambridge Ltd.*, 821 F.3d 1359, 1368 (Fed. Cir. 2016)). Additionally, Patent Owner asserts that, to the extent Petitioner proposes that Salah's and Carrier's alignment techniques would be deployed together, in parallel, such a combination would be nonsensical as it would result in two competing alignments techniques that would confuse the user, waste resources, and provide no operational advantages. *Id.* at 48 (citing Ex. 2028 ¶ 181; Ex. 2030 ¶ 95; Ex. 1008, 10:22–26, 54:12–15, 31:23–25; Ex. 1006 ¶¶ 19, 63, 88–89; Ex. 1005 ¶¶ 20, 108, 165–166).

Based on the fully developed trial record, we do not agree with Patent Owner's arguments as they are premised on a mischaracterization of Petitioner's proposed combination. As set forth above, in its contentions for the limitations in step 1b', Petitioner relies on Salah for its teaching of using an image acquisition apparatus including a verification means to guide a user in positioning, capturing an image of a patient's dental arch, and subsequently using deep learning to analyze the captured image to detect edges and contours therein. Pet. 27–28. Petitioner then proposes modifying Salah's system with Carrier's teaching of using contour/object detection to assess image alignment and to guide users to acquire an image of a patient's

dental arch such that all teeth are visible to detect the positions of tooth edges relative to an overlay. *Id.* at 28.

Although Carrier's alignment techniques provide the benefit of effectively assessing alignment based on the appearance of the patient's teeth to thereby ensure high quality dentition images, Petitioner does not propose a bodily incorporation of Carrier system into Salah's image acquisition system. "The test for obviousness is not whether the features of a secondary reference may be bodily incorporated into the structure of the primary reference . . . . Rather, the test is what the combined teachings of the references would have suggested to those of ordinary skill in the art." *In re Keller*, 642 F.2d 413, 425 (CCPA 1981). "The obviousness analysis cannot be confined by the formalistic conception of the words teaching, suggestion, and motivation, or by overemphasis on the importance of . . . the explicit content of issued patents." *KSR*, 550 U.S. at 402. In this case, Petitioner relies upon Salah's and Carrier's complimentary teachings of acquisition devices that guide the user in real-time to capture high quality dental images. Pet. Reply 11 (citing Ex. 1002 ¶¶ 81, 84–86). Thus, while Salah also discloses another acquisition device that uses registration marks in an overlay to align the captured picture, Petitioner does not propose using Carrier's alignment techniques in Salah's acquisition device that uses registration marks. Rather, the proposed combination seeks to incorporate Carrier's teaching of providing real-time guidance to users of Salah's image acquisition system. Accordingly, we find unavailing Patent Owner's argument regarding Salah's use of registration marks being incompatible with Carrier's alignment techniques, which mischaracterizes Petitioner's proposed combination. *See* PO Resp. 46–47; PO Sur-Reply 13–15.

### *5. Maninis's COB network Cannot Be Trained to Perform the Claimed Image Analysis*

Patent Owner argues that Petitioner improperly relies upon an incompatible deep learning device (e.g., a COB neural network) disclosed by Maninis to remedy the admitted deficiencies of Salah and Carrier.[9] PO Resp. 38–39 (citing Ex. 1002 ¶¶ 83–87; Ex. 2028 ¶¶ 168–171). According to Patent Owner, because Maninis's COB neural network can be trained only on contours to identify an image only in contours, it is incapable of being trained on a learning base containing historical images with semantic contours of individually labelled teeth to perform the claimed image analysis, as proposed by Petitioner. *Id.* at 39–41. Further, Patent Owner argues that, to the extent that Petitioner is now proposing using other neural networks disclosed in Maninis in addition to the COB neural network to perform the claimed image analysis, such an approach is not suggested in the Petition, which does not offer any evidence regarding motivations or expectations of success for such a combination. *Id.* at 42. Simply put, Patent Owner argues that Maninis's COB neural network for detecting generic contours cannot perform any semantic determination to identify image value attributes. *Id.*

---

[9] Patent Owner alleges that Petitioner's new reliance on different neural networks from Maninis to satisfy this limitation constitutes an improper new ground. PO Sur-Reply 12; *see also* Paper 27 (Patent Owner's Listing of New Arguments in Petitioner's Reply). We disagree. As set forth by Petitioner in the Reply, the Petition cited to and discussed that Maninis uses neural networks not only to detect contours, but also uses the regions identified by those contours to classify objects. Reply 8 (citing Pet. 11, 22, 23, 33–34 (citing Ex. 1007, 11–12); Ex. 1002 ¶¶ 68, 83, 85, 116–117).

Based on the fully developed trial record, we do not agree with Patent Owner's arguments for the following reasons.

*a. Scope of Limitations in Step 1b′*

As an initial matter, we note that the claim recites in step 1a') "an image acquisition apparatus" and in step 1b') "a deep learning device trained by . . . a learning base" for analyzing an image captured by the image acquisition apparatus ("analysis image"). Ex. 1001, 32:15–18. Although Patent Owner argues that the image acquisition apparatus is a mobile device, Patent Owner has not accounted for the nature of the "deep learning device" aside from indicating that the latter device pertains to a neural network trained by the learning base for assessing the analysis image. PO Resp. 10–13; Ex. 1001, 3:13–17, 18:56–59, 23:7–10. The record before us, however, is devoid of any evidence to substantiate any inference from Patent Owner that the claimed "deep learning device" is somehow integrated in the mobile device. *See, e.g.*, PO Resp. 33–34 (arguing that "a [person of ordinary skill in the art] would have recognized that the Maninis COB neural network was too computationally expensive and resource draining to run on even the most optimized mobile devices"). Further, while the Specification of the '409 patent indicates that the learning base comprises more than 100,000 historical images of patients' dental arches annotated with information to train the deep learning device in analyzing the analysis image, the claim is not so limiting. *See* Ex. 1001, 15:65–16:3. Because the claim does not require a particular type of neural network that is trained by a particular learning base in a particular way, Patent Owner's arguments to that effect (*see* PO Resp. 42) are not commensurate with the scope of the claim. *In re*

*Hinicker*, 150 F. 3d 1362, 1369 (Fed. Cr. 1998). It suffices that Petitioner need only show a deep learning device capable of being trained by a learning base to analyze a captured image to properly account for step 1b'.

*b. Incompatibility/Inoperability Arguments*

Regarding the proposed combination of Salah and Carrier with Maninis, we note Petitioner's clarification that the Petition does not use the phrase "Maninis COB neural network," which was introduced in Patent Owner's Response by Dr. Mongan, and excludes Maninis's disclosure of coupling COB with different neural networks or pipelines that are not COB. Pet. Reply 7 (citing Ex. 1037, 103:14–104:19, 107:2–17; Ex. 1038 ¶¶ 23–25). Petitioner emphasizes that such a mischaracterization of the Maninis reference distorts the proposed combination as it excludes key teachings relied upon in the Petition. *Id.* at 8. According to Petitioner, the proposed combination relies primarily on Maninis for its teaching of deep learning architecture trained by a learning base to detect and identify contours, which are used to classify objects (e.g., teeth captured by the Salah-Carrier's acquisition device). *Id.* at 8–9 (citing Pet. 11, 22, 23, 33, 34; Ex. 1007, 11–12; Ex. 1002 ¶¶ 68, 83, 85, 116–118; Ex. 1048 ¶¶ 25–28).

With this clarification from Petitioner in mind, we do not agree with Patent Owner's argument that, because Maninis's deep learning architecture is only trained to identify contours, which are used to classify objects, the disclosed deep learning device is incapable of being trained to perform the claimed image analysis. PO Resp. 39–42. As noted above, because the claim does not identify a particular type of deep learning device, it suffices that the deep learning architecture disclosed by Maninis is capable of

performing the claimed image analysis. The '409 patent provides a non-exhaustive list of deep learning devices trained with a learning base from which a suitable neural network may be chosen to include "networks specializing in the classification of images, called 'CNN.'" Ex. 1001, 16:13–19. Indeed, this is the same deep learning architecture taught by Maninis and relied on by Petitioner in its claim mapping for the limitations in step 1b'. *See* Pet. 30 (arguing that "Maninis's use of a computing device comprising a trained deep-learning [CNN] to analyze images matches the '409 patent's preferred embodiment").

More specifically, Petitioner avers, and we agree, that Salah discloses that the deep learning device can be used to perform image analysis and that employing deep learning to analyze the captured image to detect the contour of teeth teaches "the analysis of the image." Pet. 27–28. Petitioner further argues, and we agree, that Carrier invites the use of 'any appropriate technique[s] (e.g., edge detection image processing, etc.),' and Salah expressly identifies *deep learning* as an option for detecting tooth contours." *Id.* at 28–29 (emphasis added). Additionally, Petitioner argues, and we agree, that Maninis discloses a deep learning architecture of the type cited in the '409 patent for performing image analysis. *Id.* at 29–30.

To the extent Patent Owner argues that Petitioner exclusively relies on Maninis's COB neural network to teach the claimed "a deep learning device trained by means of a learning base," we disagree. *See* PO Resp. 39–42; PO Sur-Reply 8–11. In its claim mapping of step 1b', Petitioner relies on Mannis's COB together with different CNNs, which are not themselves a COB, to perform object and contour detection. *See* Pet. 29–30; Pet. Reply 7–8; *see also* Pet. 11, 22, 23, 33–34. Stated differently, at no point does

Petitioner exclusively rely on Maninis's COB neural network to teach step 1b' and any arguments from Patent Owner premised on this assertion are not responsive to Petitioner's contentions.

After considering the entire record before us, we find that Petitioner has shown by a preponderance of the evidence that the proposed combination of Salah, Carrier and Maninis teaches the limitation in step 1b'.

*6. The Proposed Combination is a Product of Impermissible Hindsight*

Patent Owner argues that the proposed combination of Salah, Carrier, and Maninis is deficient because, absent impermissible hindsight, a POSITA would not have been motivated to combine Salah and/or Carrier with the specific neural network of Maninis, as per Dr. Foroosh's own testimony. PO Resp. 43–45 (citing Ex. 2048, 44:18–22, 62:3–16, 67:18–25, 109:2–19). Patent Owner asserts that Petitioner does not identify any problem or shortcoming in Salah's and Carrier's image acquisition methods that a POSITA would have been able to address by relying on Maninis's COB network. *Id.* at 49 (citing Ex. 2028 ¶¶ 182–184). Patent Owner further asserts that, even if "the Maninis COB neural network could function as proposed, . . . the combination would not be fit-for-purpose and is fraught with disadvantages that would overwhelm any conceivable benefit." *Id.* According to Patent Owner, while Salah discloses using deep learning in the context of analyzing post image acquisition to update a 3D module, Maninis's deep learning is intended to determine image contours as opposed to guiding image acquisition. *Id.* at 50. Patent Owner contends that Salah, in fact, teaches away from using tooth contours to measure teeth in the context of bringing the acquisition apparatus into the matching position. *Id.*

(Ex. 1008, 31:12–13, 31:26–27; Ex. 2028 ¶¶ 186–87). Although Petitioner proposes that a POSITA would have good reasons (besides speeding image classification) to employ Maninis COB neural network for object detection, Patent Owner argues that Petitioner has not identified any such good reasons to combine Maninis with Salah and Carrier. *Id.* at 50–51 (citing Ex. 1002 ¶ 85). Regardless of any speculative benefits (contour accuracy, accuracy of alignment) that could potentially ensue from the proposed combination, Patent Owner argues that a POSITA would have recognized that any such potential benefits would be wiped out by the loss of Salah's existing "registration mark" technique and the significant costs, delay, and incompatibility. *Id.* at 51 (citing Ex. 2028 ¶¶ 188–190).

Based on the complete trial record before us, we do not agree with Patent Owner's arguments. As discussed above, the proposed combination seeks to combine Carrier's teaching of providing real-time guidance with Salah's acquisition system to forward an image of a dental arch being captured to Maninis's deep learning system for performing the requisite image analysis. The record before us supports that Carrier's provisioning of real time guidance to users of Salah's acquisition device as the image of the dental arch is being captured would enhance the alignment of each tooth in the dental arch, thereby enhancing the quality of the dental arch image, as taught by Carrier. *See* Ex. 1005 ¶¶ 7, 63. Further, the record before us supports that, because Maninis's image analysis tool classifies images in as little as 60 ms, it would help the Salah-Carrier mobile device to contemporaneously identify each aligned tooth in the dental arch image being captured. Pet. Reply 15–17 (citing Ex. 1048 ¶¶ 40–42, 47). As correctly noted by Petitioner, "it is well-known that trained networks could

be made substantially more efficient and less processor-intensive." *Id.* at 16 (citing Ex. 2028 ¶ 43).

We therefore disagree with Patent Owner's assertion of hindsight. Accordingly, we find that Maninis's disclosure of a deep learning architecture for performing image analysis, taken in combination with Carrier's real-time guidance for a user of Salah's image acquisition device, is no more than a simple arrangement of known elements with each performing the same function it had been known to perform, yielding no more than what one would expect from such an arrangement. *See KSR*, 550 U.S. at 416. Therefore, the POSITA, being "a person of ordinary creativity, not an automaton," would have been able to fit the teachings of these cited references together like pieces of a puzzle to predictably yield a portable device that works in conjunction with a deep learning device to perform real-time image analysis of the dental arch being captured, thereby ensuring that the captured image is of high quality. *Id.* at 420–21. Because the proposed combination would not have been "uniquely challenging or difficult for one of ordinary skill in the art," we agree with Petitioner that the proposed modification would have been within the purview of the POSITA. Pet. Reply 16; *see Leapfrog Enters., Inc. v. Fisher-Price, Inc.*, 485 F.3d 1157, 1162 (Fed. Cir. 2007) (citing *KSR*, 550 U.S. at 418).

*7. Maninis's Deep Learning Architecture is Unsuitable for Real-Time Guidance in Salah/Carrier's Mobile Devices*

Patent Owner argues that, although claim 1 of the '409 patent does not require that the recited analysis be performed in *real-time* on the mobile device, Petitioner's entire case of obviousness rests on the notion that a POSITA would have been motivated to employ Maninis's neural network to

improve real time guidance during image acquisition in Salah's and Carrier's image acquisition device (e.g., mobile phone). PO Resp. 52 (citing Ex. 1002 ¶ 86; Ex. 2048, 56:10–15, 68:25–69:8). Accordingly, Patent Owner asserts that we must consider whether a POSITA would have had the motivation advanced by Petitioner to incorporate Maninis's deep learning architecture into the real time mobile devices of Salah and Carrier during image acquisition, even if the shortcomings in Petitioner's obviousness combination do not relate to the language of all challenged claims. *Id.* at 52–53. Likewise, Patent Owner asserts that, because both the mobile devices in Carrier and Salah include software that runs on processors to provide the real-time guidance during image acquisition, Petitioner's reliance on Maninis's computationally intensive COB neural network for use in a GPU is misplaced. *Id.* at 53 (citing Ex. 1002 ¶¶ 227–230; Ex. 2028 ¶¶ 131, 146, 191–194; Ex. 2030 ¶¶ 23, 45). Accordingly, Patent Owner asserts that it would take far longer to run the software on the portable device than on Maninis's graphics processing unit ("GPU") and that a POSITA

> practicing Salah and/or Carrier would have known they need only achieve approximate alignment and thus, would not have been motivated to employ Maninis's COB technique when it would have precluded real time feedback to guide the user on their mobile phone, effectively rendering those alignment techniques unusable.

*Id.* at 54 (citing Ex. 2028 ¶¶ 195–196; *In re ICON Health & Fitness*, 496 F.3d 1374, 1382 (Fed. Cir. 2007); *In re Gordon*, 733 F.2d 900, 902 (Fed. Cir. 1984)).

Based on the complete trial record before us, we do not agree with Patent Owner's arguments. As noted above, the limitation in step 1b' does not require that the image acquisition device and the deep learning device be

integrated in a single portable device. As acknowledged by Patent Owner, both Salah and Carrier discuss the importance of including software that runs on processors to provide the real-time guidance during image acquisition. PO Resp. 53. It is likewise undisputed that Maninis relates to performing image analysis using neural networks trained by a learning base, as discussed above. We thus agree with Petitioner that because the POSITA is not an automaton, the POSITA would have been apprised of routine optimization techniques that can be adapted to combine Maninis's neural networks to work in real time with Salah-Carrier's acquisition device. Pet. Reply 16–17 (citing Ex. 1048 ¶¶ 43, 44). *See Leapfrog Enters., Inc.* 485 F.3d at 1162.

*8. Whether the Proposed Implementation of Maninis's Deep Learning Architecture in Salah and Carrier Would be Costly*

Patent Owner argues that implementing Maninis's neural network in Salah's and Carrier's mobile acquisition device would necessitate a significant amount of time and expense, which would weigh heavily against any motivation offered by Petitioner. PO Resp. 55. In particular, Patent Owner argues that, as purportedly admitted by Dr. Foroosh, implementing Maninis's neural network would require training it on more than 10,000 images of patient's teeth captured with Salah's and Carrier's mobile phone. *Id.* Patent Owner then argues that, because Dr. Foroosh has not presented any evidence that such images existed as of July 2017, Salah and Carrier would have to gather such images alone to subsequently train the Maninis neural network over time. *Id.* (citing Ex. 1002 ¶167; Ex. 2048, 103:23–106:5, 109:3–19, 222:7–12; Ex. 2028 ¶¶145–147, 197; Ex. 2030 ¶¶ 46, 47; Ex. 2032; Ex. 2039; Ex. 2041). According to Patent Owner, such an

implementation would be cumbersome as it would be exorbitantly expensive, complex, and time consuming to implement. *Id.* at 55–57.

Further, Patent Owner argues that a POSITA would not have been motivated to identify individual teeth to guide image acquisition in either Carrier or Salah. *Id.* at 57. Patent Owner asserts that, because Carrier's overlay technique includes an outline of teeth in a predetermined view that provides a high-quality dental photograph including information about all required visible teeth, there would not be a need to account for each tooth individually. *Id.* at 57–58 (citing Ex. 1006 ¶ 60; Ex. 1005 ¶ 105; Ex. 2028, ¶¶ 208–211; Ex. 2030 ¶¶ 79–82). Notably, Patent Owner argues that Dr. Foroosh's tooth counting method is flawed as various patients have different numbers of teeth due to tooth loss in previously sustained injuries, illnesses, extraction, etc. *Id.* Accordingly, Patent Owner argues that Petitioner's hindsight driven efforts to use Carrier to justify determining semantic contours associated with individual tooth should be rejected. *Id.* at 58–59.

Based on the complete trial record before us, we do not agree with Patent Owner's arguments. As noted above, because the limitation in step 1b' does not require a particular deep learning network to be trained in a particular way, Maninis's deep learning architecture describes the claimed deep learning device. Therefore, we agree with Petitioner that a POSITA would readily appreciate that the typical training for such widely used neural networks would not be as exorbitant as postulated by Patent Owner. Pet. Reply 19–20. We likewise agree with Petitioner that Patent Owner's assessment of the training costs are exaggerated, and would not deter the POSITA from the proposed implementation in the Salah-Carrier's real time acquisition device. *Id.* (citing Ex. 1048 ¶¶ 50–56, Ex. 2028 ¶ 149, Ex. 2030

¶ 49). Further, we agree with Petitioner that the POSITA would be motivated to use image recognition algorithms to ensure that all teeth are visible in the dental arch being captured as taught by Carrier. *Id.* at 20–22 (citing Ex. 1006 ¶¶ 80, 81; Ex. 1005 ¶¶ 126–128; Ex. 2030 ¶¶ 64, 78; Ex. 1035 ¶¶ 36–38; Ex. 1038, 58:8–61:2; Ex. 1048 ¶¶ 57–64). As correctly noted by Petitioner, because the overlay described by Carrier is patient specific and derived from the patient's teeth, it would be able to account for the current condition of the patient's teeth (e.g., movement or missing teeth). *Id.* at 22 (citing Ex. 1006 ¶¶ 60, 66; Ex. 1005 ¶¶ 105, 107; Ex. 1048 ¶ 65; Ex. 1035 ¶ 40).

*9. Rationale to Combine with Reasonable Expectation of Success*

Based on the fully developed record, we are persuaded that Petitioner has presented a sufficient rationale to combine the teachings of Salah, Carrier, and Maninis with a reasonable expectation of success. *See* Pet. 18–24. Petitioner contends that Salah and Carrier are in the same field of endeavor of the '409 patent, in that they disclose similar techniques of using deep learning for dental imaging (e.g., assessing alignment, using the assessment to guide users, obtaining dentition images with the user's mobile phones), with Carrier providing specific details to effectively assess alignment based on the appearance of the patient's teeth to capture high-quality dentition images. *Id.* at 21. Further, Petitioner submits the following:

> The resulting combination would use each reference's teachings to perform substantially the same function as they provide alone, with Carrier's techniques for assessing alignment used to determine the feedback to users when guiding them to acquire dental images as taught by Salah. [POSITAs] would thus have had a reasonable expectation of

> success, as the combination would be one of complementary techniques, applied in understood ways, to produce a predictable outcome.

*Id.* (citing Ex. 1002 ¶ 82).

Furthermore, Petitioner contends that, although Maninis is not restricted to dental imaging it describes broadly applicable techniques (e.g., deep learning) for image classification and contour detection, which would have complemented the contour/edge detection discussed in Salah and Carrier. *Id.* at 22 (citing Ex. 1002 ¶ 84). Thus, Salah, Carrier, and Maninis are at least reasonably pertinent to the particular problem with which the invention is involved (e.g., the contour/edge detection problem in object imaging). *Id.* (citing Ex. 1005 ¶¶ 108, 128; Ex. 1006 ¶¶ 63, 81; Ex. 1008, 34:5–36:14). More particularly, Petitioner asserts:

> Maninis motivates employing deep learning techniques for object and contour detection. Maninis teaches that the "latest wave of contour detectors takes advantage of deep learning to obtain state-of-the-art results." EX1007, 2. Maninis provides a flexible, "modular" technique and "can incorporate and benefit from future improvements in the base CNN." *Id.* Maninis also achieves improvements relative to "recent approaches to contour detection using deep learning." EX1007, 3, 9 ("Overall, comparing to previous state-of-the-art, we get a significant improvement at a fraction of the computation time (24.37 to 0.79 seconds)."), 11-12 (improved object identification); EX1002, ¶85.
>
> Based on Maninis's flexibility and prospect to improve performance, a [POSITA] would have been motivated to analyze images using a deep learning device as taught by Maninis to improve an image acquisition apparatus as taught by Salah and Carrier. For example, a [POSITA] would have been motivated to adapt Salah and Carrier's image acquisition device to employ a deep learning architecture as taught by Maninis,

> trained on images relevant to Salah's and Carrier's dental imaging applications. Maninis's deep learning architecture would provide specific functionalities required by Salah and Carrier, including the ability to identify objects (such as the required teeth Carrier proposes using image recognition software to identify) and to detect contours (such as the tooth edges Carrier uses to assess alignments), to aid in guiding image acquisition, as taught by Salah.

*Id.* at 23–24 (citing Ex.1002 ¶ 86).

Further, we are not persuaded by Patent Owner's argument that Petitioner's proposed reasons to combine the teachings of Salah, Carrier, and Maninis are insufficient, thereby rendering the proposed combination improper. Thus, because the proposed combination involves known elements performing their ordinary functions to produce a predictable result, Petitioner has sufficiently established by a preponderance of the evidence that a POSITA would have appreciated that the proposed combination teaches the limitations of step 1b'.[10] Pet. 27–31.

[10] It has been held that where the claimed subject matter involves more than the simple substitution of one known element for another or the mere application of a known technique to a piece of prior art ready for the improvement, a holding of obviousness *must* be based on "an apparent reason to combine the known elements in the fashion claimed." *KSR*, 550 U.S. at 417–18. That is, "there must be some articulated reasoning with some rational underpinning to support the legal conclusion of obviousness." *Id.* at 418 (quoting *In re Kahn*, 441 F.3d 977, 988 (Fed. Cir. 2006)). Such reasoning can be based on interrelated teachings of multiple patents, the effects of demands known to the design community or present in the marketplace, and the background knowledge possessed by a person having ordinary skill in the art. *Id.* at 417–18.

The U.S. Supreme Court has held "[t]he combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results." *KSR*, 550 at 416.

The Court further instructs that:

> Often, it will be necessary for a court to look to interrelated teachings of multiple patents; . . . and the background knowledge possessed by a person having ordinary skill in the art, all in order to determine whether there was an apparent reason to combine the known elements in the fashion claimed by the patent at issue.

*Id*. at 418.

However, the Court also instructs that "the analysis need not seek out precise teachings directed to the specific subject matter of the challenged claim, for a court can take account of the inferences and creative steps that a person of ordinary skill in the art would employ." *Id*. In addition, the Court instructs, "if a technique has been used to improve one device, and a person of ordinary skill in the art would recognize that it would improve similar devices in the same way, using the technique is obvious unless its actual application is beyond his or her skill." *Id*. at 417. "This is the so-called 'known-technique' rationale. And if there's a known technique to address a known problem using 'prior art elements according to their established functions,' then there is a motivation to combine." *Intel Corp. v. PACT XPP Schweiz AG*, 61 F.4th 1373, 1380 (Fed. Cir. 2023) (citing *Intel Corp. v. Qualcomm Inc.*, 21 F.4th 784, 799–800 (Fed. Cir. 2021)).

This precedent controls, and the application of the cited legal principles to the facts of this case provide us with the necessary guidance in the present proceeding. As discussed above, Petitioner demonstrates on the record before us that a POSITA would have been motivated to incorporate Maninis's teaching of using a deep learning architecture to identify

edges/contours in images into the Salah-Carrier image capturing process to enhance the overall quality of images of a patient's dental arch as they are being captured. Pet. Reply 14 (citing Ex. 1006, ¶¶ 5, 54-55, 63; Ex. 1005, ¶¶ 5, 99, 100, 108; Ex. 1002, ¶¶ 49, 112; Ex. 1008, 60:14–29).

After considering Patent Owner's arguments, we find by a preponderance of the evidence that Petitioner's rationale, which is supported by the testimony of Dr. Foroosh, is a sufficient demonstration of a motivation to combine the references with a reasonable expectation of success. *See KSR*, 550 U.S. at 417–18.

*10. Step 1c') determination of a value for an image attribute*

Independent claim 1 recites "determination, for the analysis image, as a function of the results of the analysis in the preceding step, of a value for an image attribute." Ex. 1001, 32:19–21.

Petitioner argues that the combination of Salah, Carrier, and Maninis teaches these limitations. Pet. 31–36. In particular, Petitioner argues that Salah teaches an acquisition apparatus capable of providing feedback regarding whether a captured image is acceptable and properly positioned. *Id.* at 31 (citing Ex. 1008, 27:21–28:2). According to Petitioner, while Salah does not expressly teach determining the value for an image attribute, a POSITA would have recognized such a step naturally flows from Salah's determination of whether the image is acceptable as it would merely require routine skill. *Id.* at 31–32 (citing Ex. 1002 ¶¶ 110–111).

Petitioner further argues that Carrier provides examples that illustrate such routine image analysis. *Id.* at 32–33 (citing Ex. 1002 ¶¶ 112–115; Ex. 1005 ¶¶ 108, 114, 128; Ex. 1006 ¶¶ 63, 68, 81) (asserting that Carrier

teaches analyzing an image to determine whether detected tooth edges are aligned with those in an overlay by assessing the distance therebetween, and alternatively, using image algorithms to ensure that all required teeth are visible). Petitioner asserts that a POSITA would have understood that Carrier's measured distance teaches the image attribute values because they indicate the presence or absence of required teeth in the image as a whole. *Id.* at 33 (citing Ex. 1002 ¶ 121).

Additionally, Petitioner argues that Maninis further complements the Salah-Carrier combination to teach this limitation. *Id.* at 33–36 (citing Ex. 1002 ¶¶ 117–120, 122; Ex. 1006, Fig. 6B; Ex. 1007, Abstr., 1–2, 5, 11–12; Ex. 1008, Fig. 4d, 54:23–26) (asserting that a POSITA would have been motivated to use Maninis's deep-learning based contour detection techniques to identify and classify objects, thereby enabling users of the Salah-Carrier system to identify individual teeth in the image being captured).

Patent Owner does not specifically respond to these arguments. *See generally* PO Resp.

We have reviewed Petitioner's unrebutted arguments and the underlying evidence, and we find that Petitioner has shown by a preponderance of the evidence that the combination of Salah, Carrier, and Maninis teaches the limitations in step 1c'.

*11. Step 1d') comparison of said image attribute value with a setpoint*

Independent claim 1 recites "comparison of said image attribute value with a setpoint." Ex. 1001, 32:22–23.

Petitioner argues that the combination of Salah, Carrier, and Maninis teaches these limitations. Pet. 36–37. In particular, Petitioner argues that Salah teaches an acquisition apparatus capable of assessing whether a captured image is acceptable and properly positioned. *Id.* at 36 (citing Ex. 1008, 27:21–28:2). According to Petitioner, while Salah does not expressly teach comparing an image attribute thereof to a setpoint, a POSITA would have recognized such a step as a "routine option" as exemplified by Carrier's teachings discussed above. *Id.* at 36–37 (citing Ex. 002 ¶¶ 123–127) (asserting that a "[POSITA] would naturally have applied Carrier's teaching by determining whether every required tooth was visible or not by comparing a value (the required teeth's visibility or non-visibility) to a setpoint (they must be visible)").

Patent Owner does not specifically respond to these arguments. *See generally* PO Resp.

We have reviewed Petitioner's unrebutted arguments and the underlying evidence, and we find that Petitioner has shown by a preponderance of the evidence that the combination of Salah, Carrier, and Maninis teaches the limitations in step 1d'.

*12. Step 1e') sending of an information message as a function of said comparison*

Independent claim 1 recites:

> sending of an information message as a function of said comparison, the information message being related to the quality of the image acquired or to the position of the acquisition apparatus in relation to said arch or to the setting of the acquisition apparatus or to the opening of the mouth or to the wearing of a dental appliance, or to a combination thereof, to check whether the analysis image respects the setpoint and, if

> it does not respect the setpoint, to guide the operator in order for him or her to acquire a new analysis image

Ex. 1001, 32:24–33.

Petitioner argues that the combination of Salah, Carrier, and Maninis teaches these limitations. Pet. 37–41. In particular, Petitioner argues that Salah teaches an acquisition apparatus capable of providing written and voice prompts to guide acquisition of an image, to assess the image, and to position the image, as well as to take another photo, as needed. *Id.* at 37–38 (citing Ex. 1008, 27:21–28:2; Ex. 1002 ¶¶ 128–29). Accordingly, Petitioner asserts that Salah teaches sending information messages. *Id.* at 38.

Petitioner further argues that Carrier likewise teaches these limitations. Pet. 38–41 (citing Ex. 1002 ¶¶ 130–139; Ex. 1005 ¶¶ 108, 112–116, 120; Ex. 1006 ¶¶ 63, 67–70) (asserting that Carrier teaches visual, audible and/or tactile indications when the image and the overlay are aligned). Petitioner asserts that a POSITA would been motivated to send messages to guide users in capturing an acceptable image of the patient's dental arch or otherwise to adjust or redo the photo. *Id.* at 40–41.

Patent Owner does not specifically respond to these arguments. *See generally* PO. Resp.

We have reviewed Petitioner's unrebutted arguments and the underlying evidence, and we find that Petitioner has shown by a preponderance of the evidence that the combination of Salah, Carrier, and Maninis teaches the limitations in step 1e'.

*Conclusion Regarding Independent Claim 1*

For the foregoing reasons, we find Petitioner has shown by a preponderance of the evidence that independent claim 1 is unpatentable under § 103 as obvious over the combination of Salah, Carrier, and Maninis.

*13. Dependent claim 7*

*7.1 Historical Images Having Attribute Values*

Claim 7 depends directly on claim 1, in which the step b') comprises: "[step] 1') creation of a learning base comprising more than 1000 images of dental arches, or 'historical images', each historical image comprising an attribute value for at least one image attribute, or 'image attribute value.'" Ex. 1001, 33:10–15.

Petitioner argues that the combination of Salah, Carrier, and Maninis teaches these limitations. Pet. 50–51. In particular, Petitioner argues that, because Maninis teaches pixel-wise annotations of all objects in each image of its training database, a POSITA would have been motivated to create a learning base of more than 1,000 historical images (including at least an image attribute) of dental arches to train a neural network. *Id.* at 51 (citing Ex. 1007, 5–6). Further, Petitioner argues that, in the context of Salah and Carrier, these images would be representative of acquired dental images such that each historical image would have a set of required teeth that are visible. *Id.* (citing Ex. 1002 ¶¶175–177; Ex. 1006 ¶ 81; Ex. 1005 ¶ 128).

Patent Owner argues that Petitioner incorrectly insinuates that training on "semantic contours" as taught by Maninis necessarily requires training on historical images labelled with tooth attribute values. PO Resp. 59. According to Patent Owner, because the neural networks in Maninis that

determine semantic contours are trained only on tooth attribute values (pixel-wise annotations), they are incapable of learning from any image attribute value (including the list of teeth present in the image). *Id.* (citing Ex. 2028 ¶¶ 219–232). Patent Owner asserts that, "although an image attribute value can be determined from the identified tooth attributes values *after* the image has been analyzed, in Dr. Foroosh's proposed combination, the historical images in the learning base *cannot* comprise those same image attribute values—as required by claim 7—only tooth attribute values." *Id.* Patent Owner further argues that the reference to "image attribute value" in claim 7 embodies a global analysis approach, whereas the discussion of tooth zones in claims 2 through 6 pertains to a detailed analysis approach. *Id.* at 60 (citing Ex. 2028 ¶ 219). While Patent Owner acquiesces that an "image attribute value" encompasses a "tooth attribute value," Patent Owner nonetheless seeks to distinguish historical images for the two. *Id.* at 59. In particular, Patent Owner takes the position that such an overlap exists between the two phrases only *after* the image has been analyzed. *Id.* Simply put, Patent Owner argues that, because Maninis's use of images labelled with semantic contours/boundaries to identify the tooth bounded by that contour, teeth identified within the boundaries are tooth attributes, not image attributes. *Id.* at 60–61.

As an initial matter, we note that the disputed claim limitation only requires that each historical image in the learning base include an "image attribute value" (i.e., a value for an attribute of the image). We further note that the claim does not recite a "tooth attribute value" (i.e., a value for an attribute of a tooth). Consequently, we find no basis in the claim for the purported distinction between the two phrases. In our view, an image (e.g.,

a dental arch) being captured includes a plurality of teeth, each individual tooth having one or more attribute values. That is, an "image attribute value" refers to a value for any attribute of the image, and a "tooth attribute value" refers to a value for any attribute (e.g., size, shape, number) of a tooth. *See, e.g.,* Ex. 1001, 26:16–26 (disclosing "an attribute value of the analysis image" may include "tooth attribute values"). Because each included tooth is a part of a dental arch being captured, an attribute of a tooth also constitutes an attribute of the image. *Id.* Although an image attribute can also encompass other characteristics (type, size) of the image as a whole, the claim is not so limiting. It suffices that the historical dental information be sufficient to train the deep learning device to recognize similar dental images. Therefore, we agree with Petitioner that Maninis's disclosure of using pixelwise annotations as historical images, taken in combination with the Salah-Carrier acquisition of dental arches to train the deep learning device to recognize a particular tooth, teaches using both the "tooth attribute values" as well as the "image attribute values" for such training. *See* Pet. 50–51; Pet. Reply 23–24.

After considering Patent Owner's arguments, we determine that Petitioner has shown by a preponderance of the evidence that the combination of Salah, Carrier, and Maninis teaches the limitations in step 7.1.

*7.2 Training the Deep Learning Device*

Claim 7 recites that step b') of claim 1 comprises "[step] 2') training of at least one deep learning device by means of the learning base." Ex. 1001, 33:16–17.

Petitioner argues that the combination of Salah, Carrier, and Maninis teaches these limitations for the same reasons it identifies above with respect to the limitations of claim 3, step 3(2). Pet. 51. That is, Petitioner argues that "Maninis's deep-learning-based neural network is trained using a training dataset, which is a 'learning base' in the context of the '409 patent." *Id.* at 45 (citing Ex. 1007, 3–4, 7–8; Ex. 1002 ¶¶ 153, 154). Petitioner further argues that, "[i]n the context of Salah and Carrier, a learning base containing annotated historical images of dental arches would be used to train a neural network like Maninis's." *Id.* (citing Ex. 1002 ¶ 155).

Patent Owner does not specifically respond to these arguments. *See generally* PO Resp.

We have reviewed Petitioner's unrebutted arguments and the underlying evidence, and we find that Petitioner has shown by a preponderance of the evidence that the combination of Salah, Carrier, and Maninis teaches the limitations in step 7.2.

*7.3 Submitting the Analysis Image to the Deep Learning Device*

Claim 7 recites that step b') of claim 1 comprises "[step] 3') submission of the analysis image to the deep learning device for it to determine, for said analysis image, at least one probability relating to said image attribute value." Ex. 1001, 33:18–21.

Petitioner argues that the combination of Salah, Carrier, and Maninis teaches these limitations. Pet. 52. In particular, Petitioner argues Maninis determines probabilities that it uses to detect boundaries between regions and enable identification of objects visible in those regions. *Id.* (citing Ex. 1007, 4–5, 11–12). According to Petitioner, the probabilities relate to the

image attributes as they help to determine whether all required teeth are visible or the distance between the teeth's edges and Carrier's overlay. *Id.* (citing Ex. 1002 ¶¶ 180–182).

Patent Owner argues that Maninis's probability values relate only to "tooth attribute values," and not "image attribute values." PO Resp. 61–64.

Patent Owner's arguments are not persuasive. As previously discussed above in section 7.1, this distinction between these two phrases is immaterial as the latter phrase encompasses the former.

After considering Patent Owner's arguments, we find Petitioner has shown by a preponderance of the evidence that the combination of Salah, Carrier, and Maninis teaches the limitations in step 7.3.

*Conclusion Regarding Dependent Claim 7*

For the foregoing reasons, we find Petitioner has shown by a preponderance of the evidence that dependent claim 7 is unpatentable under § 103 as obvious over the combination of Salah, Carrier, and Maninis.

*14. Dependent Claims 8 and 9*

Each of claims 8 and 9 depend directly on claim 1, and further recite that "the learning base is composed according to" six steps. Ex. 1001, 33:22–34:24.

Petitioner asserts that the combination of Salah, Carrier, and Maninis teaches each of these steps. Pet. 52–65. In particular, Petitioner contends that Salah's disclosure of registering a 2D image to a segmented arch model to map individual teeth to different portions of the image, which is then added to a learning base, teaches the steps of claim 8. *Id.* at 52 (citing Ex. 1008, Fig. 1). According to Petitioner, Salah's tooth model of attributes

corresponds to Maninis's annotations reflecting the "ground-truth" for training images. *Id.* at 52–53 (citing Ex. 1002 ¶ 183). Petitioner therefore argues that a POSITA would have been motivated to use Salah's technique to "identify locations of teeth in images to be added to a training library because doing so would enable the training dataset to contain 'carefully localized pixel-wise semantic annotations' by providing a simple mechanism to connect regions of pixels in each image to the 'ground-truth' represented by Salah's tooth models." *Id.* at 53 (citing Ex. 1007, 2, 5–6). Therefore, Petitioner submits that using Salah's image-model registration technique would have enabled a POSITA to leverage information contained in existing patient dental models to label images for training by labeling photographs acquired in conditions similar to those contemplated by Salah and Carrier. *Id.* (citing Ex. 1008, 1:20–21, 31:4–7; Ex. 1002 ¶¶ 184–85).

Patent Owner argues that a POSITA would not have been motivated to create a learning base by altering Salah's method of transferring information from the updated images to the 3D model of patient's teeth, but instead would have transferred information from the 3D model to the updated images, because Petitioner has proffered no motivation to support the proposed alteration of Salah. PO Resp. 64 (citing Ex. 2028 ¶¶ 214–218). According to Patent Owner, because Salah's 3D models or reference images are not labelled with any "tooth attributes," such information would not be available for transfer to the updated images needed to create the learning base of labelled historical images. *Id.* at 65. Further, Patent Owner argues that, because Maninis's learning bases were annotated by humans, a POSITA would not have been motivated to use a computer program that label employed images with pixel-wise contours labeled by a computer

algorithm. *Id.* According to Patent Owner, a POSITA would have wanted to confirm that the contours were accurately applied to the training images, which would undermine any possible motivation to employ Salah because the quality of training images directly impacts the quality of the neural network's analysis. *Id.* at 65–66.

As previously addressed in our discussion of claim 1 above, Petitioner provides ample motivations on the record before us to support the proposed combination of Salah's teachings with those of Carrier and Maninis. Among the rationales highlighted by Petitioner include (1) providing a "simple mechanism to connect regions of pixels . . . to the 'ground-truth,'" (2) "leverag[ing] information contained in existing patient dental models to label images," (3) applying known techniques to achieve efficient annotation, (4) straightforward, predictable process providing annotations used by Maninis. Pet. Reply 24–25 (alterations in original); Pet. 53, 60–61; Ex. 1002 ¶¶ 197–99. These statements of motivation are supported by testimony from Dr. Foroosh, and corroborated by published papers, demonstrating that relevant techniques of labeling using registered data from models were known to POSITAs. *See* Ex. 1002 ¶¶ 38, 199 (citing Ex. 1013, 3689–90; Ex. 1014, 3198, 3200–01).

Further, we agree with Petitioner that Patent Owner's argument regarding Salah not particularly teaching its 3D models being capable of labelling teeth by number constitutes an individual attack against the combination of references because the Petition relies upon well-known labelling techniques in combination with Salah for such teaching. Pet Reply 25; Pet. 56 (citing Ex. 1002 ¶ 190; Ex. 1009 ¶¶ 7, 8, 12). One cannot show non-obviousness by attacking the references individually where the

rejections are based on combinations of references. *In re Merck & Co.*, 800 F.2d 1091, 1097 (Fed. Cir. 1986); *see also In re Keller*, 642 F.2d at 426. Additionally, we agree with Petitioner that only routine skill would be required to automatically label images that were previously labelled manually.[11] *See* Pet 60 (citing Ex. 1002 ¶ 198).

After considering Patent Owner's arguments, we determine that Petitioner has shown by a preponderance of the evidence that the combination of the combination of Salah, Carrier, and Maninis teaches the limitations of claims 8 and 9.

For the foregoing reasons, we find Petitioner has shown by a preponderance of the evidence that dependent claims 8 and 9 are unpatentable under § 103 as obvious over the combination of Salah, Carrier, and Maninis.

*15. Dependent Claim 14*

Claim 14 depends directly on claim 1, and further recited that the "analysis image is analyzed and checked in real-time." Ex. 1011, 34:48–49.

Petitioner argues that the combination of Salah, Carrier, and Maninis teaches this limitation. Pet. 68–69 (citing Ex. 1002 ¶ 226). In particular, Petitioner argues that Carrier's disclosure of conducting its image analysis and checking in real-time by comparing an image of patient teeth to setpoints on an overlay to automatically detect an alignment therewith

[11] Providing an automatic way to replace a manual activity accomplishing the same result is not sufficient to distinguish an automated process over the prior art. *In re Venner*, 262 F.2d 91, 95 (CCPA 1958).

teaches the limitation of claim 14. *Id.* at 69 (citing Ex. 1002 ¶ 227; Ex. 1005 ¶¶ 99, 108; Ex. 1006 ¶¶ 54, 63). Further, Petitioner asserts the following:

> The combination of Salah and Maninis with Carrier to use a deep learning device for the analysis is consistent with Carrier's teaching of real-time analysis. Like Carrier, Salah also provides real-time feedback on alignment. *See* EX1008, 27:21-28:2. Maninis teaches that its deep learning contour detection algorithms produce fast, efficient, and highly-accurate results, categorizing even challenging images in less than 800 ms. EX1007, 1-2; *see id.*, 9, Table 1. Thus, a [POSITA] would have expected Maninis's deep-learning-based neural network to maintain Carrier's capacity for real-time image analysis. EX1002, ¶228.

*Id.*

Patent Owner argues that the combination of Salah, Carrier, and Maninis does not disclose the "analysis image is analyzed and checked in real-time," as claimed. PO Resp. 66. In particular, Patent Owner reiterates that the proposed combination of Carrier and Maninis with Salah would be inoperable for the intended purpose of performing real-time analysis of an image. *Id.*

As detailed in our discussion of Patent Owner's incompatible/inoperability arguments presented with respect to independent claim 1 above, Petitioner does not propose a bodily incorporation of Carrier and Maninis into Salah's image acquisition system. *See In re Keller*, 642 F.2d at 425. We agree with Petitioner that Carrier's real-time feedback would help guide users of Salah's image acquisition device in capturing a patient's dental arch in real-time while Maninis's deep learning device architecture analyzes the dental arch. Pet. 69. Accordingly, we reiterate that, because Maninis's disclosure of a deep learning device architecture for performing image analysis, taken in combination with Carrier's real-time

guidance for a user of Salah's image acquisition device, is no more than a simple arrangement of old elements with each performing the same function it had been known to perform, yielding no more than what one would expect from such an arrangement, the proposed combination supports a conclusion of obviousness.

After considering Patent Owner's arguments, we determine that Petitioner has shown by a preponderance of the evidence that the combination of Salah, Carrier, and Maninis teaches the limitations of claim 14.

For the foregoing reasons, we find Petitioner has shown by a preponderance of the evidence that dependent claim 14 is unpatentable under § 103 as obvious over the combination of Salah, Carrier, and Maninis.

*16. Dependent claims 2–6, 10–13, and 15*

Petitioner also contends that claims 2–6, 10–13, and 15, which depend directly or indirectly from independent claim 1, would have been obvious over the combination of Salah, Carrier, and Maninis. Pet. 41–50, 65–70. We have reviewed Petitioner's contentions as to the additional limitations of these dependent claims, and find that Petitioner has shown by a preponderance of the evidence that the combination of Salah, Carrier, and Maninis teaches each of the limitations of these claims. *Id.* We further note that Patent Owner does not separately address the patentability of these claims beyond its arguments as to independent claim 1, as well as to dependent claims 7–9 addressed above. *See* PO Resp.

We have reviewed Petitioner's unrebutted assertions and evidence, and in light of the foregoing, we determine that Petitioner has shown by a

preponderance of the evidence that dependent claims 2–6, and 10–13, and 15 are unpatentable under § 103 as obvious over the combination of Salah, Carrier, and Maninis.

*G. Patent Owner's Motion to Exclude*

Patent Owner seeks to exclude Exhibits 1022,[12] 1023,[13] 1025,[14] 1026,[15] 1031,[16] and paragraphs 62–67 of Exhibit 1002.[17] PO Mot. Excl. 1–15. Petitioner opposes the motion. Pet. Opp. Mot. Excl. 1–15. Patent Owner filed a reply to the opposition. PO Reply Mot. Excl. 1–5.

*1. Whether Exhibits 1022, 1023, 1025, and 1026 Lack Authenticity*

Patent Owner argues that, because Petitioner offered Exhibits 1022, 1023, 1025, and 1026 as archival webpages obtained from the Internet Archive, but offers no evidence to authenticate their respective archival dates, each of said Exhibits is inadmissible as inauthentic and should be excluded. PO Mot. Excl. 8–9 (citing *Standard Innovation*[18]). In particular, Patent Owner argues that, as in *Standard Innovation*, Petitioner did not provide testimony regarding "the reliability and functioning of the Internet

---

[12] Arxiv.org Submission Help Page.
[13] Arxiv.org Article Replacement Help Page (2017).
[14] Arxiv.org Author Search Page for Luc Van Gool.
[15] Arxiv.org Article Replacement Help Page (2016).
[16] Declaration of Nathaniel E. Frank-Wright.
[17] Declaration by of Dr. Hassan Foroosh.
[18] *Standard Innovation Corp. v. Lelo, Inc.*, IPR2014-00148, 2015 WL 1906730, *5-6 (PTA.B Apr. 23, 2015) (citing *U.S. v. Bansal*, 663 F.3d 634, 667-68 (Fed. Cir. 2011)); alternative citation *Standard Innovation Corp. v. Lelo, Inc.*, IPR2014-00148, Paper 42 (PTAB Apr. 23, 2015) (Final Written Decision).

Archive," nor a witness with personal knowledge that Exhibits 1022, 1023, 1025, and 1026 are the product of any such functionality. *Id.* at 9. Further, Patent Owner argues that, as in *Standard Innovation*, Petitioner provided no evidence regarding the significance and reliability of any created and modified dates in these exhibits. *Id.* Patent Owner emphasizes that none of the cited Exhibits contains a facially recognizable date and that Dr. Foroosh's mere assertion of what the archival dates are is simply insufficient to authenticate those Exhibits. *Id.* (citing Ex. 1002 ¶¶ 62–67).

In response, Petitioner argues that each of Exhibits 1022, 1023, 1025, and 1026 has been authenticated because Exhibit 1031 indisputably meets the requirements for (1) the "reliability and functioning of the Internet Archive," and (2) "facially recognizable date." Pet Opp. Mot. Excl. 5–6. In particular, Petitioner asserts the following:

> EX1031 indisputably meets these requirements, as Mr. Frank-White explains the reliable functioning of the Internet Archive's Wayback Machine and explains how each page's URL reflects its archiving date. EX1031. He also provides copies of each exhibit and its corresponding URL. *See id.*, Ex. A. This alone satisfies the authenticity requirements for each exhibit. *See also supra* §II. PO's motion is silent on EX1031 when arguing EX1022, EX1023, EX1025, and EX1026 lack authenticating testimony.
>
> Furthermore, EX1030 is another declaration from Mr. Frank-White (which [Patent Owner] has not moved to exclude), and which provides the same testimony regarding the regular practices of the Internet Archive and the meaning of its URLs. Each of EX1022, EX1023, EX1025, and EX1026 contains the URL from which it was printed in its header, as [Patent Owner] notes. *See* MTE, 3-5. The same URLs from which each page was printed were provided by Dr. Foroosh in his original declaration (EX1002, p. 126 (Appendix of Exhibits)), as well as in Petitioner's exhibit list. *See also* EX1002, ¶¶65-67 (describing each archived page). Mr. Frank-White's explanation of the Internet Archive's functionality (*see* EX1030;

> EX1031) shows that these URLs confirm the archiving dates of EX1022, EX1023, EX1025, and EX1026 (May 3, 2017; July 18, 2017; July 8, 2017; and Sep. 8, 2016, respectively).

*Id.* at 6–7.

According to Petitioner, the reliability of Internet Archive's Wayback Machine to show dates of publication cannot be questioned because the U.S. Court of Appeals for the Federal Circuit has approvingly noted that various district courts have taken judicial notice that archived webpages constituted "facts that can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." *Id.* at 7 (citing *Valve Corp. v. Ironburg Inventions Ltd.*, 8 F.4th 1364, 1374 (Fed. Cir. 2021) (quoting Erickson v. Neb. Mach. Co., No. 15-CV-01147-JD, 2015 WL 4089849, at *1 n.1 (N.D. Cal. July 6, 2016)).

Patent Owner's arguments that Exhibits 1022, 1023, 1025, and 1026 lack authenticity are not persuasive. Petitioner produces a Declaration by Dr. Foroosh attesting under oath about his own personal knowledge of arXiv.org's routine business practice at the time and an express intent to publish. Ex. 1002 ¶¶ 62–67, 234, 235. Moreover, Petitioner produces a Declaration by Mr. Frank-White, the Records Request Processor at the Internet Archive, attesting under oath his own personal knowledge of true and accurate copies of screenshots of the Internet Archived records and the archived files for the URLs and the dates specified in the Exhibit. Ex. 1030. Additionally, Petitioner produces a second Declaration by Mr. Frank-White attesting under oath the functioning of the Internet Archive's Wayback Machine and further explaining how each archived page's URL reflects its archiving date. Ex. 1031.

We do not agree with Patent Owner that Exhibit 1031 was served untimely as supplemental evidence in response to the authenticity objections. PO Reply Opp. Mot Excl. 1 (citing 37 C.F.R. 42.64(b)(2); PTAB Trial Practice Guide 2019, 79; *Standard Innovation*). Although we agree with Patent Owner that *Vidstream*[19] did not create a per se rule that allows the belated submission of a Declaration, we note that the holding in *Vidstream* nonetheless permits the submission of evidence in a reply supporting the prior art status of an asserted reference, especially when, as here, Patent Owner challenges whether Maninis qualifies as prior art to the '409 patent in the Patent Owner Response. *Id.* at 1–2. In *Vidstream,* our reviewing court confirms that under our rules

> [a] petitioner in an *inter partes* review proceeding may introduce new evidence after the petition stage if the evidence is a legitimate reply to evidence introduced by the patent owner, or if it is used to document the knowledge that skilled artisans would bring to bear in reading the prior art identified as producing obviousness.

*Vidstream* , 981 F.3d at 1065.

In light of the foregoing Declarations, and supporting Exhibits filed by Petitioner, we find that Petitioner has demonstrated by a preponderance of the evidence that Exhibits 1022, 1023, 1025, and 1026 are true and accurate versions of documents downloaded using the Internet Archive's Wayback Machine. Accordingly, we are satisfied that Exhibits 1022, 1023, 1025, and 1026 have thereby been authenticated by the testimony of Mr. Frank-White. Ex. 1031. For these reasons, we decline to exclude or disregard Exhibits 1022, 1023, 1025, and 1026 as lacking authenticity.

---

[19] *Vidstream LLC v. Twitter, Inc.*, 981 F.3d 1060, 1064-65 (Fed. Cir. 2020).

*2. Whether Exhibits 1022, 1023, 1025, and 1026 are Inadmissible Hearsay.*

Patent Owner argues that Exhibits 1022, 1023, 1025, and 1026 should be excluded as inadmissible hearsay because they are out-of-court statements by arXiv.org that appear in archival webpage exhibits, and not in a qualifying Declaration. PO Mot. Excl. 9. Patent Owner asserts that, because Petitioner and its declarant, Dr. Foroosh, offered these statements and depended on these exhibits "to prove the truth of the matter asserted in the statement[s]" (including the alleged policies of arXiv.org and the alleged date as of which the arXiv.org webpages were archived), they are inadmissible hearsay that should be excluded. *Id.* at 10 (citing Fed. R. Evid. 801 (c), *Standard Innovation Corp.*).

Petitioner counters that the Exhibits (copies of archived webpages generated and maintained by Internet Archive) are admissible at least under the business records exception (Fed. R. Evid. 803 (6)) based at least on Mr. Frank-White's Declarations. Pet. Opp. Mot. Excl. 7. According to Petitioner, to the extent that they are hearsay, they are admissible under hearsay exceptions set forth in Fed. R. Evid. 803(3), 803(6), and 807. *Id.* at 7–8. First, Petitioner argues that Patent Owner's hearsay arguments do not apply to Exhibit 1025, as it is not one of the four Exhibits upon which Petitioner relies to establish arXiv.org's actual publication policy as of their putative archival dates. *Id.* at 8. According to Petitioner, because Exhibit 1025 is a page showing the arXiv.org publications of Dr. Luc van Gool, one of the Maninis authors, Patent Owner's argument that it is hearsay is misplaced. *Id.* at 8–9. Second, Petitioner argues that Exhibits 1022, 1023, Exhibit 1026 are also admissible for non-hearsay purposes as they

collectively show the policies that arXiv.org communicated to authors. *Id.* at 9. In particular, Petitioner argues that these three Exhibits indicate that submitted papers would be published within one business day of submission. *Id.* According to Petitioner, because these three Exhibits express the intentions or plans of arXiv.org to publish papers within one day of submission, the statements contained therein constitute an exception to the hearsay rule under Fed. R. Evid 803(3). *Id.* at 9–11. ((citing *Catalan v. GMAC Mortg. Corp.*, 629 F.3d 676, 694 (7th Cir. 2011) (written statements describing bank's intentions admissible as non-hearsay); *Constant v. Advanced Micro-Devices, Inc.*, 848 F.2d 1560, 1569 (Fed. Cir. 1988) ("Evidence of routine business practice can be sufficient to prove that a reference was made accessible before a critical date.")). Further, Petitioner asserts that these three Exhibits are also admissible under the 803(6) exception to the hearsay rule because they relate to Dr. Foroosh's explanation about how arXiv.org operates based on his own experience using the site, including uploading multiple papers on the site in May 2017. *Id.* at 11 (citing *Samsung Elecs. Co. v. Huawei Techs. Co.*, IPR2017-01487, Paper 45 at 17–20 (Dec. 10, 2018) (indicating that there is no requirement of custodian testimony from an employee of the record-keeper; it suffices under Rules 803(6) and 902(11) that a person understand the system used). Furthermore, Petitioner argues that, to the extent any of Exhibits1022, 1023, 1025, and 1026 are found to be hearsay not subject to a hearsay exception, they are admissible under the residual hearsay rule. Fed. R. Evid. 807. *Id.* at 12.

Patent Owner's arguments that Exhibits 1022, 1023, 1025, and 1026 should be excluded as inadmissible hearsay are not persuasive. At the

outset, we do not agree with Patent Owner's assertion that Exhibits 1022, 1023, 1025, and 1026 are out-of-court statements by arXiv.org that appear in archival webpage exhibits, and not in a qualifying Declaration. As noted above, Petitioner produces a qualifying Declaration by Dr. Foroosh attesting under oath about his own personal knowledge of arXiv.org's routine business practice at the time and an express intent to publish. Ex. 1002 ¶¶ 62–67, 234, 235. In particular, paragraphs 62 through 67 of Dr. Foroosh's Declaration discusses each of these four Exhibits to corroborate the publication policy of arXiv.org, as well as how they support Petitioner's position that the Maninis reference was published before the priority date of the '409 patent. *Id.* Because these four Exhibits were discussed in a qualifying Declaration, we do not agree with Patent Owner that they are inadmissible hearsay. *See also* Fed. R. Evid 703 ("If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted.").

Further, even if these four Exhibits are hearsay, we agree with Petitioner that they are admissible under the hearsay exception category because they are provided to express the intentions or plans of arXiv.org to publish papers within one day of submission. Fed. R. Evid. 803(3); *Catalan*, 629 F.3d at 694. In *Catalan*, our reviewing court held that so long as the out-of-court statements were made with personal knowledge, the declarant's statement is admissible to help explain the declarant's intention. *Id.* at 696. In this case, as explained in his Declaration, Dr. Foroosh relates his personal knowledge of the arXiv.org's policy, which stipulates an intent to publish articles within one business day of submission according to the website's

routine business practice. Ex. 1002 ¶¶ 62–66 (citing Ex. 1022; Ex. 1023; Ex. 1026). *See also Fed. R. Evid.* 406 ("Evidence of a person's habit or an organization's routine practice may be admitted to prove that on a particular occasion the person or organization acted in accordance with the habit or routine practice.").

We do not agree with Patent Owner that Petitioner relies upon statements of what arXiv.org does presently, not what it intends to do in the future. PO Reply Opp. Mot. Excl. 3. The specific statements pointed out by Patent Owner in Exhibits 1022, 1023, and 1026 are different from the statements in these Exhibits discussed in the Foroosh Declaration and relied upon by Petitioner. *Id.* As discussed above, Petitioner relies primarily upon the statement that submitted articles are published on arXiv.org within one business day of submission; and that Maninis was submitted on April 30, 2017 to arXiv.org and, therefore, Maninis was publicly available on arXiv.org no later than May 3, 2017. For these reasons, we decline to exclude or disregard Exhibits 1022, 1023, 1025, and 1026 as inadmissible hearsay.

*3. Whether Exhibit 1031 Is Untimely Supplemental Evidence*

After institution, Patent Owner filed a first set objections to evidence (Paper 13), including an objection to Exhibit 1007 (the Maninis reference) under FRE 402/403 that Petitioner "has failed to demonstrate that it is prior art." In its Patent Owner Response, Patent Owner argues that Petitioner has not demonstrated that Maninis is prior art to the '409 patent. *See* PO Resp. 35–37. Petitioner responded by filing its Reply addressing the prior art status of Maninis, together with the Nathanael E. Frank-Wright

Declarations. Pet. Reply 6; Exs. 1030, 1031. Thereafter, Patent Owner filed a second set of objections to evidence (Paper 24), including an objection to Exhibit 1031 under Fed. R. Evid. (FRE) 105, FRE 402/403, FRE 801/802, and FRE 901. With this procedural posture in mind, we understand Petitioner to have relied on the Frank-Wright Declarations as reply evidence to rebut Patent Owner's argument that Petitioner has not demonstrated that Maninis is prior art to the '409 patent.

Patent Owner argues that, by filing Exhibit 1031 with Petitioner's Reply, it is untimely supplemental evidence because it was filed after the ten (10) business days response period has lapsed, as provided by 37 C.F.R. § 42.64(b)(2).[20] PO Mot. Excl. 10–11. More particularly, Patent Owner contends that Petitioner seeks to circumvent the deadline by filing that supplemental evidence with the Reply. *Id.* at 11–12 (citing *Toshiba Corp. v. Optical Devices, LLC*, IPR2014-01446, Paper 31, 32 (PTAB Mar. 9, 2016) (Final Written Decision); *Standard Innovation*, 2015 WL 1906730, *4-5).

Petitioner counters that Patent Owner's sole basis for the requested exclusion of Exhibit 1031 is that its filing was untimely supplemental evidence. Pet. Opp. Mot. Excl. 3–4. According to Petitioner, Patent Owner's failure to cite any Federal Rule of Evidence in its argument for exclusion of Exhibit 1031 is sufficient to deny the requested exclusion. *Id.* at 4. Further, Petitioner asserts that Patent Owner's reliance upon *Toshiba* and *Standard Innovation* is misplaced because the Federal Circuit's holding in *Vidstream* is the controlling authority on this issue. *Id.* (citing *Advanced*

---

[20] *See* 37 C.F.R. § 42.64(b)(2) (authorizing a party relying on evidence to which an objection is timely served to respond to the objection by serving supplemental evidence within ten business days of service of the objection).

*Micro Devices*, IPR2019-01526, Paper 37 at 101–103 (PTAB Mar. 10, 2021) (Final Written Decision)).

Patent Owner's arguments that Exhibit 1031 is untimely supplemental evidence that requires exclusion are not persuasive. As discussed above, Patent Owner presented arguments challenging the dissemination and public accessibility of Maninis in its Patent Owner Response. *See* PO Resp. 35–37. Petitioner submitted the Frank-Wright Declarations (Exs. 1030, 1031) and supporting exhibits with its Reply, specifically in response to Patent Owner's challenges to the dissemination and public accessibility of Maninis raised in Patent Owner's first set of objections to evidence and the arguments raised in the Patent Owner Response. We find that this new evidence is permissible here because it was filed timely in response to arguments raised in Patent Owner's Response. *See Cooler Masters Co. v. Aavid Thermalloy LLC*, IPR2019-00337, Paper 49 at 32 (PTAB June 4, 2020) (Final Written Decision). Also, the new evidence did not amount to, or result in, a change to Petitioner's theory in the case, and is relied on to further support Petitioner's initial position raised in the Petition that Maninis qualifies as a prior art printed publication. Thus, we do not agree with Patent Owner that Exhibit 1031, submitted with the Reply, was improper as untimely. Our determination in this regard is further supported by our reviewing court's holding in *Vidstream*, which stated that the "PTAB was within its discretion in considering evidence that petitioner first submitted with its reply briefs and did not initially provide with its petitions for *inter partes* review." *Vidstream* , 981 F.3d at 1065.

We agree with Petitioner that the non-precedential decisions in *Toshiba Corp.* and *Standard Innovation* relied upon by Patent Owner to

support these arguments are neither controlling nor persuasive on this issue. *Toshiba Corp.* and *Standard Innovation* are non-precedential Board decisions issued in 2016 and 2015, respectively, which was before a patent owner was permitted to file a sur-reply as a matter of right. *See* Consolidated Trial Practice Guide[21] at 73–74 (Nov. 21, 2019) (which is the first trial practice guide that explained a patent owner is permitted to file a sur-reply as a matter of right). Consequently, we determine that, consistent with the Federal Circuit's holding in *Vidstream*, Exhibit 1031 was timely presented with the Reply because Patent Owner was provided with a fair opportunity to depose Mr. Frank-Wright prior to filing its Sur-Reply and, if necessary, address his cross-examination testimony therein. Patent Owner did not take advantage of that opportunity. In any event, even if Exhibit 1031 constitutes supplemental evidence that should have been served in response to the first set of objections to evidence long before it was filed with the Reply, the panel excuses Petitioner's late action under 37 CFR 42.5(c)(3). For these reasons, we decline to exclude or disregard Exhibit 1031 as untimely supplemental evidence.

*4. Whether Exhibit 1002 ¶¶ 62-67 Lacks Foundation and is Improper Opinion Testimony*

Patent Owner argues that the Board should exclude paragraphs 62 through 67 of Exhibit 1002 because Dr. Foroosh lacks sufficient knowledge and/or perception to rationally support the opinions he draws regarding Maninis's publication and the practices of arXiv.org. PO Mot. Excl. 13 (citing Fed. R. Evid 701(a), 602). In particular, Patent Owner argues that,

[21] *Available at* https://www.uspto.gov/TrialPracticeGuideConsolidated.

because Dr. Foroosh has no personal knowledge regarding Maninis's publication date, his testimony including his occasional and anecdotal experience does not provide a sufficient basis for his opinion regarding the consistency, reliability or promptness of arXiv.org publication practices. *Id.* Consequently, Patent Owner asserts that his testimony is inadmissible as lacking foundation and as improper lay opinion testimony. *Id.* Further, Patent Owner argues that Dr. Foroosh's opinions are likewise inadmissible as expert testimony because Petitioner has not demonstrated that Dr. Foroosh is qualified as an expert in the policies of arXiv.org or in their likely application to Maninis. *Id.* at 14 (citing Fed. R. Evid. 702, 703). In particular, Patent Owner argues that Petitioner has not demonstrated that Dr. Foroosh has the requisite specialized knowledge, training, experience or skill in the policies of arXiv.org, nor does he have any personal knowledge regarding the Maninis's publication date. *Id.* According to Patent Owner, even if Dr. Foroosh is qualified as an expert, his opinions regarding Maninis's publication date are not the result of any disclosed principle or methodology, but rather they are purely speculative based on his acceptance of the hearsay in Exhibits 1022, 1023, 1025, and 1026. *Id.* at 14–15.

In response, Petitioner argues that paragraphs 62 through 67 of Dr. Foroosh's Declaration describe arXiv.org's publication practices based on his personal experience, which confirms the mechanical process by which the policies described in Exhibits 1022, 1023, 1025, and 1026 were being regularly followed. Pet. Opp. Mot. Excl. 11–12. According to Petitioner, these archived documents are more probative than any other reasonably available evidence regarding what the policies at the time were, since they are direct, contemporaneous, public statements of those policies by

arXiv.org itself. *Id.* at 12. Therefore, Petitioner asserts that these Exhibits provide the requisite foundation for Dr. Foroosh's discussion of them in paragraphs 62–67 of the Declaration. *Id.* at 13. In particular, Petitioner asserts that Dr. Foroosh's expertise as a computer scientist provides the requisite foundation to offer the testimony about arXiv.org's routine publication practices. *Id.* More particularly, Petitioner asserts that Dr. Foroosh's discussion of how the file's metadata of the Maninis paper corroborates its date of creation and last modification as April 30, 2017. *Id.* (citing Ex. 1002 ¶ 66; Ex. 1029 ¶ 3). Likewise, Petitioner argues that Dr. Foroosh's own personal knowledge of arXiv.org's publication practices help establish the foundation for arXiv.org's routine business practices. *Id.* at 13–14 (citing Fed. R. Evid 406, 701–703; Ex. 1002 ¶ 63). According to Petitioner,

> At minimum, Dr. Foroosh's experience in disseminating papers via arXiv.org provides him with "specialized knowledge" to help determine facts in issue, and his discussion in ¶¶62-67 bases his opinions on sufficient facts or data, applied reliably to the facts of the case. Fed. R. Evid. 702. . . . Dr. Foroosh's personal knowledge and experience with arXiv.org corroborates its manner of publication, confirming the date on which Maninis was publicly available for download. *See* EX1002, ¶¶62-67. Dr. Foroosh's personal experience as an author who published papers on arXiv.org is admissible evidence of the practices followed by arXiv.org when Maninis was submitted for publication. *See id.*

*Id.* at 14–15.

We agree with Petitioner that Dr. Foroosh's testimony in paragraphs 62–67 is admissible. As discussed above, Petitioner produces a Declaration by Dr. Foroosh attesting under oath about his own personal knowledge of arXiv.org's routine business practice at the time and an express intent to

publish. Ex. 1002 ¶¶ 62–67, 234, 235. Petitioner substantiates this particular testimony by producing archived copies of the arXiv.org website from 2016 and 2017 reflecting the "policy" of arXiv.org to endeavor to publish articles shortly after they are submitted. Ex. 1022; Ex. 1023; Ex. 1026. Because paragraphs 62 through 67 of the Foroosh Declaration discuss the routine business practice of arXiv.org as corroborated by Exhibits 1022, 1023, 1025, 1026, and 1029, and these paragraphs further include Dr. Foroosh's technical analysis of the file's metadata included in Maninis,[22] we find that Petitioner has established by a preponderance of the evidence paragraphs 62 through 67 of the Declaration are supported by sufficient foundation, and that Dr. Foroosh's Declaration about the routine publication practices of arXiv.org admissible. ; *see also Cooler Masters Co. v. Aavid Thermalloy LLC*, IPR2019-00337, Paper 49 at 30, 37–38 (testimony of routine business practice of Japanese Patent Office sufficient to establish publication). For these reasons, we decline to exclude paragraphs 62 through 67 of Exhibit 1002.

## III. CONCLUSION

For the reasons discussed above, Petitioner has shown by a preponderance of the evidence that claims 1–15 of the '409 patent are unpatentable.[23]

---

[22] Because Maninis (Ex 1007) qualifies as a prior art printed publication (*see* section E.2 above), we do not reach Patent Owner's argument as to whether Exhibit 1021 is a duplicate of Exhibit 1007. PO. Mot. Reply Mot. Excl. 5.

[23] Should Patent Owner wish to pursue amendment of the challenged claims in a reissue or reexamination proceeding subsequent to the issuance of this decision, we draw Patent Owner's attention to the April 2019 *Notice*

In summary:

| Claim(s) | 35 U.S.C. § | Reference(s)/Basis | Claim(s) Shown Unpatentable | Claim(s) Not Shown Unpatentable |
|---|---|---|---|---|
| 1–15 | 103 | Salah, Carrier, Maninis | 1–15 | |

## IV. ORDER

In consideration of the foregoing, it is hereby:

ORDERED that Petitioner has shown by a preponderance of the evidence that claims 1–15 of the ’409 patent are unpatentable;

FURTHER ORDERED that Patent Owner’s Motion to Exclude is *denied*; and

FURTHER ORDERED that, because this is a Final Written Decision, parties to this proceeding seeking judicial review of this Decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

---

*Regarding Options for Amendments by Patent Owner Through Reissue or Reexamination During a Pending AIA Trial Proceeding*. *See* 84 Fed. Reg. 16,654 (Apr. 22, 2019). If Patent Owner chooses to file a reissue application or a request for reexamination of the challenged patent, we remind Patent Owner of its continuing obligation to notify the Board of any such related matters in updated mandatory notices. *See* 37 C.F.R. § 42.8(a)(3), (b)(2).

For PETITIONER:

Michael Rosato
Patrick Medley
Matthew Argenti
WILSON SONSINI GOODRICH & ROSATI
mrosato@wsgr.com
pmedley@wsgr.com
margenti@wsgr.com

For PATENT OWNER:

Charlotte Jacobsen
Jaysen S. Chung
GIBSON, DUNN & CRUTCHER LLP
cjacobsen@gibsondunn.com
JSChung@gibsondunn.com

# Attachment C

Final Written Decision,
*Align Technology, Inc. v. Dental Monitoring SAS*,
IPR2024-00052, Paper 42 (Apr. 16, 2025)

Trials@uspto.gov
571-272-7822

Paper 42
Date: April 16, 2025

UNITED STATES PATENT AND TRADEMARK OFFICE

---

BEFORE THE PATENT TRIAL AND APPEAL BOARD

---

ALIGN TECHNOLOGY, INC.,
Petitioner,

v.

DENTAL MONITORING SAS,
Patent Owner.

---

IPR2024-00052
Patent 11,049,248 B2

---

Before JEAN R. HOMERE, MICHAEL R. ZECHER, and
KARA L. SZPONDOWSKI, *Administrative Patent Judges*.

SZPONDOWSKI, *Administrative Patent Judge*.

JUDGMENT
Final Written Decision
Determining All Challenged Claims Unpatentable
*35 U.S.C. § 318(a)*
Denying Patent Owner's Motion to Exclude
*37 C.F.R. § 42.64(c)*

# I. INTRODUCTION

We instituted an *inter partes* review of claims 1, 2, 4, 7, 8, and 13–16 of U.S. Patent No. 11,049,248 B2, issued on June 29, 2021 (Ex. 1001, "the '248 patent"), in response to a Petition (Paper 2, "Pet.") filed by Align Technology, Inc. ("Petitioner"). Paper 10 ("Dec."). During trial, Dental Monitoring SAS ("Patent Owner") filed a Response to the Petition (Paper 20,[1] "PO Resp."), Petitioner filed a Reply (Paper 25, "Reply"), and Patent Owner filed a Sur-reply (Paper 30, "Sur-reply"). In addition, Patent Owner filed a Motion to Exclude (Paper 34, "PO Mot. Excl."), Petitioner filed an Opposition (Paper 35, "Pet. Opp. Mot. Excl."), and Patent Owner filed a Reply (Paper 37, "PO Reply Opp. Mot. Excl.").

We held a consolidated oral hearing in this proceeding and related IPR2024-00110 on January 29, 2025, and a copy of the transcript is entered into the record. Paper 41 ("Tr.").

We have jurisdiction under 35 U.S.C. § 6 (2018). This Decision is a Final Written Decision under 35 U.S.C. § 318(a) as to the patentability of the claims on which we instituted trial. Petitioner has the burden of proving unpatentability of a claim by a preponderance of the evidence. 35 U.S.C. § 316(e).

Based on the complete record, Petitioner has shown, by a preponderance of the evidence, that claims 1, 2, 4, 7, 8, and 13–16 of the '248 patent are unpatentable.

We also *deny* Patent Owner's Motion to Exclude.

[1] Patent Owner filed two copies of the Patent Owner Response, as Papers 20 and 21. We cite to Paper 20 herein.

## II. BACKGROUND

### A. *Real Parties-in-Interest*

Petitioner identifies itself as the real party-in-interest. Pet. 63. Patent Owner identifies itself as the real party-in-interest. Paper 4, 1 (Mandatory Notices of Patent Owner).

### B. *Related Matter*

Petitioner and Patent Owner identify *Dental Monitoring SAS v. Align Technology, Inc.*, No. 3:22-cv-07335-WHA (N.D. Cal.) as a related matter. Pet. 63; Paper 4, 1.

### C. *The '248 Patent (Ex. 1001)*

The '248 patent was filed as U.S. Patent Application No. 16/030,137 on July 9, 2018, and claims priority to French Patent Application No. 1756956, which was filed on July 21, 2017. Ex. 1001, codes (21), (22), (30).

The '248 patent is titled "Method for Analyzing an Image of a Dental Arch" and describes, among other things, "[a] method for assessing the shape of an orthodontic aligner." Ex. 1001, codes (54), (57). In particular, the orthodontist determines the positioning of the teeth that he or she wants to obtain, and has manufactured an orthodontic appliance suited for this treatment, such as an orthodontic aligner. *Id.* at 27:26–34. The '248 patent describes that, conventionally, an aligner is in the form of a removable monobloc appliance made of a transparent polymer, that comprises a tray shaped in such a way to house teeth. *Id.* at 27:35–39. The shape of the aligner is "adapted to hold the aligner in position on the teeth, while exerting an action of correction on the positioning of certain teeth." *Id.* at 27:40–42.

Conventionally, the shapes that different aligners take during treatment are determined and manufactured at the start of treatment, and the patient changes the aligner at predetermined times. *Id.* at 27:48–52. The patient visits the orthodontist at regular intervals for a visual inspection, so that the orthodontist can determine whether the aligner being worn by the patient is still suited to the treatment. *Id.* at 27:55–69.

The invention described in the ’248 patent “considerably simplifies the assessment of the good suitability of the aligner to the treatment,” in particular, “the method may be implemented from simple photographs or films, taken with no particular precautions, for example by the patient,” thereby limiting the number of appointments with the orthodontist. Ex. 1001, 28:35–42. Specifically, a method is proposed “for analyzing an image called ‘analysis image’, of a dental arch of a patient, a method in which the analysis image is submitted to a deep learning device, preferably a neural network, in order to determine at least one value of a tooth attribute relating to a tooth represented on the analysis image, and/or at least one value of an image attribute relating to the analysis image.” *Id.* at 1:22–29.

The “analysis image” is “an image representing the aligner worn by the teeth of the patient” and is preferably captured by the patient on a cellphone. Ex. 1001, 8:43–53, 8:66–67, 30:16–18, 30:31–32. The “analysis image” may be taken “when the assessment of the shape of an aligner is desired, for example, more than 1 week after the start of the treatment with the aligner,” and preferably, at least one reminder is sent to the patient to capture the “analysis image.” *Id.* at 30:19–30.

The "analysis image" is submitted to and analyzed by a "deep learning device," preferably a neural network, that was trained on a specific dataset, called a "learning base." Ex. 1001, 1:39–43, 1:66–2:1, 16:5–6, 16:44–45, 24:3–5. According to the '248 patent, the neural network may be chosen from networks specializing in the classification of images called CNN ("convolutional neural network"), for example, Microsoft ResNet or VGG Net. *Id.* at 16:7–25. "By presenting, as input for the deep learning device, historical images (images+descriptions), the deep learning device progressively learns to recognize patterns on an image, and to associate them with tooth zones and with tooth attribute values, for example tooth numbers." *Id.* at 16:38–43. The deep learning device, therefore, analyzes the "analysis image" and is capable of recognizing patterns therein. *Id.* at 16:46–49. The tooth attribute may be related to separation, such as the separation between the tooth and an aligner worn by the tooth. *Id.* at 28:43–67, 30:35–41. "The value for this tooth attribute therefore provides an information item relating to the shape of the aligner relative to the shape of the teeth of the patient." *Id.* at 30:42–44. Based upon this information, an assessment can be made as to the suitability of the aligner. *Id.* at 30:54–31:3.

D. *Illustrative Claims*

Among the challenged claims, claims 1 and 15 are independent. Independent claim 1, reproduced below, is illustrative of the claimed subject matter:

> 1. A method for assessing the shape of an orthodontic aligner, said method comprising the following steps:

a″) more than l week after the start of the treatment with the aligner, acquisition of at least one image at least partially representing the aligner in a service position in which it is worn by a patient, called “analysis image”, the analysis image being a photograph, or an image extracted from a film;

b″) analysis of the analysis image by means of a deep learning device, trained by means of a learning base, so as to determine a value

for at least one tooth attribute of an “analysis tooth zone” representing, at least partially, a tooth on said analysis image, the tooth attribute relating to a separation between the tooth represented by the analysis tooth zone, and the aligner represented on the analysis image,

in the step a″), a cellphone is used to acquire the analysis image.

Ex. 1001, 32:6–23. Independent claim 15 recites similar limitations, but recites an “image attribute” rather than a “tooth attribute.” *Id.* at 34:43–57. Dependent claim 7 recites:

7. The method as claimed in claim 1**,** in which the step b") comprises the following steps:

1) creation of a learning base comprising more than 1000 images of dental arches, or “historical images”, each historical image representing an aligner worn by a “historical” patient and comprising one or more zones each representing a tooth, or “historical tooth zones”, to each of which, for at least one tooth attribute relating to a separation between the tooth represented by the historical tooth zone considered, and the aligner represented, a tooth attribute value is assigned;

2) training of at least one deep learning device, by means of the learning base;

> 3) submission of the analysis image to the deep learning device for it to determine at least one probability relating to:
>
> the presence, in a location of said analysis image, of an analysis tooth zone, and
>
> the attribute value of the tooth represented on said analysis tooth zone;
>
> 4) determination, as a function of said probability, of the presence of a separation of the aligner and of the tooth represented by said analysis tooth zone.

Ex. 1001, 32:45–67. Dependent claim 14 also depends from claim 1 and recites similar limitations. *Id.* at 34:21–42. Dependent claim 8 also depends from claim 1, and recites similar limitations as dependent claim 7, but recites an "image attribute" or "image attribute value" rather than a "tooth attribute" or "tooth attribute value." *Id.* at 33:1–15.

### E. *Prior Art and Asserted Challenge to Patentability*

Petitioner asserts that claims 1, 2, 4, 7, 8, and 13–16 are unpatentable based on the following challenge (Pet. 14):

| Claims Challenged | 35 U.S.C. §[2] | References/Basis |
|---|---|---|
| 1, 2, 4, 7, 8, 13–16 | 103 | Kim,[3] Invisalign,[4] Salah, [5] Maninis[6] |

In support of its proposed challenge, Petitioner relies on the Declarations of Hassan Foroosh, Ph.D (Exs. 1002, 1029, 1048), Declaration of Nathaniel E. Frank-White (Ex. 1010), Declaration of Mitra Derakhshan (Ex. 1011), and Third and Fourth Affidavits of Nathaniel E. Frank-Wright (Exs. 1031, 1032). Patent Owner relies on the Declaration of John Mongan, M.D., Ph.D (Ex. 2028) and Declaration of Budi Kusnoto, D.D.S., M.S. (Ex. 2030). Deposition transcripts have been submitted to the record for Dr. Foroosh (Exs. 2048, 2054, 2065), Dr. Mongan (Exs. 1037, 1051), and Dr. Kusnoto (Exs. 1038, 1052).

[2] Because the '248 patent issued from a patent application that was filed after March 16, 2013 (Ex. 1001, codes (21), (22)), patentability is governed by the version of 35 U.S.C. § 103 as amended by the Leahy-Smith America Invents Act ("AIA"), Pub L. No. 112–29, 125 Stat. 284 (2011).
[3] Kim, US 2017/0281313 A1, published Oct. 5, 2017 ("Kim," Ex. 1005). Petitioner contends that Kim is prior art to the '248 patent under 35 U.S.C. § 102(a)(2). Pet. 6.
[4] *Invisalign Clinical Monitoring Guide*, Align Technology, Inc. (2003) ("Invisalign," Ex. 1006). Petitioner contends that Invisalign is prior art to the '248 patent under 35 U.S.C. § 102(a)(1). Pet. 8.
[5] Salah et al., WO 2016/066651 A1, published May 6, 2016 ("Salah," Ex. 1008). Petitioner contends that Salah is prior art to the '248 patent under 35 U.S.C. § 102(a)(1). Pet. 9.
[6] Maninis et al., *Convolutional Oriented Boundaries: From Image Segmentation to High-Level Tasks*, arXiv.org, published no later than May 2, 2017 ("Maninis," Ex. 1007). Petitioner contends that Maninis is prior art to the '248 patent under 35 U.S.C. § 102(a)(1). Pet. 10.

## III. ANALYSIS

### A. *Legal Standards*

A claim is unpatentable under 35 U.S.C. § 103 if "the differences between the claimed invention and the prior art are such that the claimed invention as a whole would have been obvious before the effective filing date of the claimed invention to a person having ordinary skill in the art to which the claimed invention pertains." The question of obviousness is resolved on the basis of underlying factual determinations, including (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of skill in the art; and (4) when in evidence, objective evidence of nonobviousness, i.e., secondary considerations. *See Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966).

A patent claim "is not proved obvious merely by demonstrating that each of its elements was, independently, known in the prior art." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 418 (2007). An obviousness determination based on a combination of references requires finding "both 'that a skilled artisan would have been motivated to combine the teachings of the prior art references to achieve the claimed invention, and that the skilled artisan would have had a reasonable expectation of success in doing so.'" *Intelligent Bio-Sys., Inc. v. Illumina Cambridge Ltd.*, 821 F.3d 1359, 1367–68 (Fed. Cir. 2016) (citation omitted); *see KSR*, 550 U.S. at 418. Further, an assertion of obviousness "cannot be sustained by mere conclusory statements; instead, there must be some articulated reasoning with some rational underpinning to support the legal conclusion of obviousness." *KSR*, 550 U.S. at 418; *In re NuVasive, Inc.*, 842 F.3d 1376,

1383 (Fed. Cir. 2016) (a finding of a motivation to combine "must be supported by a 'reasoned explanation'" (citation omitted)).

In an *inter partes* review, a petitioner bears the burden of persuasion to prove "unpatentability by a preponderance of the evidence." *Dynamic Drinkware, LLC v. Nat'l Graphics, Inc.*, 800 F.3d 1375, 1378 (Fed. Cir. 2015) (quoting 35 U.S.C. § 316(e)). This burden of persuasion never shifts to Patent Owner. *Dynamic Drinkware*, 800 F.3d at 1378 (citing *Tech. Licensing Corp. v. Videotek, Inc.*, 545 F.3d 1316, 1326–1327 (Fed. Cir. 2008). Petitioner must explain with particularity how the prior art would have rendered the challenged claims unpatentable. 35 U.S.C. § 312(a)(3); 37 C.F.R. § 42.104(b)(4) (2024) ("The petition must specify where each element of the claim is found in the prior art patents or printed publications relied upon.").

B. *Level of Ordinary Skill in the Art*

Determining whether an invention would have been obvious under 35 U.S.C. § 103 requires resolving the level of ordinary skill in the pertinent art at the time of the effective filing date of the claimed invention. *Graham*, 383 U.S. at 17. The person of ordinary skill in the art is a hypothetical person who knows the relevant art. *In re GPAC Inc.*, 57 F.3d 1573, 1579 (Fed. Cir. 1995). Factors that may be considered in determining level of ordinary skill in the art include (1) the educational level of the inventor; (2) the types of problems encountered in the art; (3) prior art solutions to those problems; (4) the rapidity with which innovations are made; (5) the sophistication of the technology; and (6) the educational level of active

workers in the field. *Daiichi Sankyo Co. v. Apotex, Inc.*, 501 F.3d 1254, 1256 (Fed. Cir. 2007).

Petitioner contends that a person of ordinary skill in the art "would typically have an advanced degree, such as a Masters' Degree or Ph.D. in computer science, computer engineering, electrical engineering, or a related field, with at least two years of work in computer vision, image analysis, medical imaging, or related areas." Pet. 14 (citing Ex. 1002 ¶¶ 60–61). Petitioner further contends that a person of ordinary skill in the art "could have less education but significant professional experience in one or more of these fields" and "could be a member of an interdisciplinary team." *Id.*

Patent Owner offers a slightly different definition of the level of ordinary skill in the art. PO Resp. 3–4; Sur-reply 2. Patent Owner contends that a person of ordinary skill in the art:

> would have had a bachelor's degree or higher in computer science, bioinformatics, or a related engineering discipline, and several years of work experience relating to the development of machine learning or artificial intelligence models or algorithms. A [person of ordinary skill in the art] ***would*** have also worked as part of a multi-disciplinary team, which ***would have included individuals familiar with medical imaging, dental imaging, dentistry, and/or orthodontics***.

PO Resp. 3–4 (quoting Ex. 2028 ¶ 47–50; citing Ex. 2028 ¶¶ 54–57, Ex. 2030 ¶¶ 27–30) (emphasis in original). Patent Owner argues that "the relevant field is aligner treatment." *Id.* at 4 (citing Ex. 2030 ¶ 57). According to Patent Owner, it would have been necessary for a POSITA to consult with an individual having experience in dentistry and/or orthodontics

in order to understand Invisalign, Kim, and Salah. *Id.* (citing Ex. 2030 ¶¶ 56–57; Ex. 2028 ¶ 50); Sur-reply 2.

The parties agree that the proposed levels of ordinary skill in the art are "not materially different." PO Resp. 4; Reply 2. The difference, essentially, is that Patent Owner more explicitly describes the members on the interdisciplinary team, and argues that it would be necessary to consult with such individuals, particularly with persons experienced in dentistry or orthodontics, whereas Petitioner's proposal states that one "could" consult with such individuals. However, Patent Owner's argument that it would be necessary for a person of ordinary skill in the art to consult with an individual having experience in dentistry and/or orthodontics is narrower than Patent Owner's proposed level of skill in the art, which describes "individuals familiar with medical imaging, dental imaging, dentistry, and/or orthodontics." PO Resp. 3 (emphasis omitted, emphasis added). Neither party presents any argument explaining how the differences in the respective educational backgrounds and work experience in the proposed definitions affect the dispute.

Having considered the parties' respective arguments and the evidence of record, we adopt a modified version of the parties' proposals, and determine for purposes of this Decision that a person of ordinary skill in the art would have an advanced degree, such as a Masters' Degree or Ph.D. in computer science, computer engineering, electrical engineering, or a related field, with at least two years of work in computer vision, image analysis, medical imaging, or related areas. Further, a person of ordinary skill in the art could have less education but significant professional experience in one

or more of these fields, and could be a member of an interdisciplinary team which would have included individuals familiar with medical imaging, dental imaging, dentistry, and/or orthodontics.

Patent Owner argues that Dr. Foroosh is not qualified to testify as a person of ordinary skill in the art and, therefore, his testimony should be given no weight. PO Resp. 5; Sur-reply 2–4 (citing *Kyocera Senco Indus. Tools Inc. v. Int'l Trade Comm'n*, 22 F.4th 1369, 1376–77 (Fed. Cir. 2022)). Several of Patent Owner's arguments rest on Dr. Foroosh's alleged lack of qualifications. *See, e.g.*, PO Resp. 47–54. Patent Owner asserts that Dr. Foroosh "has no training or experience with dentistry or orthodontics, and did not consult with such a person to form his opinions." *Id.* at 5 (citing Ex. 2048, 11:9–12, 12:19–22, 13:12–23; Ex. 2054, 124:16–19)). According to Patent Owner, this lack of relevant experience caused Dr. Foroosh to "misinterpret or ignore portions of" the prior art. *Id.*; *see also id.* at 49–51 (arguing Dr. Foroosh was "unable to understand key portions of Invisalign or explain the meaning of terms appearing on the same pages of Invisalign that he cites"). For example, Patent Owner asserts that Dr. Foroosh testified that he had "no idea" whether the photograph in Invisalign's Figure A is a common position for an aligner, and "could not say how an orthodontist allegedly assessed aligner fit in 2017." *Id.* at 5 (citing Ex. 2054, 60:18–61:4, 45:17–19, 74:9–14, 42:4–7, 58:24–59:5, 65:12–13) (emphasis omitted); *see also id.* at 49–50 (arguing the same).

We are satisfied that Dr. Foroosh qualifies as a person of ordinary skill in the art. First, Dr. Foroosh has the required educational background, with, for example, a Bachelor of Science in Electrical Engineering, a Master

of Science in Electrical Engineering, a Master of Science in Computer Science and Engineering, and a Ph.D in Computer Science. Ex. 1003, 7; Ex. 1002 ¶ 3. Second, Dr. Foroosh has the required work experience, with, for example, research in machine learning, deep learning, and neural networks, image and video processing and analysis, and computer vision. Ex. 1003, 2, 4–8; *see also id.* at 9–13 (list of projects), 14–29 (list of publications), 32 (list of interdisciplinary research); Ex. 1002 ¶¶ 2–5 (describing work experience), 6–9 (describing research experience).

Dr. Foroosh has also been part of interdisciplinary research efforts including those relating to the medical or dental fields, such as, research on the intersection of computer vision and augmented reality in medical and surgical interventions. Ex. 1003, 32; Ex. 1002 ¶ 12. Dr. Foroosh describes a research project, *Modeling and Visualization of Muscoloskeletal Structures in Dental CT-Scan* (2006–2007), where he "developed algorithms for [three-dimensional ('3D')] registration, modeling and visualization of maxilla and mandible of patients for dental surgery using Computer Aided Tomography (CAT) scanning." Ex. 1002 ¶ 6. He describes another project for the National Science Foundation, which "was directed to the registration/alignment of dental CT scans of patients over a period of time during the treatment of a patient, with the purpose of improving the quality of 3D models, e.g., corrections and noise removal in 3D CT scans." *Id.* ¶ 7. He was also a co-author on *Alignment of Maxillofacial CT Scans to Stone-Cast Models Using 3D Symmetry for Backscattering Artifact Reduction*, Proceedings of Medical Image Understanding and Analysis Conference (MIUA) (2006), and an adviser for a dissertation directed to "*Sub-pixel*

*Registration in Computational Imaging and Applications to Enhancement of Maxillofacial CT Data*," which "focused on registration and alignment of 2D images and 3D digitized data obtained by dental CT scans and dental imprints of a patient." *Id.* ¶¶ 8, 9. Although Dr. Foroosh is not a dentist or orthodontist, we determine that the breadth of his background, as fully set forth in Exhibit 1003, qualifies him to provide testimony from the perspective of a person of ordinary skill in the art. In short, we agree with Petitioner that Dr. Foroosh has "ample experience with medical and dental imaging," as set forth above. Reply 2 (citing Ex. 1002 ¶¶ 6–9; Ex. 1003, 14, 15, 21, 26, 32).

Moreover, we are afforded broad discretion in assigning weight that is to be accorded expert testimony. *See Yorkey v. Diab*, 601 F.3d 1279, 1284 (Fed. Cir. 2010) ("[T]he Board was well within its discretion to give more credibility to [one expert over another] unless no reasonable trier of fact could have done so."); *see also* CTPG[7] 34–36. In the analysis that follows, when applicable, we weigh the credibility of Dr. Foroosh's testimony, including with respect to Patent Owner's arguments regarding Dr. Foroosh's testimony on the Invisalign reference, and provide our reasons therefore.

C. *Claim Construction*

In an *inter partes* review, we apply the same claim construction standard as would be used by a district court to construe a claim in a civil action involving the validity or infringement of a patent. 37 C.F.R.

---

[7] Patent Trial and Appeal Board Consolidated Trial Practice Guide (CTPG) (Nov. 2019) (*available at* https://www.uspto.gov/sites/default/files/documents/tpgnov.pdf?MURL=TrialPracticeGuideConsolidated).

§ 42.100(b). Under that standard, claim terms are generally given their ordinary and customary meaning, as would have been understood by one with ordinary skill in the art, in the context of the intrinsic record including the specification, the prosecution history, and other claims, and extrinsic evidence including expert and inventor testimony, dictionaries, and learned treatises. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312–17 (Fed. Cir. 2005) (en banc). Only those claim terms that are in controversy need to be construed, and only to the extent necessary to resolve the controversy. *Realtime Data, LLC v. Iancu*, 912 F.3d 1368, 1375 (Fed. Cir. 2019) ("The Board is required to construe 'only those terms . . . that are in controversy, and only to the extent necessary to resolve the controversy.'" (quoting *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999)).

Petitioner provides constructions for the term "tooth attribute," as recited in claim 1, the term "image attribute," as recited in claims 8 and 15, and the term "image extracted from a film," as recited in claims 1 and 15. Pet. 15–18. In addition, Petitioner contends that the second step of claims 1 and 15 (i.e., steps 1(b") and 15(b")), whether construed as a means-plus-function limitation or not, does not distinguish over the prior art. *Id.* at 19. However, Petitioner identifies the corresponding function as "analyzing an image" and the structure "to encompass a device comprising a deep learning neural network trained with a learning base." *Id.* at 19–20.

Patent Owner responds to Petitioner's proposed constructions for "tooth attribute" and "image attribute," and further provides constructions for the terms "deep learning device," as recited in claims 1, 7, 8, and 13–16,

and "shape of an orthodontic aligner," as recited in claims 1 and 15. PO Resp. 13–16. We address the parties' contentions below.

*1. Tooth attribute*

Petitioner contends that "tooth attribute," as recited in claim 1, "includes any attribute related to a tooth." Pet. 15 (citing Ex. 1002 ¶¶ 62–64). Petitioner further contends that the "tooth attribute" "includes any attribute of a tooth that may relate to the tooth's separation from an aligner, including attributes specific to the tooth or to the aligner, such as their respective positions or edges, which may bear a relation to the separation between the tooth and the aligner." *Id.* at 16 (citing Ex. 1002 ¶ 65).

Patent Owner argues that "Petitioner's construction is overbroad and should be rejected." PO Resp. 13 (citing Ex. 20[30] ¶¶ 143–149; Ex. 1001, 28:62–29:13). According to Patent Owner, the '248 patent distinguishes between a "tooth zone," which corresponds to the "zone" or "location" of a tooth in the analysis image, and a "tooth attribute," which is an "'attribute' of the tooth." *Id.* at 13–14 (citing Ex. 20[30] ¶¶ 144–145); *see also id.* at 14 (arguing "tooth attribute" should be construed as "attribute of a tooth").

We agree with the parties that a "tooth attribute" is an "attribute of a tooth." Petitioner's proposed construction goes further, and provides examples of what a "tooth attribute" may include. However, the relevant claim language of claim 1 recites a "tooth attribute relating to a separation between the tooth represented by the analysis tooth zone, and the aligner represented on the analysis image." Ex. 1001, 32:19–21. In light of the plain language of the claim, and based on the record before us, we determine that no further construction of "tooth attribute" is necessary for purposes of

this Decision. We further discuss the "tooth attribute" below in connection with our analysis of dependent claims 7 and 14.

*2. Image attribute*

Petitioner contends that an "image attribute," as recited in claims 8 and 15 "includes an attribute having a value (which may be a set of values for multiple teeth) relating to an image as a whole." Pet. 16 (citing Ex. 1002 ¶ 66). Petitioner further contends that an "image attribute" "includes any attribute of the image as a whole that relates to the separation between one or more teeth and the aligner," such as, for example, "an indication of whether an aligner or gap was present in the image, a measure of individual or average separation[,] an indication of whether the overall separation is acceptable, or a measure of another value that may be used to assess separation of teeth from the aligner." *Id.* at 17 (citing Ex. 1002 ¶ 67).

Patent Owner agrees that the "image attribute" relates to the "image as a whole" and may be "a function of the tooth attribute values," but disagrees to the extent that Petitioner's construction includes its "overbroad construction" of "tooth attribute." PO Resp. 15.

We agree with the parties that the "image attribute" relates to the "image as a whole." However, again, Petitioner's proposed construction provides examples of what the image attribute may include. Claim 8 recites that "the image attribute" may relate "to a separation between the tooth or teeth and the aligner represented on the historical image." Ex. 1001, 33:6–9. Similarly, claim 15 recites that "the image attribute" may relate "to a separation between at least one tooth represented on the analysis image, and the aligner represented on said analysis image." *Id.* at 34:54–57. In light of

the plain language of these claims, and based on the record before us, we determine that no further construction of "image attribute" is necessary for purposes of this Decision. We further discuss the "image attribute" below in connection with our analysis of dependent claim 8.

*3. Image extracted from a film*

Petitioner contends that "image extracted from a film," as recited in claims 1 and 15, "should be interpreted to refer to an image extracted from a video recording." Pet. 18 (citing Ex. 1002 ¶ 68).

Patent Owner does not respond to Petitioner's proposed construction. *See generally* PO Resp. As there is no dispute between the parties, and after reviewing the record, we determine that express construction of "image extracted from a film" is not necessary for purposes of this Decision. As set forth below, Petitioner's contentions rely on the alternative, "the analysis image being a photograph."

*4. Deep learning device*

Patent Owner contends that a person of ordinary skill in the art would have understood a deep learning device in the context of the '248 patent is "a device that, through training, is capable of analyzing an image and recognizing patterns therein." PO Resp. 15 (citing Ex. 1001, 16:46–48, 17:30–32, 24:26–48; Ex. 2028 ¶¶ 153–156; Ex. 2054, 169:22–171:11).

Petitioner argues that Patent Owner's construction "does not distinguish over the combination proposed in the [P]etition," so the claims are "unpatentable regardless of Patent Owner's construction." Reply 5.

As there is no dispute between the parties, and after reviewing the record, we determine that express construction of "deep learning device" is not necessary for purposes of this Decision.

*5. Shape of an orthodontic aligner*

Patent Owner contends that, to the extent the preambles of claims 1 and 15 are limiting, the "shape of an orthodontic aligner" should be construed to mean "the shape of the aligner relative to the shape of the teeth of the patient." PO Resp. 16 (citing Ex. 2028 ¶¶ 157–160).

Petitioner argues that Patent Owner does not argue that the preambles are limiting and "makes no arguments relying on its construction," so the claims are "unpatentable regardless of Patent Owner's construction." Reply 5.

As there is no dispute between the parties, and after reviewing the record, we determine that express construction of "shape of an orthodontic aligner" is not necessary for purposes of this Decision.

D. *Alleged Obviousness Over Kim, Invisalign, Salah, and Maninis*

Petitioner contends claims 1, 2, 4, 7, 8, and 13–16 would have been obvious over the combination of Kim, Invisalign, Salah, and Maninis. Pet. 20–59. Patent Owner disputes Petitioner's contentions. PO Resp. 42–70. We first provide overviews of Kim, Invisalign, Salah, and Maninis, and then we address the parties' arguments.

*1. Kim (Ex. 1005)*

Kim is titled "Method and System for Providing Remote Teeth Alignment Services and Computer-Readable Medium on Which the Method is Recorded," and is generally directed to "a method and system for

providing remote teeth alignment services to remotely advise an appropriate step of a clear aligner using a smartphone of an orthodontic patient, and a computer-readable medium on which the method is recorded." Ex. 1005, code (54), ¶ 1.

In particular, Kim describes:

> a method and system for providing remote teeth alignment services, by which an orthodontist may obtain accurate teeth alignment information using a device, e.g., a smartphone, of an orthodontic patient, may remotely and accurately diagnose the condition of the patient based on the teeth alignment information, and may remotely provide information about an accurate step of a clear aligner to be currently worn by the orthodontic patient, thereby greatly reducing a diagnosis time and cost of the orthodontic patient and the orthodontist, the accuracy of diagnosis may be improved by automatically obtaining photos of accurate sizes and locations using various virtual lines, the teeth alignment information may be easily used by the orthodontist by providing the teeth alignment information in the form of report information and classifying the teeth alignment information based on time, teeth alignment may be precisely performed in a customized manner by providing manufacturing information to a clear aligner manufacturer when an additional or modified clear aligner is necessary, interest of orthodontic patients may be increased by disclosing the teeth alignment information of a selected orthodontic patient, and the orthodontic patients may be inspired with a greater desire for aligned teeth by providing benefits to the selected orthodontic patient, and a computer-readable medium having recorded the method thereon.

Ex. 1005 ¶ 10. Figure 1, which depicts "a conceptual view of a system for providing remote teeth alignment services," (*id.* ¶ 26) is reproduced below:

FIG. 1




Figure 1, shows, among other things, orthodontic patient terminal 10, orthodontist terminal 20, clear aligner manufacturer terminal 30, operator terminal 100, and server computer 60, all interconnected through network 50. Ex. 1005 ¶¶ 39, 49, Fig. 1. Orthodontic patient terminal 10 may be, for example, a smartphone or mobile device. *Id.* ¶ 42. Orthodontist terminal 20 may, likewise, be a smartphone or mobile device. *Id.* ¶ 44.

According to Kim, the patient may provide "teeth alignment information" to orthodontist terminal 20 by taking a variety of photographs of the patient's teeth from different angles using orthodontic patient terminal 10. Ex. 1005 ¶¶ 10, 42, 55, 56, 60 80. Orthodontic patient terminal 10 may send "clear aligner information about a currently worn clear aligner" to orthodontist terminal 20, so that "the orthodontist checks a photo or a video of the clear aligner currently worn by the orthodontic patient, and determines whether the clear aligner is normal and corresponds to an appropriate step." *Id.* ¶ 66; *see also id.* ¶ 10.

*2. Invisalign (Ex. 1006)*

Invisalign is "intended to help the Invisalign practitioner successfully monitor Invisalign treatments and address issues that may arise between receipt of Aligners from Align to the completion of treatment." Ex. 1006, i. Invisalign provides guidance to monitor treatment progress of patients after aligners have been received and are being worn by the patient. *Id.* at i–iv. For example, the practitioner can "evaluate any fit concerns that may arise" by "[h]av[ing] patients arrive with the previous stage Aligner and the current Aligner." *Id.* at ii. Invisalign includes information on "Managing Aligner fit and seating," and advises that an "Aligner [is] seating poorly" if there is greater than 1 mm gap between the teeth and aligner. *Id.* at 1. Invisalign further states that "Aligners should be fitting well at the end of the 2-week period." *Id.*

*3. Salah (Ex. 1008)*

Salah is titled "Method for Monitoring Dentition," and is generally directed to "monitoring . . . the appearance of the teeth of a patient."

Ex. 1008, codes (54), (57). Salah generally describes methods for monitoring the positioning, shape, and/or appearance of a patient's teeth by obtaining two-dimensional ("2D") images of a patient's teeth and comparing them to a 3D digital reference model. *Id.* at 1:1–2:19.

Salah's method starts with the creation of a 3D "initial reference model" of the patient's dental arch, then a 2D "updated image" is acquired and analyzed to assess tooth deformation and/or displacement since the "initial reference model," and then the "initial reference model" is modified until a "final reference model" is obtained that corresponds to the updated image. Ex. 1008, 1:28–2:19.

Salah describes that the "updated image" may be a "photograph taken by the patient." Ex. 1008, 2:24, 31:5–7 ("image acquisition can be carried out by the patient himself or by one of their relatives, using a simple cell phone, anywhere, and especially outside a medical, dental or orthodontic practice"); *see also id.* at 27:11–13. In order to compare the updated and reference images, Salah describes comparing discriminant information on both images. *Id.* at 40:19–20. "Discriminant information is preferably chosen from the group consisting of *contour information*, color information, density information, a distance information, brightness information, saturation information, reflection information and combinations of these." *Id.* at 34:8–10 (emphasis added). Salah discloses various methods for processing an image to obtain discriminant information, including deep learning. *Id.* at 34:11–36:14.

*4. Maninis (Ex. 1007)*

*a) Description of Maninis*

Maninis is titled "Convolutional Oriented Boundaries: From Image Segmentation to High-Level Tasks." Ex. 1007, 1. Maninis "present[s] Convolutional Oriented Boundaries (COB), which produces multiscale oriented contours and region hierarchies starting from generic image classification Convolutional Neural Networks (CNNs)." *Id.* (Abstract). Maninis "also evaluate[s] COB on high-level tasks when coupled with multiple pipelines for object proposals, semantic contours, semantic segmentation, and object detection." *Id.*; *see also id.* at 11–12.

Maninis states that the "latest wave of contour detectors takes advantage of deep learning to obtain state-of-the-art results," and provides "an end-to-end deep framework to boost the efficiency and accuracy of contour detection, using convolutional feature maps and a novel loss function." Ex. 1007, 2. Figure 2 of Maninis, reproduced below, further illustrates using a deep learning device for performing contour and edge detection in images. *Id.* at 3.




Fig. 2. **Our deep learning architecture** (best viewed in color). The connections show the different stages that are used to generate the multiscale contours. Orientations further require additional convolutional layers in multiple stages of the network.

Figure 2, above, illustrates a deep learning architecture depicting connections between different stages used to generate the multiscale contours using multiple feature map layers in a CNN to detect image contents at different scales (fine and coarse detections) as well as different orientations. Ex. 1007, 3. It "depicts how we make use of information provided by the intermediate layers of a CNN to detect contours and their orientations at multiple scales." *Id.* Maninis further describes "recent approaches to contour detection using deep learning . . . [and] presenting our CNN architecture to produce contour detection." *Id.* Maninis "start[s] from a deep network pretrained on ImageNet, such as VGG, or ResNet." *Id.* at 4.

*b) Whether Maninis Qualifies as Prior Art*

Patent Owner argues that Petitioner has not demonstrated that Maninis is prior art to the '248 patent. PO Resp. 40. Specifically, Patent Owner contends that Petitioner has not shown that Maninis is a prior art printed publication. *Id.*

Petitioner contends that Maninis was published no later than May 2, 2017 on arXiv.org.[8] Pet. 10. In support, Petitioner relies on various exhibits purporting to establish arXIV.org's policies at the time of Maninis's submission, including (1) archival snapshots of arXiv.org web pages from the Internet Archive (also known as "The Wayback Machine"); (2) the Declaration of Mr. Frank-Wright[9]; and (3) testimony from Dr. Foroosh. *Id.*

[8] Dr. Foroosh testifies that "arXiv.org is an openly accessible, moderated repository for scholarly articles, covering an array of scientific fields." Ex. 1002 ¶ 54.

[9] Mr. Frank-White is a Records Request Processor at the Internet Archive, which created the Wayback Machine. Ex. 1031 ¶¶ 1, 3.

(citing Ex. 1002 ¶¶ 53–58; Ex. 1007, 1; Ex. 1022[10]; Ex. 1023[11]; Ex. 1026[12]; Ex. 1024[13]; Ex. 1025[14]; Ex. 1021); Reply 7 (citing Ex. 1022; Ex. 1031[15]; Ex. 1002 ¶¶ 53–59; Ex. 1023; Ex. 1026).

We first address Patent Owner's Motion to Exclude (Paper 34), which challenges many of Petitioner's supporting Exhibits. *See also* PO Resp. 40–41.

*(1) Patent Owner's Motion to Exclude*

Patent Owner seeks to exclude Exhibits 1022, 1023, 1025, and 1026, and paragraphs 53–58 of Dr. Foroosh's Declaration (Exhibit 1002). PO Mot. Excl. 1– 8. Petitioner opposes the motion. Pet. Opp. Mot. Excl. 1–13. For the reasons set forth below, we deny Patent Owner's motion.

*(a) Whether Exhibit 1002 ¶¶ 53–58 Lacks Foundation and is Improper Opinion Testimony*

Patent Owner argues that the Board should exclude paragraphs 53 through 58 of Exhibit 1002 because "Dr. Foroosh lacks sufficient knowledge and/or perception to rationally support the opinions he draws regarding Maninis's publication and the practices of arXiv.org." PO Mot. Excl. 6. In particular, Patent Owner argues that, because Dr. Foroosh has no personal

[10] arXiv.org Submission Help web page from The Wayback Machine, dated May 3, 2017.
[11] arXiv.org Article Replacement Help web page from TheWayback Machine, dated July 18, 2017.
[12] arXiv.org Article Replacement Help web page from The Wayback Machine, dated September 8, 2016.
[13] Maninis reference from The Wayback Machine, dated May 3, 2017.
[14] arXiv.org Author Search Page for Luc Van Gool from The Wayback machine, dated July 8, 2017.
[15] Third Affidavit of Mr. Frank-White, dated April 3, 2024.

knowledge regarding Maninis's publication date, his testimony lacks foundation and is improper lay opinion testimony. *Id.* at 7. Patent Owner further argues that Dr. Foroosh's opinions are not admissible as expert testimony because Petitioner has not shown that Dr. Foroosh "is an expert in the policies of arXiv.org or in their likely application to Maninis," and his opinions are "pure speculation." *Id.* at 7–8.

We agree with Petitioner that Dr. Foroosh's testimony in paragraphs 53–58 of Exhibit 1002 has sufficient foundation. *See* Opp. Mot. Excl. 10–12. Paragraphs 53–58 of Dr. Foroosh's declaration generally describe Dr. Foroosh's familiarity with arXiv.org, including its process and policies for publishing submitted papers at the time that Maninis was submitted, and application of these policies to Maninis. Dr. Foroosh testifies, for example, that he was a user of arXiv.org, a registered author of numerous articles available from the system, and had submitted several papers to arXiv.org in the same field of Maninis in May 2017. Ex. 1002 ¶ 53. Therefore, Dr. Foroosh testifies, he is "familiar with the processes practiced by arXiv.org for publishing submitted papers at the time that Maninis was submitted." *Id.* Based upon this testimony, as well as the policies of arXiv.org as reflected in Exhibits 1022, 1023, 1024, and 1026, Dr. Foroosh applies his personal familiarity and knowledge of arXiv.org to provide testimony about Maninis's publication date. *Id.* ¶¶ 54–58.

We further agree with Petitioner that Dr. Foroosh's testimony in paragraphs 53–58 of Exhibit 1002 is admissible. *See* Opp. Mot. Excl. 10–12. Dr. Foroosh's testimony is admissible under Federal Rule of Evidence 701. "[I]t is possible for the same witness to provide both lay and expert

testimony in a single case." Fed. R. Evid. 701 committee notes (2000 amendment). We find Dr. Foroosh's testimony in paragraphs 53–58 is "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." *See* Fed. R. Evid. 701. As such, it is admissible as opinion testimony by a lay witness. Moreover, the Board is well positioned to determine and assign appropriate weight to the evidence presented. *See, e.g., Donnelly Garment Co. v. NLRB*, 123 F.2d 215, 224 (8th Cir. 1941) ("One who is capable of ruling accurately upon the admissibility of evidence is equally capable of sifting it accurately after it has been received . . . ."). Under these circumstances, we deny Patent Owner's motion to exclude paragraphs 53–58 of Exhibit 1002.

*(b) Whether Exhibits 1022, 1023, 1025, and 1026 are Inadmissible Hearsay*

Each of Exhibits 1022, 1023, 1025, and 1026 is an archival web page of arXiv.org retrieved using The Wayback Machine. Patent Owner argues that Exhibits 1022, 1023, 1025, and 1026 should be excluded as inadmissible hearsay because they are out-of-court statements by arXiv.org that appear in archival webpage exhibits, and not in a qualifying declaration. PO Mot. Excl. 5. Patent Owner asserts that, because Petitioner and Dr. Foroosh offered and depended on the statements made in these exhibits "to prove the truth of the matter asserted in the statement[s]" (including the alleged policies of arXiv.org on the archival dates), they are inadmissible hearsay that should be excluded. *Id.* at 5–6 (citing Fed. R. Evid. 801 (c)).

Petitioner counters that Patent Owner's challenge is moot, because the Declaration of Mr. Frank-White (Ex. 1031) contains copies of each of the web pages shown in Exhibits 1022, 1023, 1025, and 1026, yet Patent Owner did not move to exclude Exhibit 1031. Pet. Opp. Mot. Excl. 3.

Petitioner argues that Exhibit 1025 is not inadmissible hearsay because Petitioner does not rely on Exhibit 1025 to demonstrate arXiv.org's publication policy, but rather to show that interested persons of ordinary skill in the art were provided with a link from which to directly download the Maninis reference prior to the '248 patent priority date. Pet. Opp. Mot. Excl. 3–4. According to Petitioner, "[t]his shows that Maninis was available to [persons of ordinary skill in the art] at the time" and "[t]he existence of a link is not an assertion relied on for its truth." *Id.* at 4. Additionally, Petitioner argues that Exhibits 1022, 1023, and 1026 are admissible for non-hearsay purposes because they "collectively show the policies that were communicated to authors by arXiv.org, explaining how its publication process would work, and in particular indicating that submitted papers would be published according to a defined schedule, putting their publication within about one business day of submission." *Id.* at 4–5. Further, Petitioner argues that, to the extent that they are hearsay, they are admissible under hearsay exceptions set forth in Fed. R. Evid. 803(3) (Then-Existing Mental, Emotional, or Physical Condition), 803(6) (Records of a Regularly Conducted Activity), and 807 (Absence of a Record of a Regularly Conducted Activity). *Id.* at 5–10.

Patent Owner responds that the link in Exhibit 1025 points to a different version of Maninis (Ex. 1021), so is not probative of Maninis's

publication date, and further argues that if Petitioner is arguing that Exhibit 1025 states which version of Maninis was linked, such statement is offered for its truth and is inadmissible hearsay. PO Reply Mot. Excl. 1. Patent Owner further argues that Petitioner fails to cite to any reliance on non-hearsay purposes for Exhibits 1022, 1023, and 1026. *Id.* Additionally, Patent Owner argues, among other things, that Petitioner cannot rely on Dr. Foroosh to establish the Rule 803(6) exception because the conditions must be "shown by the testimony of the custodian or another qualified witness." *Id.* at 3. Patent Owner also argues that Rule 807 is reserved for "exceptional cases." *Id.* at 4.

Patent Owner's arguments that Exhibits 1022, 1023, 1025, and 1026 should be excluded as inadmissible hearsay are not persuasive. Petitioner provides a Declaration from Mr. Frank-White, a Records Request Processor at the Internet Archive, describing the archive process used for URLs (i.e., a website address), which includes an archive date for a given URL. Ex. 1031 ¶¶ 1–5. Attached to the Declaration "are true and accurate copies of browser screenshots of the Internet Archive's records of the archived files for the URLs and the dates specified." *Id.* ¶ 6. These copies of browser screenshots reflect the same URLs, dates, and content as Exhibits 1026, 1025, 1023, and 1022. Patent Owner does not present evidence that Mr. Frank-White's testimony is unreliable or untruthful,[16] that the attached screenshots are inaccurate, or that Internet Archive was unreliable.

[16] Patent Owner's argument that Petitioner never cited Exhibit 1031 in its Reply is not accurate. *See* Reply 7–8.

In addition, Petitioner submits testimony from Dr. Foroosh, describing that, among other things, he is "familiar with arXiv.org as a user of the system and registered author of numerous articles available from the system," "submitted several papers to arXiv.org in the same field" in May 2017," and is "familiar with the processes practiced by arXiv.org for publishing submitted papers at the time that Maninis was submitted." Ex. 1002 ¶ 54. For example, Dr. Foroosh testifies that Exhibit 1022 explains that a submitted paper will be announced about one day after being submitted, and then mailed to all arXiv.org subscribers shortly thereafter, which is "consistent with [his] experience with arXiv.org typical practice in early 2017, as I observed regarding papers I submitted and papers I received as a subscriber during that time." *Id.* ¶ 56. Similarly, Patent Owner does not present evidence or rebuttal that Dr. Foroosh's testimony as to his personal knowledge of arXiv.org is unreliable or untruthful.

We determine that the Declarations of Mr. Frank-White and Dr. Foroosh provide sufficient support that Exhibits 1022, 1023, 1025, and 1026 are admissible under at least Fed. R. Evid. 803(6), the business records exception or Fed. R. Evid. 807, the residual hearsay rule.

Under Federal Rule of Evidence 803(6), records of a regularly conducted activity are not hearsay provided the opposing party has not established that the source of information or the method or circumstances of their preparation indicate a lack of trustworthiness, and the party offering the records establishes through the testimony of a qualified witness that the records are (a) made at or near the time from information transmitted by someone with knowledge, (b) kept in the course of a regularly conducted

business activity, and (c) made as a regular practice of that activity. Fed. R. Evid. 803(6). The qualified witness "who must authenticate business records need not be the person who prepared or maintained the records, or even an employee of the record-keeping entity, as long as the witness understands the system used to prepare the records." *Conoco Inc. v. Dept. of Energy*, 99 F.3d 387, 391 (Fed. Cir. 1996). "Because of the general trustworthiness of regularly kept records and the need for such evidence in many cases, the business records exception has been construed generously in favor of admissibility." *Id*. Similarly, under Federal Rule of Evidence 807, a hearsay statement is not excluded if (1) "the statement is supported by sufficient guarantees of trustworthiness–after considering the totality of the circumstances under which it was made and evidence, if any, corroborating the statement"; and (2) "it is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts."

As discussed above, Patent Owner does not provide any rebuttal evidence that the information contained in Exhibits 1022, 1023, 1025, and 1026 does not, for example, accurately reflect the submission policies (Ex. 1022), replacement policies (Ex. 1023, 1026), or search results for author "Gool_L" (Ex. 1025) or that any of the information contained therein is untrustworthy. *See, e.g.*, *Valve Corp. v. Ironburg Inventions Ltd.*, 8 F.4th 1364, 1374–1375 (Fed. Cir. 2021) (noting that "[d]istrict courts have taken judicial notice of the contents of webpages available through the Wayback Machine 'as facts that can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned'" and stating "[w]e

agree"). Mr. Frank-Wright's testimony establishes the date that the web pages in these exhibits were available, and Dr. Foroosh's testimony corroborates the information contained therein, based on his personal knowledge. *See* Pet. Opp. Mot. Excl. 8–10. Under these circumstances, we deny Patent Owner's motion to exclude Exhibits 1022, 1023, 1025, and 1026.

*(2) Analysis*

Whether a reference qualifies as a "printed publication" is a legal conclusion based on underlying factual findings, including whether the reference was publicly accessible. *Jazz Pharms., Inc. v. Amneal Pharm., LLC*, 895 F.3d 1347, 1356 (Fed. Cir. 2018)). "A reference is considered publicly accessible 'upon a satisfactory showing that such document has been disseminated or otherwise made available to the extent that persons interested and ordinarily skilled in the subject matter or art, exercising reasonable diligence, can locate it.'" *Id.* at 1355–56 (citing *In re Wyer*, 655 F.2d 221, 226 (CCPA 1981)). "If accessibility is proved, there is no requirement to show that particular members of the public actually received the information." *Constant v. Advanced Micro-Devices, Inc.*, 848 F.2d 1560, 1569 (Fed. Cir. 1988). In an *inter partes* review, the petitioner bears the burden of establishing that a particular document is a prior art printed publication. *Jazz Pharms.*, 895 F.3d at 1356 (citing *Medtronic, Inc. v. Barry*, 891 F.3d 1368, 1380 (Fed. Cir. 2018)).

Patent Owner argues that, although Petitioner has shown that Maninis was submitted to arXiv.org on April 28, 2017, Petitioner has not sufficiently identified the date Maninis was published, but has only provided two pieces

of circumstantial evidence that Maninis was published between April 28, 2017 and July 21, 2017, the priority date of the ’248 patent. PO Resp. 40 (citing Ex. 1007, 1; Ex. 1002 ¶ 55; Ex. 2048, 236:17–24). First, Patent Owner contends that Petitioner produces archived copies of the arXiv.org website from 2016 and 2017 reflecting the "policy" of arXiv.org to endeavor to publish articles shortly after they are submitted. *Id.* at 40–41 (citing Ex. 1022; Ex. 1023; Ex. 1026; Ex. 1002 ¶¶ 53–56). Second, Patent Owner contends that Petitioner cites another archived copy of Maninis dated January 17, 2017, but does not rely on this copy. *Id.* at 41 (citing Ex. 1024; Ex. 1002 ¶¶ 57–58); *see also* Ex. 1021; Ex. 1002 ¶ 53. However, Patent Owner argues, because both versions of Maninis share the same URL, this suggests that only the first version was published as of the archived date. PO Resp. 41 (citing Ex. 2048, 235:5–236:8).

We are persuaded that Petitioner has sufficiently shown that Maninis is prior art to the ’248 patent. There is no dispute that Maninis was submitted to arXIV.org on April 28, 2017, as is reflected in the indicia on the face of the document. Ex. 1007, 1; PO Resp. 40–41; Reply 7; Ex. 1002 ¶ 55. Therefore, the only dispute is whether Maninis was published prior to July 21, 2017.

Petitioner submits the arXIV.org Submission Help Page, dated May 3, 2017, which describes the submission process and the availability of submissions. Ex. 1022, 3. A chart is provided that describes when submissions received at certain times during the week will be announced and mailed to subscribers. *Id.* For example, submissions received between Thursday 14:00 to Friday 14:00 will be announced Sunday 20:00 and mailed

to subscribers Sunday Night / Monday Morning. *Id.* Similarly, submissions received between Friday 14:00 to Monday 14:00 will be announced Monday 20:00 and mailed to subscribers Monday Night / Tuesday Morning. *Id.* Dr. Foroosh corroborates that this is consistent with his experience with arXiv.org, that papers were published within about one business day after submission. Ex. 1002 ¶ 56. Therefore, Dr. Foroosh testifies that, since Maninis was submitted on Friday, April 28, 2017, it would have been announced on Sunday, April 30, 2017, or Monday, May 1, 2017, and would have been transmitted to subscribers no later than Tuesday, May 2, 2017. *Id.* ¶ 56.

Petitioner also provides two versions of the arXIV.org Article Replacement Help Page, dated September 8, 2016 and July 18, 2017, which both state that changes cannot be made without generating a new version of the article, and that previous versions of submitted articles are still publicly available. *See* Exs. 1023, 1026. Dr. Foroosh testifies that this is reflected in the two versions of Maninis that were submitted by Petitioner, one being the first version dated January 17, 2017, and the second version dated April 28, 2017. Ex. 1002 ¶ 57; Exs. 1021, 1007. Further, Dr. Foroosh testifies that he compared the metadata in Maninis, which indicates that second version was created and last modified on April 30, 2017, which is consistent with Maninis being placed in its final form by arXiv.org as of an announcement date of April 30, 2017, as well as his own experience. Ex. 1002 ¶ 57.

Additionally, Petitioner submits two additional exhibits providing support for Maninis's publication date. *See* Ex. 1002 ¶ 58. Petitioner submits Exhibit 1024, which is dated May 3, 2017 from the Wayback

Machine, and reflects a webpage featuring a link to arXiv.org for downloading a PDF copy of Maninis. Further, Petitioner submits Exhibit 1025, which is the arXIV.org Author Search Page for Luc Van Gool, one of the co-authors of Maninis, dated July 8, 2017. This page likewise shows a link to the Maninis article on arXiv.org. Ex. 1025, 3.

As discussed above, Petitioner submitted Mr. Frank-White's testimony that Exhibits 1026, 1025, 1023, and 1022 "are true and accurate copies of browser screenshots of the Internet Archive's records of the archived files for the URLs and the dates specified." Ex. 1031 ¶ 6. Petitioner likewise submitted testimony from Mr. Frank-Wright that Exhibit 1024 is "true and accurate copies of browser screenshots of the Internet Archive's records of the archived files for the URLs and the dates specified." Ex. 1032 ¶ 6.

We agree with Petitioner that all of the foregoing establishes that Maninis was publicly accessible prior to July 21, 2017. *See* Ex. 1002 ¶¶ 53–58; Reply 7–8; Pet. 10. Patent Owner's arguments largely address the admissibility of Petitioner's supporting exhibits, which, as discussed above, do not persuade us. *See* PO Resp. 40–41; Sur-reply 6–8. Although Patent Owner argues that "[m]any questions about Maninis's publication remain unanswered," (Sur-reply 6–7), Patent Owner does not elaborate or provide persuasive argument that Maninis was "irrevocably delayed" or that the submission and publication policies described in the arXiv.org exhibits submitted by Petitioner were not followed. Accordingly, we determine that the totality of the evidence supports that Maninis is prior art.

*5. Analysis of Independent Claim 1*

Petitioner contends that the combination of Kim, Invisalign, Salah, and Maninis teaches the limitations of independent claim 1. Pet. 27–41. Patent Owner disputes Petitioner's contentions. PO Resp. 42–63. For the reasons set forth below, we determine that, on the complete record, Petitioner has shown by a preponderance of the evidence that independent claim 1 would have been obvious over the combination of Kim, Invisalign, Salah, and Maninis.

*a) Preamble*

The preamble recites "[a] method for assessing the shape of an orthodontic aligner, said method comprising the following steps." Ex. 1001, 32:6–7. Petitioner contends that Kim and Invisalign teach such a method.[17] Pet. 28. According to Petitioner, "Kim teaches evaluating an aligner by reviewing an image of the aligner currently worn by the patient, to determine whether the aligner is normal and appropriate." *Id.* (citing Ex. 1005 ¶ 66). Petitioner also contends that "Invisalign teaches that evaluating a currently-worn clear aligner includes assessing the fit of the aligner, and that this assessment involves determining a distance between the teeth and the aligner when worn by the patient." *Id.* (citing Ex. 1006, 1).

Patent Owner does not dispute Petitioner's contentions. *See generally* PO Resp. After considering the arguments and evidence of the complete

[17] Petitioner does not argue, one way or the other, whether the preamble is limiting. We make no determination whether the preamble of claim 1 is limiting.

record, we determine that Petitioner has shown by a preponderance of the evidence that Kim and Invisalign teach the recited elements of the preamble.

*b) Limitation 1(a″)*

Limitation 1(a″) recites "more than l week after the start of the treatment with the aligner, acquisition of at least one image at least partially representing the aligner in a service position in which it is worn by a patient, called 'analysis image', the analysis image being a photograph, or an image extracted from a film," and claim 1 further recites that "in the step a″), a cellphone is used to acquire the analysis image." Ex. 1001, 32:8–13, 32:22–23.

*(1) Petitioner's Contentions*

Petitioner contends that limitation 1(a″) would have been obvious over Kim, Invisalign, and Salah. Pet. 29. Petitioner contends that Kim teaches that the patient's smartphone camera may be used to acquire photographs "showing a teeth alignment state of the orthodontic patient," which can further include "receiving the clear aligner information about a currently worn clear aligner," and enabling the orthodontist to "check[] a photo or a video of the clear aligner currently worn by the orthodontic patient" to "determine[] whether the clear aligner is normal and corresponds to an appropriate step." *Id.* (citing and quoting Ex. 1005 ¶¶ 55, 56, 66) (alterations in original). Petitioner further contends that Kim teaches acquiring an image at least one week after the start of treatment with the aligner, by disclosing that images may be taken recurrently based on calendared appointments. *Id.* at 32–33 (citing Ex. 1005 ¶ 83, Fig. 15).

Petitioner argues, "to the extent Patent Owner may argue Kim does not sufficiently describe the aligner currently worn and imaged is in a service position on the patient's teeth, taking such an image would have been readily apparent in view of Invisalign's teachings." Pet. 21. Petitioner contends that "Invisalign provides a reason to acquire an image of the patient's teeth with an aligner being worn in a service position: by assessing the gap visible between aligner and teeth, Invisalign teaches that it can be determined whether an aligner fits correctly (e.g., is normal and corresponds to an appropriate step), or whether it is seated or fit[s] poorly." *Id.* at 30 (citing Ex. 1002 ¶ 88); *see also* Ex. 1006, 1; *see also* Pet. 21–22. Petitioner also contends that Invisalign teaches acquiring an image at least one week after the start of treatment with the aligner, by disclosing the evaluation of issues that may arise during treatment, and that "treatments naturally take course over many weeks, and Invisalign teaches that treatment is assessed over such periods." Pet. 32 (citing Ex. 1006, i, 1); *see also id.* (citing Ex. 1002 ¶ 91).

Petitioner contends that, in view of Kim and Invisalign's teachings, a person of ordinary skill in the art "would have had reason to analyze images of the teeth of a patient wearing an aligner in a service position to evaluate whether the aligner fit appropriately." Pet. 22. According to Petitioner, the proposed "combination would be applying known methods for orthodontic evaluation of aligner fit based upon the appearance of the aligner worn on the patient's teeth, as taught by Invisalign, in order to analyze a photo or video of the aligner worn by the patient, as taught by Kim, thereby providing feedback regarding tooth-aligner separation to aid an orthodontist regarding

whether the clear aligner is normal and corresponds to an appropriate step of treatment." *Id.* at 22–23. Petitioner contends that Kim indicates that "employing such techniques would serve goals including enhancing accuracy, reducing the time and cost of treatment, and facilitating remote assessment." *Id.* at 23 (citing Ex. 1005 ¶¶ 8–10, 72).

Petitioner further contends that "Salah similarly teaches acquiring dental images with a cellphone, including of teeth fitted with orthodontic appliances." Pet. 30; *see id.* (citing Ex. 1008, 27:11–13, 31:4–7, 64:7–12, Fig. 11; Ex. 1002 ¶ 89); *see also id.* at 24. According to Petitioner, "[u]se of cellphones to acquire images depicting teeth wearing an aligner is also consistent with published methods of orthodontic practice." Pet. 31; *see id.* (citing Ex. 1009,[18] 19 ("Frey"); Ex. 1002 ¶ 90); *see also id.* at 23–24. Further, Petitioner argues that a person of ordinary skill in the art would have known how to determine the width of [gaps between the aligner and teeth] using image processing software, arguing that "Salah teaches application of computer image analysis to dental images for orthodontic treatment purposes," where the "images may be analyzed to 'measure the effectiveness of orthodontic treatment,' including by 'remotely monitor[ing] the progress of an orthodontic treatment.'" Pet. 24 (citing Ex. 1008, 46:15–24) (alteration in original).

---

[18] Scott Frey, *DIY Dental Monitoring Solution*, ORTHO COSMOS (April 29, 2017), http://theorthocosmos.com/blog [https://web.archive.org/web/20170504155213/http://theorthocosmos.com:80/blog].

*(2) Patent Owner's Arguments*

Patent Owner presents three main arguments that Petitioner has not established sufficient motivation to combine Kim and Invisalign.

First, Patent Owner argues that "Petitioner's motivation to combine Kim with Invisalign is premised on the incorrect assertion that Kim teaches the use of photographs of seated aligners." PO Resp. 47 (citing Ex. 1002 ¶¶ 71–72). More specifically, Patent Owner asserts that Kim's disclosure of "clear aligner information" "concerns images of the aligner itself, not a patient wearing the aligner." *Id.* (quoting Ex. 1005 ¶ 66).

Second, Patent Owner argues that Dr. Foroosh is not qualified to provide testimony regarding Invisalign because he lacks orthodontic experience, and, is therefore "unable to understand key portions of Invisalign or explain the meaning of terms appearing on the same pages of Invisalign that he cites." PO Resp. 49–51 (citing, e.g., Ex. 2054, 33:14–34:11, 36:5–17, 38:18–39:24; Ex. 1002 ¶¶ 47–48).

Third, Patent Owner argues that a person of ordinary skill in the art would not have been motivated to assess aligner fit by using an aligner image. PO Resp. 51. Patent Owner presents several arguments relating to the combination of Kim and Invisalign. Patent Owner argues that "Kim does not disclose the use (or usefulness) of photographs showing seated aligners," but, rather "expressly relates to 'remote teeth alignment services.'" *Id.* (citing Ex. 2028 ¶¶ 69, 70, 185, 186; Ex. 1005 ¶ 10; Ex. 2030 ¶ 76). Patent Owner draws a distinction between assessing teeth alignment and assessing aligner fit, arguing that Kim does not purport to provide a new way to assess aligner fit from a photograph, and Invisalign is concerned with

in person-analysis, where orthodontists perform certain steps at each appointment that cannot be performed remotely. *Id.* at 52 (citing Ex. 2030 ¶ 58). Moreover, Patent Owner argues that the images in Invisalign were not acquired on a cellphone, and a person of ordinary skill in the art "would have recognized that the images in Invisalign were taken by trained professionals with a more sophisticated camera than a 2017 cellphone." *Id.* (citing Ex. 2054, 71:11–14, 134:10–135:11; Ex. 2030 ¶ 67). Patent Owner argues that Invisalign does not suggest using cellphones to assess aligner fit, nor suggest measuring the separation on an image to assess aligner fit. *Id.* at 52–53 (citing Ex. 2028 ¶ 187). In short, Patent Owner argues "nothing in Kim or Invisalign suggests that the in-person techniques of Invisalign could be successfully replaced with computer-implemented analyses on patient-initiated photographs captured using a cellphone." *Id.* at 53 (citing Ex. 2028 ¶ 189).

Patent Owner also argues against the combination of Kim, Invisalign, and Salah.[19] Patent Owner argues that, "[a]lthough Salah includes one image showing a device positioned on the teeth, that device" is "not a removable aligner." PO Resp. 54 (citing Ex. 1008, Fig. 11; Ex. 2028 ¶ 190; Ex. 2030 ¶¶ 83–84). Moreover, Patent Owner asserts, "Salah does not describe any method for assessing the fit of a device." *Id.* Patent Owner also argues that Petitioner's motivation to combine Kim with Salah is "based on the faulty premise that Kim 'teaches application of computer image

[19] We address additional arguments regarding the combination with Salah in Section III.D.5.c.3 below.

analysis to dental images,'" but "Kim discloses no computer image analysis." *Id.* at 48 (emphasis omitted).

We address each of Patent Owner's arguments below.

*(3) Analysis*

Petitioner has shown, by a preponderance of the evidence, that the combination of Kim, Invisalign, and Salah teaches limitation 1(a″), and has persuasively explained why a person of ordinary skill in the art would have been motivated to combine Kim, Invisalign, and Salah.

Generally, Patent Owner's arguments against the combination of Kim, Invisalign, and Salah (1) address the references separately, rather than in combination as proposed by Petitioner; (2) argue that the references themselves do not teach the motivation to combine; or (3) argue features in the references that are not relied upon by Petitioner for this particular limitation. These arguments are not persuasive. *See*, *e.g.*, *In re Merck & Co., Inc.*, 800 F.2d 1091, 1097 (Fed. Cir. 1986) ("Non-obviousness cannot be established by attacking references individually where the rejection is based upon the teachings of a combination of references."); *DyStar Testilfarben GmbH v. C.H. Patrick Co.*, 464 F.3d 1356, 1368 (Fed. Cir. 2006) (stating that motivation to combine prior art references may exist "even absent any hint of suggestion in the references themselves").

We begin by reiterating how Petitioner relies on each of the references to teach limitation 1(a″): "more than l week after the start of the treatment with the aligner" (Kim and Invisalign), "acquisition of at least one image at least partially representing the aligner in a service position in which it is worn by a patient, called 'analysis image', the analysis image being a

photograph, or an image extracted from a film," (Kim or Kim, Invisalign, and Salah), and "in the step a″), a cellphone is used to acquire the analysis image" (Kim and Salah). Pet. 29–34.

*(a) Whether Kim or Kim, Invisalign, and Salah Teaches "acquisition of at least one image at least partially representing the aligner in a service position in which it is worn by a patient, called 'analysis image'"*

There is no dispute that Kim teaches using a smartphone or mobile device to acquire an image of a patient's teeth. *See, e.g.*, Ex. 1005 ¶¶ 1, 10, 13 (describing "photographing step information, . . . and a front-view teeth photo, a bottom-view low-angle teeth photo, . . . which are taken using a camera of the orthodontic patient terminal"), 42 (describing that the orthodontic patient terminal is not limited to a smartphone and may also be a mobile device), 56, 58 (describing "a teeth contour automatic recognition photographing program 647 for displaying a virtual teeth line on the screen of the orthodontic patient terminal 10 and automatically recognizing and taking a photo of the teeth of the orthodontic patient shown on the screen"). However, in various instances, Kim refers to the "currently worn clear aligner" or a "clear aligner to be currently worn" (e.g., Ex. 1005 ¶¶ 10, 66), and the parties dispute whether this refers to the patient wearing the aligner when the photograph is taken (as Petitioner argues) or whether it simply refers to the aligner by itself that the patient is currently using (as Patent Owner argues). Pet. 29; PO Resp. 47; Sur-reply 14–15.

Kim at least *suggests* that a photograph may be acquired while the aligner is being worn. For example, Kim describes that:

> The clear aligner information transmission program **69** may be a program for receiving the *clear aligner information about a*

> *currently worn clear aligner from the orthodontic patient terminal* ***10,*** storing the clear aligner information, and transmitting the clear aligner information to the orthodontist terminal **20** in such a manner that the *orthodontist checks a photo or a video of the clear aligner currently worn by the orthodontic patient*, and determines whether the clear aligner is normal and corresponds to an appropriate step.

Ex. 1005 ¶ 66 (emphasis added); *see also id.* ¶¶ 13 (teeth alignment report information may include photographs taken using a camera of the orthodontic patient terminal), 14 (teeth alignment report information input program may include various guidance information for taking the photograph), 20 (based on the teeth alignment report information, determining that an additional or modified clear aligner is needed, and transmitting a clear aligner information to a clear aligner manufacturing terminal), 64 (teeth alignment guidance information may include at least one of a clear aligner information about a clear aligner to be worn in a current step among a clear aligner set); *see also id.* ¶¶ 56, 58.

Patent Owner argues that the disclosure in paragraph 66 cited above refers to a photograph of the clear aligner by itself (PO Resp. 47; Ex. 2030 ¶ 74); however, Patent Owner does not identify any disclosure in Kim that describes taking a photograph of the clear aligner by itself. Rather, the photograph provided in the teeth alignment report information in Kim describes photographs taken of the patient's mouth and jaw area. Ex. 1005, ¶¶ 13, 56, 87. Further, Patent Owner's argument that Kim's image is not used for diagnostic or treatment purposes (PO Resp. 47), is not supported by the disclosure in Kim. Paragraph 66 of Kim, reproduced above, explicitly states that "the orthodontist checks a photo or a video of the clear aligner

currently worn by the orthodontic patient, and determines whether the clear aligner is normal and corresponds to an appropriate step."

Even if Kim only teaches taking a photograph of the patient's teeth with no aligner in place, we agree with Petitioner that taking the photograph with the seated aligner in place would have been obvious in view of the teachings in Invisalign and Salah. Pet. 21, 29–31; Reply 14. That is, Salah teaches using a cellphone to acquire an image of the patient's teeth while the user is wearing an orthodontic appliance and analyzing that image. Ex. 1008, 27:11–13, 31:4–7, 34:5–36:15, 64:7–12, Fig. 11. And, as Petitioner argues, "Invisalign provides a reason to acquire an image of the patient's teeth with an aligner being worn in a service position: by assessing the gap visible between aligner and teeth, Invisalign teaches that it can be determined whether an aligner fits correctly (e.g., is normal and corresponds to an appropriate step), or whether it is seated or fit poorly." Pet. 30 (citing Ex. 1002 ¶ 88); *see also id.* at 21–23.[20] Patent Owner's arguments that the images in Invisalign were not taken on a cellphone are beside the point (and Invisalign is not relied upon for that teaching), given the disclosures in both Kim and Salah that teach acquiring dental images using a cellphone. *See* PO Resp. 52–53.

*(b) Whether Dr. Foroosh Failed to Properly Analyze Invisalign*

We are not persuaded by Patent Owner's arguments that Dr. Foroosh does not understand "key portions" of Invisalign nor does he "explain the

[20] Patent Owner argues that Dr. Foroosh is not qualified to offer this opinion. PO Resp. 52. However, for the reasons described in Section III.B. and in Section III.D.5.b.3.b below, we disagree.

meaning of terms appearing on the same pages of Invisalign that he cites." PO Resp. 49; *see* Reply 15–16.

Patent Owner provides no explanation as to why the terms Patent Owner's counsel chose to ask Dr. Foroosh about during deposition (e.g., "auxiliary," "interproximal reduction," "patient compliance," "unengaged attachment," "scalar") are relevant to the challenged claims of the '248 patent, or the combination as proposed by Petitioner. *See* Reply 16. As described in the Petition, "Invisalign provides a reason to acquire an image of the patient's teeth with an aligner being worn in a service position." Pet. 30 (citing Ex. 1002 ¶ 88). Patent Owner's argument that Dr. Foroosh did not understand the Invisalign reference because he could not provide a dentist's or orthodontist's opinion on what certain medical terms mean is not persuasive. However, we note that in several instances Dr. Foroosh indicated familiarity with the terms. For example, when asked about the term "interproximal reduction," Dr. Foroosh testified that "I have come across this term back when I was working on imaging sciences on that project; so I am familiar with treatments for, you know, creating spaces between teeth." Ex. 2054, 36:5–10. Dr. Foroosh also testified "I know what scalers are. They're in dentists' offices." *Id.* at 65:12–18.

Patent Owner also argues that Dr. Foroosh disregarded certain portions of Invisalign that describe methods for assessing aligner fit that can only be performed in person (PO Resp. 49–50; Sur-reply 16–17), but there is no dispute that Invisalign methods were performed in person. *See, e.g.*, Ex. 2054, 66:14–15 (Dr. Foroosh stating that "I consider Invisalign not a remote treatment disclosure"), 67:5–7 (Dr. Foroosh stating that "I understand that

Invisalign is not disclosing a remote assessment or treatment"); Ex. 2030 ¶ 58. We further note that, as Petitioner points out (Reply 3), Dr. Kusnoto testified that, "with the exception of the illustration of poor fit," Dr. Foroosh is "getting the terminology correct." Ex. 1052, 44:1–45:11.

*(c) Whether Petitioner has Established Motivation to Combine Kim, Invisalign, and Salah*

Patent Owner argues that a person of ordinary skill in the art would not have been motivated to assess aligner fit using an aligner image. PO Resp. 51. Patent Owner incorrectly focuses on whether any one of the references teaches assessing aligner fit using an image, rather than Petitioner's proposed combination and reasons explaining why a person of ordinary skill in the art would have been motivated to do so.

With respect to Kim, although we recognize that there is a difference between teeth alignment and aligner fit (*see* PO Resp. 48, 51), the record supports a relationship between the two. For example, Kim describes "providing remote teeth alignment services to remotely advise an appropriate step of a clear aligner using a smartphone of an orthodontic patient." Ex. 1005 ¶ 1; *see also id.* ¶ 66 (stating that the orthodontist "determines whether the clear aligner is normal and corresponds to an appropriate step"). Further, in discussing conventional clear-aligner treatment, Kim states "an orthodontic patient should regularly visit a dental clinic for a long period of time to allow a dentist to accurately check the state of his/her teeth and determine a currently appropriate step of a clear aligner." Ex. 1005 ¶ 8; *see also* Ex. 2030 ¶¶ 46–49 (Dr. Kusnoto testifying that in a conventional in-person analysis, the orthodontist would first visually inspect the current state of dentition and compare that state to the

anticipated dentition expected at that point in the treatment, and second assess the aligner treatment); Ex. 1001, 27:55–59 ("At regular intervals, the patient goes to the orthodontist for a visual inspection, notable to check whether the displacement of the teeth confirms to the expectations and whether the aligner worn by the patient is still suited to the treatment."). The record also supports Petitioner's contentions that assessment of an aligner is naturally made when the aligner is worn on the teeth. *See* Reply 13–14. For example, Dr. Kusnoto testifies that, "[g]enerally, a patient was asked to try on their current aligner, and each aligner was visually and manually examined for large gaps between the aligner and the teeth." Ex. 2030 ¶ 49.

Patent Owner fails to persuasively address Petitioner's motivation to combine the references. *See* Pet. 20–23. Rather, Patent Owner's arguments attack the references individually and fail to persuasively address Petitioner's extensive reasoning. For example, Patent Owner argues that Kim does not suggest providing a new way to assess aligner fit from a photograph, Invisalign does not indicate that images taken with a cellphone would be suitable for assessing aligner fit, Invisalign does not suggest measuring separation on an image to assess aligner fit, and neither reference suggests that Invisalign's in-person techniques could be successfully replaced with computer-implemented analyses on patient-initiated photographs captured using a cellphone. PO Resp. 51, 53. However, the motivation need not come from the references themselves, *see DyStar*, 464 F.3d at 1356, and these arguments do not directly address Petitioner's stated motivation to combine the references. *See* Pet. 20–27. For example, *Dystar*

states that motivation can arise when the combination "create[s] a faster, cheaper, and more convenient . . . process." PO Resp. 56–57 (citing *Dystar*, 464 F.3d 1356 at 1358). Petitioner provides similar types of reasons for the combination here, citing Kim, that "employing such techniques would serve goals including enhancing accuracy, reducing the time and cost of treatment, and facilitating remote assessment." Pet. 23 (citing Ex. 1005 ¶¶ 8–10, 72). We find that Petitioner's reasoning provides persuasive support that a person of ordinary skill in the art "would have been motivated" to combine the references, and Patent Owner has not persuasively argued otherwise. *See InTouch Techs., Inc. v. VGO Commc'ns, Inc.*, 751 F.3d 1327, 1352 (Fed. Cir. 2014).

Moreover, Patent Owner's focus on Kim and Invisalign does not take into account Petitioner's reliance on Salah, which teaches "application of computer image analysis to dental images for orthodontic treatment purposes." Pet. 24 (citing Ex. 1008, code (57), 8:19–28, 13:24–28, 31:4–9). We do not find persuasive Patent Owner's arguments against the combination of Salah with Kim, for the reasons set forth by Petitioner. Reply 14–15. That is, we agree with Petitioner that Salah teaches application of computer image analysis to dental images for orthodontic treatment purposes, and that Kim also teaches analysis of images on computers. *Id.*; *see also* Pet. 24. As described above, Kim teaches taking a photograph of (at minimum) the patient's teeth on a smartphone, including guidance information on how to take that photograph, and transmitting that photograph to an orthodontist terminal for the orthodontist to check. E.g., Ex. 1005 ¶¶ 55–58, 66. Likewise, Patent Owner's arguments that "Salah

does not describe any method for assessing the fit of a device" are not persuasive because Petitioner does not rely on Salah to teach a method for assessing the fit of a device. *See* Pet. 24–26, 30, 34–35.

Moreover, we disagree with Patent Owner's arguments that the purported benefits of Kim that Petitioner relies upon – enhancing accuracy, reducing the time and cost of treatment, and facilitating remote assessment – only stem from its use of teeth alignment information. PO Resp. 47. Rather, these benefits are a direct result of Kim's ability to provide *remote* teeth alignment services, where the condition of the patient may be *remotely* and accurately diagnosed, and the information about the accurate step of a clear aligner to be currently worn may be *remotely* provided. Ex. 1005 ¶ 10; *see also id.* ¶¶ 8–9; *see* Reply 16. In fact, the problems described in Kim leading to remote teeth alignment services are nearly identical to the problems described in the '248 patent. Ex. 1005 ¶ 9 (describing that if a patient is not able to frequently visit the dental clinic, or stops visiting the dental clinic, problems can occur such as increased time and cost); Ex. 1001, 1:54–58 (describing that the need to travel to the orthodontist's is a burden on the patient and can lead to additional expense). These disclosures support Petitioner's reasons to combine the references.

In short, we are persuaded by Petitioner's reasoning,[21] which is supported by testimony from Dr. Foroosh, that the combination "appl[ies]

---

[21] Petitioner also relies on Frey to support the argument that "[u]se of cellphones to acquire images depicting teeth wearing an aligner is also consistent with published methods of orthodontic practice." Pet. 31 (citing Ex. 1009, 19). Our determination does not depend on Petitioner's reliance

known methods for orthodontic evaluation of aligner fit based upon the appearance of the aligner worn on the patient's teeth, as taught by Invisalign, in order to analyze a photo or video of the aligner worn by the patient, as taught by Kim[, Invisalign, and Salah],[22] thereby providing feedback regarding tooth-aligner separation to aid an orthodontist regarding whether the clear aligner is normal and corresponds to an appropriate step of treatment." *See* Pet. 22–23. Petitioner provides extensive persuasive reasons for the combination, such as those as stated in Kim, of "enhancing accuracy, reducing the time and cost of treatment, and facilitating remote assessment," and Invisalign's teachings of "how to evaluate aligner fit." *Id.* at 20–23 (citing Ex. 1005 ¶¶ 8–10, 72).

*(d) Conclusion Limitation 1(a")*

After considering the arguments and evidence of the complete record, we determine that Petitioner has shown, by a preponderance of the evidence, that the combination of Kim, Invisalign, and Salah teaches this limitation, and has persuasively explained why a person of ordinary skill in the art would have been motivated to combine Kim, Invisalign, and Salah.

---

on Frey. That is, Frey is not necessary to support our determination that Petitioner has shown by a preponderance of the evidence that a person of ordinary skill in the art would have been motivated to combine Kim, Invisalign, and Salah. Therefore, we do not address Patent Owner's arguments regarding Frey. *See* PO Resp. 56–57.

[22] As described above, Petitioner alternatively relies on Kim, Invisalign, and Salah to teach the photo of the aligner worn by the patient. *See* Pet. 21, 29–31.

*c) Limitation 1(b″)*

Limitation 1(b″) recites "analysis of the analysis image by means of a deep learning device, trained by means of a learning base, so as to determine a value for at least one tooth attribute of an 'analysis tooth zone' representing, at least partially, a tooth on said analysis image, the tooth attribute relating to a separation between the tooth represented by the analysis tooth zone, and the aligner represented on the analysis image." Ex. 1001, 32:14–21.

*(1) Petitioner's Contentions*

Petitioner contends that limitation 1(b″) would have been obvious over the combination of Kim, Invisalign, Salah, and Maninis. Pet. 34 (citing Ex. 1002 ¶¶ 93–94).

Petitioner contends that "Salah teaches that dental images may be analyzed to detect 'discriminant information,' which can include contours of objects depicted in the images, including teeth and other intraoral objects such as gums." Pet. 34 (citing and quoting Ex. 1008, 34:5–14, 55:21–56:7). According to Petitioner, the "contours may be detected using deep learning." *Id.* at 35 (citing Ex. 1008, 36:14; Ex. 1002 ¶ 96).

Petitioner contends that Maninis teaches applicable deep learning techniques for contour and object detection, and that "Maninis's use of a computing device comprising a trained deep-learning convolutional neural network to analyze images matches the '248 patent's preferred embodiment." Pet. 36–38 (citing, e.g., Ex. 1001, 1:24–25, 16:9–36; Ex. 1007, 2, 3–5, 9, Fig. 2); *see also id.* at 24–25.

According to Petitioner, a person of ordinary skill in the art "would have been motivated to use [Maninis's] techniques to identify teeth and aligners depicted in orthodontic images by detecting their contours and identifying the objects found within each contour." Pet. 38. Petitioner argues:

> Based on Maninis's flexibility and prospect to improve performance, a [person of ordinary skill in the art] would have been motivated to analyze images using a deep learning device as taught by Maninis to improve image acquisition and analysis apparatus as taught by Salah and Kim. For example, a [person of ordinary skill in the art] would have been motivated to adapt Salah and Kim's image acquisition and analysis apparatus to employ a deep learning architecture as taught by Maninis, trained on images relevant to the dental imaging applications of Salah, Kim, and Invisalign. Maninis's deep learning architecture would provide specific functionalities required by Salah, Kim, and Invisalign, including the ability to identify objects (such as the teeth and aligners depicted in each image) and to detect contours (such as the edges of teeth and aligners useful to assess aligner fit as taught by Invisalign).

*Id.* at 26 (citing Ex. 1002 ¶ 78).

Petitioner contends that the adjustments to Maninis's deep learning device, which "include providing an appropriately annotated training set and setting output layers to provide the required object identifications corresponding to the labels used to identify the locations of teeth, aligners, and the gaps between them," would have been "straightforward and well within the skill level of the [person of ordinary skill in the art]." Pet. 38. (citing Ex. 1002 ¶ 102); *see also* Ex. 1002 ¶¶ 102–103 (cited at Pet. 38–39).

> Petitioner contends that a person of ordinary skill in the art
>
> would have been motivated in view of Kim and Invisalign to apply the contour-detection techniques of Salah and Maninis to detect edges of teeth and aligners depicted in images of patient's teeth so that the assessment of gap between aligner and teeth could be made, as taught by Invisalign. For example, because the detected edges of the aligner and teeth correspond to the edges of the physical objects depicted, a [person of ordinary skill in the art] would have understood that measuring the distance between the outlines of the teeth and the aligner as detected by Salah's image processing software would allow determination of the gap between each tooth and the corresponding part of the aligner.

Pet. 39–40 (citing Ex. 1002 ¶ 104); *see also id.* at 26–27. Petitioner contends that, contour detection of a region (as taught by Maninis) containing a tooth (alone, or a tooth and an aligner surface separated by a gap) constitutes an analysis tooth zone at least partially representing a tooth on the analysis image. *Id.* at 40–41 (citing Ex. 1007, Abstract, 3–5; Ex. 1002 ¶ 106). In addition, Petitioner argues, "this analysis would generate tooth attributes, including the locations of the surfaces of the tooth and aligner (corresponding to detected contours), as well as the measured separation between them (the distance between the contours), consistent with the teachings of Invisalign." *Id.* at 41 (citing Ex. 1002 ¶ 107).

Petitioner contends that "[t]he resulting combination would use each reference's teachings to perform substantially the same function as they provide alone, applying the contour detection taught by Salah and Maninis to detect edges of teeth and aligners to produce a measurement of distance between these surfaces, as taught by Invisalign, to assess whether the imaged aligner fits appropriately for the current step in patient treatment, as taught

by Kim." Pet. 27. Petitioner contends that a person of ordinary skill in the art would "have had a reasonable expectation of success, as the combination would be one of complementary techniques, applied in understood ways, to produce a predictable outcome." *Id.* (citing Ex. 1002 ¶¶ 80–81).

*(2) Patent Owner's Arguments*

Patent Owner argues that a person of skill in the art would not have been motivated to combine Kim, Salah, and Invisalign with Maninis to teach limitation 1(b″). PO Resp. 58.

First, Patent Owner argues that the proposed combination is inoperable because "the Maninis COB network is incapable of being trained [in the manner proposed by Petitioner] or performing such an analysis." PO Resp. 42–43 (citing Ex. 2028 ¶¶ 172–183).

Second, Patent Owner argues that Dr. Foroosh relies on impermissible hindsight, rather than the motivations and teachings of the art in 2017. PO Resp. 59 (citing Ex. 2054, 157:21–158:23, 159:10–13, 178:20–179:2; Ex. 2059 ¶ 83).

Third, Patent Owner presents various arguments challenging Petitioner's motivation to combine the references, and argues that a person of ordinary skill in the art would not have been motivated to assess aligner fit using a deep learning device. PO Resp. 60–62.

Fourth, Patent Owner argues that the significant time and expense associated with implementing Maninis's deep learning architecture to assess aligner images weighs against any motivation to combine the references. PO Resp. 62–63.

We address each of Patent Owner's arguments below.

*(3) Analysis*

Petitioner has shown, by a preponderance of the evidence, that the combination of Kim, Invisalign, and Salah teaches limitation 1(b″), and has persuasively explained why a person of ordinary skill in the art would have had reasons to combine Kim, Invisalign, Salah, and Maninis, with some rational underpinning, and would have had a reasonable expectation of success in doing so.

We again begin by setting forth how Petitioner relies on each of the references to teach limitation 1(b″): "analysis of the analysis image" (Salah and Maninis) "by means of a deep learning device" (Salah and Maninis), "trained by means of a learning base" (Maninis), and "so as to determine a value for at least one tooth attribute of an 'analysis tooth zone' representing, at least partially, a tooth on said analysis image, the tooth attribute relating to a separation between the tooth represented by the analysis tooth zone, and the aligner represented on the analysis image" (Salah and Maninis). We address each of Patent Owner's arguments in turn.

*(a) Whether the Combination is Inoperable*

Patent Owner's argument that the combination is inoperable is based on a mischaracterization of Petitioner's arguments. *See* Reply 9. Patent Owner argues that "[t]he Maninis COB neural network can be trained *only* on contours and can identify in an image *only* contours," but "is incapable of determining ***what those objects might be***." PO Resp. 44 (citing Ex. 2028 ¶¶ 178–179). Patent Owner argues "[a]s Maninis itself discloses, another neutral network is required to make that kind of 'semantic' determination." *Id.* Patent Owner argues that, "[a]lthough Maninis refers to other neural

networks, which are described by different authors in different papers not in evidence in this proceeding, Petitioner cannot rely on that disclosure now." *Id.* at 44–45 (emphasis omitted).

However, Petitioner explicitly relies on the "semantic" determination disclosed in Maninis. *See, e.g.*, Pet. 37–39 (citing, e.g., Ex. 1007, 11–12, Tables 4–12). As argued by Petitioner, "[t]he petition repeatedly cites to that section of Maninis (section 6, pages 11-13) when explaining that Maninis uses neural networks not only to detect contours, but also uses the regions identified by those contours to classify objects." Reply 9–10 (citing Pet. 10, 25, 37–38, 45, 53; Ex. 1002 ¶¶ 59, 75, 77, 101, 102). Therefore, to the extent Patent Owner argues that Petitioner exclusively relies on Maninis's COB neural network to teach the claimed "a deep learning device trained by means of a learning base," we disagree. At no point does Petitioner exclusively rely on Maninis's COB neural network to teach step 1(b″) and any arguments from Patent Owner premised on this assertion are not responsive to Petitioner's contentions.

Further, we do not agree with Patent Owner's argument that, because Maninis's deep learning architecture is only trained to identify contours, which are used to classify objects, it is incapable of being trained to perform the claimed image analysis. PO Resp. 42–46, 68–70. Claim 1 does not identify a particular type of deep learning device; it suffices that the deep learning architecture disclosed by Maninis is capable of performing the claimed image analysis. The '248 patent describes that "a deep learning device, preferably a neural network, is trained with the learning base." Ex. 1001, 16:5–6. The '248 patent further provides a non-limiting list of neural

networks, including "networks specializing in the classification of images, called 'CNN' ('convolutional neural network')." *Id.* at 16:9–11. This is the same deep learning architecture taught by Maninis and relied on by Petitioner. *See* Pet. 36–37 (arguing that "Maninis's use of a computing device comprising a trained deep-learning [CNN] to analyze images matches the '248 patent's preferred embodiment"); *see also* Ex. 1007, Abstract, 3–5, Fig. 2.

*(b) Whether the Proposed Combination is a Product of Impermissible Hindsight*

We do not find Patent Owner's impermissible hindsight arguments to be persuasive. In support of these arguments, Patent Owner compares Dr. Foroosh's approach in this proceeding to his approach in related IPR2024-00110, where the claims at issue do not require deep learning, and Dr. Foroosh relies on a different, non-deep learning method identified as "preferred" in Salah. PO Resp. 59. However, Patent Owner does not dispute that Salah discloses various processes to detect high-contrast regions and determine contours, including "the following well-known and preferred methods" such as "applying a Canny filter," as well as "not preferred" methods such as deep learning. Ex. 1008, 34–36. In connection with these processes, Salah also states that "[a] person of skill in the art [would] know how to process an updated image to reveal discriminant information . . . for example, [by using] the application of well-known masks or filters provided by image processing software . . . to detect high-contrast regions and determine contours." *Id.* at 34:11–14. As argued by Petitioner, and we agree, "Salah clearly teaches deep learning and other image processing algorithms are options to determine contours and other discriminant

information," and "similar motivations would lead [persons of ordinary skill in the art], at their preference, to either use deep learning . . . or use the other image processing techniques taught by Salah." Reply 19–20. Therefore, contrary to Patent Owner's arguments, Dr. Foroosh's testimony is based upon the express disclosure of Salah, not hindsight. *See, e.g., In re Gartside*, 203 F.3d 1305, 1319 (Fed. Cir. 2000) (stating that "the best defense against the subtle but powerful attraction of a hindsight-based obviousness analysis is rigorous application of the requirement for a showing of the teaching or motivation to combine prior art references," which "may come from . . . the teachings of the references themselves") (quoting *In re Dembiczak*, 175 F.3d 994, 998 (Fed. Cir. 1999).

*(c) Rationale to Combine with a Reasonable Expectation of Success*

Based on the complete record, we are persuaded that Petitioner has presented a sufficient rationale to combine the teachings of Kim, Invisalign, Salah, and Maninis with a reasonable expectation of success. *See* Pet. 20–27.

Patent Owner's arguments that a person of ordinary skill in the art would not have been motivated to assess aligner fit using a deep learning device are not persuasive. We agree with Petitioner that "Salah teaches that dental images may be analyzed [using deep learning] to detect 'discriminant information,' which can include contours of objects depicted in images, including teeth or other intraoral objects, such as gums." Pet. 34–35 (citing e.g., Ex. 1008, 34:11–36:14, 55:21). To that end, we disagree with Patent Owner that a person of ordinary skill in the art "would not have viewed

Salah as a general teaching to apply 'computer image analysis to entail images for orthodontic treatment purposes.'" PO Resp. 60.

Patent Owner's argument that Salah would not have provided motivation because it states that "deep learning" is "not preferred" (PO Resp. 60) is not persuasive. *See In re Fulton*, 391 F.3d 1195, 1200 (Fed. Cir. 2004) ("[O]ur case law does not require that [the] particular combination must be the preferred, or the most desirable, combination described in the prior art in order to provide motivation for the current invention."); *In re Mouttet*, 686 F.3d 1322, 1334 (Fed. Cir. 2012) (stating "just because better alternatives exist in the prior art does not mean that an inferior combination is inapt for obviousness purposes"). Further, as Petitioner points out (Reply 21), Salah teaches that its image analysis is "best carried out either on the patient's own device, preferably using the device used in step b), **or** with an app at a dental professional's office, **or** with a dedicated third-party server," (Ex. 1008, 33:6–8, emphasis added), so Patent Owner's arguments that because "Salah's image analysis is 'best carried out . . . on the patient's own device'" it would have discouraged a person of ordinary skill in the art from using deep learning (PO Resp. 60) is likewise not persuasive for the same reasons.

We are also not persuaded by Patent Owner's argument that Salah teaches away from the combination because it teaches that "low-contrast" areas will produce low quality contours. PO Resp. 55–56 (citing Ex. 1008, 60:17–61:3; Ex. 2028 ¶¶ 124, 171 191; Ex. 2030 ¶ 84); Sur-reply 18–19. "A reference may be said to teach away when a person of ordinary skill, upon reading the reference, would be discouraged from following the path set out

in the reference, or would be led in a direction divergent from the path that was taken by the applicant." *DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 567 F.3d 1314, 1327 (Fed. Cir. 2009) (quoting *Ricoh Co., Ltd. v. Quanta Comput. Inc.*, 550 F.3d 1325, 1332 (Fed. Cir. 2008)). A reference does not teach away "if it merely expresses a general preference for an alternative invention but does not 'criticize, discredit, or otherwise discourage' investigation into the invention claimed." *Id.* (quoting *In re Fulton*, 391 F.3d at 1201).

Relying on testimony from Dr. Kusnoto and Dr. Mongan, Patent Owner argues that, "[b]ecause aligners visually blend with teeth, they represent areas of low contrast." PO Resp. 55 (citing Ex. 2030 ¶ 84; Ex. 2028 ¶ 124). We find persuasive Dr. Foroosh's testimony that "Salah does not teach that only maximal-contrast areas can produce useful contours." Ex. 1048 ¶ 23. There is no persuasive evidence in the record that aligners on teeth represent areas of unacceptably low contrast. *See* Reply 17 (citing Ex. 1051, 60:6–62:13; Ex. 1048 ¶ 23). For example, Dr. Mongan testified that he "didn't see a need to run any tests to confirm something that I think was clear to me and was confirmed by . . . [Dr. Kusnoto]" and that an "image with an aligner in a service position would likely have a lower contrast than equivalent image without the aligner there." Ex. 1051, 60:6–14, 62:3–13.

Rather, Dr. Foroosh provided examples of edge detection in an image from Invisalign, as well as images that Dr. Kusnoto asserted would have been representative of aligner fit, using Canny edge detection and bilateral

filtering techniques,[23] which show sufficient contrast to detect edges. Ex. 1002 ¶ 103; Ex. 1048 ¶¶ 20–21. We find persuasive these examples provided by Dr. Foroosh, as to how the combined system would work, and in particular, that "the photographs of Kim, Salah, and Invisalign are ordinary camera images such as those acquired by a cellphone, [so] they show essentially the same thing a person would see when viewing teeth and an aligner in real life. The ability to see a gap and virtually assess it in real life naturally maps over the ability to detect and measure the same gap using computer vision techniques like Salah and Maninis's contour and edge detection." Ex. 1002 ¶ 103; *see* Ex. 1048 ¶¶ 20–21.

Dr. Foroosh further testifies that "the edges of teeth and aligners, and the gap between them, can be resolved even with simple edge detection techniques," so "[a]pplying more advanced techniques, such as the deep learning taught by Salah and Maninis, would have been expected to resolve the locations of each tooth's edge and the corresponding aligner edges with even greater precision and accuracy." Ex. 1048 ¶ 21. Further, Dr. Foroosh provides testimony that Maninis "teaches how contours of different strengths may be used advantageously to discern shapes of objects (and parts of objects) at varying levels of detail." Ex. 1048 ¶ 24; *see also* Ex. 1002 ¶¶ 59, 97, 131. Accordingly, we are not persuaded that Salah teaches away from the combination.

We further agree with Petitioner that "[a]pplicable deep learning techniques for contour and object detection are taught by Maninis,"

---

[23] Salah discloses using Canny edge detection and bilateral filtering techniques. Ex. 1008, 34:11–35:11.

including "methods of detecting edges (or 'contours') in images with a computing device using a deep learning neural network to perform image analysis," and "us[ing] the contours it generates to define boundaries around regions and to identify the objects in each region of the image." Pet. 36–38 (citing, e.g., Ex. 1007, Abstract, 1–5, 11–12, Figs. 2–5). As discussed above in Section III.D.5.c.3.a, Patent Owner's argument that Maninis's COB neural network does not conduct semantic segmentation is not persuasive because it is not responsive to Petitioner's contentions. *Id.* at 10, 25, 37–38, 45, 53; Ex. 1007, 11–12.

In summary, Salah is generally relied upon to teach analyzing a dental image using deep learning to detect contours, including teeth or gums. Pet. 34–35. Maninis provides further detail describing the use of deep learning techniques for contour and object detection in an image, including to define the boundaries around regions and to identify the objects in each region of the image. *Id.* at 36–38. For the reasons set forth by Petitioner (*id.* at 24–27, 34–41), we are persuaded that a person of ordinary skill in the art "would have been motivated in view of Kim and Invisalign to apply the contour-detection techniques of Salah and Maninis to detect edges of teeth and aligners depicted in images of patient's teeth so that the assessment of gap between aligner and teeth could be made, as taught by Invisalign." *Id.* at 39–40. Further, we are persuaded that "because the detected edges of the aligner and teeth correspond to the edges of the physical objects depicted," a person of ordinary skill in the art "would have understood that measuring the distance between the outlines of the teeth and the aligner as detected by Salah's image processing software would allow determination of the gap

between each tooth and the corresponding part of the aligner." *Id.* at 40 (citing Ex. 1002 ¶ 104).

*(d) Whether Time and Expense Weigh Against Motivation*

Patent Owner argues that implementing Maninis's deep learning architecture to assess aligner images would necessitate a significant amount of time and expense, which would weigh heavily against any motivation offered by Petitioner. PO Resp. 62–63. In particular, Patent Owner argues that Dr. Foroosh states that Maninis's neural network would have been trained on more than 10,000 images of patient's teeth with seated aligners captured with cellphones, but Petitioner "has identified no such collection of images that existed in 2017." *Id.* at 62 (citing Ex. 1002 ¶ 100; Ex. 2048, 103:23–106:5, 109:3–19, 222:7–12; Ex. 2028 ¶¶ 138–140; Ex. 2030 ¶ 87; Ex. 2010, 8; Ex. 2041; Ex. 2054, 154:3–12). Patent Owner argues that, because "none of Kim, Invisalign, or Salah discloses photographing seated aligners using a cellphone . . . they could not be used to generate such a learning base." *Id.* at 63 (citing Ex. 2028 ¶¶ 91, 203). And Patent Owner argues that, if a dentist began capturing such images, they would need to be anonymized and labelled, which a person of ordinary skill in the art would understand to be challenging and expensive. *Id.* (citing Ex. 2028 ¶ 140; Ex. 2030 ¶¶ 88–89).

Based on the complete trial record before us, we are not persuaded by Patent Owner's arguments. Although Patent Owner contends that there is "significant cost and time" associated with creating a learning base, there is little concrete evidence in the record supporting these arguments. For example, Dr. Mongan testifies that "Dr. Kusnoto . . . informed me . . . there

would be a significant expense associated with labeling photographs to create the learning base and also with de-identifying patient data for purposes of privacy laws," but does not further explain what that "significant cost" is. Ex. 2028 ¶ 140. Dr. Kusnoto testifies that "I know that the cost of anonymization can exceed $100,000 per practice for datasets that are smaller than the 10,000 at issue here," "there may be yet further costs and barriers," and "it could have cost hundreds of dollars per hour for a dental professional to undertake the labeling." Ex. 2030 ¶¶ 88, 89. Neither Dr. Kusnoto nor Dr. Mongan provides further information on the time involved. Ex. 2030 ¶¶ 88–90; Ex. 2028 ¶ 140).

Patent Owner's arguments regarding cost and effort, however, do not undermine Petitioner's persuasive reasoning for the combination, as discussed above. Neither Dr. Mongan nor Dr. Kusnoto testify that a person of ordinary skill in the art would have been deterred by the alleged costs and effort involved when training Maninis's deep learning architecture to assess aligner images. *See* Ex. 2028 ¶ 140; Ex. 1048 ¶¶ 25–26; Ex. 2030 ¶¶ 87–90. Moreover, the Federal Circuit has held that:

> [T]he fact that the two disclosed apparatus would not be combined by businessmen for economic reasons is not the same as saying that it could not be done because skilled persons in the art felt that there was some technological incompatibility that prevented their combination. Only the latter fact is telling on the issue of nonobviousness.

*Orthopedic Equipment, Co. Inc. v. U.S.*, 702 F.2d 1005, 1013 (Fed. Cir. 1983); *see also Grit Energy Solutions, LLC v. Oren Techs., LLC*, 957 F.3d 1309, 1323–24 (Fed. Cir. 2020) (stating that "even if we accept the Board's factual determination that swapping [the reference's] components would

result in a more expensive system, that determination, standing alone, is insufficient to reject each of [Petitioner's] arguments as to why a skilled artisan would have been motivated to make the proposed swamp"); *Medichem, S.A. v. Rolabo, S.L.*, 437 F.3d 1157, 1165 (Fed. Cir. 2006) (stating that "a given course of action often has simultaneous advantages and disadvantages, and this does not necessarily obviate motivation to combine").

*(e) Conclusion Limitation 1(b")*

After considering the arguments and evidence of the complete record, we determine that Petitioner has shown, by a preponderance of the evidence, that the combination of Kim, Invisalign, Salah, and Maninis teaches this limitation, and has persuasively explained why a person of ordinary skill in the art would have been motivated to combine Kim, Invisalign, Salah, and Maninis.

*d) Conclusion Independent Claim 1*

Therefore, we determine that, on the complete record, Petitioner has shown by a preponderance of the evidence that independent claim 1 would have been obvious over the combination of Kim, Invisalign, Salah, and Maninis.

*6. Dependent Claims 7 and 14*

Petitioner relies on the combination of Kim, Invisalign, Salah, and Maninis to teach the limitations in claims 7 and 14. Pet. 44–50, 54–55. Patent Owner disputes Petitioner's contentions, arguing that Petitioner fails to identify any "tooth attribute value" assigned to the historical images, as recited in claims 7 and 14. PO Resp. 63.

Limitation "1)" or step 7(1) in claim 7 recites

> creation of a learning base comprising more than 1000 images of dental arches, or "historical images", each historical image representing an aligner worn by a "historical" patient and comprising one or more zones each representing a tooth, or "historical tooth zones", to each of which, for at least one tooth attribute relating to a separation between the tooth represented by the historical tooth zone considered, and the aligner represented, a tooth attribute value is assigned.

Ex. 1001, 32:47–55. Limitation "1)" or step 14(1) in claim 14 recites the same language. *Id.* at 34:23–31.

Petitioner contends, among other things, that a person of ordinary skill in the art would have understood that "a large number of images, often far more than 1000, would be typically used to train a deep learning device." Pet. 45 (citing Ex. 1002 ¶ 122). Petitioner further argues that a person of ordinary skill in the art "would also have used historical 'images of dental arches' when adapting Maninis's contour and detection to the dental imaging apparatus of Kim and Salah," and "would have used images of patient's teeth wearing aligners in the training set" to "train a deep-learning-based neural network to recognize teeth, aligners, and their respective edges that delimit the gap between them." *Id.* (citing Ex. 1002 ¶ 123). According to Petitioner, a person of ordinary skill in the art "would have applied annotations [i.e., Maninis's 'pixel-wise semantic annotations' to indicate which pixels correspond to each object in a given image] to historical dental images to indicate each object's attributes, including assigning tooth attributes to each tooth in each image, as well as to other parts of the image

including the aligner and the gap separating the aligner and the tooth." *Id.* (citing Ex. 1002 ¶ 124). Petitioner argues:

> With labels to indicate the pixels corresponding to teeth, the pixels corresponding to aligners, and the pixels corresponding to the gap between the two, each historical image would include tooth attribute values assigned directly to the image by the labels. EX1002, ¶¶125-26. For example, *the boundaries between regions would directly indicate the edges of teeth, or of the aligner, both of which are tooth attributes relating to the separation between the tooth and the aligner*. *Id.* Further, labeling the pixels between each tooth and the corresponding aligner surface (i.e., the gap), the image would include a direct label for the tooth of the separation between the tooth and the aligner—*the labeled gap is literally a label of the separation* to be detected in order to apply Invisalign's teaching to assess the separation between teeth and the corresponding parts of the aligner.

Pet. 46–47 (emphasis added).

Patent Owner provides an annotated drawing, depicting the boundaries described by Petitioner, which is reproduced below:



PO Resp. 65 (citing Ex. 2028 ¶¶ 209–10) (referring to Ex. 1002 ¶ 103). The drawing above shows teeth, with pixels identified as teeth contours in red, pixels identified as aligner contours in blue, and pixels identified as gap contours in green. *Id.* at 64.

Patent Owner argues that the contours identified by Petitioner define "zones," not "attributes." PO Resp. 65. According to Patent Owner, a "tooth zone" corresponds to the "zone" or "location" of a tooth in either the historical or analysis image, whereas the "tooth attribute" is an "attribute" of the tooth represented "on said . . . tooth zone." *Id.* Patent Owner also argues that "[b]oundaries and edges are also not 'values' as required by the claims," but instead are images (i.e. bitmaps of individual pixel values) that are provided to the neural network as vectors. *Id.* at 65–66 (citing Ex. 2028 ¶¶ 211–214). Therefore, Patent Owner argues, Petitioner has failed to identify any "value" that would have been labelled in the historical image or identified. *Id.* at 66.

In the Reply, Petitioner reiterates that a "labeled gap is literally a label of the separation," and further argues that Patent Owner ignores the Petition's explanation that the images would include pixelwise labels indicating "the pixels corresponding to teeth, the pixels corresponding to aligners, and the pixels corresponding to the gap between the two." Reply 25.

Based on the complete record, we agree with Petitioner that historical images of dental arches with annotated boundaries between regions representing teeth, aligner, and gap contours teach the claimed "tooth attribute values." As set forth above, the claim language recites "one tooth

attribute relating to a separation between the tooth represented by the historical tooth zone considered, and the aligner represented, a tooth attribute value is assigned." As cited by Petitioner, the '248 patent provides a variety of example categories of "tooth attributes." Pet. 15–16 (citing Ex. 1001, 7:64–8:42, 28:48–55). For example,

> Preferably, *said tooth attribute is chosen from the group formed by a maximal separation along the free edge of the tooth, a mean separation along the free edge of the tooth* . . . .
>
> The tooth attribute relating to the separation may in particular be the existence of the separation, this attribute being able to take the tooth attribute values 'yes' or 'no; or *a value measuring the scale of the separation, for example an observed maximal separation or an assessment in relation to a scale*.

Ex. 1001, 28:48–61 (emphasis added). We find Petitioner's contentions that "the boundaries between regions would directly indicate the edges of teeth, or of the aligner, both of which are tooth attributes relating to the separation between the tooth and the aligner" (Pet. 47), are consistent with this disclosure. Similarly, Petitioner's contentions that "labeling the pixels between each tooth and the corresponding aligner surface (i.e., the gap), the image would include a direct label for the tooth of the separation between the tooth and the aligner—the labeled gap is literally a label of the separation," (Pet. 47), are also consistent with the disclosure in the '248 patent.

Accordingly, we determine that, on the complete record, Petitioner has shown by a preponderance of the evidence that dependent claims 7 and 14 would have been obvious over the combination of Kim, Invisalign, Salah, and Maninis.

*7. Dependent Claim 8*

Petitioner relies on the combination of Kim, Invisalign, Salah, and Maninis to teach the limitations in claim 8. Pet. 50–53. Patent Owner disputes Petitioner's contentions, arguing that Petitioner fails to identify any "image attribute value," as recited in claim 8. PO Resp. 66–70.

Limitations "1')" and "3')" or step 8(1') and 8(3') in claim 8 recite:

> 1') creation of a learning base comprising more than 1000 images of dental arches, or "historical images", each historical image comprising an attribute value for at least one image attribute, or "image attribute value', the image attribute relating to a separation between the tooth or teeth and the aligner represented on the historical image;
>
> . . .
>
> 3') submission of the analysis image to the deep learning device for it to determine, for said analysis image, at least one probability relating to said image attribute value.

Ex. 1001, 33:3–15.

For limitation "1')," Petitioner presents similar arguments as for claim 7, but argues that Maninis teaches pixel-wise annotations of all objects in each image of its training database, and as combined with Kim, Invisalign, and Salah "each image would have an aligner and teeth represented in the image, with annotations indicating the regions containing each tooth and corresponding aligner portion, as well as indicating the separation between each tooth and corresponding aligner part." Pet. 51 (citing Ex. 1007, 5–6; Ex. 1002 ¶ 139). Petitioner contends that "[b]y annotating the images with an aligner (where present) or gap (where present), the image would be annotated with (and thus comprise) image attributes relating to the recited

separation" of the teeth and the aligner. *Id.* at 52 (citing Ex. 1002 ¶ 140). Thus, argues Petitioner, "the set of annotations would collectively represent an image attribute value as claimed, as they would indicate whether the aligner in the image was well or poorly fitted, under the standard taught by Invisalign." *Id.* For limitation "3')," Petitioner argues that the probabilities determined by Maninis to detect boundaries between regions and enable identification of objects visible in those regions relate to the image attributes, such as the presence of an aligner and a gap between teeth and aligner, a determination of the distance between the teeth's edges and the corresponding edges of the aligner, and an indication of a good fit or a poor fit according to Invisalign's teachings. *Id.* at 53.

Patent Owner argues that the "image attributes" in step 8(1') and step 8(3') have to be the same, and none of the "image attributes" identified by Petitioner are "image attributes" within the meaning of claim 8. PO Resp. 67–70.

Based on the complete record, we agree with Petitioner that presence of an aligner or the presence of a gap between the aligner and the teeth, each of which relates to a dental arch image as a whole, teach the claimed "image attribute value." The '248 patent discloses that "the value of the image attribute relates to the whole image and not to part of the image," "[a] tooth attribute value may be used to define a value for an image attribute," and "an attribute value of the analysis image is determined as a function of the tooth attribute values." Ex. 1001, 3:24–62, 26:3–4. The '248 patent also discloses that the "image attribute is chosen from the group formed by a maximal separation along all of the teeth represented, a mean separation along the

free edges of all of the teeth represented, an overall acceptability of the separation of the teeth represented." *Id.* at 28:51–54; Ex. 1002 ¶ 67. As cited by Petitioner (Pet. 52), the '248 patent discloses that "[t]he attribute value of the analysis image may also be, for example, the 'presence' or 'absence' of a dental, preferably orthodontic, appliance." Ex. 1001, 26:10–14. Although Patent Owner argues that this refers to a "regional" attribute, not an "image" attribute (PO Resp. 67), the plain language of the text conflicts with Patent Owner's assertions, and neither Patent Owner nor Dr. Mongan provides further explanation on this point. Ex. 2028 ¶ 219. Moreover, as recited in the claim language, the "the image attribute" may relate "to a separation between the tooth or teeth and the aligner represented on the historical image." Ex. 1001, 33:6–9.

Given these disclosures in the '248 patent, we are persuaded that Dr. Foroosh's identification of the presence of the aligner or presence of a separation as image attribute values is consistent with the '248 patent, and the values for these attributes are reflected in the annotations. Ex. 1002 ¶ 140. We are also persuaded by Dr. Foorosh's testimony that the locations of each tooth and corresponding aligner part would also be image attributes, because they relate to the tooth-aligner separation, and that the annotation of gaps between the aligner and tooth would indicate attribute values. *Id.*; s*ee* Ex. 1001, 3:59–62. We do not find persuasive Patent Owner's argument that Petitioner's identified "image attributes" in limitation "1')" and limitation "3')" are different. Although Petitioner does not use identical language, Petitioner relies on the "presence of an aligner and a gap between teeth and aligner, as well as a determination of the distance between the teeth's edges

and corresponding edges of the aligner, and whether this indicated a good fit or a poor fit according to Invisalign's teachings." Pet. 53 (citing Ex. 1002 ¶¶ 142–143). This is consistent with Petitioner's identification for limitation "1')."

Moreover, we are not persuaded by Patent Owner's arguments that Maninis cannot be trained on historical images labeled with an "image attribute value," (PO Resp. 68–70) for the same reasons discussed in Section III.D.5.c.3.a, addressing Patent Owner's inoperability argument.

Accordingly, we determine that, on the complete record, Petitioner has shown by a preponderance of the evidence that dependent claim 8 would have been obvious over the combination of Kim, Invisalign, Salah, and Maninis.

*8. Remaining Claims*

Petitioner contends that the combination of Kim, Invisalign, Salah, and Maninis teaches the additional limitations of dependent claims 2, 4, 13, 15, and 16 and, in support, identifies certain passages and figures in the references and explains their significance with respect to the corresponding limitations. Pet. 41–44, 53–59. Patent Owner does not separately challenge these contentions. *See generally* PO Resp. We have reviewed Petitioner's contentions, which we find persuasive and adopt as our own. Therefore, we determine that Petitioner has also shown those dependent claims to be unpatentable by a preponderance of the evidence. *Id.*

## IV. CONCLUSION[24]

For the foregoing reasons, we are persuaded that Petitioner has established by a preponderance of the evidence that claims 1, 2, 4, 7, 8, and 13–16 of the ’248 patent are unpatentable.

| Claims | 35 U.S.C. § | References/Basis | Claims Shown Unpatentable | Claims Not Shown Unpatentable |
|---|---|---|---|---|
| 1, 2, 4, 7, 8, 13–16 | 103 | Kim, Invisalign, Salah, Maninis | 1, 2, 4, 7, 8, 13–16 | |

## V. ORDER

In consideration of the foregoing, it is hereby:

ORDERED that claims 1, 2, 4, 7, 8, and 13–16 of the ’248 patent have been shown to be unpatentable; and

FURTHER ORDERED that Patent Owner’s Motion to Exclude (Paper 34) is *denied*; and

FURTHER ORDERED that, because this is a Final Written Decision, parties to this proceeding seeking judicial review of our Decision must comply with the notice and service requirements of 37 C.F.R. § 90.2

[24] Should Patent Owner wish to pursue amendment of the challenged claims in a reissue or reexamination proceeding subsequent to the issuance of this Decision, we draw Patent Owner’s attention to the April 2019 *Notice Regarding Options for Amendments by Patent Owner Through Reissue or Reexamination During a Pending AIA Trial Proceeding*. *See* 84 Fed. Reg. 16,654 (Apr. 22, 2019). If Patent Owner chooses to file a reissue application or a request for reexamination of the challenged patent, we remind Patent Owner of its continuing obligation to notify the Board of any such related matters in updated mandatory notices. *See* 37 C.F.R. § 42.8(a)(3), (b)(2).

For PETITIONER:

Matthew Argenti
Michael Rosato
Patrick Medley
WILSON SONSINI GOODRICH & ROSATI
margenti@wsgr.com
mrosato@wsgr.com
pmedley@wsgr.com

For PATENT OWNER:

Charlotte Jacobsen
Jaysen Chung
GIBSON, DUNN & CRUTCHER LLP
cjacobsen@gibsondunn.com
jschung@gibsondunn.com