# United States Court of Appeals for the Federal Circuit

DENTAL MONITORING SAS,

*Plaintiff-Appellant,*

v.

ALIGN TECHNOLOGY, INC.,

*Defendant-Appellee.*

Appeal from the United States District Court for the
Northern District of California, No. 3:22-cv-07335-WHA

## REPLY BRIEF FOR DENTAL MONITORING SAS

Mark A. Perry
Adam W. Mitchell
Caroline Voelker
WEIL, GOTSHAL & MANGES LLP
2001 M Street NW, Suite 600
Washington, DC 20036
(202) 682-7511
mark.perry@weil.com

Rocco Recce
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153
(212) 310-8000

*Counsel for Dental Monitoring
SAS*

April 28, 2025

# TABLE OF CONTENTS

Introduction ................................................................................................ 1

Argument ..................................................................................................... 4

   I.  The Claims At Issue Are Patent-Eligible Under § 101 .................... 7

      A.  *Alice* Step One ................................................................. 8

          1.  Claim 14 of the '248 Patent Is Directed to a Specific Improvement in Orthodontic Technology (AI-Assisted Quantitative Assessment of Aligner Fit) ............................... 9

          2.  Claims 7 and 12 of the '409 Patent Are Directed to a Specific Improvement in Orthodontic Technology (AI-Guided Remote Imaging of Aligners by Patients) .............. 15

      B.  *Alice* Step Two ................................................................ 20

          1.  Claim 14 of the '248 Patent Contains an Inventive Concept (Specially Trained AI To Determine Aligner Fit by Tooth-by-Tooth Separation) ............................... 21

          2.  Claim 7 and 12 of the '409 Patent Contain an Inventive Concept (Specially Trained AI for Assessing Clinical Usability of Patient Generated Images) .............................. 24

   II.  Other Validity Issues Are Not Properly Before the Court ............. 27

Conclusion ................................................................................................ 33

Certificate of Compliance ........................................................................ 34

# TABLE OF AUTHORITIES

<b>Page(s)</b>

**Cases**

*Adasa Inc. v. Avery Dennison Corp.*,
   55 F.4th 900 (Fed. Cir. 2022) ........................................................... 8

*Alice Corp. Pty. v. CLS Bank Int'l*,
   573 U.S. 208 (2014) ................................................................*passim*

*Amdocs (Isr.) Ltd. v. Openet Telecom, Inc.*,
   841 F.3d 1288 (Fed. Cir. 2016) ...................................................... 22

*Ancora Techs., Inc. v. HTC Am., Inc.*,
   908 F.3d 1343 (Fed. Cir. 2018) ......................................................... 8

*BASCOM Glob. Internet Servs., Inc. v. AT&T Mobility LLC*,
   827 F.3d 1341 (Fed. Cir. 2016) ................................................. 20, 22

*Berkheimer v. HP Inc.*,
   881 F.3d 1360 (Fed. Cir. 2018) .................................... 23, 24, 26, 27

*CardioNet, LLC v. InfoBionic, Inc*,
   955 F.3d 1358 (Fed. Cir. 2020) ........................................... 12, 13, 28

*Carpenter v. United States*,
   585 U.S. 296 (2018) ........................................................................ 31

*CosmoKey Sols. GmbH v. Duo Sec. LLC*,
   15 F.4th 1091 (Fed. Cir. 2021) ................................... 20, 22, 23, 29

*Crown Packaging Tech., Inc. v. Ball Metal Beverage Container Corp.*,
   635 F.3d 1373 (Fed. Cir. 2011) ...................................................... 24

*CyberSource Corp. v. Retail Decisions, Inc.*,
   654 F.3d 1366 (Fed. Cir. 2011) ...................................................... 11

*Diamond v. Diehr,*
450 U.S. 175 (1981) .................................................... 6, 9, 28

*Elec. Power Grp. v. Alstom S.A.*, 830 F.3d 1350, 1353 (Fed.
Cir. 2016).................................................................. 21

*Enfish, LLC v. Microsoft Corp.,*
822 F.3d 1327 (Fed. Cir. 2016) ..................................... 18

*Falko-Gunter Falkner v. Inglis,*
448 F.3d 1357 (Fed. Cir. 2006) ..................................... 30

*Hawk Tech. Sys., LLC v. Castle Retail LLC,*
60 F.4th 1349 (Fed. Cir. 2023) ...................................... 14

*In re Killian,*
45 F.4th 1373 (Fed. Cir. 2022)................................. 10, 25

*Koninklijke KPN N.V. v. Gemalto M2M GmbH,*
942 F.3d 1143 (Fed. Cir. 2019) ..................................... 12

*McRO, Inc. v. Bandai Namco Games Am. Inc.,*
837 F.3d 1299 (Fed. Cir. 2016) ....................... 8, 9, 12, 19

*Minn. Mining & Mfg. Co. v. Chemque, Inc.,*
303 F.3d 1294 (Fed. Cir. 2002) ..................................... 30

*Recentive Analytics, Inc. v. Fox Corp.,*
No. 2023-2437, 2025 WL 1142021 (Fed. Cir. Apr. 18,
2025) ................................................................*passim*

*Smart Sys. Innovations, LLC v. Chi. Transit Auth.,*
873 F.3d 1364 (Fed. Cir. 2017) ..................................... 32

*TecSec, Inc. v. Adobe Inc.,*
978 F.3d 1278 (Fed. Cir. 2020) ................................... 8, 9

*Uniloc USA, Inc. v. LG Elecs. USA, Inc.,*
957 F.3d 1303 (Fed. Cir. 2020) ..................................... 14

*Visual Memory LLC v. NVIDIA Corp.,*
867 F.3d 1253 (Fed. Cir. 2017) ..................................... 14

## Statutes and Constitutional Provisions

35 U.S.C. § 101 .............................................................*passim*

35 U.S.C. § 102 ................................................................ 28

35 U.S.C. § 103 ................................................................ 28

35 U.S.C. § 112 ............................................................ 29, 30

U.S. Const. art. I, § 8, cl. 8 ................................................ 32

## Other Authorities

21 C.F.R. § 860.200.............................................................. 2

Ben Hattenbach & Gavin Snyder, *Rethinking the Mental
    Steps Doctrine and Other Barriers to Patentability of
    Artificial Intelligence*, 19 Colum. Sci. & Tech. L. Rev.
    313, 318 (2018) ................................................................ 31

Xinru Qiu et al., *Advances in AI for Protein Structure
    Prediction: Implications for Cancer Drug Discovery and
    Development*, 14 *Biomolecules* 339 (2024),
    https://www.mdpi.com/2218-273X/14/3/339 ................................... 32

Letter from Malvina Eydelman, FDA, to Isabelle Puraye,
    Dental Monitoring SAS (May 17, 2024), https://www.
    accessdata.fda.gov/cdrh_docs/pdf23/DEN230035.pdf ...................... 2

# INTRODUCTION

The district court's declaration that the claims at issue—which disclose innovative technological advances in dental treatment that improve patient care and outcomes using specially trained deep learning devices—are patent-ineligible turns § 101 on its head. Align's central defense of the decision below—that "apply it with AI" is no more inventive than "apply it with a computer," RedBr2—reflects a fundamental misunderstanding of the claims at issue. These claims do not recite routine computerization of well-understood economic principles or business methods. Rather, they disclose specific improvements to orthodontic technology that no human could perform unaided. They demonstrate patent-eligibility at both steps of the framework established by *Alice Corp. Pty. v. CLS Bank International*, 573 U.S. 208 (2014). Accordingly, the judgment must be reversed or vacated.

Dental Monitoring (DM) is a technology company founded in 2014 with a core mission to revolutionize patient care in dentistry and orthodontics. Appx110(¶9). DM has invested hundreds of millions of dollars to develop and commercialize its innovative hardware- and software-based technologies; and DM has built a robust patent portfolio to protect its inventions and recover its investments in return for disclosure. Appx110-111(¶10).

In 2017, DM sought to transform patient care by harnessing the power of artificial intelligence to solve two problems that had previously beset orthodontics. *Id.*(¶¶9-10); Appx24([30]; [57]); Appx54([30]; [57]). DM invented a method, described and claimed in U.S. Patent No. 11,049,248, of training a deep learning device to objectively determine how accurately an orthodontic aligner fits each individual tooth—to a degree not achievable either by humans or with prior technology. Appx53(34:21-42). DM also invented a method, described and claimed in U.S. Patent No. 10,755,409, of using a deep learning device to guide a patient through the process of acquiring a medical-grade dental image—without the need for an office visit. Appx83(33:10-21; 34:34-35).

DM's claimed methods are so innovative that the U.S. Food and Drug Administration granted DM's products, which practice the patents, *de novo* approval—a rare designation "for devices for which there is no legally marketed device on which to base a review of substantial equivalence," 21 C.F.R. § 860.200(a)—and created an entirely new category for "dental image analyzer[s]," Letter from Malvina Eydelman, FDA, to Isabelle Puraye, Dental Monitoring SAS (May 17, 2024), https://www. accessdata.fda.gov/cdrh_docs/pdf23/DEN230035.pdf.

These patented innovations have led orthodontics into an entirely new technological era. *See* Appx532(¶34) (Align's expert conceding that

AI-based dentistry was not "part of the standard of care" before July 2017). Before the invention disclosed in the '248 patent, dental professionals (collectively, "orthodontists" or "providers") could not objectively evaluate the fit of an aligner, on a tooth-by-tooth basis, even during an in-person visit. Appx526(¶20); Appx863(¶24). And before the invention disclosed in the '409 patent, providers could not monitor the course of treatment without a time-consuming office visit. Appx108. The technological innovations developed and disclosed by DM have lowered costs, saved time for providers and patients, and improved dental care. Through advances in orthodontic technology, these inventions have led to improved patient outcomes that no human provider could have achieved before or could replicate now. Appx301; Appx320(¶156); Appx869-870(¶48).

The outcome of this appeal will provide important guidance for inventors seeking to develop and protect AI-based technological advancements, and for courts evaluating the eligibility of patents claiming such inventions. Align convinced the district court—and now asks this Court—to rule that the mere involvement of machine learning renders a claim ineligible. Appx13. If allowed to stand, the district court's approach would disincentivize the development of and investment in AI-based technologies, to which billions of dollars are being devoted in the United

States and abroad. That disastrous outcome would be averted by reversing or vacating the decision below.

## ARGUMENT

In this competitor-versus-competitor dispute, DM invented and was first to market innovative hardware and software products that have changed the technological landscape of orthodontic care. Appx110-113(¶¶9-14). Align, with billions of dollars of annual revenue from its well-known "Invisalign" dental aligners, was caught off-guard and tried to catch up, including during the Covid lockdowns that spurred much remote medical care, by offering products that infringe the patents that DM secured to protect its inventions. Appx116-123(¶¶26-43).

Align's argument that DM's claims use only a "a generic 'deep learning device' trained using a generic 'learning base,'" RedBr12, is refuted by the very language of the claims. Claim 14 of the '248 patent recites a method for quantitatively analyzing how closely an orthodontic aligner fits a patient's teeth. Appx52(32:6-23); Appx53(34:21-42); Appx869-870(¶48). The claim itself details—"with a great deal of particularity," Appx6—how this method is achieved: creating a learning base of at least 1,000 historical patient images; training a deep learning device on those images; and determining, on a tooth-by-tooth basis, how closely the aligner fits the patient's teeth, Appx52(32:6-23); Appx53(34:21-

42). The specification further details the training of the claimed deep learning device, which powers the model's accuracy: the historical images include decipherable descriptions of various attributes to teach the deep learning device how to recognize and associate patterns with particular teeth and separation values. Appx44(16:37-43); Appx45(18:60-61). This innovative technological method allows providers to adjust treatment to address the separation detected on a given tooth in a way that human providers could not achieve.

Claims 7 and 12 of the '409 patent recite methods that guide a patient through acquiring a clinical-grade image of his/her dental arch that is suitable for provider assessment of aligner fit. The patient uses an "acquisition apparatus," such as a smartphone camera, coupled with a deep learning device to determine both the usability of an image and whether a new image must be taken—providing specific, immediate feedback. Appx82(32:13-33); Appx83(33:10-21; 34:34-35); Appx115(¶24). Claim 7 details a method of training the deep learning device that employs a custom learning base of thousands of historical patient images containing relevant "image attribute value[s]," such as, for example, camera distance, rotation angle, amount of lighting, and correct framing of the patient's dental arch in the photograph. Appx67(1:22-65); Appx82(32:13-33); Appx83(33:10-21). Claim 12 recites that the acquisition

apparatus can send an "information message" to the patient when the previously taken image is clinically unusable, notifying the patient of what to correct so that the patient may take another image that is clinically usable. Appx83(34:34-35). The specification further explains that the claimed invention allows a patient to remotely capture clinically usable images in real time for orthodontic assessment, without the need for an office visit. Appx79(25:50-52; 26:6-8; 26:27-47).

In this appeal, the only question is whether these claims are patent-eligible.[1] The district court's conclusion that they are ineligible cannot be reconciled with this Court's only precedential decision to date applying *Alice* to the eligibility of machine-learning patents. That decision, while holding ineligible the specific claims at issue, correctly recognized that AI-based inventions are "a burgeoning and increasingly important field" that "may lead to patent-eligible improvements in technology." *See Recentive Analytics, Inc. v. Fox Corp.*, No. 2023-2437, 2025 WL 1142021, at *8 (Fed. Cir. Apr. 18, 2025). The claims at issue here represent just such improvements.

---

[1] Because claim 14 of the '248 patent and claims 7 and 12 of the '409 patent depend from the independent claim 1 of each patent, the limitations of the independent claims must be considered. *See, e.g., Diamond v. Diehr*, 450 U.S. 175, 188 (1981) ("[C]laims must be considered as a whole.").

# I.     The Claims At Issue Are Patent-Eligible Under § 101

Claim 14 of the '248 patent and claims 7 and 12 of the '409 patent recite specific advancements in orthodontic technology that improve patient care and outcomes. The claims do not constitute mere computerization or automation of well-understood economic principles or business methods—the type of claims at issue in *Alice*. The claims here are not directed to an abstract idea and thus are eligible under *Alice* step one. Alternatively, the claims are eligible under step two because they recite specific technical improvements over then-current orthodontic technology; at minimum, there is a factual question as to the claimed inventive concepts.

At both steps of the *Alice* framework, this Court's recent decision in *Recentive* provides a meaningful contrast. Contrary to Align's characterization of that decision in its Rule 28(j) letter (D.I. 24), the Court in *Recentive* merely applied its longstanding rule that simple automation of a process that can be performed by human beings, without a technological improvement, does not confer subject matter eligibility. *Recentive*, 2025 WL 1142021, at *5. Unlike the claims in *Recentive*, the claims here do not merely invoke machine learning to speed up processes within human capabilities. Rather, the claims recite technological advancements that allow objective assessment of aligner fit and dental treatment based on patient images—harnessing AI to do things that

human orthodontists could not (and did not) do before DM invented these methods. For the same reason, the district court was wrong to describe the claims as the application of a generic deep learning device to a specific field of use. Appx8. There is nothing generic about these claims, which describe particular technological innovations of practical utility in advancing orthodontic care—the essence of a "new and useful" invention. 35 U.S.C. § 101.

## A. *Alice* Step One

An "accurate characterization of what the claims require and of what the patent asserts to be the claimed advance" is "crucial" to determining whether the claims are "directed to" an abstract idea. *TecSec, Inc. v. Adobe Inc.*, 978 F.3d 1278, 1294 (Fed. Cir. 2020). The Court evaluates "the language of the asserted claims themselves considered in light of the specification" to determine "what the patent asserts to be the focus of the claimed advance over the prior art." *Id.* at 1292 (cleaned up). A claim that recites a "specific and concrete technological advance" and does not merely invoke generic processes ends the inquiry, and "the claim is eligible." *Adasa Inc. v. Avery Dennison Corp.*, 55 F.4th 900, 908 (Fed. Cir. 2022); *see also Ancora Techs., Inc. v. HTC Am., Inc.*, 908 F.3d 1343, 1349 (Fed. Cir. 2018); *McRO, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299, 1312-13 (Fed. Cir. 2016) (quoting *Diehr*, 450 U.S. at 178).

The claims here are directed to technological advances—specific methods of training and implementing a deep learning device to achieve orthodontic results that could not have been realized, at all, in the absence of these pioneering methods. By ignoring what it called "excess verbiage and techno-jargon" in the claims, Appx6, the district court considered the claims at a level of generality that was erroneous as a matter of law. Courts cannot "disregard elements of the claims at issue that the specification makes clear are important parts of the claimed advance in the combination of elements." *TecSec*, 978 F.3d at 1294. Courts also "must be careful to avoid oversimplifying the claims" by looking at them generally and failing to account for the specific requirements of the claims. *McRO*, 837 F.3d at 1313 (citation omitted).

### 1. Claim 14 of the '248 Patent Is Directed to a Specific Improvement in Orthodontic Technology (AI-Assisted Quantitative Assessment of Aligner Fit)

The '248 patent, titled "Method for Analyzing an Image of a Dental Arch," describes and claims "method[s] for assessing the shape of an orthodontic aligner." Appx24([54]; [57]). Claim 14 discloses an innovative improvement in orthodontic technology for objectively assessing the fit of a dental aligner: an AI-based method of treatment that cannot "be performed in the human mind, or by a human using a pen and paper" even given sufficient time. *In re Killian*, 45 F.4th 1373, 1379 (Fed. Cir. 2022)

(citation omitted). Claim 14 recites a technological advance that permits quantitative analysis—to within one millimeter, Appx301; Appx320(¶156); Appx869-870(¶48)—how closely an orthodontic aligner, on a tooth-by-tooth basis, fits a patient's teeth, Appx52(32:6-23); Appx53(34:21-42).

The claim limitations detail the steps of this innovative method. First, a "learning base"—"comprising more than 1000 images," each of a prior patient's dental arch with an aligner—is created. Appx53(34:23-31). Then, the deep learning device, a type of AI, Appx793(¶27&n.1); Appx795(¶30); Appx306, is "train[ed]," using the learning base, Appx53(34:32-33). Finally, an image of the patient's teeth with the aligner is submitted, and the trained deep learning device determines, on a tooth-by-tooth basis, how closely the aligner fits the patient's teeth—with millimeters of precision. Appx53(34:34-42); Appx301; Appx320(¶156); Appx869-870(¶48). A provider can then use these results to adjust treatment, such as by altering the mold to produce a new aligner. Appx861(¶17); Appx51(30:42-44).

The specification further explains that the training process involves "presenting" the learning base to "the deep learning device" "as input," and "progressively" teaching the device "to recognize patterns" and "to associate [those patterns]" with particular teeth and separation values.

Appx44(16:37-43). The customized training of the deep learning device, the specification explains, increases the model's accuracy. Appx45(18:60-61).

Contrary to the district court's unsupported assumption, Appx13, the method of claim 14 "could not, as a practical matter, be performed entirely in a human's mind," *CyberSource Corp. v. Retail Decisions, Inc.*, 654 F.3d 1366, 1376 (Fed. Cir. 2011). No person could objectively analyze orthodontic patterns from looking at 1000-plus images of teeth with aligners. Nor could a human precisely and objectively determine the degree of separation between an aligner and each tooth in the mouth to within one millimeter. Appx869-870(¶48). Indeed, as both DM's and Align's experts agreed, prior to the invention of the '248 patent, a practitioner would subjectively estimate aligner fit by simply visually inspecting a patient's dental arch, Appx526(¶20), and applying pressure with their fingers to portions of the aligner, Appx863(¶24). This method was "susceptible to inconsistency and inaccuracy" due to a given orthodontists' experience, "speed of review, number of patients seen," or "fatigue." Appx862-863(¶22). Unlike the claims in *Recentive*, claim 14 does not simply "speed up human activity." 2025 WL 1142021, at *6. Rather, claim 14 recites a method that humans could not perform at all without the assistance of machine-learning tools.

The claimed method does not, as the district court said, merely "describe the process of 'doing it on a computer.'" Appx9. The method is an advance in orthodontic technology itself: the deployment of a specific AI-based learning tool, trained with an extensive knowledge base, to perform more precise and objective evaluation of the fit of an aligner than was previously possible. The claim is therefore not directed to an abstract idea and is patent eligible under § 101. *Cf. CardioNet, LLC v. InfoBionic, Inc*, 955 F.3d 1358, 1368 (Fed. Cir. 2020) (holding eligible claims that "focus on a specific means or method that improves cardiac monitoring technology" (cleaned up)); *Koninklijke KPN N.V. v. Gemalto M2M GmbH*, 942 F.3d 1143, 1150-51 (Fed. Cir. 2019) (holding eligible claims that employ "a new way" of detecting errors "that prior art systems were previously not equipped to detect"); *McRO*, 837 F.3d at 1314-16 (holding eligible claims that recite a combined order of particular rules to render information into a specific format).

Align parrots the district court's order, arguing that these improvements in orthodontic technology are "inherent" benefits from the method's use of machine learning. RedBr33; Appx7. Not so. The evolution from qualitative to quantitative aligner assessment is different in kind from increasing the speed and efficiency of a process that humans otherwise could perform. The specific, AI-based method of claim 14 does

not merely automate sorting or alphabetizing, for example. Rather, the claims "achieve[] speedier, more accurate, and clinically significant detection" of the separation between the aligner and each of the patient's teeth, giving the orthodontist the information needed to modify the aligner and adjust treatment. *CardioNet*, 955 F.3d at 1370.

Align also argues that the "'deep learning device' is simply a generic computer" that uses "off-the-shelf neural networks." RedBr24. Align, asserting that "[t]hat is all DM's patents do," D.I. 24, at 2, ignores the fundamental difference between a generic computer and the deep learning device described at length in the patent. Training the claimed deep learning device is not generic at all—the patents disclose that the particular method of training, and the training data used, is unique to each deep learning device and determines the device's performance. Appx44(15:57-66); Appx793-796(¶¶28-31); Appx802-803(¶37); Appx807(¶¶39-40); Appx809-811(¶¶53-55). Unlike the "use of generic machine learning" at issue in *Recentive*, claim 14 requires creating a library of images of patients' teeth and training a deep learning device with that library to quantitatively assess the fit of a particular aligner. Even the district court recognized: "[T]he claim describes the training process with a great deal of particularity." Appx6.

Align argues that the technological improvements of claim 14 are not "tethered to the claims." RedBr31-32. Although the step one analysis must focus on the claim language, *Hawk Tech. Sys., LLC v. Castle Retail LLC*, 60 F.4th 1349, 1356-57 (Fed. Cir. 2023), this Court has said that the claim limitations themselves "need not articulate the advantages of the claimed combinations to be eligible," *Uniloc USA, Inc. v. LG Elecs. USA, Inc.*, 957 F.3d 1303, 1309 (Fed. Cir. 2020). Further, this Court has recognized that a claim's advantages may be described in the specification if, as here, those benefits "flow from the [claimed invention]." *Visual Memory LLC v. NVIDIA Corp.*, 867 F.3d 1253, 1259 (Fed. Cir. 2017).

Align argues that nothing in the claim requires any "level of precision." RedBr31. But Claim 14's recited "amplitude of said separation" requires quantitative assessment of the aligner's fit. Appx53(34:41-42). This benefit is further described by the specification. *See, e.g.*, Appx51(30:42-44) ("The value for this tooth attribute therefore provides an information item relating to *the shape of the aligner relative to the shape of the teeth* of the patient." (emphasis added)); Appx51(30:54-59) ("[A] search is conducted to see if the separation of the aligner with at least one tooth exceeds an *acceptability threshold*." (emphasis added)).

Align also argues that claim 14 is "*not limited* to remote applications." RedBr31. But the claim recites the use of "a cellphone" to acquire the

"analysis image," Appx52(32:8-13; 32:22), and the specification further reflects that the invention enables a patient to prepare for and receive care remotely, *see, e.g.*, Appx45(17:36-38) ("A detailed analysis method according to the invention is in particular useful for modeling a dental arch, notably for establishing a *remote diagnostic*." (emphasis added)); Appx45(17:48-51) ("Conventionally, the checks are performed by an orthodontist who has appropriate apparatus. These checks are therefore *costly*. Furthermore, the appointments are *restrictive*." (emphasis added)); Appx48(23:20-23); Appx50(28:34-42). The benefits described in the specification are therefore anchored to and flow directly from the claim language.

For these reasons, claim 14 is directed to non-abstract, eligible subject matter—a particular, AI-based method for quantitatively assessing the fit of a dental aligner on a tooth-by-tooth basis—an innovative advancement in orthodontic technology.

## 2. Claims 7 and 12 of the '409 Patent Are Directed to a Specific Improvement in Orthodontic Technology (AI-Guided Remote Imaging of Aligners by Patients)

The '409 patent, titled "Method for Analyzing an Image of a Dental Arch," describes and claims methods for taking an image of a patient's dental arch taken by an "image acquisition apparatus," such as a smartphone camera, and then analyzing that image with "a deep learning

device trained by a [specially trained] learning base." Appx54([54]; [57]). The deep learning device calculates a value for an "image attribute," such as camera distance, angle, lighting, and correct framing of the patient's dental arch in the photograph, and compares that value to a setpoint to determine whether the image is clinically sufficient or whether the patient needs to be notified that a new image is required. Appx67(1:22-65).

Claims 7 and 12 of the '409 patent are directed to a method for acquiring an image of a patient's dental arch under guidance from a specifically trained deep learning device that provides immediate feedback about the clinical utility of that image. Appx82(32:13-33); Appx83(33:10-21; 34:34-35). Claim 1, from which these claims depend, discloses an image apparatus device that analyzes an acquired image with a deep learning device that has been trained with a specific learning base. Appx82(32:13-18). That deep learning device has been uniquely trained "to check whether the analysis image respects the setpoint"—i.e., is usable for treatment purposes. Appx82(32:19-31). If the image is unusable, the patient will be notified of the clinically significant shortcomings of the image and prompted to take a new picture. Appx82(32:31-33). Claim 7, in turn, describes the specific method of training the deep learning device using a unique learning base comprising over "1000 images of dental arches." Appx83(33:10-21). Claim 12 then facilitates the sending of an

informational message when the deep learning device determines the acquired image as unacceptable. Appx83(34:34-35). Without assistance from the claimed AI, a patient would not be able to acquire useable images from his/her smartphone.

The '409 specification further explains the training process. Appx74(16:44-50). The specification also discloses the precise technological challenges that the invention overcame. Prior to the '409 patent, patients could not receive orthodontic assessments without visiting their provider in person, could not regularly acquire clinically satisfactory dental images during remote appointments, and could not be properly instructed to take improved images. Appx67(1:16-18); Appx68(4:32-38); Appx75(18:16-24); Appx79(25:34-39); Appx80(28:12-20); Appx491-492(¶81) (citing Appx67(1:11-15)).

The district court summarily concluded that these claims "merely recite[] a common practice long performed by dental practitioners." Appx10. But no human could aggregate 1000 or more images of dental arches to generate an objective, clinically useful baseline for image usability. Claims 7 and 12 of the '409 patent recite technological advances because they enable objective, consistent quantitative evaluation of a particular image's attributes. *See Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1334, 1337 (Fed. Cir. 2016) (holding eligible claims that constitute

an improvement to computer function by increasing flexibility and reducing search times and memory requirements). And claims 7 and 12 are unlike those in *Recentive* because they do not "perform a task previously undertaken by humans with greater speed and efficiency"— they recite methods that patients previously could not perform at all. 2025 WL 1142021, at *6.

Align argues that the benefits provided by claims 7 and 12— specifically, the ability of a patient to take a clinical-grade image remotely based on real-time feedback—"are not tethered to the claims." RedBr52. That is false. The claims recite "an image acquisition apparatus," not limited by location, that "check[s] whether the analysis image respects the setpoint [usability] and, if it does not … guide[s] the operator … to acquire a new analysis image." Appx82(32:15; 32:31-33). The specification expounds on these technological benefits. *See, e.g.*, Appx78(23:47-49) ("An image analysis according to the invention is also useful for guiding the acquisition of an image of a dental arch, in particular for establishing a *remote diagnosis*." (emphasis added)); Appx79(25:34-35; 25:50-52) ("The *operator*, generally the patient, may however make a mistake in the acquisition of the updated images. … By virtue of the invention, each updated image is an analysis image which may be analyzed and checked, preferably in real time." (emphasis added)); Appx79(26:6-8);

Appx79(26:37-41). The benefits described in the specification are therefore anchored to and flow directly from the claim language.

Align accuses DM of framing the claimed invention in terms of "generic concepts," such as "attribute value[s]," "image attribute," and "specific learning base" that would categorically apply to any number of deep learning devices. RedBr52-53. But merely using certain terms to describe the operations of a claimed invention does not defeat eligibility. Moreover, the specification explains in detail how the "attributes" are captured and used. *See, e.g.*, Appx68(4:13-31); Appx70(8:7-52). Similar to the claims that this Court upheld in *McRO*, claims 7 and 12 present a combined order of particular rules to render information into a specific format that generates readable images for orthodontic assessment—and an informational message to the patient if more data is needed. 837 F.3d at 1314-16.

Align finally argues that the claims' "limitations merely reflect automation via a deep learning device of the manual process one goes through in capturing a photo, determining whether it meets some expectation, and if necessary[,] capturing another photo." RedBr56. The relevant claims are more than "a dialogue as old as photography itself." RedBr56. More than just determining the subjective quality of an image, the claims describe an AI-assisted method of evaluating a patient's images

of their dental arch and ensuring that the image is clinically usable by referencing a setpoint related to that usability. Appx82(32:13-33). Claims 7 and 12 are not directed to abstract ideas.

## B. *Alice* Step Two

A claim is eligible at step two if it goes "beyond the abstract idea … and improve[s] upon the prior art." *CosmoKey Sols. GmbH v. Duo Sec. LLC*, 15 F.4th 1091, 1098-99 (Fed. Cir. 2021). The claims here meet this standard because, even if they are directed to abstract ideas (which they are not), they transform those ideas "into a particular, practical application" and "technical improvement" over current orthodontic technology. *BASCOM Glob. Internet Servs., Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 1350, 1352 (Fed. Cir. 2016). Unlike the claims in *Recentive*, which recited "no more than … the abstract idea itself," 2025 WL 1142021, at *7, the claims here include inventive applications of the analysis and imaging concepts that the district court identified (erroneously) as abstract.

DM was a pioneer in using technology to advance the state of the art in dental treatment. DM gathered a team of over 130 developers, scientists, orthodontists, and technicians to create the tailored AI-based inventions before the Court today. Appx110-111(¶10). The technological solutions claimed in these patents were followed by DM's development of

a unique AI-training process that relies on a database comprising an expanding library of images of historical patient photographs, many of which were hand-curated by DM staff and partners. *Id.* They claim methods that—as Align's own expert conceded below and as Align does not dispute (or even address) in this Court—were not part of the standard of dental care as of the priority date. Appx532(¶34). They therefore could not have been routine or conventional; at minimum there is a factual dispute as to the claimed inventive concepts.

1. **Claim 14 of the '248 Patent Contains an Inventive Concept (Specially Trained AI To Determine Aligner Fit by Tooth-by-Tooth Separation)**

The district court ruled that claim 14 is directed to the abstract idea of "collecting information, analyzing it, and displaying certain results of the collection and analysis." Appx6 (quoting *Elec. Power Grp. v. Alstom S.A.*, 830 F.3d 1350, 1353 (Fed. Cir. 2016)). But the court ignored claim limitations disclosing the inventive concept of creating and training a deep learning device to objectively determine the separation of an aligner from each tooth to within one millimeter—a degree not possible with current technology, as DM's expert acknowledged. This technological innovation enhances the quality of dental treatment, allowing the orthodontist to more precisely adjust the molding of the aligner.

21

**a.** Claim 14 "recite[s] a specific, discrete implementation" of the idea identified by the district court that transforms it "into a particular, practical application" and "technical improvement" over current orthodontic technology. *BASCOM*, 827 F.3d at 1350, 1352. Claim 14 is therefore eligible under § 101. *Cf. CosmoKey*, 15 F.4th at 1098-99 (holding eligible claims that "recite a specific improvement to authentication" going "beyond the abstract idea … and improve upon the prior art by providing … higher security"); *Amdocs (Isr.) Ltd. v. Openet Telecom, Inc.*, 841 F.3d 1288, 1300-02 (Fed. Cir. 2016) (holding eligible claims that "enhance data in a distributed fashion" where the "solution requires arguably generic components," but the claim achieved "a technical improvement over prior art technologies").

Align contends that claim 14 uses routine methods to train an off-the-shelf neutral network to assess a patient's dentition as any human would. RedBr40-43. In reality, the claim recites an innovative method that creates and trains, using a specific training process, a particular AI-based learning tool that performs more precise and objective evaluation of the fit of an aligner than is possible with current orthodontic technology. Appx53(34:23-31); Appx44(16:37-43). And to the extent that any generic components are involved, the "particular arrangement" of the steps detailed in claim 14 "provides a technical improvement over conventional

[orthodontic] methods" of assessing aligner fit. *CosmoKey*, 15 F.4th at 1099.

Align fundamentally mischaracterizes the invention when it argues that "'do it with AI' is no more inventive than 'do it with a computer.'" RedBr18. As the specification explains (and Dr. Mongan confirmed), how a deep learning device is trained determines its performance. Appx44(15:57-66); Appx793-796(¶¶28-31); Appx797-803(¶¶35-37). Claim 14 involves far more than simply an instruction to "do it with AI" because, among other things, it claims a particular method of training to solve the technological problem of measuring how closely, to the millimeter, each tooth fits with the mold of the patient's aligner. Claim 14 therefore contains an inventive concept and is eligible at *Alice* step two.

**b.** At a minimum, the Court should remand for fact finding on the inventive aspects of the claims. *See Berkheimer v. HP Inc.*, 881 F.3d 1360, 1370 (Fed. Cir. 2018) ("Whether [the claims] perform well-understood, routine, and conventional activities to a skilled artisan is a genuine issue of material fact making summary judgment inappropriate with respect to these claims."). For example, Align disputes Dr. Kusnoto's commonsense testimony that "a dental professional could not and did not previously determine" separations "with their naked eye (*e.g.*, spaces less than one mm)." Appx869-870(¶48). *See* RedBr5 (quoting Appx966(46:21-47:7)). At

most, this position creates a factual dispute regarding whether claim 14 contains an inventive concept, rendering summary judgment inappropriate. *See, e.g.*, *Crown Packaging Tech., Inc. v. Ball Metal Beverage Container Corp.*, 635 F.3d 1373, 1384 (Fed. Cir. 2011) ("Where there is a material dispute as to the credibility and weight that should be afforded to conflicting expert reports, summary judgment is usually inappropriate."). Thus, at a minimum, the Court should vacate the district court's judgment and remand the case for factual findings.

### 2. Claim 7 and 12 of the '409 Patent Contain an Inventive Concept (Specially Trained AI for Assessing Clinical Usability of Patient Generated Images)

Align argues that claims 7 and 12 of the '409 patent contain no inventive concept because they use generic computer components and apply machine learning to "automate [a] conventional process." RedBr3, 58-61.

a.  As explained, applications of deep learning devices to guide orthodontic treatment were not "conventional" activity in 2017. *See Berkheimer*, 881 F.3d at 1367-68 (holding claims eligible at step two because the limitations "involve[d] more than performance of well-understood, routine, [and] conventional activities" (internal quotation marks and citation omitted)). The training disclosed in the '409 patent was by no means intuitive in 2017. Dr. Mongan testified that a relevant artisan

at the time would not have known that there was such a learning base that could train an existing neural network to perform the functions disclosed in the '409 patent. Appx809-814(¶¶52-60); *see also* Appx807(¶40) (stating that "the use of deep learning" for a particular task was, and still is, "not necessarily straightforward, reliable, or possible"). The minimum 1000 historical images required to train the deep learning device and its resulting functionality clearly represent an inventive concept because they are far beyond the "'humanly comprehensible' amount of information useful for users" performing "information collection and analysis." *Killian*, 45 F.4th at 1385.

The combination of a deep learning device *with* a camera-enabled device was not conventional, either. Appx479-480(¶47); Appx482-483(¶55); Appx493-494(¶86). Align argues that, by 2017, smart phone photographs of "high-quality" could be used for medical treatment, and that photo editing was common practice among patients. RedBr5-7. However, in 2017, patient-captured dental images by cell phone, were neither clinical-grade nor could be evaluated in real time. Appx871-872(¶¶63-65); Appx526(¶20); Appx79(25:34-35). Rather, the "standard of care" in the "very conservative" dental and orthodontic field would have required imaging in the orthodontist's office, or at least live instruction by an orthodontist to a patient taking pictures, sending images to the

orthodontist for review, and waiting for feedback. Appx898(50:3-5); Appx110-111(¶¶9-10). Claims 7 and 12 facilitate this feedback in real time, outside of an orthodontic visit or virtual appointment, and combine elements that, even if preexisting separately, could not have been performed by a relevant artisan sooner. Claims 7 and 12 therefore contain an inventive concept and are eligible at *Alice* step two.

Align also relies on the Salah reference (a publication by the inventors of the '248 and '409 patents) to argue that using a cellphone to "acquire images of their dental arches" was conventional. RedBr48. This reference confirms that DM was the pioneer in the field, *not* that DM's claimed invention was conventional. In any event, Align identifies no disclosure in Salah establishing that it was *conventional* to acquire dental images and provide specific feedback about them in connection with a trained deep learning device. *Berkheimer*, 881 F.3d at 1369 ("The mere fact that something is disclosed in a piece of prior art does not mean it was well-understood, routine, and conventional.").

**b.** In the alternative, vacatur and remand are necessary for fact-finding on the question of inventive concept. Align argues that the use of deep learning "underwent a revolution in 2012" and applications were "rapidly expanding" in medical imaging by 2016, including into dental imaging by 2017. RedBr60. Even accepting this timeline, however, the

French patent applications filed in 2017 (to which the '248 and '409 patents claim priority), were at the cutting edge of this technological revolution. Appx24([30]); Appx54([30]). Indeed, voluminous evidence showed that the claimed specially trained deep learning device did not exist outside of DM's invention before July 2017. Appx807(¶¶39-40); Appx810-811(¶¶54-55); Appx840-841(¶¶121-22); Appx866-867(¶35); Appx871(¶63); Appx872-874(¶¶66-68).

Further, Align's expert, Dr. Valley, testified that deep learning devices were not "part of the standard of care" for aligner assessment at the time of invention, especially in what was a "very conservative" dental and orthodontic field. Appx898(50:3-5). Align's CEO even admitted that "many doctors *began using* video calls, texts, and *patient-submitted photos*" only in response to the COVID-19 pandemic. Appx889 (emphasis added). Critically, Align disputes neither of these points in its red brief. Thus, because there is a genuine dispute of material fact as to the state of the art, summary judgment was inappropriate. *Berkheimer*, 881 F.3d at 1370.

## II.   Other Validity Issues Are Not Properly Before the Court

During the patent showdown, the district court took briefing and argument on several asserted grounds of invalidity but ultimately ruled only on patent-eligibility under § 101. Appx22-23. DM's appeal challenges that judgment, which should be reversed or vacated for the reasons set

forth above. Nevertheless, Align tries to smuggle in additional grounds of invalidity to this appeal.

First, many of Align's arguments in this Court sound in non-novelty or obviousness based primarily on the Salah reference. *See* RedBr7, 58-62. "The novelty," however, of "the process itself is of no relevance in determining whether the subject matter of a claim falls within … § 101." *CardioNet*, 955 F.3d at 1372 (cleaned up) (quoting *Diehr*, 450 U.S. at 188-89). Sections 102 and 103 come into play only after the coarse filter of § 101 has been applied.[2]

In any event, the Salah reference (PCT Publication No. WO2016/066651), co-authored by all four inventors of both the '248 and '409 patents, does not demonstrate that claimed inventions were well-known or conventional. The specifications of both the '248 and '409 patents explain the inventors' prior work as disclosed in the Salah reference and how each of these new patents technically improve upon it. Appx37(2:42-47); Appx38(3:4-10); Appx40-41(7:38-9:30); Appx45(17:58-18:3); Appx67(2:42-47); Appx68(3:4-10); Appx70-71(7:44-9:39); Appx75(17:65-

___

[2] Align's Rule 28(j) letter notes that the Patent Trial and Appeal Board recently issued Final Written Decisions determining unpatentable certain claims of the '248 and '409 patents. D.I. 24, at 2. But those rulings rested on grounds separate from § 101 that are not at issue in this appeal. This Court will have the opportunity to assess the correctness of the Board's determinations in due course.

18:24); *cf. CosmoKey*, 15 F.4th at 1098-99 (finding the claims contained an inventive concept and were not conventional where the specification explained that the claimed steps were "developed by the inventors, are not admitted prior art, and yield certain advantages over the described prior art").

Second, Align asks the Court to affirm the judgment on the "alternative" ground of indefiniteness. RedBr20, 63-69. The Court is without jurisdiction to do so because the district court's judgment does not encompass that issue. The judgment reads: "Claims 1 and 14 of the '248 patent and claims 1, 7, and 12 of the '409 patent are not patent-eligible under 35 U.S.C. § 101." Appx22-23. The court below never ruled that the claims at issue in this appeal are invalid under § 112, Appx1; Appx1391, as Align conceded below, Appx18(¶3), and in this Court, RedBr63-64 ("The district court concluded that those [§ 112] grounds were moot in light of its § 101 ruling ....").

Because the judgment is limited to invalidity on § 101 grounds, the Court lacks jurisdiction to consider Align's § 112 arguments. A judgment that "specifie[s] particular types of invalidity" is "insufficient to bring all of forms [sic] of invalidity into issue" on appeal. *See Minn. Mining & Mfg. Co. v. Chemque, Inc.*, 303 F.3d 1294, 1309 (Fed. Cir. 2002). Doing so would require modifying the judgment and "changing the basis for the invalidity

determination." *Id.* Align does not even acknowledge this long-established rule, which forecloses Align's "alternative" argument.

Align is also wrong on the merits of § 112. Align argues that the claims at issue here are invalid for lack of written description and indefiniteness because the specifications state that the device is "preferably" a neural network. RedBr64. Align incorrectly contends that a disclosed *preference* for neural-network-type deep learning devices means that DM necessarily claims the opposite of that preference. *Id.* Not so. The claims themselves recite a "deep learning device," *e.g.*, Appx53(34:21-42); Appx83(33:10-21; 34:34-35), and the specifications sufficiently describe what that device is, *e.g.*, Appx44(16:5-36); Appx74(16:13-43); Appx827-828(¶91).

Finally, merely disclosing a preferred embodiment does not automatically import non-preferred embodiments into the claim language. *Cf. Falko-Gunter Falkner v. Inglis*, 448 F.3d 1357, 1366 (Fed. Cir. 2006) ("A patent claim is not necessarily invalid for lack of written description just because it is broader than the specific examples disclosed.").

*       *       *

Align's central contention—that "do it with AI" is no different from "do it with a computer"—is both unsupported and dangerous. If accepted, this approach would put the next frontier in information technology

beyond the reach of the Patent Act. The billions of dollars that individuals and companies around the world are pouring into AI would go unprotected, at least in the United States, by the statutory reward for innovative investment. Align expresses concern that a reversal would render *Alice* a "dead letter" as applied to machine learning. But accepting Align's position and affirming the judgment here would put the next wave of digital innovation outside the patent laws—the exact opposite of what *Alice* stands for.

*Alice* and its progeny "developed almost entirely outside of the artificial intelligence context," Ben Hattenbach & Gavin Snyder, *Rethinking the Mental Steps Doctrine and Other Barriers to Patentability of Artificial Intelligence*, 19 Colum. Sci. & Tech. L. Rev. 313, 318 (2018), and they must be applied to the new technology here with great care, *cf. Carpenter v. United States*, 585 U.S. 296, 318 (2018). AI is a burgeoning tool that holds the potential for untold innovations in applications known and unknown, far beyond dentistry, based on its ability to solve complex problems that the human mind could not otherwise comprehend. As just one example, AI is currently being used to synthesize proteins that could treat cancer. *See, e.g.*, Xinru Qiu et al., *Advances in AI for Protein Structure Prediction: Implications for Cancer Drug Discovery and Development*, 14 *Biomolecules* 339 (2024), https://www.mdpi.com/2218-273X/14/3/339.

Affirming the decision below would not "promote the Progress of Science and useful Arts," U.S. Const. art. I, § 8, cl. 8; on the contrary, striking down the specific, AI-based claims here as ineligible would irreparably stunt development of today's groundbreaking technologies. *See Smart Sys. Innovations, LLC v. Chi. Transit Auth.*, 873 F.3d 1364, 1378 (Fed. Cir. 2017) (Linn, J., concurring in part) (describing AI-based inventions as "some of today's most important").

This Court's recent decision in *Recentive* examined one type of machine-learning claim, which it held to be ineligible because it did not recite anything but simple application of generic machine learning to a new field of use. This appeal involves the obverse type of claims— particularized limitations that, with the associated specifications, describe the training and deployment of deep learning devices to solve particular problems in dentistry that humans could not perform without technological assistance—that are clearly patent-eligible. It therefore provides the opportunity for the Court to explain that, contrary to the district court's mistaken assumption, the recitation of a machine-learning-based step does not by itself render a method claim ineligible. Rather, the *Alice* framework must be applied to such claims as to all others; and properly applying the statute and this Court's precedents to the claims at issue here establishes that they are patent-eligible.

## CONCLUSION

For the foregoing reasons, the judgment should be reversed; in the alternative, the judgment should be vacated and the case remanded for fact-finding.

Respectfully submitted,

/s/ Mark A. Perry

Mark A. Perry
Adam W. Mitchell
Caroline Voelker
WEIL, GOTSHAL & MANGES LLP
2001 M Street NW, Suite 600
Washington, DC 20036
(202) 682-7511
mark.perry@weil.com

Rocco Recce
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153
(212) 310-8000

April 28, 2025

*Counsel for Appellant Dental Monitoring SAS*

## CERTIFICATE OF COMPLIANCE

The undersigned counsel of record certifies pursuant to Fed. R. App. P. 32(g) that the Brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(i) because, excluding the parts of the Brief exempted by Fed. R. App. P. 32(f), this document contains 6,830 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Century Schoolbook font in 14 point size.

/s/ Mark A. Perry

Mark A. Perry
WEIL, GOTSHAL & MANGES LLP
2001 M Street NW, Suite 600
Washington, DC 20036
(202) 682-7511
mark.perry@weil.com

April 28, 2025

*Counsel for Appellant Dental Monitoring SAS*