**Weil, Gotshal & Manges LLP**

2001 M Street, NW Suite 600
Washington, DC 20036
+1 202 682 7000 tel
+1 202 857 0940 fax

**Mark A. Perry**
+1 (202) 682-7511
Mark.Perry@weil.com

BY CM/ECF

May 26, 2026

The Honorable Jarrett B. Perlow
Circuit Executive & Clerk of the Court
United States Court of Appeals for the Federal Circuit
717 Madison Place, N.W.
Washington, DC 20439

Re: *Dental Monitoring SAS v. Align Technology, Inc.*, No. 24-2270

Dear Mr. Perlow:

Pursuant to Rule 28(j), Dental Monitoring respectfully notes several developments since the reply brief was filed regarding the eligibility of patents involving machine learning.

*First*, the Director of the U.S. Patent and Trademark Office authored a precedential decision stating:

> Categorically excluding AI innovations from patent protection in the United States jeopardizes America's leadership in this critical emerging technology. Yet, under the panel's reasoning, many AI innovations are potentially unpatentable—even if they are adequately described and nonobvious—because the panel essentially equated any machine learning with an unpatentable "algorithm" and the remaining additional elements as "generic computer components," without adequate explanation.

*Ex parte Desjardins*, No. 2024-000567, at 9 (P.T.A.B. Appeals Review Panel Sept. 26, 2025); *see also Ex parte Carmody*, No. 2025-002843 at 2, 7-8 (P.T.A.B. Appeals Review Panel Dec. 31, 2025) (applying *Desjardins* to hold eligible claims "directed to artificial intelligence (AI) based orchestration of marketing, sales, and customer lifecycle strategies"). The panel ruling reversed in *Desjardins* was analytically similar to the district court's ruling in this appeal, which (if not corrected) presents the precise risk to innovation that the Director identified. *See* Blue Br. 33-39, 53-57; Reply Br. 13, 19-20.

*Second*, this Court has issued a decision that follows *Recentive Analytics, Inc. v. Fox Corp.*, 134 F.4th 1205 (Fed. Cir. 2025), in holding machine learning claims ineligible. *Rensselaer Polytechnic Inst. v. Amazon.com, Inc.*, 2026 WL 506661 (Fed. Cir. Feb. 24, 2026). As Dental Monitoring has explained, however, this appeal is the obverse of *Recentive* because, among other reasons, the claims in *Recentive* automated tasks that humans admittedly already performed, whereas Dental Monitoring's claims here

enable tasks that could not be performed (by humans or machines) prior to these inventions. Reply Br. 7-8, 30-32; *see also, e.g.*, *Osseo Imaging, LLC v. Dentsply Sirona, Inc.*, 802 F. Supp. 3d 436 (E.D.N.Y. 2025) (holding eligible claims "describ[ing] a 'dental and orthopedic densitometry modeling system'"). *Rensselaer* is distinguishable for the same reasons.

Dental Monitoring respectfully submits that these recent authorities further support eligibility of the claims at issue in this appeal and reversal of the decision below.

Respectfully submitted,

*/s/ Mark A. Perry*

Mark A. Perry

cc: Counsel of Record via CM/ECF

# Attachment A

*Ex parte Desjardins*
No. 2024-000567 (P.T.A.B. Appeals Review Panel Sept. 26, 2025)

UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 16/319,040 | 01/18/2019 | Guillaume Desjardins | 45288-8015US1 | 2007 |

151793 7590 09/26/2025
FISH & RICHARDSON P.C.
PO BOX 1022
MINNEAPOLIS, MN 55440-1022

| EXAMINER | |
|---|---|
| TRIEU, EM N | |

| ART UNIT | PAPER NUMBER |
|---|---|
| 2128 | |

| NOTIFICATION DATE | DELIVERY MODE |
|---|---|
| 09/26/2025 | ELECTRONIC |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

Notice of the Office communication was sent electronically on above-indicated "Notification Date" to the following e-mail address(es):

PATDOCTC@fr.com

Patent Trial and Appeal Board
PRECEDENTIAL
Designated: 11/4/2025

UNITED STATES PATENT AND TRADEMARK OFFICE

————————

BEFORE THE APPEALS REVIEW PANEL OF THE
PATENT TRIAL AND APPEAL BOARD

————————

*Ex parte* GUILLAUME DESJARDINS, RAZVAN PASCANU,
RAIA THAIS HADSELL, JAMES KIRKPATRICK,
JOEL WILLIAM VENESS, and NEIL CHARLES RABINOWITZ

————————

Appeal 2024-000567
Application 16/319,040
Technology Center 2100

————————

Before JOHN A. SQUIRES, *Under Secretary of Commerce for Intellectual Property and Director of the United States Patent and Trademark Office*, VALENCIA MARTIN WALLACE, *Acting Commissioner for Patents*, and MICHAEL W. KIM, *Vice Chief Administrative Patent Judge*.

SQUIRES, *Under Secretary of Commerce for Intellectual Property and Director of the United States Patent and Trademark Office*.

DECISION ON REQUEST FOR REHEARING

## I. INTRODUCTION

This Appeals Review Panel ("ARP") was convened to review the Board's Decision on Appeal ("Dec.") and Decision on Request for Rehearing ("Reh'g Dec."), with particular focus on the Board's new ground of rejection of claims 1–6 and 8–20 under 35 U.S.C. § 101. We have jurisdiction under 35 U.S.C. § 6(b).

On review, we vacate the Board's new ground of rejection. We do not disturb the Board's previous decisions in any other respects.

## II. BACKGROUND

*A. Claimed Invention*

Application No. 16/319,040 relates to training machine learning models. Specification ("Spec.") ¶ 2. Independent claim 1 reads:

> 1. A computer-implemented method of training a machine learning model,
>
> wherein the machine learning model has at least a plurality of parameters and has been trained on a first machine learning task using first training data to determine first values of the plurality of parameters of the machine learning model, and
>
> wherein the method comprises:
>
> determining, for each of the plurality of parameters, a respective measure of an importance of the parameter to the first machine learning task, comprising:
>
> > computing, based on the first values of the plurality of parameters determined by training the machine learning model on the first machine learning task, an approximation of a posterior distribution over possible values of the plurality of parameters,
> >
> > assigning, using the approximation, a value to each of the plurality of parameters, the value being the respective measure of the importance of the parameter to the first machine learning task and approximating a probability that the first value of the parameter after the training on the first machine learning task is a correct value of the parameter given the first training data used to train the machine learning model on the first machine learning task;
>
> obtaining second training data for training the machine learning model on a second, different machine learning task; and

> training the machine learning model on the second machine learning task by training the machine learning model on the second training data to adjust the first values of the plurality of parameters to optimize performance of the machine learning model on the second machine learning task while protecting performance of the machine learning model on the first machine learning task,
>
> wherein adjusting the first values of the plurality of parameters comprises adjusting the first values of the plurality of parameters to optimize an objective function that depends in part on a penalty term that is based on the determined measures of importance of the plurality of parameters to the first machine learning task.

Appeal Br. 16 (Claims Appendix).

The Specification discloses:

> Particular embodiments of the subject matter described in this specification can be implemented so as to realize one or more of the following advantages. By training the same machine learning model on multiple tasks as described in this specification, once the model has been trained, the model can be used for each of the multiple tasks with an acceptable level of performance. As a result, systems that need to be able to achieve acceptable performance on multiple tasks can do so while using less of their storage capacity and having reduced system complexity. For example, by maintaining a single instance of a model rather than multiple different instances of a model each having different parameter values, only one set of parameters needs to be stored rather than multiple different parameter sets, reducing the amount of storage space required while maintaining acceptable performance on each task. In addition, by training the model on a new task by adjusting values of parameters of the model to optimize an objective function that depends in part on how important the parameters are to previously learned task(s), the model can effectively learn new tasks in succession whilst protecting knowledge about previous tasks.

Spec. ¶ 21.

*B. Procedural History*

On March 4, 2025, a Board panel issued a Decision on Appeal (1) affirming the rejection of all pending claims 1–6 and 8–20 under 35 U.S.C. § 103 (one judge entered an opinion concurring-in-part, and would have reversed this rejection), and (2) entering a new ground of rejection of claims 1–6 and 8–20 under 35 U.S.C. § 101. On May 5, 2025, the Appellant[1] filed a Request for Rehearing ("Req."), and addressed the new ground of rejection. Req. 7–10. On July 14, 2025, the Board panel issued a Decision on Request for Rehearing denying the Request in all respects.

*C. Principles of Law and the Manual of Patent Examining Procedure ("MPEP")*

35 U.S.C. § 101 provides that "[w]hoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor." Section 101, however, "contains an important implicit exception: Laws of nature, natural phenomena, and abstract ideas are not patentable." *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 573 U.S. 208, 216 (2014) (quoting *Ass'n for Molecular Pathology v. Myriad Genetics, Inc.*, 569 U.S. 576, 589 (2013)). *Alice* identifies a framework for determining whether claimed subject matter is directed to an abstract idea. *Id.* at 217. According to *Alice*, "[w]e must first determine whether the claims at issue are *directed to* a patent-ineligible concept." *Id.* at 218 (emphasis added).

[1] The "Appellant" refers to the "applicant" as defined in 37 C.F.R. § 1.42(a) (2022). The Appellant identifies DeepMind Technologies Limited as the real party in interest. Appeal Br. 1.

> Under *Alice* step one, we consider whether the claims at issue are directed to patent-ineligible subject matter, here, an abstract idea. This "directed to" inquiry does more than "simply ask whether the claims *involve* a patent-ineligible concept." *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1335 (Fed. Cir. 2016) (emphasis in original). Instead, we must look to the character of the claims as a whole to determine whether they are "directed to" patent-ineligible subject matter. *Id.*

*AI Visualize, Inc. v. Nuance Commc'ns, Inc.*, 97 F.4th 1371, 1378 (Fed. Cir. 2024). If so, the next step is "a search for an 'inventive concept'—*i.e.*, an element or combination of elements that is 'sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself.'" *Alice*, 573 U.S. at 217–18 (quoting M*ayo Collaborative Servs. v. Prometheus Labs., Inc.*, 566 U.S. 66, 72–73 (2012)) (alteration in original).

The MPEP describes the process the Office follows in evaluating whether a claim is drawn to patent-eligible subject matter under § 101. *See* MPEP § 2106. Consistent with the statute, the process entails, at Step 1, determining whether the claimed subject matter falls within one of the four statutory categories of invention (i.e., process, machine, manufacture, or composition of matter). *See* MPEP § 2106.03. Consistent with *Alice*'s two-part framework, Step 2 of the process is a two-part test to identify whether claims are directed to a judicial exception, i.e., an abstract idea, law of nature, or natural phenomenon (Step 2A; *see* MPEP § 2106.04), and then to evaluate if additional elements of the claim provide an inventive concept; that is, whether they provide "significantly more" than the recited judicial exception (Step 2B; *see* MPEP § 2106.05).

Step 2A is a two-pronged inquiry. "Prong One asks does the claim recite an abstract idea, law of nature, or natural phenomenon?" MPEP

§ 2106.04(II)(A)(1). "Prong Two asks does the claim recite additional elements that integrate the judicial exception into a practical application?" MPEP § 2106.04(II)(A)(2). Only after a determination is made that the claim recites a judicial exception under the Prong One inquiry do we proceed to the Prong Two inquiry, and then to Step 2B. "The Step 2A Prong One analysis articulated in MPEP § 2106.04 . . . requir[es] a claim to recite (*i.e.*, set forth or describe) an abstract idea in Prong One before proceeding to the Prong Two inquiry . . . ." MPEP § 2106.04(a)(1). If, at Prong Two, the claim as a whole is not directed to a judicial exception, the eligibility analysis is concluded. MPEP § 2106.04(II)(A)(2).

## III. ANALYSIS

The Board's decisions and the Appellant's arguments focus on MPEP Step 2A (*Alice* Step One). *See* Dec. 20–23; Req. 7–9; Reh'g Dec. 5–7. Accordingly, we confine our discussion to Step 2A, as that resolves our review.

### *A. Alice Step One; MPEP Step 2A, Prong One*

Independent claim 1 recites "computing . . . , an approximation of a posterior distribution over possible values of the plurality of parameters." Independent claims 18 and 19 recite similar limitations. Appeal Br. 20–21 (Claims App.). In entering the new ground of rejection, the Board determined that at least this limitation recites a mathematical calculation, which is a mathematical concept, and, thus, an abstract idea. Dec. 20–21. For this limitation, the Appellant neither disputed that the limitation recites an abstract idea, nor identified the limitation as reciting features that confer technical improvements. Req. 7–8. We see no reason to disturb this

undisputed finding, and so because independent claims 1, 18, and 19 each recite at least one abstract idea, we proceed to the next part of our analysis—MPEP Step 2A, Prong Two.

*B. Alice Step One; MPEP Step 2A, Prong Two*

The Board determined next that "we discern no additional element (or combination of elements) recited in Appellant's claims 1, 18, and 19 that may have integrated the judicial exception into a practical application." Dec. 22. The Appellant disagrees, asserting that "the claims recite additional elements that reflect '[a]n improvement in the functioning of a computer, or an improvement to other technology or technical field,' as discussed in MPEP §§ 2106.04(d)(1) and 2106.05(a)." Req. 7. In particular, the Appellant identifies certain limitations of independent claim 1 and asserts that "the claimed subject matter provides technical improvements over conventional systems by addressing challenges in continual learning and model efficiency by reducing storage requirements and preserving task performance across sequential training," citing paragraph 21 of the Specification for support. *Id.* at 7–9; *see also id.* at 8 ("This training strategy allows the model to preserve performance on earlier tasks even as it learns new ones, directly addressing the technical problem of 'catastrophic forgetting' in continual learning systems."). We agree with the Appellant.

The determination requires us to "evaluate the significance of the additional elements relative to the invention," while being mindful that "the ultimate question" is "whether the exception is integrated into a practical application." MPEP § 2106.04(d)(II). On the one hand, claims "[g]enerally linking the use of a judicial exception to a particular technological environment or field of use" are not patent eligible. *See* MPEP § 2106.05(h)

(citing *Affinity Labs of Tex. v. DirecTV, LLC*, 838 F.3d 1253 (Fed. Cir. 2016) and *Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1354 (Fed. Cir. 2016)). On the other, claims directed to an improvement in the functioning of a computer, or an improvement to other technology or technical field are patent eligible. *See* MPEP §§ 2106.04(d)(1) and 2106.05(a) (citing *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1339 (Fed. Cir. 2016) and *McRO, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299, 1315 (Fed. Cir. 2016)).

*Enfish* ranks among the Federal Circuit's leading cases on the eligibility of technological improvements. In particular, *Enfish* recognized that "[m]uch of the advancement made in computer technology consists of improvements to software that, by their very nature, may not be defined by particular physical features but rather by logical structures and processes." 822 F.3d at 1339. Moreover, because "[s]oftware can make non-abstract improvements to computer technology, just as hardware improvements can," the Federal Circuit held that the eligibility determination should turn on whether "the claims are directed to an improvement to computer functionality versus being directed to an abstract idea." *Id.* at 1336.

Paragraph 21 of the Specification, which the Appellant cites, identifies improvements in training the machine learning model itself. Of course, such an assertion in the Specification alone is insufficient to support a patent eligibility determination, absent a subsequent determination that the claim itself reflects the disclosed improvement. *See* MPEP § 2106.05(a) (citing *Intellectual Ventures I LLC v. Symantec Corp.*, 838 F.3d 1307, 1316 (Fed. Cir. 2016)). Here, however, we are persuaded that the claims reflect such an improvement. For example, one improvement identified in the

Specification is to "effectively learn new tasks in succession whilst protecting knowledge about previous tasks." Spec. ¶ 21. The Specification also recites that the claimed improvement allows artificial intelligence (AI) systems to "us[e] less of their storage capacity" and enables "reduced system complexity." *Id.* When evaluating the claim as a whole, we discern at least the following limitation of independent claim 1 that reflects the improvement: "adjust the first values of the plurality of parameters to optimize performance of the machine learning model on the second machine learning task while protecting performance of the machine learning model on the first machine learning task." We are persuaded that constitutes an improvement to how the machine learning model itself operates, and not, for example, the identified mathematical calculation.

Under a charitable view, the overbroad reasoning of the original panel below is perhaps understandable given the confusing nature of existing § 101 jurisprudence, but troubling, because this case highlights what is at stake. Categorically excluding AI innovations from patent protection in the United States jeopardizes America's leadership in this critical emerging technology. Yet, under the panel's reasoning, many AI innovations are potentially unpatentable—even if they are adequately described and nonobvious—because the panel essentially equated any machine learning with an unpatentable "algorithm" and the remaining additional elements as "generic computer components," without adequate explanation. Dec. 24. Examiners and panels should not evaluate claims at such a high level of generality.

However, it is with this view that the panel's *sua sponte* action is most troubling, as it eschewed the clear teachings of *Enfish*, and instead

substituted only a cursory analysis that ignored this well-settled precedent. Panels should treat such precedent with more care, especially when acting *sua sponte*.

At the same time, the claims at issue stand rejected under § 103. This case demonstrates that §§ 102, 103 and 112 are the traditional and appropriate tools to limit patent protection to its proper scope. These statutory provisions should be the focus of examination.

For these reasons, we determine that although independent claim 1 may recite an abstract idea, it is not directed to an abstract idea. Instead, we determine that independent claim 1, when considered as a whole, integrates an abstract idea into a practical application. Our analysis is also applicable to independent claims 18 and 19, and all pending dependent claims 2–6, 8–17, and 20.

## IV. CONCLUSION

In sum, we vacate the Board's New Ground of Rejection. We do not disturb the Board's previous decisions in any other respects.

## TIME PERIOD FOR RESPONSE

No time period for taking any subsequent action in connection with this appeal may be extended under 37 C.F.R. § 1.136(a)(l)(iv).

# Attachment B

*Ex parte Carmody*
No. 2025-002843 (P.T.A.B. Dec. 31, 2025)

UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
| --- | --- | --- | --- | --- |
| 17/736,366 | 05/04/2022 | Daniel CARMODY | 120748-0006UT01 | 3871 |

27189 7590 12/31/2025

PROCOPIO, CORY, HARGREAVES & SAVITCH LLP
525 B STREET
SUITE 2200
SAN DIEGO, CA 92101

| EXAMINER | |
| --- | --- |
| WHITE, DYLAN C | |

| ART UNIT | PAPER NUMBER |
| --- | --- |
| 3625 | |

| NOTIFICATION DATE | DELIVERY MODE |
| --- | --- |
| 12/31/2025 | ELECTRONIC |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

Notice of the Office communication was sent electronically on above-indicated "Notification Date" to the following e-mail address(es):

PTONotifications@procopio.com
docketing@procopio.com

UNITED STATES PATENT AND TRADEMARK OFFICE

---

BEFORE THE PATENT TRIAL AND APPEAL BOARD

---

*Ex parte* DANIEL CARMODY, TANVI SHAH, AMAR DOSHI, ALEX LIN, STEVEN SASSMAN, YUKIA TYUTINA, VIRAL BAJARIA, and ADITYA MAJUMDAR

---

Appeal 2025-002843
Application 17/736,366
Technology Center 3600

---

Before JON M. JURGOVAN, AMBER L. HAGY, and MICHAEL J. ENGLE, *Administrative Patent Judges*.

JURGOVAN, *Administrative Patent Judge*.

DECISION ON APPEAL

Appellant[1] seeks review under 35 U.S.C. § 134(a) from a final rejection of claims 1–8, 11, 13, 15, and 17–23, all of the pending claims. We have jurisdiction under 35 U.S.C. § 6(b).

We reverse.[2]

---

[1] "Appellant" refers to "applicant(s)" as defined in 37 C.F.R. § 1.42(a) (2024). The real party in interest is 6Sense Insights, Inc. Appeal Br. 2.

[2] Our Decision refers to the Specification filed May 4, 2022 ("Spec."); the Non-Final Office Action mailed August 15, 2024 ("Non-Final Act."); the Appeal Brief filed February 3, 2025 ("Appeal Br."); the Examiner's Answer

## CLAIMED SUBJECT MATTER

The claims are directed to artificial intelligence (AI) based orchestration of marketing, sales, and customer lifecycle strategies to help companies grow their businesses and customer relationships. Spec. ¶ 3.

Claims 1, 19, and 20 are independent. Claim 1 is a method claim, claim 19 is a system claim, and claim 20 is a non-transitory computer-readable medium claim. Claims 1, 19, and 20 are otherwise analogous to one another. Claims 2–8, 11, 13, 15, 17, 18, and 21–23 depend from claim 1, directly or indirectly.

Claim 1 is illustrative of the claimed subject matter and is reproduced below:

> 1. A method comprising using at least one hardware processor to:
>
> during a training phase:
>
> train a profile model using machine learning with a first training dataset that associates contact features, comprising one or more job descriptors, with an indication of whether a sales opportunity was opened, won, or lost; and
>
> train at least one of a plurality of modular plug-and-play tactic-specific models using machine learning with a second training dataset comprising labeled feature vectors, wherein each of the labeled feature vectors comprises a set of orchestration features labeled with an indication of whether or not an engagement resulted within a defined time period;
>
> and
>
> during an operation phase:
>
> receive one or more orchestration settings;

---

mailed April 4, 2025 ("Ans."); and the Reply Brief filed June 4, 2025 ("Reply Br.").

automatically apply a recommendation engine to a data pipeline representing a plurality of company accounts by

receiving activity data associated with the plurality of company accounts,

receiving firmographic data associated with the plurality of company accounts,

calculating one or more engagement metrics based on the activity data, wherein the one or more engagement metrics indicate a level of engagement by each of the plurality of company accounts,

applying a plurality of predictive models to one or both of the activity data and the firmographic data to generate a predictive output, wherein the plurality of predictive models comprises the profile model and an intent model,

wherein the profile model accepts, as input, the contact features for each of one or more contacts within contact data associated with each of one or more of the plurality of company accounts, and outputs a profile score for each of the one or more contacts, wherein the profile score for each of the one or more contacts represents a relevance of that contact to a sales opportunity, and wherein the profile scores that are output by the profile model are incorporated into the predictive output, and

wherein the intent model accepts, as input, activity data associated with each of one or more of the plurality of company accounts, and outputs an intent score, wherein the intent score represents a likelihood to engage in a sales opportunity, and wherein the intent scores that are output by the intent model are incorporated into the predictive output,

applying a tactic recommendation model to orchestration features, comprising the engagement metrics

and the predictive output, to generate one or more recommended tactics, wherein the tactic recommendation model comprises the plurality of modular plug-and-play tactic-specific models, and wherein each of the plurality of modular plug-and-play tactic-specific models is trained to determine whether or not a respective tactic should be used for each of the plurality of company accounts based on the orchestration features associated with that company account,

applying a contact recommendation model to contact data to generate one or more recommended contacts, and

combining the one or more recommended tactics with the one or more recommended contacts to generate an orchestration comprising one or more recommended actions; and

execute the orchestration, wherein executing the orchestration comprises at least one of adding one of the one or more recommended contacts to a marketing campaign, adding one of the plurality of company accounts to a marketing campaign, purchasing a new contact, or initiating a marketing campaign to at least one of the one or more recommended contacts, one or more of the plurality of company accounts, or one or more purchased new contacts.

Appeal Br. A-1–A-2 (Claims App'x).

## REJECTIONS and EVIDENCE

Claims 1–8, 11, 13, and 17–23 stand rejected under 35 U.S.C. § 101. Non-Final Act. 2–7.

## ANALYSIS

Appellant has the burden on appeal to the Board to demonstrate error in the Examiner's position. *See In re Kahn*, 441 F.3d 977, 985–86 (Fed. Cir. 2006). We review the appealed rejection for error based upon the issues identified by Appellant and in light of the arguments and evidence produced thereon. *Ex parte Frye*, 94 USPQ2d 1072, 1075 (BPAI 2010) (precedential),

(*cited with approval in In re Jung*, 637 F.3d 1356, 1365 (Fed. Cir. 2011) ("[I]t has long been the Board's practice to require an applicant to identify the alleged error in the [E]xaminer's rejections.")). After considering the evidence presented in this Appeal in light of the Examiner's findings and determinations as well as Appellant's arguments, we are persuaded that Appellant identifies reversible error, as explained below.

*§ 101 Rejection of Claims 1–8, 11, 13, and 17–23*

Title 35 U.S.C. § 101 provides that "[w]hoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor." There are, however, exceptions to patent eligibility under § 101, such as laws of nature, natural phenomena, and abstract ideas. *Alice Corp. v. CLS Bank Int'l*, 573 U.S. 208, 216 (2014).

The MPEP sets forth the process that the Office follows in evaluating whether a claim is drawn to patent-eligible subject matter under § 101. MPEP § 2106. In Step 1, it is determined whether the claimed subject matter falls within one of the four statutory categories of invention (i.e., process, machine, manufacture, or composition of matter). MPEP § 2016.03.

Step 2A has two prongs. Prong One asks whether the claim recites an abstract idea, law of nature, or natural phenomenon. MPEP § 2106.04(II)(A)(1). If so, then the analysis proceeds to Prong Two which asks whether the claim recites additional elements that integrate the judicial exception into a practical application. MPEP § 2106.04(II)(A)(2).

Step 2B asks "whether any additional element or combination of elements are other than what is well-understood, routine, conventional activity in the field." MPEP § 2106.05(II).

Patent eligibility is a question of law that is reviewable *de novo*. *Dealertrack, Inc. v. Huber*, 674 F.3d 1315, 1333 (Fed. Cir. 2012).

With this background, we proceed to analyze the claims under USPTO Step 1. Claims 1–8, 11, 13, 15, 17, 18, and 21–23 recite methods which qualify as "processes" under § 101. Claim 19 recites a "system" which qualifies as a "machine" under § 101. Claim 20 recites a "non-transitory computer-readable medium" which qualifies as an "article of manufacture" under § 101. Accordingly, the claims satisfy USPTO Step 1.

Under Step 2A, Prong One, we determine whether the claims recite an abstract idea, law of nature, or natural phenomenon. The Examiner determined that the claims recite methods of organizing human activity and mental processes. Non-Final Act. 4–5. We agree with the Examiner's assessment regarding organizing human activity. Specifically, the claims recite orchestrating a marketing campaign, which amounts to organizing human activity.

We also agree with the Examiner that the claims recite a mental process. For example, "calculating one or more engagement metrics based on the activity data" in claim 1 is a mental step because it could be done in the human mind. Claims 19 and 20 recite similar features. Because the claims recite methods of organizing human activity and mental steps, we proceed to Step 2A, Prong Two.

Regarding Step 2A, Prong Two, Appellant argues that the claimed

> specific models, training datasets, and architecture enable automated orchestration. The inventors have identified, and the Appellant has claimed, the particular sets of features and labels required to train models that are sufficiently accurate to inform a recommendation engine, and the particular architecture of the recommendation engine (i.e., ordered combination of models) that is sufficient to generate usable orchestrations.

Appeal Br. 13. In other words, Appellant argues, and we agree, that the claims recite an improvement in training of models for use by the recommendation engine to generate useful orchestrations.

For example, claim 1 recites the following feature:

> train at least one of a plurality of modular plug-and-play tactic-specific models using machine learning with a second training dataset comprising labeled feature vectors, wherein each of the labeled feature vectors comprises a set of orchestration features labeled with an indication of whether or not an engagement resulted within a defined time period.

Claims 19 and 20 recite similar features. The Specification explains the improvement achieved by these claim limitations as follows:

> [t]his modular approach to tactic recommendation (i.e., with a separate model for each tactic) enables the model for each tactic to be updated and improved separately and independently from other tactic-specific models, and also enables models for new tactics to be easily incorporated into tactic recommendation model 475 (e.g., as a plug-and-play module).

Spec. ¶ 101. Hence, the claims recite additional elements that integrate the judicial exception into a practical application, and the claims are patent-eligible under § 101.

Our decision in this case is consistent with *Ex parte Desjardins*, Appeal 2024-000567 (PTAB Nov. 4, 2025) (precedential) where, under similar circumstances, the Director indicated that the claims recited

improvements in training a machine learning model. *Id.* at 8–9. The Director's decision in *Ex parte Desjardins* identified the claimed improvement of optimizing performance of a machine leaning model on a second machine learning task while protecting performance of the machine learning model on the first machine learning task. *Id.* at 9. Similarly, in this case, modular plug-and-play tactic-specific models allow the models to be modified separately and independently without affecting other models. *See* Spec. ¶ 101.

The Director in *Desjardins* further noted the holding in *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1339 (Fed. Cir. 2016), that "[s]oftware can make non-abstract improvements to computer technology, just as hardware improvements can," as well as the importance of recognizing patent eligibility for AI-related inventions when appropriate. *Ex parte Desjardins* at 9–10. Faced with a similar situation here, we follow the Director's guidance and do not sustain the § 101 rejection.

DECISION SUMMARY

We reverse the Examiner's rejection of claims 1–8, 11, 13, 15, and 17–23 under 35 U.S.C. § 101.

In summary:

| **Claim(s) Rejected** | **35 U.S.C. §** | **Reference(s)/Basis** | **Affirmed** | **Reversed** |
|---|---|---|---|---|
| 1–8, 11, 13, 15, 17–23 | 101 | Eligibility | | 1–8, 11, 13, 15, 17–23 |

REVERSED

# Attachment C

*Rensselaer Polytechnic Inst. v. Amazon.com, Inc.,*
No. 24-1725, 2026 WL 506661 (Fed. Cir. Feb. 24, 2026)

NOTE: This disposition is nonprecedential.

# United States Court of Appeals for the Federal Circuit

---

**RENSSELAER POLYTECHNIC INSTITUTE, CF DYNAMIC ADVANCES LLC,**
*Plaintiffs-Appellants*

**v.**

**AMAZON.COM, INC.,**
*Defendant-Appellee*

---

2024-1725, 2024-1739

---

Appeals from the United States District Court for the Northern District of New York in Nos. 1:18-cv-00549-BKS-TWD, 1:23-cv-00227-BKS-TWD, Judge Brenda K. Sannes.

---

Decided: February 24, 2026

---

LI ZHU, Robins Kaplan LLP, Redwood City, CA, argued for plaintiffs-appellants. Also represented by ANNIE HUANG, New York, NY; BENJAMEN LINDEN, CYRUS ALCORN MORTON, NAVIN RAMALINGAM, Minneapolis, MN.

JEREMY ANGUS ANAPOL, Morgan, Lewis & Bockius LLP, Costa Mesa, CA, argued for defendant-appellee. Also represented by COLIN B. HEIDEMAN, Seattle, WA; GABRIEL K. BELL, MATTHEW J. MOORE, Latham & Watkins LLP,

Washington, DC; JEFFREY H. DEAN, Amazon.com, Inc., Seattle, WA; JOSEPH R. RE, Knobbe, Martens, Olson & Bear, LLP, Irvine, CA.

---

Before DYK, SCHALL, and STARK, *Circuit Judges*.

DYK, *Circuit Judge*.

Rensselaer Polytechnic Institute and CF Dynamic Advances LLC (together, "Rensselaer") brought suit against Amazon.com, Inc. ("Amazon") in the Northern District of New York for infringement of United States Patent No. 7,177,798 (the "'798 patent"). Amazon countersued for a determination that the '798 patent was directed to patent ineligible subject matter. The district court granted summary judgment for Amazon, determining that the '798 patent claimed ineligible subject matter under the Supreme Court's decision in *Alice Corp. v. CLS Bank Int'l*, 573 U.S. 208 (2014). We *affirm*.

BACKGROUND

The '798 patent discloses a "method for processing a natural language input provided by a user." '798 patent, abstract. As Rensselaer argues, the '798 patent is "directed to the novel application of case-based reasoning to a metadata database within [natural language processing]." Appellants' Br. 4. Rensselaer argues that case-based reasoning is "an established problem-solving technique for computers," *id.* at 7, and, when applied to the field of natural language processing, it uses "case information to learn from metadata associated with past utterances" to resolve the natural ambiguities existing in human language, such as when one word carries multiple meanings, *id.* at 10. In doing this, the claimed method can process an input of natural human language without needing to first augment the input by translating it into a more easily readable syntax. *See id.* at 5–6. In short, case-based reasoning is, in the context of this patent, a type of machine learning or artificial

intelligence ("AI"). *See* Appellants' Br. 43 ("Case-based reasoning is itself a specific form of computerized reasoning rooted in artificial intelligence . . . .").

Before the district court, Rensselaer conceded that independent claim 1 of the '798 patent is representative of most[1] of the claims and recites:

> 1. A method for processing a natural language input provided by a user, the method comprising:
>
> > providing a natural language query input by the user;
> >
> > performing, based on the input, without augmentation, a search of one or more language-based databases including at least one metadata database comprising at least one of a group of information types comprising:
> >
> > > case information;
> > >
> > > keywords;
> > >
> > > information models; and
> > >
> > > database values;
> >
> > providing, through a user interface, a result of the search to the user;
> >
> > identifying, for the one or more language-based databases, a finite number of database objects; and

---

[1] Before the district court, Rensselaer argued that claims 2, 5, and 6 are not represented by claim 1. On appeal, Rensselaer does not argue in its opening brief that these claims require distinct analysis, and we accordingly do not separately address them.

> determining a plurality of combinations of the finite number of database objects.

’798 patent, claim 1.

Before the district court, the parties cross-moved for summary judgment. The district court concluded that, based on the patent’s intrinsic record, the claims were ineligible as a matter of law and granted Amazon’s motion. Rensselaer appeals. We have jurisdiction under 28 U.S.C. § 1295(a)(1).

## DISCUSSION

“Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor . . . .” 35 U.S.C. § 101. However, the Supreme Court has concluded the statute should be construed to exclude certain subject-matter from patent eligibility, namely “[l]aws of nature, natural phenomena, and abstract ideas.” *Alice*, 573 U.S. at 216; *Mayo Collab. Servs. v. Prometheus Lab’ys, Inc.*, 566 U.S. 66, 71 (2012). To determine whether a patent improperly claims an abstract idea, we apply the two-step analysis articulated in *Alice*. *Alice*, 573 U.S. at 217; *Recentive Analytics, Inc. v. Fox Corp.*, 134 F.4th 1205, 1211 (Fed. Cir. 2025), *cert. denied* — S. Ct. —, No. 25-505, 2025 WL 3507020. At step one, “we determine whether the claims at issue are directed to one of those patent-ineligible concepts.” *Alice*, 573 U.S. at 217. Then, if we find they are so directed, we assess the “elements of each claim both individually and ‘as an ordered combination’” to determine whether they contain an “inventive concept” that is sufficient to transform the claimed invention into something more than the ineligible subject matter. *Id.* at 217–18 (quoting *Mayo*, 566 U.S. at 79).

In evaluating a software patent, the *Alice* inquiry often examines whether the claims focus on a specific technological improvement to computer capabilities or merely invoke

computers as a tool that implements an abstract idea. *Recentive*, 134 F.4th at 1212 (citing *Koninklijke KPN N.V. v. Gemalto M2M GmbH*, 942 F.3d 1143, 1149 (Fed. Cir. 2019)). This inquiry "often turns to the question of what the patent asserts as the claimed advance over the prior art." *GoTV Streaming, LLC v. Netflix, Inc.*, —F.4th—, No. 2024-1669, 2026 WL 346200, at *7 (Fed. Cir. Feb. 9, 2026) (quoting *Broadband iTV, Inc. v. Amazon.com, Inc.*, 113 F.4th 1359, 1367 (Fed. Cir. 2024)). We have consistently concluded that claims that use "functional, result-focused language" or merely "encompass ordinary computers and networks to perform their ordinary functions in carrying out an abstract idea, even when narrowed to a particular use or environment," do not provide an inventive concept capable of rendering the claims patent eligible. *GoTV*, 2026 WL 346200, at *11 (collecting cases). Instead, the claims must "require a specific implementation to improve *how* those functions are carried out." *Id.*

The district court determined that the claims were directed to an abstract idea at step one and that the claims do not contain an inventive concept capable of rendering the claims eligible at step two. We review the district court's grant of summary judgment de novo. *Focus Prods. Grp. Int'l, LLC v. Kartri Sales Co.*, 156 F.4th 1259, 1271 (Fed. Cir. 2025) (applying Second Circuit law). Amazon is only entitled to summary judgment if, resolving all material factual disputes in favor of Rensselaer, Amazon is entitled to judgment as a matter of law. *See id.* (citing Fed. R. Civ. P. 56(a)).

## I

We conclude that at step one, the claims are abstract. Here, the claims largely recite the use of generic technology using standard methods. *See, e.g.*, '798 patent col. 9 ll. 18–20 (noting the claimed invention uses a "general purpose computer system"); *id.* col. 9 ll. 58–60 ("[T]he invention is not limited to a particular computer system platform,

processor, operating system, or network."); *id.* col. 9 ll. 60–64 (noting that "other appropriate computer systems could also be used"). On appeal, Rensselaer nonetheless argues that the claimed improvement over the prior art is the novel application of case-based reasoning to the context of natural language processing and that this improvement renders the claims non-abstract at *Alice* step one. *See, e.g.*, Appellants' Br. 59 ("[T]he ['798] [p]atent . . . provid[ed] a novel [natural language processing] system that implemented, for the first time, case-based reasoning . . . ."). We disagree.

Generic use of AI without other parameters, such as "improving the mathematical algorithm or making machine learning better," is abstract. *Recentive*, 134 F.4th at 1213. A claim that merely restricts an abstract idea to a particular field or environment is still directed to the abstract idea. *See Recentive*, 134 F.4th at 1213; *GoTV*, 2026 WL 346200, at *8; *Intell. Ventures I LLC v. Capital One Bank (USA)*, 792 F.3d 1363, 1366 (Fed. Cir. 2015). In *Recentive*, we determined that a claim that was directed towards applying machine learning to a "new field of use" was directed to an abstract idea because "the only thing the claims disclose about the use of machine learning is that machine learning is used in a new environment." *Recentive*, 134 F.4th at 1213. Rensselaer concedes that, under *Recentive*, claims that require nothing more than application of artificial intelligence to a new environment are directed to an abstract idea.

It follows under *Recentive* that in the context of software patents the application of a well-established idea (case-based reasoning or AI) to a novel environment (natural language processing) is abstract at step one of the *Alice* analysis.

II

Rensselaer argues that at step one, the claims of the '798 patent are different in one respect from the claims we

considered in *Recentive* and involve something more than the mere use of AI in natural language processing. The independent claims here recite a "metadata database, comprising at least one of a group of information types comprising: case information; keywords; information models; and database values." '798 patent, claims 1, 9, which Rensselaer argues on appeal represents an unconventional technological improvement that renders the claims, as a whole, non-abstract.

The use of case information in the claimed database simply involves the use of AI as applied to a new environment and cannot render the claims non abstract under *Recentive*. Nor does the database otherwise involve a non-abstract concept. Our cases suggest that adding new content to a database is insufficient to render claims directed to a database non-abstract. *See BSG Tech LLC v. Buyseasons, Inc.*, 899 F.3d 1281, 1288 (Fed. Cir. 2018) ("[A]n improvement to the information stored by a database is not equivalent to an improvement in the database's functionality."); *Intell. Ventures I LLC v. Erie Indemnity Co.*, 850 F.3d 1315, 1328 (Fed. Cir. 2017) (adding 'tags' to database entries was abstract); *Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1353 (Fed. Cir. 2016) (considering "collecting information, including when limited to particular content" to be an "abstract idea[]"). We need not decide the question whether adding non-conventional data to a conventional database is non-abstract here because, here, the remaining information types comprising the claimed database were established to be conventional.[2]

---

[2] Conventionality is often considered during the step two analysis, which requires a determination as to whether the claimed "improvements in the recited computer technology go beyond 'well-understood, routine, conventional activit[ies]' and render the invention patent-eligible." *BASCOM Glob. Internet Servs., Inc. v. AT&T Mobility*

The use of a data structure that is "already routine and conventional" will not render a claim non-abstract. *See GoTV*, 2026 WL 346200, at *9.

The intrinsic record does not support Rensselaer's argument that the metadata database is otherwise unconventional. There is no suggestion in the specification that these other elements are not conventional or that the combination of the other elements is not conventional. The specification indicates that, generally, a metadata database "is well-known in the art of data and knowledge management tools," '798 patent, col. 16 ll. 16–18. The use of keywords is conventional. *See, e.g.*, *id.* col. 13 l. 61–col. 14 l. 1 (recognizing that conventional natural language processing methods utilized keywords). The district court's construction of "information models" suggest they are broadly and generically claimed. *See* J.A. 2613 (construing "information models" to mean "webs of concepts for enterprise databases"). The specification's description of "database values" as "database computational operators" likewise suggests that these, too, are generic components of conventional databases. '798 patent, col. 30 ll. 27–28.

As to extrinsic evidence, Amazon's expert testified that "the metadata database was admittedly well-understood, routine, and conventional at the time of the patent's filing." J.A. 3223. Contrary to Rensselaer's position on appeal that the claimed database is unconventional, Rensselaer did not present evidence below to argue there was a dispute of fact related to this theory that precluded a grant of summary judgment in Amazon's favor. Rensselaer's expert never asserted that, apart from the case-based component of the

---

*LLC*, 827 F.3d 1341, 1348 (Fed. Cir. 2016) (alteration in original) (quoting *Alice*, 573 U.S. at 225). We have also "repeatedly analyzed conventionality at step one as well." *CareDx, Inc. v. Natera, Inc.*, 40 F.4th 1371, 1379 (Fed. Cir. 2022).

database, the claimed database was unconventional. This was insufficient to raise a genuine dispute of fact as to whether the remainder of the database was conventional. Once the district court determined that Amazon satisfied its burden, and we agree that it did, it was incumbent upon Rensselaer, as the nonmoving party, to produce some evidence refuting Amazon's claim. *See Enzo Biochem v. Gen-Probe, Inc.*, 424 F.3d 1276, 1284 (Fed. Cir. 2005) ("Attorney argument is no substitute for evidence."). Rensselaer failed to do so.

III

The arguments that Rensselaer raises fare no better at step two than step one. "An inventive concept . . . must be significantly more than the abstract idea itself." *BASCOM*, 827 F.3d at 1349. So too, "simply appending conventional steps, specified at a high level of generality," to a method "well known in the art" and consisting of "well-understood, routine, conventional activit[ies]" previously engaged in by workers in the field, is not sufficient to supply the inventive concept. *Alice*, 573 U.S. at 221–22, 225.

At step two, Rensselaer argues that "it is undisputed that case-based reasoning did not exist anywhere within the NLP field before the ['798] Patent," Appellants' Br. 52, and that the "ordered combination did not exist prior to the invention memorialized in the ['798] patent," *id.* at 54. However, these arguments speak to *novelty*, which is a separate inquiry, and we held in *Recentive* that at step two, the use of AI in a novel field is not an inventive concept. 134 F.4th at 1214–15. A conventional application of case-based reasoning, even to a novel environment, is abstract. Therefore, the application of case-based reasoning to natural language processing does not provide an inventive concept sufficient to render the claims patent-eligible at step two of *Alice*.

## CONCLUSION

We have considered Rensselaer's other arguments[3] and find them unpersuasive. We therefore conclude that the claims of the '798 patent are directed to ineligible subject matter under § 101.

## AFFIRMED

## COSTS

Costs to Amazon.

---

[3] It its opening brief, Rensselaer does not argue that any of the dependent claims contain elements that would change our analysis. In its reply brief, Rensselaer argues that the "reference dictionary" claimed in claims 4, 14, and the claims depending from those claims renders those claims patent eligible. These belated arguments, even if we do not consider them forfeited, are unavailing. The term, "reference dictionary" was construed to mean a "set of database entries or objects and their relations." J.A. 2613. There is no question that reference dictionaries were "commonly understood" in the art, J.A. 345, and we do not read the claims, as construed, to provide any structural details that suggest a different conclusion.

# Attachment D

*Osseo Imaging, LLC v. Dentsply Sirona, Inc.*,
802 F. Supp. 3d 436 (E.D.N.Y. 2025)

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x
OSSEO IMAGING, LLC,

Plaintiff,

- against -

DENTSPLY SIRONA, INC., *et al.*

Defendants.
-------------------------------------------------------x

**MEMORANDUM & ORDER**
23-CV-7952 (PKC) (CHK)

PAMELA K. CHEN, United States District Judge:

Plaintiff Osseo Imaging, LLC ("Plaintiff") filed suit against Defendants Dentsply Sirona Inc., Sirona Dental Systems, LLC, and Sirona Dental, Inc. (collectively, "Dentsply" or "Defendants") on October 25, 2023, alleging infringement of Plaintiff's patents. (Compl., Dkt. 1.) On November 8, 2024, Defendants moved to dismiss the action, challenging the validity of Plaintiff's patents. (Dkt. 36.) For the reasons stated below, the motion to dismiss is denied.

**BACKGROUND**[1]

**I. Plaintiff's Patents**

Plaintiff owns three patents relating to dental imaging systems, U.S. Patent Nos. 6,381,301, 6,944,262, and 8,498,374 (the "'301 Patent," the "'262 Patent," and "'374 Patent," respectively; collectively, "Plaintiff's patents").[2] (Compl., Dkt. 1, ¶ 1.) Ronaldo E. Massie ("Massie") applied for the '301 Patent in 1999; it was issued in 2002 and then expired in 2019. (*Id.* ¶¶ 11–12.) Massie

[1] For purposes of Defendants' motion, the Court accepts as true all non-conclusory factual allegations in the Complaint. *See Sacerdote v. N.Y. Univ.*, 9 F.4th 95, 106–07 (2d Cir. 2021) (citing *Palin v. N.Y. Times Co.*, 940 F.3d 804, 809 (2d Cir. 2019)).

[2] Plaintiff has attached a copy of its patents to the Complaint. (*See* '301 Patent, Dkt. 1-1; '262 Patent, Dkt. 1-2; '374 Patent, Dkt. 1-3.) The Court considers the attached patents in deciding this motion. *See DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) (citations omitted).

applied for the '262 Patent in 2003; it was issued in 2005 and then expired in 2020. (*Id.* ¶¶ 13–14.) Finally, Massie applied for the '374 Patent in 2012; it was issued in 2013 and then expired in 2019. (*Id.* ¶¶ 15–16.) Plaintiff was assigned the three patents in 2013. (*Id.* ¶ 17.) Plaintiff's patents describe a "dental and orthopedic densitometry modeling system" that includes "a controller with a microprocessor" connected to a memory device, an input device, an output device, and a three-axes positioning motor connected to X-ray equipment. ('301 Patent, Dkt. 1-1, at ECF[3] 2; *see also*'262 Patent, Dkt. 1-2, at ECF 4; '374 Patent, Dkt. 1-3, at ECF 4.)

Plaintiff's patents "teach improved dental X-ray imaging systems for generating tomographic models of dental structures which include densitometric data." (Compl., Dkt. 1, ¶ 18.) The patents combine the use of hardware devices to generate and store models of patients' dental structures as well as software that captures, processes, and stores these models for use by dentists. (*Id.* ¶ 19.) Further, they improve the detection and diagnosis of "dental pathologies," such as "[i]ncipient caries," "[d]ental fractures," and "apical abscesses," all of which "are particularly difficult to diagnose with conventional equipment," some "particularly in the early stages." ('301 Patent, Dkt. 1-1, at ECF 5.) The patents also "ha[ve] applications in monitoring osseointegration," which "can provide the dental . . . practitioner with important information in evaluating the effectiveness of implant procedures." (*Id.*) Plaintiff licenses and enforces these patents. (Compl., Dkt. 1, ¶ 20.)

## II. Defendants' Products

Defendants provide "3D dental imaging systems" which include "systems for topographically modeling a dental structure." (Compl., Dkt. 1, ¶ 5.) In particular, during the

---

[3] Citations to "ECF" refer to the pagination generated by the Court's CM/ECF docketing system and not the document's internal pagination.

Damages Period[4] Defendants sold "a family of 3D dental imaging systems referred to as the Sirona 3D X-Ray Family," as well as "software for use with the Sirona 3D X-Ray Family," and "provided a computerized device . . . on which the Sirona Software was installed" (collectively, hereinafter, "the Sirona Systems"). (*Id.* ¶ 23.) The Sirona Systems "were operable to produce three-dimensional X-ray models of a patient's dental structure using cone beam computed tomography." (*Id.* ¶ 24.) "[T]he Sirona 3D X-Ray Family generated digital x-ray images and merged them into tomographic models" that included "bone density values calculated . . . with the use of a microprocessor." (*Id.*) These models were then "received, stored, and displayed on an output device . . . running the Sirona Software," which could include "a side-by-side function that linked . . . tomographic models of the same patient obtained at different times for comparison." (*Id.*) In simpler terms, the Sirona Systems include machines and software that allow for the scan of a patient's teeth and the presentation of a digital three-dimensional model of the teeth along with certain computations about the density of the teeth and comparisons to prior scans. Defendants sold these products in the United States and abroad. (*Id.* ¶ 26.)

Plaintiff now alleges that Defendants' systems infringed on Plaintiff's patents. It alleges that all elements of multiple claims for each of Plaintiff's patents were embodied in the Sirona Systems, establishing direct infringement, inducement of infringement, and contributory infringement. (*See id.* ¶¶ 32–49 (alleging violations of 35 U.S.C. § 271).) Plaintiff argues that these violations caused it "injury to business and property." (*Id.* ¶¶ 36, 43, 49.)

---

[4] Plaintiff defines the "Damages Period" as October 25, 2017, through August 9, 2020. (Compl., Dkt. 1, ¶ 23 n.1.)

### III. Defendants' Motion

Defendants move to dismiss Plaintiff's claims, arguing that Plaintiff's patents "are invalid as a matter of law because (1) [the patents] are directed to abstract ideas and (2) they do not include an inventive concept that limits them to patent-eligible subject matter." (Defs.' Mem. Support Mot. ("Mem."), Dkt. 36-1, at 1.)[5] In support of this argument, Defendants rely on the two-step analysis described in *Alice Corporation Pty. Ltd. v. CLS Bank International, et al.*, 573 U.S. 208 (2014). (Mem., Dkt. 36-1, at 2, 13 (citing *Alice*, 573 U.S. at 221–23).) Because, as discussed below, the Court finds at this stage of the litigation that *Alice* does not invalidate Plaintiff's patents, Defendants' motion is denied.

### IV. Related Litigation

#### A. The Delaware Litigation

Plaintiff previously brought an action enforcing these patents against a different defendant in the United States District Court for the District of Delaware. (Compl., Dkt. 1, ¶ 20.) At trial, the jury found that Plaintiff's patents had been violated by the defendant, Planmeca USA Inc. ("Planmeca"). (*Id.* ¶ 22); *see also Osseo Imaging, LLC v. Planmeca USA Inc.* ("*Planmeca I*"), No. 17-CV-1386 (JFB), 2023 WL 1815975, at *1 (D. Del. Feb. 8, 2023). There, Planmeca asserted a post-trial challenge to the verdict, arguing that Plaintiff's patents were invalid as a matter of law on the grounds of "obviousness" and "for lack of written description and enablement." *Planmeca I*, 2023 WL 1815975, at *3–*4. The court rejected the challenge, holding that there was

---

[5] Though Defendants do not specify under which of the Federal Rules of Civil Procedure they seek dismissal, they argue that an asserted patent's validity "is a question of law . . . that may be resolved on a Rule 12(b)(6) motion." (Mem., Dkt. 36-1, at 11 (quoting *Athena Diagnostics, Inc. v. Mayo Collaborative Servs., LLC*, 915 F.3d 743, 749 (Fed. Cir. 2019)).) The Court therefore construes Defendants' motion as one seeking dismissal for "failure to state a claim upon which relief can be granted" under Rule 12(b)(6) of the Federal Rules of Civil Procedure.

sufficient evidence for the jury to reject the findings that would have been necessary to support both grounds for challenging Plaintiff's patents. *Id.* Planmeca appealed, and the Federal Circuit affirmed the district court's decision concerning obviousness on similar grounds, finding that "[s]ubstantial evidence support[ed] the jury's findings." *See Osseo Imaging, LLC v. Planmeca USA Inc.* ("*Planmeca II*"), 116 F.4th 1335, 1343–44 (Fed. Cir. 2024).

**B. The Georgia Litigation**

Plaintiff also sought enforcement of Plaintiff's patents in an action in Georgia, where the defendant, Carestream Dental LLC ("Carestream"), moved to dismiss the case arguing that the patents were invalid under *Alice*, as Defendants do here. *Osseo Imaging, LLC v. Carestream Dental LLC* ("*Carestream*"), No. 23-CV-3116 (LMM), 2024 WL 5329866, at *2 (N.D. Ga. Oct. 17, 2024). Carestream similarly "argue[d] that [Plaintiff's] [p]atents are directed to abstract ideas" under the first step of the *Alice* inquiry. *Id.* at *3; *see Alice*, 573 U.S. at 216. The court rejected the argument, finding that the patents are "directed to a more specific technological process than . . . general ideas" and did not "merely replace[] existing technology." *Carestream*, 2024 WL 5329866, at *3. The parties thereafter settled. *See* Stipulation of Dismissal, *Carestream*, No. 23-CV-3116 (LMM) (N.D. Ga. Feb. 14, 2025), Dkt. 50.

**LEGAL STANDARD**

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Hogan v. Fischer*, 738 F.3d 509, 514 (2d Cir. 2013) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). In assessing a complaint's sufficiency, a court "must construe [the complaint] liberally, accepting all factual allegations therein as true and drawing all reasonable inferences in the plaintiff['s] favor." *Sacerdote*, 9 F.4th at 106–07 (citing *Palin*, 940 F.3d at 809). "A claim is plausible 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the

defendant is liable for the misconduct alleged.'" *Matson v. Bd. of Educ.*, 631 F.3d 57, 63 (2d Cir. 2011) (quoting *Iqbal*, 556 U.S. at 678). Although the court must assume that all factual allegations contained in the complaint are true, this solicitude "does not extend 'to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.'" *Roe v. St. John's Univ.*, 91 F.4th 643, 651 (2d Cir. 2024) (quoting *Iqbal*, 556 U.S. at 678).

## DISCUSSION

### I. The Court Adopts Plaintiff's Proposed Claim Constructions for the Purposes of This Motion

Plaintiff argues that Defendants' motion should be precluded by questions of fact, in particular by the need for claim construction. (Pl.'s Opp'n ("Opp'n"), Dkt. 38, at 21–22.) Plaintiff proposes that the Court adopt the claim constructions made in the Delaware litigation for various claim terms. (*Id.* at 22–24.) Defendants disagree that claim construction is needed and instead argue the patents are invalid with or without a claim construction determination. (*See* Mem., Dkt. 36-1, at 7, 7 n.10.)

"When a non-moving party proposes a construction, 'the court must proceed by adopting the non-moving party's constructions, or the court must resolve the disputes to whatever extent is needed to conduct the [*Alice*] analysis [regarding patent validity].'" *Sanderling Mgmt. Ltd. v. Snap Inc.*, 65 F.4th 698, 704 n.3 (Fed. Cir. 2023) (quoting *Aatrix Software, Inc. v. Green Shades Software Inc.*, 882 F.3d 1121, 1125 (Fed. Cir. 2018)); *see UTTO Inc. v. Metrotech, Corp.*, 119 F.4th 984, 994 (Fed. Cir. 2024) (citing *Aatrix*, 882 F.3d at 1125). Here, the non-moving party, Plaintiff, has proposed claim constructions. (*See* Opp'n, Dkt. 38, at 23–24.) Given that Defendants claim that "the result is the same" "whether or not the Court accepts" these constructions, (Mem.,

Dkt. 36-1, at 7 n.10), the Court adopts Plaintiff's proposed constructions for the purpose of deciding this motion.

## II. The *Alice* Test

### A. Legal Standard

"Section 101 of the Patent Act defines the subject matter eligible for patent protection" and covers "any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof." *Alice*, 573 U.S. at 216 (quoting 35 U.S.C. § 101 ("Section 101")). But Section 101 also includes an "important implicit exception" in that "[l]aws of nature, natural phenomena, and abstract ideas are not patentable." *Id.* (quoting *Ass'n for Molecular Pathology v. Myriad Genetics, Inc.*, 569 U.S. 576, 589 (2013)).

To determine patent eligibility, courts apply a two-step framework: at step one, courts "'determine whether the claims at issue are directed to a patent-ineligible concept' such as an abstract idea"; at step two, courts "'consider the elements of each claim both individually and as an ordered combination to determine whether the additional elements transform the nature of the claim into a patent-eligible application.'" *PersonalWeb Techs. LLC v. Google LLC*, 8 F.4th 1310, 1314 (Fed. Cir. 2021) (quoting *Alice*, 573 U.S. at 217–18). The two steps are "plainly related" and "involve overlapping scrutiny of the content of the claims." *Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1353 (Fed. Cir. 2016) (citations omitted).

The first step looks "at the 'focus' of the claims" and "their 'character as a whole,'" while the second step inquires "more precisely at what the claim elements add—specifically, whether . . . they identify an 'inventive concept.'" *Id.* (citations omitted). Courts "conduct this analysis by ascertaining the 'basic character' of the claimed subject matter" and "often examine the focus of the claimed advance over prior art." *Contour IP Holding LLC v. GoPro, Inc.*, 113 F.4th 1373, 1379 (Fed. Cir. 2024) (citations and internal quotation marks omitted). This

advancement must be "directed to 'a specific means or method that improves the relevant technology' rather than simply being directed to 'a result or effect that itself is the abstract idea.' An improved result, without more is not enough." *Id.* (first quoting *McRO, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299, 1314 (Fed. Cir. 2016); and then citing *Koninklijke KPN N.V. v. Gemalto M2M GmbH*, 942 F.3d 1143, 1150 (Fed. Cir. 2019)).

**B. Step One**

1. Storing, Collecting, and Displaying Information

Defendants describe Plaintiff's patents as directed to "the process of using a computer to store, collect, and display . . . information in dental and orthopedic applications," drawing parallels to the patents with similar language that the Federal Circuit have held abstract under step one. (Mem., Dkt. 36-1, at 13; *see, e.g.*, *id.* at 10 (describing *AI Visualize v. Nuance Commc'ns, Inc.*, 97 F.4th 1371 (Fed. Cir. 2024), as "illustrat[ing] the [Federal Circuit's] approach for determining whether claims are directed to an abstract idea"); *id.* at 14–17 (discussing additional cases).) Plaintiff responds by claiming that Defendants' description of Plaintiff's patents is a broad one that "fails to capture the specific technical components and solutions provided by the inventions." (Opp'n, Dkt. 38, at 9.) Plaintiff describes its patents as being directed towards "improv[ing] the capabilities of dental imaging systems by incorporating a specific implementation of a solution that addresses express technical problems."[6] (*Id.* at 11.) Plaintiff urges the Court to look to the Federal Circuit's decision in *Contour*, 113 F.4th 1373. (*Id.* at 12–14.)

[6] In its initial opposition, Plaintiff also relied on the non-obviousness findings made in *Planmeca I* and *Planmeca II*, but later "acknowledge[d] that th[ose] findings . . . are *not* directly on point with the issues presented here, and that the standards applied are different." (Pl.'s Suppl. Br., Dkt. 39, at 5 (citing *Ficep Corp. v. Peddinghaus Corp.*, No. 22-CV-1590, 2023 WL 5346043, at *7 (Fed. Cir. Aug. 21, 2023)).)

Notably, the court in *Carestream* rejected arguments similar to those Defendants make here. *See Carestream*, 2024 WL 5329866, at *3–4. The court there found that Plaintiff's patents "model[] a *new* type of data that was previously unattainable using conventional dental technology" because they "improve[] upon existing dental imaging technology by showing a patient's bone density" and "allow[] users to detect dental caries, fractures, and abscesses with greater accuracy than traditional X-ray technology." *Id.* at *3. The court also found that Plaintiff's patents and those at issue in *AI Visualize* and *Electric Power Group*, both cases Defendants rely on, could not be compared because *AI Visualize* and *Electric Power Group* "involved inventions that merely converted existing data from one format to another." *Id.* at *4 (citations omitted). Turning to *Contour*, the court found that that case concerned "a similar improvement to existing technology [that the Federal Circuit found] was not directed to an abstract concept." *Id.* at *3 (citation omitted).

The Court agrees with the finding in *Carestream* that Plaintiff's patents describe a system that does more than the "store, collect, and display" systems to which Defendants draw analogies. The plain text of the first claim of the '301 Patent[7] also recites the "merging of information from multiple tomographic scans," the use of these scans "to produce a representation of the subject," and the creation of new data through a calculation of "quantitative density differences . . . using densitometry from at least one focal point." (Opp'n, Dkt. 38, at 23.) Further, the '301 Patent claims state that all steps are done with specific machines, that preexisting tomographic models could also be used by the invention, and that the steps described in the claims involve the conversion of signals. (*See id.* at 23–24.) Especially under Plaintiff's proposed construction, (*id.*),

[7] The Court focuses on this claim because Defendants argue it is representative of the '301 Patent, (Mem., Dkt. 36-1 at 13), and is "directed to the same abstract idea" as the allegedly representative claims for the '374 Patent and '262 Patent, (*see id.* at 16, 18, 22).

the claims are specific about how the improvements are achieved and accordingly do not merely describe an "improved result," *see Contour*, 113 F.4th at 1379.

While Defendants claim that all of these steps can be reduced to "collecting and displaying" data, (Mem., Dkt. 36-1, at 18), the Court finds that to be an oversimplification of Plaintiff's proposed construction that impermissibly "describ[es] the claims at a high level of abstraction, divorced from the claim language itself," *Contour*, 113 F.4th at 1379 (citation omitted). As *Carestream* highlighted, "courts must 'be careful to avoid oversimplifying the claims' by describing them at a high level of generality." *Carestream*, 2024 WL 5329866, at *3 (quoting *McRO, Inc.*, 837 F.3d at 1313); *see also Alice*, 573 U.S. at 217 (recognizing that "[a]t some level, 'all inventions . . . embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas," so courts must "tread carefully in construing this exclusionary principle lest it swallow all of patent law" (citations omitted)).

The *AI Visualize* decision does not counsel to the contrary, as its facts are materially distinguishable from those here. *AI Visualize* concerned patents "for viewing . . . a volume visualization dataset" by "accepting" and "stor[ing]" that dataset and, upon user requests, "creat[ing] virtual views" of volume visualization datasets. 97 F.4th at 1375. The processing of data described therein existed only insofar as it was necessary for the system to retrieve and store the data.[8] *See id.* at 1377–78. *Electric Power Group*, which the *Carestream* court also analyzed, likewise concerned a system that received data from various sources relating to power systems, detected and analyzed events in real time based on limits, sensitivities, and rates of change, and

[8] In *AI Visualize*, the system described by the patent's claims included features standard to network computer systems, such as load balancing, security, and physical storage—none of which are material to the comparison here. 97 F.4th at 1375. Likewise, the systems described in the claims of the other patents analyzed by the *AI Visualize* court also included different but standard techniques on handling storage and data caching that are immaterial to this analysis. *Id.*

displayed these measurements and events. 830 F.3d at 1351–52. Little more was done with the data; the system only "analyz[ed] information by steps people go through in their minds, or by mathematical algorithms, without more." *See id.* at 1354 (citations omitted). Thus, as the court concluded in *Carestream*, the patents at issue in *AI Visualize* and *Electric Power Group* are materially different from Plaintiff's patents. *See Carestream*, 2024 WL 5329866, at *4 (first citing *AI Visualize*, 97 F.4th at 1378–79; and then citing *Elec. Power Grp.*, 830 F.3d at 1353–53).

By contrast, Plaintiff's patents concern the merging and displaying of multiple tomographic scans, the creation of representations for these scans that include densitometry data from one or more focal planes, and comparisons with past models. (*See* Opp'n, Dkt. 38, at 23; '301 Patent, Dkt. 1-1, at ECF 7–8.) Taken as a whole, this system includes far more complex data processing than the "store, collect, and display" systems described in *AI Visualize* and *Electric Power Group*. *See also Data Engine Techs. LLC v. Google LLC*, 906 F.3d 999, 1008–09 (Fed. Cir. 2018) (affirming patent validity where the patent's claims described a method for navigating three-dimensional data that would otherwise require complex efforts). Instead, the claims here, like the ones held not abstract in *Contour*, allow the visualization and analysis of X-ray scans by a computer in ways "differently than it otherwise could" through "specific means" of generating densitometry data. 113 F.4th at 1380; *see also Data Engine Techs.*, 906 F.3d at 1008 (affirming validity of patent offering a "specific solution" to a "known technological problem"). As in *Contour*, the claims here concern a "technological solution to a technological problem"—the computation, visualization, and comparison of densitometry data otherwise not available in dentistry for addressing early-stage dental pathologies and monitoring of osseointegration. *See Contour*, 113 F.4th at 1380*; Broadband iTV, Inc. v. Amazon.com, Inc.*, 113 F.4th 1359, 1368 (Fed. Cir. 2024).

2. Combination of Conventional Components

In their reply, briefed after the *Carestream* decision, Defendants shifted their argument to claim that Plaintiff's patents are abstract because they concern a combination of "conventional component[s]" and that the patents' claims fail to identify "any improvement to the functionality of any conventional component" or "any problem overcome in combining the components." (Defs.' Reply ("Reply"), Dkt. 37, at 8.) Though Defendants recognize Plaintiff's arguement that there is an "improvement" in the way the tomography equipment is used, Defendants argue that the patents are invalid because Plaintiff's claimed improvement is importing a practice from the medical field. (*See id.* at 10.)[9] Defendants similarly distinguish *Contour* by arguing that Plaintiff merely uses "conventional components and equipment" and that "the improvement was a long-known or fundamental practice . . . in the medical imaging field." (*See id.* at 12 (citing 113 F.4th at 1380.)) These new arguments do not change the outcome.

Defendants' rejection of Plaintiff's claimed improvement overstates the language from Federal Circuit precedent. That a patent employs known or conventional components that existed in the prior art "does not necessarily mean that the claim is *directed* to an abstract idea . . . at step one [of *Alice*]." *Contour*, 113 F.4th at 1380 (collecting cases). And "the *Alice* inquiry is not a prior art search." *Broadband iTV, Inc*, 113 F.4th at 1367; *see CardioNet, LLC v. InfoBionic, Inc*, 955 F.3d 1358, 1372 (Fed. Cir. 2020) ("The 'novelty' of any element or steps in a process, or even

[9] Defendants also argue that the *Carestream* court: (1) should have considered the '301 Patent's initial rejection and framed the inventive concept around storage of existing information, (*see* Reply, Dkt. 37, at 2–3); (2) misapplied the law by focusing on what the patents "describe" rather than on the claims' language and how Plaintiff's patents achieve their solution, (*id.* at 4–5); and (3) failed to recognize that the bone density calculation that Plaintiff's patents describe as used for dentistry was previously available in different fields, (*id.* at 5–6). Since the Court does not defer to the *Carestream* decision, the Court does not find it necessary to address these arguments that relate specifically to the reasoning in *Carestream* other than to state that Defendants' protestations do not preclude the Court's conclusion here.

of the process itself, is of no relevance in determining whether the subject matter of a claim falls within the [Section] 101 categories of possibly patentable subject matter." (quoting *Diamond v. Diehr*, 450 U.S. 175, 188–89 (1981))).

Defendants rely on three cases that the Court finds inapplicable here and do not support the broad proposition for which Defendants cite them. (*See* Reply, Dkt. 37, at 10 (first citing *Bozeman Fin. LLC v. Fed. Rsrv. Bank of Atlanta*, 955 F.3d 971, 980 (Fed. Cir. 2020); then *Intell. Ventures I LLC v. Symantec Corp.*, 838 F.3d 1307, 1321 (Fed. Cir. 2016), and then *FairWarning IP, LLC v. Iatric Sys., Inc.*, 839 F.3d 1089, 1094 (Fed. Cir. 2016)).) All three concerned claims seeking to patent a well-established practice, with the only alleged innovation being the addition of the conventional use of computers and/or the Internet to that practice. *See Bozeman*, 955 at F.3d at 980; *Intell. Ventures*, 838 F.3d at 1321; *FairWarning*, 839 F.3d at 1094. But as *Carestream* highlighted, "this is not a situation 'where general-purpose computer components are added post-hoc to a fundamental economic practice or mathematical equation.'" 2024 WL 5329866 at *4 (quoting *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1339 (Fed. Cir. 2016)). Plaintiff's patents, as a whole, are directed to more than just the use of computers or tomography equipment, and in fact provide for new functionalities otherwise unavailable, *see supra*.

Accordingly, the Court finds that Plaintiff's patents are not directed at an abstract idea and, as such the Court does "not need to proceed to step two" of the *Alice* analysis." *Enfish, LLC*, 822 F.3d at 1339 (citing *Alice*, 573 U.S. at 217).

**CONCLUSION**

For the reasons explained above, Defendants' motion to dismiss is denied. The matter is referred to Magistrate Judge Clay H. Kaminsky for pretrial proceedings.

SO ORDERED.

*/s/ Pamela K. Chen*
Pamela K. Chen
United States District Judge

Dated: September 29, 2025
Brooklyn, New York